AO 106 (Rev. 04/10)  Application for a Search Warrant

FILED                LODGED
_____ RECEIVED

DEC 03 2018

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY                              DEPUTY

# UNITED STATES DISTRICT COURT
### for the
### Western District of Washington

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

The locations and vehicles more particularly described in Attachments A, and A1 through A84

)
)
)
)
)
)

Case No.  MJ18 - 5277

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachments A, and A1 through A84,

located in the _____Western_____ District of _____Washington_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841(a)(1), 843(b), 846, and 18 USC 924(c), 1956, and 1957 | Drug trafficking conspiracy and related offenses, money laundering and related offenses. |

The application is based on these facts:

See Attached Affidavit of DEA Special Agent Jeremy Tan.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jeremy Tan, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ____12/03/2018____

_____
*Judge's signature*

City and state:  Tacoma, Washington

Theresa L. Fricke, United States Magistrate Judge
*Printed name and title*

1

**AFFIDAVIT**

2

3  STATE OF WASHINGTON           )

4                                )        ss

5  COUNTY OF PIERCE              )

6

7     I, Jeremy T. Tan, Special Agent, Drug Enforcement Administration (DEA), United

8  States Department of Justice, being first duly sworn on oath, depose and state:

9  **I.   INTRODUCTION AND AGENT BACKGROUND**

10     1.   I am an "investigative or law enforcement officer of the United States"

11  within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of

12  the United States who is empowered by law to conduct investigations of, and to make

13  arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

14     2.   I am a Special Agent with the Drug Enforcement Administration (DEA)

15  and have been since July 2017.  My current assignment is to the Tacoma Resident Office.

16  Prior to my employment with the DEA, I was as a Ranger Fire Team Leader for the

17  United States Army, from February 2012 to October 2016.

18     3.   My training and experience includes, but is not limited to, a 20-week course

19  at the DEA academy in Quantico, Virginia.  At the DEA academy, I was trained in all

20  aspects of conducting narcotics investigations to include debriefing defendants,

21  witnesses, and informants; conducting surveillance; executing search warrants;

22  conducting controlled deliveries; utilizing law enforcement, open source, and social

23  media databases; and seizing narcotics and narcotics-related assets.  I have also acquired

24  knowledge and information about the illegal drug trade and the various means and

25  methods by which it is furthered from formal and informal training, other law

26  enforcement officers and investigators, informants, individuals I have interviewed, and

27  from my participation in investigations.

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

## II.   PURPOSE OF AFFIDAVIT

4.     This Affidavit is submitted in support of an application to search the following 48 locations and 35 vehicles, as further described in Attachments A, and A1 to A84[1] for evidence, fruits and instrumentalities of drug trafficking and money laundering crimes committed by the drug trafficking organization (DTO) referred to herein as the CASTRO DTO, in violation of Title 21, United States Code, Sections 841(a)(1), 843(b), 846, and 952, and Title 18, United States Code, Sections 924(c), 1956, and 1957, as further described in Attachment B.  The locations and vehicles that I am requesting authorization to search are identified in bold font throughout this Affidavit, and each specific location and vehicle is described more particularly in Attachments A1 through A84.  With respect to the 35 vehicles, although my application to search each of the 48 locations includes a request to search vehicles found on the curtilage of the respective location, I am specifically requesting authorization to search the 35 vehicles listed herein in the event they are not physically present or otherwise within the curtilage of the particular location being searched.

## **LOCATIONS TO BE SEARCHED**

1) Suspected drug and money stash location and prior residence of Carlos Eduardo LOPEZ Hernandez:  **22025 100th Ave. SE, Kent, Washington;**

2) Residence of Carlos Eduardo LOPEZ Hernandez:  **Pasa Fino II Apartments 12212 SE 310th St., Apt AA303, Auburn, Washington;**

3) Business location of Cindy SOLTERO Jimenez:  **Soltero's Market Mexican Store, 24202 104th Ave. SE, Unit 104, Kent, Washington;**

4) Residence of Cindy SOLTERO Jimenez:  **31600 126th Ave. SE, Space 106, Auburn, Washington 98092;**

5) Residence of Jesus Rene SARMIENTO Valenzuela:  **10545 SE 238th St., Unit 8, Kent, Washington;**

[1] Due to a last-minute change to this document, there is no Attachment A49 included with this Affidavit.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

6)   Residence of Jaime HEREDIA Castro and Jose Luis SIERRA Barrientos: **350 S Burlington Blvd., Burlington, Washington;**

7)   Residence of Juan AVILES Berrelleza: **11247 SE 258th Pl., Apartment D306, Kent, Washington;**

8)   Residence of Hector Manuel URIAS Moreno: **428 105th St. SW, Everett, Washington;**

9)   Stash location for Hector Manuel URIAS Moreno: **8503 8th Ave. W, Everett Washington;**

10)  Residence of Jorge VALENZUELA Armenta: **4416 S 137th St., Tukwila, Washington;**

11)  Residence of Michael John and Esther La Rena SCOTT: **8024 150th St. SE, Snohomish, Washington;**

12)  Business location of Michael John and Esther La Rena SCOTT: **Wired in Networks, 18421 Highway 99, Suite B, Lynnwood, Washington;**

13)  Residence of Gerald Keith RIGGINS: **5824 152nd St. E, Puyallup, Washington;**

14)  Residence of Julian Gauge ORDONEZ: **34402 28th Pl. SW, Federal Way, Washington;**

15)  Residence of Julian Gauge ORDONEZ: **34235 18th Pl. S, Federal Way, Washington;**

16)  Residence of Monique GREEN: **1020 SW 305th St., Federal Way, Washington;**

17)  Residence of Rolando ESPINDOLA Hernandez and Jessica JOHNSON: **314 N 133rd St., Seattle, Washington;**

18)  Stash location for Carlos Alejandro CASTRO Perez and Nicolas CISNEROS: **952 SW Campus Dr., Apt 26E-1, Federal Way, Washington;**

19)  Residence of Carlos Alejandro CASTRO Perez: **Fox Run Apartments, 34726 2nd Lane S, Unit C40, Federal Way, Washington;**

20)  Residence of Emmanuel REYES Perez: **2136 S 260th St., Apartment CC-201, Des Moines, Washington;**

AFFIDAVIT OF JEREMY TAN - 3

21)     Residence of Karen SURYAN: **210 NW 107th St., Seattle, Washington;**

22)     Residence of Michael SURYAN: **16809 8th Ave. SW, Normandy Park, Washington;**

23)     Residence of Orlando BARAJAS: **310 N Anacortes St., Burlington, Washington;**

24)     Business location of Orlando BARAJAS: **Taco El Antojito, 628 E Fairhaven Ave., Burlington, Washington;**

25)     Residence of Jose VELASCO: **506 Tiger Lane, Burlington, Washington;**

26)     Residence of Brian LIVELY: **8123 71st Pl. SE, Snohomish, Washington;**

27)     Residence of Uriel ZELAYA: **28527 37th Pl. S, Auburn, Washington;**

28)     Residence of Omar VALTIERRA: **16508 SE 147th St., Renton, Washington;**

29)     Residence of Jerry Austin RODRIGUEZ Jaime: **859 116th St., Tacoma, Washington;**

30)     Residence of Jake WILSON: **7111 193rd St. E, Spanaway, Washington;**

31)     Residence of Joshua MENDIOLA: **a 5th wheel trailer parked at 21515 111th Ave. Court E, Graham, Washington;**

32)     Residence of Allex and David HUBLY: **713 S Yakima Ave., Apartment 9, Tacoma, Washington;**

33)     Residence of Charles JOSLYN: **8422 214th Ave. E, Bonney Lake, Washington;**

34)     Residence of Tim CRAWFORD: **3435 Auburn Way S, Apartment 38, Auburn, Washington;**

35)     Residence of Kurtis and Lindsay NEMEYER: **9119 114th St. E, Puyallup, Washington;**

36)     Residence of Natasha DJORDJEVIC: **1001 E 63rd St., Tacoma, Washington;**

37)     Residence of Corey RILEY: **9121 Washington Hwy 162, Puyallup, Washington;**

38)     Residence of Julia CAMMEL: **7002 224th St. E, Graham, Washington;**

39)     Residence of Blake HYNEK: **1908 92nd Ave. E, Edgewood, Washington;**

40)   Residence of Larry SWEITZER:  **75 Brookdale Lane, Apartment E102, Bremerton, Washington;**

41)   Storage unit of Gregory WERBER:  **Unit 248B at 1st Avenue Self Storage, 2400 1st Ave. South, Seattle, Washington;**

42)   Residence of Frances and Agustin JUAREZ Castillo:  **20707 106th Pl. SE, Kent, Washington;**

43)   Residence of Carlos HERNANDEZ:  **521 S Henderson St., Seattle, Washington;**

44)   Residence of Edgar CABRERA:  **900 NE 65th St., Apartment 609, Seattle, Washington;**

45)   Residence of Constantino MARES Garcia: **1312 80th Ave. SE, Lake Stevens, Washington;**

46)   Residence of Oscar Humberto CARRILLO Salcedo: **Airmark Apartments, 229 Andover Park East, Apartment 409, Tukwila, Washington;**

47)   Residence of Martin Dean GREGORY: **204 18th St. SE, Puyallup, Washington;** and

48)   Residence of Jose RANGEL Ortega: **11007 Paine Field Way, Everett, Washington.**

## VEHICLES TO BE SEARCHED

1)   Vehicle driven by Carlos Eduardo LOPEZ Hernandez:  **a red 2006 Ford Ranger bearing Washington license C04697M** (also referred to as **Target Vehicle 4, or TV4**);

2)   Vehicle driven by Jesus Rene SARMIENTO Valenzuela:  **a white 2008 Honda Accord bearing Washington license BJN4395** (also referred to as **Target Vehicle 3 or TV3**);

3)   Vehicle driven by Jaime HEREDIA Castro:  **a red 2002 Honda Civic bearing Washington license BKS2788;**

4)     Vehicle driven by Juan AVILES Berrelleza: **a beige 2001 Jeep Grand Cherokee bearing Washington license BKG1931** (also referred to as **Target Vehicle 8 or TV8**);

5)     Vehicle driven by Cindy SOLTERO Jimenez: **a 2016 Nissan Frontier bearing Washington license C30123H**;

6)     Vehicle driven by Hector Manuel URIAS Moreno: **a black 2007 Kia Rondo bearing Washington license BLE9305** (also referred to as **Target Vehicle 7 or TV7**);

7)     Vehicle driven by Carlos Alejandro CASTRO Perez: **a green 2005 BMW X5 bearing Washington license BJM0956** (also referred to as **Target Vehicle 9 or TV9**);

8)     Vehicle driven by Michael John SCOTT: **a 2008 black Honda Civic bearing Washington License BFZ2558**;

9)     Vehicle driven by Julian Gauge ORDONEZ: **a 2000 tan Chevy Silverado bearing Washington license C67402H**;

10)     Vehicle driven by Esther La Rena SCOTT: **a silver 2013 Toyota Highlander bearing Washington license AQB8456**;

11)     Vehicle driven by Edgar CABRERA: **a grey 2009 Toyota Camry bearing Washington license BKD8497** (also referred to as **Target Vehicle 14 or TV14**);

12)     Vehicle driven by Rolando ESPINDOLA: **a red 1995 Mitsubishi Eclipse bearing Washington license AEV9270**;

13)     Vehicle driven by Gerald Keith RIGGINS: **a 2010 Harley Davidson motorcycle bearing Washington License 3E8988**;

14)     Vehicle driven by Michael SURYAN: **a silver 2000 Toyota Camry bearing Washington license BKU5269**;

15)     Vehicle driven by Jose RANGEL Ortega: **a grey 2007 Toyota Scion bearing Washington license BGH6676** (also referred to as **Target Vehicle 13 or TV13**);

16)    Vehicle driven by Constantino MARES Garcia: **a white 1998 Honda Accord bearing Washington license BKC6466;**

17)    Vehicle driven by Constantino MARES Garcia: **a blue 2016 Toyota Tacoma bearing Washington license C08613M;**

18)    Vehicle driven by Orlando BARAJAS: **a red 2018 Chevrolet Silverado bearing Washington license C66267L;**

19)    Vehicle driven by Martin Dean GREGORY: **a spray-painted red 2001 Lexus IS bearing Washington license 419ZVA;**

20)    Vehicle driven by Omar VALTIERRA: **a white 2012 Dodge Ram 1500 truck bearing Washington license C50312M;**

21)    Vehicle driven by Omar VALTIERRA: **a 2013 black Chrysler 300 sedan bearing Washington license AKG4277;**

22)    Vehicle driven by Jorge VALENZUELA Armenta: **a 2005 grey Volkswagen Jetta bearing Oregon license 902KTS;**

23)    Vehicle driven by Jose VELASCO: **a 2001 white Nissan Altima bearing Washington license AVW7517;**

24)    Vehicle driven by Andrew Cain KRISTOVICH: **a 2000 black Mercedes 5004D bearing Washington license BLY6302** (also referred to as **Target Vehicle 11 or TV11**);

25)    Vehicle driven by Andrew Cain KRISTOVICH: **a 2002 silver Mercedes 3204D bearing Washington license AYT2335** (also referred to as **Target Vehicle 12 or TV12**);

26)    Vehicle driven by Carlos Alejandro CASTRO Perez: **a 2012 white Hyundai Accent bearing California license 7CQD771** (also referred to as **Target Vehicle 10 or TV10**);

27)    Vehicle driven by Carlos HERNANDEZ: **a grey 2004 Hummer H2 bearing Washington license ADH9133;**

1  28)  Vehicle driven by Uriel ZELAYA:  **a black 1999 Toyota Corolla bearing**
2      **Washington license AXZ8671**;
3  29)  Vehicle driven by Ramon PUENTES:  **a 2010 red tractor trailer truck bearing**
4      **California license XP09765**;
5  30)  Vehicle driven by Jerry Austin RODRIGUEZ Jaime:  **a blue 2004 Volvo S80**
6      **bearing Washington license plate BHK8013**;
7  31)  Vehicle driven by Brian LIVELY:  **a silver 2006 BMW bearing Washington**
8      **license AYY7257**;
9  32)  Vehicle driven by Brian LIVELY:  **a black Chevrolet Silverado bearing**
10     **Washington license C21970N**;
11 33)  Vehicle driven by Larry SWEITZER:  **a blue Ford focus bearing Washington**
12     **License BER8834**;
13 34)  Vehicle driven by Joshua MENDIOLA:  **a 1996 white Nissan Maxima bearing**
14     **Washington license BGR7720**; and
15 35)  Vehicle driven by Oscar Humberto CARRILLO Salcedo: **a grey 2016 Honda**
16     **Accord bearing Arizona license CJN8101 and Oregon license CA99207.**

### III.   INVESTIGATION OVERVIEW

18     5.     Agents are investigating a drug trafficking organization (DTO) in Western
19  Washington they believe Juan and Florencio Castro Valenzuela and their associates,
20  including Jesus Rene SARMIENTO Valenzuela, Jorge VALENZUELA Armenta, Arturo
21  FRIAS Ceballos, Carlos Eduardo LOPEZ Hernandez, Juan Jose HIGUERA Gonzalez,
22  Jaime HEREDIA Castro, Daniel Osvaldo ROCHA Lopez, Juan AVILES Berrelleza,
23  Manuel LOYA Soto (aka Jesus Loya Soto), Leonel Sillas Berrelleza, Oscar Humberto
24  CARRILLO Salcedo, Gregory WERBER, Hector Manuel URIAS Moreno, Jose
25  RANGEL Ortega, Cesar LOYA, Carlos Alejandro CASTRO Perez, Cindy SOLTERO
26  Jimenez, Michael John SCOTT, Esther La Rena SCOTT, Gerald Keith RIGGINS, Julian
27  Gauge ORDONEZ, Monique GREEN, Rolando ESPINDOLA, Jessica JOHNSON,
28  Emmanuel REYES Perez, Michael SURYAN, Karen SURYAN, Orlando BARAJAS,

1  Jose VELASCO, Brian LIVELY, Alek James BAUMGARTNER, Andrew Cain

2  KRISTOVICH, Brittany Renae KRISTOVICH, Bernardo HIGUERA Guerrero, Uriel

3  ZELAYA, Omar VALTIERRA,  Jerry Austin RODRIGUEZ Jaime, Joshua

4  MENDIOLA, Allex HUBLY, David HUBLY, Megan CHAPMAN,  Charles JOSLYN,

5  Shalesha HUDSON, Tim CRAWFORD, Kurtis NEMEYER,  Lindsay NEMEYER,

6  Natasha DJORDJEVIC, Corey RILEY, Julia CAMMEL, Larry SWEITZER, Oscar

7  CARRILLO, Gregory WERBER, Frances JUAREZ Castillo, Agustin JUAREZ Castillo,

8  Edgar CABRERA, Constantino MARES Garcia, and others known and unknown, are

9  operating.  This organization is referred to as the CASTRO DTO and is predominantly

10  involved in the trafficking of high-purity heroin, counterfeit oxycodone pills, and

11  methamphetamine.  This investigation started as a local drug investigation by the

12  Bremerton Police Department in August 2017, and has been expanding in scope ever

13  since that time.

14          6.        During this extensive investigation, agents have conducted multiple

15  controlled and undercover purchases of heroin (totaling around 500 grams) using a

16  confidential source and an undercover agent; conducted hundreds of hours of physical

17  and electronic surveillance; installed tracking devices on several target vehicles and

18  tracking devices/pen registers on several target telephones; used mounted surveillance

19  cameras to watch the activities at several significant DTO locations; executed several

20  search warrants on Facebook accounts used by the CASTROs to aid in their distribution

21  of heroin in Western Washington; identified several high-level international drug

22  traffickers in Sinaloa, Mexico, with direct ties to Western Washington; executed a

23  delayed-notice search warrant at a DTO stash apartment and a similar delayed-noticed

24  search warrant at two DTO storage units; and have obtained authorization to intercept

25  wire and electronic communications over several different telephones used by multiple

26  members of the CASTRO DTO in Western Washington.

27

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

# IV.   SOURCES OF INFORMATION

7.      I have obtained the facts set forth in this Affidavit through my personal participation in this investigation, and from my review of intercepted calls, oral and written reports of other law enforcement officers participating in this and related investigations, and records, documents, and other evidence obtained during this investigation.  Since this Affidavit is being submitted for the limited purpose of obtaining search warrants for the residences and vehicles identified above and in Attachments A and A1 to A89, I have set forth only the facts that I believe are necessary to establish probable cause for these warrants.

8.      This Affidavit also sets forth facts and information obtained from intercepted communications that were conducted primarily in the Spanish language. Spanish-speaking monitors documented the content of these communications and prepared line sheets summarizing them.  The intercepted communications discussed herein include the summaries of pertinent portions as prepared by the monitors, and are not necessarily the entire conversations between the parties involved.

9.      Through my training and experience, I know that individuals involved in the distribution of controlled substances and other criminal activity often use coded words and vague terms when referring to illegal activity.  When such words were used in the instant investigation, I used this training and experience, along with facts obtained throughout the entirety of this investigation, to include what I believe to be an accurate translation of these coded words and vague references in parentheses throughout this Affidavit.

10.     As part of the instant investigation, investigators received information about the CASTRO DTO from two confidential sources as described below.

11.     Confidential Source One (CS1) agreed to cooperate with law enforcement in 2017, in exchange for judicial considerations.  CS1 was arrested by members of the Bremerton Police Department Special Operations Group (SOG) for his/her involvement in drug trafficking.  CS1 cooperated with SOG and provided them with information about

1  a group of Mexican drug traffickers who were distributing large amounts of heroin in the

2  Puget Sound region.  CS1 advised SOG that he/she had been selling various controlled

3  substances for several years and had been in contact with several of the people within this

4  group of Mexican drug traffickers (the CASTRO DTO).  CS1 spoke to SOG about a

5  now-prominent member of the DTO whom the CS knew as "Juan" or "Jose."  The CS

6  believed the individual he/she knew as "Juan/Jose" was the local leader of the DTO at the

7  time when "Juan/Jose" and the CS had originally met several years ago, and believed

8  "Juan/Jose" was more recently promoted to a larger role in the DTO.

9     12. CS1 told members of SOG that "Juan/Jose" used Facebook to communicate

10  with the CS and many other heroin distributors.  Bremerton Police Detective (Det.)

11  Jordan Ejde located a Facebook account under the name of "Juan Andres Castro

12  Valenzuela" with which CS1 and other local suspected drug dealers were associated.

13  Det. Ejde questioned CS1 about the account and CS1 confirmed "Juan Andres Castro

14  Valenzuela" was the male whom he/she referred to as "Juan" or "Jose."  CS1 also

15  showed Det. Ejde messages confirming that Juan CASTRO was in contact with CS1,

16  using the account in his (Juan Castro's) name.  According to CS1 and the Facebook data

17  he/she provided, he/she has been talking to Juan Castro via Facebook Messenger for

18  purposes of making drug transactions since the summer of 2016.

19     13. A review of CS1's Facebook account showed Juan Castro also contacted

20  CS1 from additional Facebook accounts under the names of "Rebeca Spencer," "Annel

21  Baker," and "Katherine Thomas."  A review of CS1's phone showed Juan Castro

22  additionally used Mexican phone numbers 52-668-199-4039 (TT1), 52-668-248-4230,

23  52-668-225-5890, and 52-668-199-5533 (TT2) to communicate with CS1 via text

24  message and voice calls.  The "Katherine Thomas" Facebook account and TT1 were Juan

25  Castro's most current methods of drug related communications with CS1 at the time

26  he/she provided the initial information to SOG.

27     14. Utilizing CS1, SOG conducted six controlled purchases of suspected heroin

28  from Juan Castro through DTO courier Jesus Rene SARMIENTO Valenzuela (aka

AFFIDAVIT OF JEREMY TAN - 11

1   "Miguel"), totaling approximately 90.4 grams.  Prior to and after each controlled

2   purchase of heroin, detectives searched CS1 and his/her vehicle, and provided CS1 with

3   pre-recorded SOG funds to make each purchase.  During the course of each controlled

4   purchase, detectives maintained surveillance on CS1.  After each purchase, detectives

5   tested the suspected heroin using a NIK test kit with presumptive positive results for the

6   presence of heroin, and then processed the heroin according to SOG's policies and

7   procedures.  For the second through sixth controlled purchases, detectives recorded the

8   buys with a covert surveillance camera.

9        15.    SOG and DEA began their joint investigation into the CASTRO DTO in

10   the fall of 2017 and used CS1 to make another (seventh) controlled purchase of heroin

11   from the CASTRO DTO.  CS1 continued to provide agents with updated information on

12   the DTO's communications methods/platforms and, as detailed later in this Affidavit,

13   CS1 was able to introduce an undercover DEA agent (UC) to the CASTRO DTO towards

14   the end of 2017.

15        16.    Unfortunately, CS1 was battling heroin addiction for most of the time

16   he/she was working with agents.  After the seventh controlled purchase with CS1 (the

17   first in which the DEA was involved), which took place toward the end of October 2017,

18   agents provided CS1 with cash reimbursement for his/her expenses after the purchase

19   was completed.  After this, CS1 and agents parted ways; agents assumed CS1 would

20   travel back to his/her residence.  Unfortunately, agents conducting surveillance of the

21   CASTRO DTO couriers after the controlled purchase noticed CS1 returned to meet with

22   one of the couriers and seemed to conduct another, unsanctioned, drug transaction.

23   Agents later questioned CS1 about this encounter and he/she was immediately truthful.

24   CS1 told agents he/she had gone back to obtain a user amount of heroin.  CS1 said being

25   in the presence of heroin during the controlled purchase was enough of a temptation to

26   ignite CS1's urge to use the drug personally.  CS1 also told agents how he/she had

27   previously taken (and later used) small portions of the heroin from some of the controlled

28   purchases SOG had done prior to DEA's involvement.  Obviously, such behavior is

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  against law enforcement policies regarding confidential sources and their use in an
2  investigation.

3      17.     Agents spoke with CS1 about the dangers he/she faced by committing such
4  crimes while working for law enforcement.  After this discussion, CS1 told agents he/she
5  wanted to continue to work for law enforcement (if allowed); he/she said it was very
6  important to CS1 that he/she help take the CASTRO DTO's drugs off the streets.  CS1
7  described his/her addiction to heroin as one of the strongest mental struggles a person
8  would ever have to deal with.  From my training and experience, I know CS1's
9  statements regarding the struggle against heroin addiction to be true.  CS1 told agents
10  he/she would be willing to enter into a drug rehabilitation program or do whatever it took
11  to get past this addiction and help law enforcement take down the CASTRO DTO while
12  doing so.  Together, agents and CS1 developed a method of helping CS1 to combat
13  his/her addiction while helping the investigation.

14      18.     Agents provided CS1 with access to drug treatment programs and got CS1
15  enrolled in a rehabilitation center; they even arranged for atypical expense
16  reimbursements for CS1.  Rather than cash reimbursement for expenses incurred during
17  government operations, agents provided CS1 with food cards or gasoline—things that
18  were not readily convertible into cash.  Agents did so at the request of CS1, so he/she
19  would not be tempted to purchase drugs with any excess money.  These methods worked
20  for a time.

21      19.     CS1 successfully completed several months of his/her rehabilitation
22  program before staff asked CS1 to leave due to his/her attitude problems and problems
23  with other rehabilitation patients.  CS1 continued to help agents by providing information
24  about the DTO and helping to build the UC's reputation.  However, CS1 relapsed into
25  heroin use in the spring of 2018.  This time, CS1 quite rapidly spiraled downward into an
26  almost paranoid and delusional state.  Agents determined they could no longer use CS1
27  for any investigative purposes, but tried once again to get CS1 some help with his/her
28  drug problem.  Unfortunately, CS1 was not as amenable on this occasion and shunned

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  agents' attempts at providing assistance.  In May 2018, local police arrested CS1 and

2  charged him/her with residential burglary (felony) and driving with a suspended or

3  revoked license (misdemeanor).  SOG deactivated CS1 in May 2018 due to CS1's

4  substance abuse issues.  However, agents found CS1's information to be reliable during

5  the time agents utilized him/her to gather information.

6        20.    CS1's criminal history includes a felony conviction for

7  Manufacture/Deliver a Schedule I/II Narcotic in 2013, gross misdemeanor convictions

8  for Fourth Degree Assault in 2015 and Third Degree Malicious Mischief in 2011, as well

9  as misdemeanor convictions for Third Degree Driving With a Suspended or Revoked

10  License in 2018 and 2008, Indecent Exposure in 2013, and Third Degree Malicious

11  Mischief in 2006.

12        21.    Confidential Source Two (CS2) initially agreed to cooperate with law

13  enforcement in exchange for charging considerations, i.e., not being charged.  CS2 began

14  working with members of the Kent Police Department (KPD) in November 2017.  CS2

15  completed this initial arrangement with KPD successfully and has since been working

16  with members of KPD for monetary gain.  CS2 has completed multiple controlled

17  purchases with KPD; during each purchase, CS2 was searched prior to and after the

18  transaction for contraband with negative results, and in each case CS2 returned with the

19  anticipated quantity of drugs.  In the past two years, prior to working with KPD, CS2 has

20  successfully worked with the Seattle Police Department (two controlled purchases) and

21  the King County Sherriff's Office (one controlled purchase).  Most recently, CS2 has

22  provided KPD with information about a DTO operating in King County, Washington,

23  and has conducted controlled purchases from this DTO.

24        22.    During the second week of December 2017, the KPD's Special

25  Investigation Unit (SIU) completed the first controlled purchase from a drug trafficker

26  known to them at the time as "Pedro."  Pedro was later identified in SIU's investigation

27  as Pedro Vasquez Juarez and his residential address was identified through physical and

28  electronic surveillance as a location in Auburn, Washington.  CS2 told SIU members

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   Vasquez was a "runner" (i.e., drug/money courier) for a local drug trafficking
2   organization. The King County Sheriff's Office, who also had knowledge of the group
3   and various details about this organization, later corroborated this information.

4         23.     CS2 sent a text message to 559-514-3664 (Vasquez's phone at that time) in
5   presence of SIU members, requesting an amount of heroin known to investigators. About
6   ten minutes later, Vasquez responded and agreed to sell drugs to CS2. SIU subsequently
7   conducted the controlled purchase with CS2 (which took about 30 seconds) and
8   confirmed Vasquez was the deliveryman for that transaction. The substance Vasquez
9   delivered weighed 24.89 gross grams with packaging and field-tested positive for the
10  presence of heroin.

11        24.     During the third week of January 2018, KPD used CS2 to conduct a second
12  controlled purchase from Vasquez. SIU Detective Elizabeth Yagi monitored CS2 as CS2
13  placed text messages and a phone call to 559-514-3664, Vasquez's phone number at that
14  time. From these communications, Vasquez agreed to conduct a drug transaction with
15  CS2. Vasquez and CS2 conducted another drug transaction (while under surveillance by
16  SIU). The substance obtained by CS2 was later found to weigh 11.16 gross grams with
17  packaging and field-tested positive for the presence of heroin.

18        25.     Later in January 2018, SIU noticed service to Vasquez's phone (559-514-
19  3664) had been discontinued. CS2 advised SIU Vasquez had indeed switched to another
20  phone number, 206-380-2481. Upon looking through communications on CS2's phone
21  with Vasquez's new number (206-380-2481), SIU noted there was at least one
22  conversation they recognized, through training and experience, to be drug-related in
23  nature; CS2 confirmed this suspicion. DEA agents later provided information to SIU that
24  further corroborated CS2's information.

25        26.     Agents in this investigation initially identified 206-380-2481 as a relevant
26  phone number through telephone tolls analysis of CASTRO DTO phones (namely Daniel
27  Osvaldo ROCHA Lopez's phones, including TT24). Agents believed 206-380-2481 was
28  a likely criminal associate of ROCHA's based on their communications history. Agents

1    searched this phone number through law enforcement databases and discovered SIU's

2    ongoing investigation into Vasquez.  Agents served an administrative subpoena on 206-

3    380-2481's service provider, Sprint, and found the phone is actually subscribed to Pedro

4    Vasquez at his known address in Auburn, Washington.  Service to this device began on

5    July 28, 2017.  Agents provided this information to SIU.

6           27.    Agents continued their telephone tolls analysis of TT24 and other CASTRO

7    DTO phones throughout June and into July 2018, and discovered another top contact of

8    TT24:  206-841-5082.  Agents served an administrative subpoena on 206-841-5082's

9    service provider, which was also Sprint, and found the phone was *also* subscribed to

10   Pedro Vasquez —though this phone number was registered at a default, prepaid address

11   for Sprint phones.  Service to this device began on June 12, 2018.  Though ROCHA had

12   communicated with Vasquez's prior numbers, he had communicated most recently (at

13   that time) with Vasquez's newest phone number (206-841-5082).  Agents provided this

14   additional information to SIU and they corroborated agents' beliefs based on information

15   obtained through their independent investigation.

16          28.    I believe the information CS2 has provided to KPD SIU about Pedro

17   Vasquez is accurate and reliable.

18          29.    CS2 has criminal convictions that span five states, and include Possession

19   of Stolen Property; Violation of the Uniform Controlled Substances Act; Receiving

20   Stolen Property; Fraud; two counts of Aggravated Theft; felony Possession of Drugs;

21   Failure to Comply with Police; Drug Possession; Receiving Stolen Property; felony

22   Grand Theft; Conspiracy to Commit Grand Theft Auto; Delivery of Controlled

23   Substance; Controlled Substance Delivery (Marijuana); felony Theft; felony Escape;

24   three counts of Theft by False Promise; and felony Theft.

### V.    SUMMARY OF INVESTIGATION

26          30.    During the instant investigation, which has spanned over a year,

27   investigators have identified several locations in Western Washington that are believed to

28   be used in the facilitation of the CASTRO DTO's drug trafficking and money laundering

AFFIDAVIT OF JEREMY TAN - 16

1  activities.  The following summary of this investigation is offered in support of my belief

2  that probable cause exists to believe that these residences, including outbuildings and

3  vehicles located within the curtilage of same, contain evidence, fruits and/or

4  instrumentalities of drug trafficking and money laundering crimes committed by the

5  CASTRO DTO in violation of Title 21, United States Code, Sections 841(a)(1), 843(b),

6  846, and 952, and Title 18, United States Code, Sections 924(c), 1956, and 1957.

7       31.    The intercepted calls, surveillance observations, real-time tracking data,

8  confidential source information, and enforcement activities described herein do not

9  encompass all of the information collected concerning the instant investigation.  Rather, I

10  have set forth only the facts that I believe are essential to establish the necessary

11  foundation for the issuance of the requested search warrants.  As such, I have included in

12  this Affidavit several examples of drug trafficking activity as they relate to each location,

13  which is highlighted in bold text.  Some of these examples also encompass drug

14  trafficking activity as it relates to specific vehicles that investigators seek authorization to

15  search.  Where those vehicles are discussed in this Affidavit, the description

16  (color/make/model) and license plate of the respective vehicle and/or its Target Vehicle

17  number (if one was assigned) is highlighted in bold text.  The information and examples

18  below are only a representative sample of the evidence gathered during the entire

19  investigation.

20       a.  ***Bremerton Police Develop a Confidential Source***

21       32.    During the month of August 2017, the Bremerton Police Department

22  Special Operations Group (SOG) was investigating a suspected local heroin dealer

23  reportedly purchasing heroin from a Hispanic individual in the Snohomish and King

24  County areas.  SOG conducted controlled buys from the local dealer, and eventually

25  detained him/her during a traffic stop.  During the stop, detectives discovered a large

26  amount of cash, which the dealer claimed he/she owed as a drug "front" to a Mexican

27  drug trafficking organization (DTO).  The dealer then agreed to cooperate with law

28

1   enforcement; SOG signed up the dealer as Confidential Source 1 (CS1).  I have provided

2   details regarding SOG's initial interactions with CS1 in Section IV of this Affidavit.

3         33.     As described in Section IV, utilizing CS1, SOG conducted six controlled

4   purchases of suspected heroin from CASTRO through Jesus Rene SARMIENTO

5   Valenzuela, totaling approximately 90.4 gross grams.[2]  The first two of these buys

6   occurred in August 2017, the next three were in September 2017, and the last one took

7   place at the beginning of October 2017.  During these controlled purchases investigators

8   observed SARMIENTO driving a red Volkswagen Jetta bearing Washington plate

9   BFX7429 (Target Vehicle 1 or TV1).  After the second controlled buy, investigators

10   observed SARMIENTO conduct the transaction in the parking lot of **Soltero's Market**

11   **Mexican Store, 24202 104th Ave. SE, Unit 104, Kent, Washington**.  Investigators then

12   observed SARMIENTO walk into **Soltero's Market Mexican Store, 24202 104th Ave.**

13   **SE, Unit 104, Kent, Washington**, following the completion of the deal.  Agents also saw

14   SARMIENTO walking into **Soltero's Market Mexican Store, 24202 104th Ave. SE,**

15   **Unit 104, Kent, Washington**, just prior to the fifth controlled buy, which occurred in the

16   parking lot of **Soltero's Market**.

17         b.     ***SOG and DEA Begin their Joint Investigation into the CASTRO***

18                ***DTO***

19         34.     After uncovering the Facebook information provided by CS1 with its

20   seemingly direct connection to Mexico, Det. Ejde began working with Special Agent

21   Anthony DelVecchio to further the scope of SOG's initial investigation.  When members

22   of DEA and SOG (referred to throughout this Affidavit as "agents") first came across this

23   Facebook-related information, they were only able to view the public Facebook profile

24   information of these accounts (such as the accounts' listed "friends").  Even from this

25

---

26   [2] The first six controlled buys performed by SOG totaled approximately 90.4 grams of suspected heroin. The

27   seventh buy SOG conducted was done in conjunction with DEA, and agents obtained 46.2 gross grams of suspected heroin during this seventh purchase, for 136.6 gross grams total between the first seven controlled purchases from

28   this DTO using CS1.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  limited information, agents could see that there were many mutual friends among these
2  accounts.  The accounts' listed friends included Jerry Austin RODGRIGUEZ Jaime,
3  Natasha DJORDJEVIC, Allex HUBLY, David HUBLY, Blake HYNEK, Megan
4  CHAPMAN, Charles JOSLYN, Shalesha HUDSON, and others, all of whom have
5  criminal histories involving drug crimes, which corroborated CS1's information about
6  Juan Castro's use of these Facebook accounts specifically for drug trafficking purposes.
7  Agents believed these individuals (and others) were the local heroin distributors for the
8  CASTRO DTO based on the information provided by CS1, the criminal histories of these
9  Facebook friends, and agents' training/experience.  Subsequent physical and electronic
10  surveillance furthered these suspicions.

11       35.     Det. Ejde and Agent DelVecchio confirmed Juan Castro's identity via
12  records contained in the Washington Department of Licensing (WADOL) database.
13  Specifically, Juan Castro's WADOL photograph matches that of the individual on the
14  "Juan Andres Castro Valenzuela" Facebook account.  Furthermore, according to a law
15  enforcement database, Juan Castro was involved as a suspected "cell head" for heroin
16  distribution in the Everett area during a DEA investigation that took place in 2012.
17  Special Agent DelVecchio researched this prior DEA case and found Juan Castro was, in
18  fact, the primary target of investigation in that case.  Agents seized multiple kilograms of
19  heroin in that investigation, but did not arrest Castro.

20       36.     Juan Castro used the aforementioned Facebook accounts, as well as various
21  telephone numbers, to set up drug deals with CS1.  According to CS1, Juan Castro
22  typically arranged the transaction, but sent another Hispanic male to conduct the
23  transaction with CS1.  CS1 explained that he/she has met several different Hispanic
24  males across the Puget Sound region to conduct these drug transactions.  CS1 told law
25  enforcement he/she typically purchased 1-2 ounces of heroin several times per week.

26       37.     CS1 met with a Hispanic male whom CS1 knew as "Miguel" during many
27  of his/her controlled purchases with SOG.  Agents positively identified "Miguel" as Jesus
28  Rene SARMIENTO Valenzuela by comparing surveillance photographs of CASTRO

1   DTO members, photographs on SARMIENTO's Facebook account, and SARMIENTO's

2   visa information from the United States Department of Homeland Security.

3       38.     In late October 2017, members of the DEA Tacoma Resident Office (TRO)

4   and SOG conducted a controlled purchase of heroin from the CASTRO DTO using CS1.

5   This was the seventh overall controlled purchase from the DTO.  Agents conducted

6   surveillance of the DTO before and after this purchase, and searched CS1 and CS1's

7   vehicle for contraband before and after the purchase with negative results.  Agents

8   watched SARMIENTO make a suspected drug delivery and subsequent money transfer,

9   as well as conduct the controlled purchase with CS1.  Before and immediately following

10  this controlled buy, agents observed SARMIENTO drive TV1 to **Soltero's Market**

11  **Mexican Store, 24202 104th Ave. SE, Unit 104, Kent, Washington**.  Additionally,

12  agents observed SARMIENTO with a then-unidentified Hispanic male and suspected

13  heroin distributor; agents later identified that Hispanic male as Carlos Eduardo LOPEZ

14  Hernandez.  These early observations of SARMIENTO and LOPEZ were agents' first

15  look at LOPEZ as the driver of a silver Honda Civic bearing Washington license plate

16  BEX3964 (Target Vehicle 2 or TV2).

17          c.     ***DEA Begins Undercover Operations from the CASTRO DTO***

18      39.     After this seventh controlled purchase, CS1 was able to introduce a DEA

19  Undercover Agent (UC) to the CASTRO DTO via a conversation over Facebook

20  Messenger (with the Katherine Thomas Facebook account).  The UC was able to conduct

21  three purchases of heroin from the CASTRO DTO, through SARMIENTO, before the

22  end of 2017.  SARMIENTO used TV1 during each of these transactions and they all took

23  place in public parking lots.  Prior to the first undercover purchase, agents identified a

24  trailer located at **22025 100th Ave. SE, Kent, Washington**, as SARMIENTO and

25  LOPEZ's residence.

26      40.     During the first purchase, the UC used a combination of communications

27  over Facebook Messenger (with the Katherine Thomas account), TT1, and TT3 to

28  complete the transaction.  Agents saw SARMIENTO leaving the **22025 100th Ave. SE,**

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  **Kent, Washington**, residence, via a mounted surveillance camera, prior to this purchase.

2  SARMIENTO went to **Soltero's Market Mexican Store, 24202 104th Ave. SE, Unit**

3  **104, Kent, Washington**, where agents saw, via a mounted surveillance camera, him go

4  in before leaving to conduct the purchase with the UC.  SARMIENTO delivered about

5  49.5 grams (net weight) of a substance analyzed by the DEA Western Regional

6  Laboratory (WRL) and found to be 30-34% pure heroin.  This is the typical purity level

7  for high-purity heroin in Western Washington.  Via GPS tracking, agents followed

8  SARMIENTO back to the **22025 100th Ave. SE, Kent, Washington**, residence

9  following the completion of the purchase.  During the UC's second purchase, he/she

10  communicated with the DTO through the Katherine Thomas Facebook account and TT1.

11  SARMIENTO delivered about 99.3 grams (net weight) of a substance analyzed by the

12  DEA WRL and found to be 41-47% pure heroin.  This purity level was higher than the

13  typical purity level for high-purity heroin in Western Washington.  Due to this

14  unexpected purity, agents opted to see if the DTO could provide heroin of equal quality

15  in powder form.  The UC conducted a third transaction with the DTO in December 2017.

16  Again, the UC communicated with the CASTRO DTO over the Katherine Thomas

17  Facebook account and TT1, and SARMIENTO delivered the drugs using TV1.  Again,

18  agents observed, via mounted surveillance cameras at both locations, SARMIENTO

19  leave the **22025 100th Ave. SE, Kent, Washington**, residence and travel to **Soltero's**

20  **Market Mexican Store, 24202 104th Ave. SE, Unit 104, Kent, Washington**, before

21  conducting the transaction.  SARMIENTO delivered about 49.7 grams (net weight) of a

22  substance analyzed by the DEA WRL and found to be 33-37% pure heroin.  This was

23  back to the typical purity level agents have encountered for high-purity heroin in Western

24  Washington.

25       41.     During this third undercover purchase, SARMIENTO told the UC he would

26  be returning to Mexico in the near future.  Sure enough, agents used physical and

27  electronic surveillance means later in December 2017 to watch SARMIENTO leave

28  Washington and head to Mexico.  On December 24, 2017, Juan Castro contacted the UC

1   through Facebook Messenger, using the Katherine Thomas account.  Juan Castro

2   explained to the UC that his cousin, "Luis" would be the point of contact for any

3   immediate deals the UC required.  Castro told the UC he/she could contact "Luis" via

4   phone number 206-698-1965 (Target Telephone 4 or TT4), but not over Facebook

5   Messenger.  The following transcript reflects the referenced discussion between Juan

6   Castro and the UC on December 24, 2017:

7           •    CASTRO:  "good morning, if you need something please call or

8           send text to my cousin Luis: 2066981965 (not messenger)"

9           •    UC:  "Good morning amigo, thank you for that.  I will be in Ohio

10          with family for the holidays for the next couple weeks.  Is there someone there that

11          can do business?"

12          •    CASTRO:  "maybe"

13          •    UC:  "Ok, good"

14      42.    The UC then made contact with "Luis" over TT4 in mid-January 2018, but

15  the two were not able schedule a drug transaction.  The UC contacted Juan Castro on the

16  Katherine Thomas Facebook account and confirmed "Luis" was, in fact, the new courier;

17  Juan Castro told the UC to just contact him (Castro) directly and he would handle the

18  specifics with "Luis."

19      43.    Shortly thereafter, agents received hundreds of pages of Facebook account

20  information from the Katherine Thomas account, pursuant to a federal search warrant.

21  This information received from Facebook clearly showed use of the Katherine Thomas

22  account for drug trafficking purposes, just as agents had suspected.  Agents later received

23  court authorization to search additional accounts associated with the CASTRO DTO and

24  found very similar data of evidentiary value.  The following review of the Katherine

25  Thomas Facebook account will serve as an example of the types of data/information and

26  content agents received from the search warrants later executed on additional CASTRO

27  DTO accounts.

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1            d.     ***A Brief Review of the Katherine Thomas Facebook Account***

2       44.      Facebook records showed account number "100021806071829," which is

3 associated with the vanity name of "Katherine.thomas.104418," was registered on August

4 24, 2017, at 19:19:37 UTC. As of January 2018, Facebook records showed the account

5 was still active. The verified cell phone number associated with this account was

6 "+526681994039" (TT1), which was verified through Facebook on the day the account

7 was established. Facebook records showed a listing of internet protocol (IP) addresses

8 captured during different activities on Facebook (such as logging in or sending an

9 attachment). DEA Resident Agent in Charge (RAC) Ian McKenzie conducted an IP

10 lookup and found the majority of the IP addresses associated with this Facebook account

11 were static IP addresses located in Los Mochis, Sinaloa, Mexico. This information is

12 consistent with information received from CS1 as well as agents' own information

13 gathering efforts regarding Juan Castro's location.

14       45.      These records also showed three linked accounts used by the same digital

15 device/computer: Katherine Thomas (100021806071829), Florencio Castro Valenzuela

16 (100006465750228), and Annel Baker (100017854953772). Agents had separately

17 established this same connection between these accounts based on CS1's information and

18 their own records searches. Agents know the CASTRO DTO used the Annel Baker

19 account previously in the same manner as they used the Katherine Thomas account,

20 based on CS1's information.

21       46.      Facebook records showed the listed date of birth on the Katherine Thomas

22 account as "02/24/1990." Juan Castro's criminal record lists his date of birth as February

23 24, 1986. Agents suspect the common birthdate of "February 24" between the Katherine

24 Thomas Facebook account and Juan Castro is no coincidence, and that Castro most likely

25 used it because it is a date he can easily remember.

26       47.      These Facebook records also list all of Juan Castro's Facebook friends

27 associated with this particular account and their Facebook account numbers. Agents have

28 identified all of these Facebook friends based on their names and Facebook photographs,

AFFIDAVIT OF JEREMY TAN - 23

and a comparison with WADOL records. Agents have conducted surveillance on many

of the individuals listed below, along with law enforcement research on these individuals,

and suspect, based on agents' physical surveillance observations, they are heroin

distributors for the CASTRO DTO in Washington. The Facebook Messenger portion of

the records received from Facebook also corroborated agents' suspicions regarding these

individuals. As expected, the UC's Facebook account is also listed in this section of the

report. Some of the listed "friends" for the Katherine Thomas account are as follows:

- Megan CHAPMAN (100016721526235)
- Charles JOSLYN (100013322561905)
- Shalesha Renee [HUDSON] (1510578017)
- Blake HYNEK (100000545221409)
- Allex HUBLY (100016996650297)
- Jay A JAIME [Jerry Austin RODRIGUEZ Jaime] (100001871793095)
- David HUBLY (100012023506652)
- Natasha DJORDJEVIC (100000861552774)

48.     Facebook records also showed which people Juan Castro had sent a "friend

request" to or received a "friend request" from on the Katherine Thomas account. These

records included those individuals listed above. The following list shows some of those

who either received but did not respond to Juan Castro's Facebook friend request or

outright rejected Juan Castro's Facebook friend request, indicating they may have

distributed heroin with Juan Castro in the past, but no longer wished to do business with

him, were using an alternate Facebook account, or did not recognize the new Facebook

account Juan Castro was utilizing:

- Tim CRAWFORD (100007321574979)
- Tim CRAWFORD (100000859215933)
- Allex Annala [HUBLY] (100008229828661)
- Allex Annala [HUBLY] (100006281329451)

AFFIDAVIT OF JEREMY TAN - 24

1        •       Megan CHAPMAN (100002260914787)

2        49.     The last portion of the Facebook records was a chronological listing of

3   messaging strings, separated by individual Facebook accounts.  These messaging strings

4   were similar to text message conversations commonly found on mobile phones, though

5   these messaging conversations were between the Katherine Thomas account and the

6   Facebook friends listed above (the suspected heroin distributors for the DTO).  Agents

7   conducted a review of the messaging section of the Katherine Thomas account records

8   and noted some key items of information that were relevant to the investigation, with

9   particular regard to some of the CASTRO DTO members discussed in this Affidavit, as

10  described in the following paragraphs.

11       50.     Josh MENDIOLA:  On December 2, 2017, MENDIOLA introduced

12  himself to Juan Castro as "Jay's friend."  Agents believe MENDIOLA was referring to

13  Jerry Austin RODRIGUEZ Jaime based on MENDIOLA's description of

14  RODRIGUEZ's then-residence, 10723 59th Ave. E, Puyallup, Washington.

15  MENDIOLA also provided Castro with a description of his vehicle, a white Nissan

16  Maxima, and his address (**7111 193rd St. East, Spanaway, Washington**).  This

17  information coincides with MENDIOLA's known address based on WADOL records and

18  public records searches; as explained further in Sections VII (dd) & (ee), it appears

19  MENDIOLA was living with Jake WILSON at that address at that time but is now

20  residing elsewhere.  On December 20, 2017, Castro sent MENDIOLA a picture of

21  Castro's new "cousin" who would be arriving in the United States soon to deliver heroin

22  in the place of Jesus SARMIENTO.  Agents reviewed this picture and positively

23  identified Arturo FRIAS Ceballos as the individual in the photograph, whom Castro was

24  calling "Luis."  On December 23, 2017, MENDIOLA sent a message to Castro which

25  read, "I have been slowing down and laying low hese [sic] last couple days.  One of my

26  dealers go [sic] caught so been taking it easy…"  Two days after this messaging

27  exchange, MENDIOLA sent additional communications to Castro that complained about

28  the quality of Castro's heroin.  As agents continued to look through other messaging

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  exchanges with Castro, they noticed others were also complaining about the heroin

2  quality around that same time.  In their review of additional messages between

3  MENDIOLA and Castro, agents noticed MENDIOLA referred Castro to the location of

4  13308 Meridian East, Puyallup, Washington (a Safeway parking lot where agents had

5  followed Castro's courier to previously), discussed heroin pricing with Castro, and used

6  coded language to order heroin (using phrases like "ready for dark").

7      51.    From these Facebook records, agents can account for Juan Castro supplying

8  MENDIOLA with no less than 330 grams of heroin in one month's time.

9      52.    Allex HUBLY:  On December 14, 2017, HUBLY asked Juan Castro about

10 the "blue pills" and if she could have more of those pills from Castro.  Castro said he was

11 sold out but would have more on "Saturday."  HUBLY asked if the pills were "for sure

12 real," and Castro replied, "llok [sic], this pills are manufactured in clandestine

13 laboratories, these are not pharmaceutical."  Agents believe HUBLY and Castro were

14 likely discussing counterfeit oxycodone pills, based on HUBLY's specificity with regard

15 to the color of the pills.  On November 24, 2017, HUBLY sent Castro a police report that

16 involved Blake HYNEK and another individual.  Based on that messaging conversation,

17 agents believe HYNEK likely introduced HUBLY to Castro, similar to the way HYNEK

18 introduced CHAPMAN to Castro.

19     53.    From these Facebook records, agents can account for Juan Castro supplying

20 Allex HUBLY with no less than 561 grams of heroin in less than two months.

21     54.    Jerry Austin RODRIGUEZ Jaime:  During a Facebook Messenger

22 conversation on November 27 and 28, 2017, Juan Castro told RODRIGUEZ (using an

23 account in the name "Jay A Jaime") the "work" was "very slow" and he "needed more

24 people."  I believe this was Castro's way of telling RODRIGUEZ that he (RODRIGUEZ)

25 needed to sell more heroin or find other distributors to sell more of Castro's heroin.

26 RODRIGUEZ told Castro, "I have alot [sic] of customers undee [sic] me."  Castro

27 seemed to like RODRIGUEZ's claim of having many drug customers and then offered to

28 provide RODRIGUEZ with a half-ounce of heroin on a "front."  This means Castro was

AFFIDAVIT OF JEREMY TAN - 26

1  agreeing to provide RODRIGUEZ with the drugs without requiring RODRIGUEZ to pay

2  for them at the time of delivery.

3         55.     On December 1, 2017, RODRIGUEZ provided Juan Castro with his phone

4  number (253-363-5327). Agents' review of Facebook records found this number to

5  coincide with RODRIGUEZ's listed phone number. On December 1, 2017,

6  RODRIGUEZ sent a picture of his house and (then-current) address, 10798 59th Ave.

7  East, Puyallup, Washington, to CASTRO. Agents have watched TV1 travel to this

8  residence many times, using physical and electronic surveillance means. On December

9  4, 2017, CASTRO provided an address to RODRIGUEZ of "23953 104th SE, Kent WA

10  98031." Agents believe this residence was a possible drug stash house for the CASTRO

11  DTO, based on these messages. Similar to Castro's activities with MENDIOLA, on

12  December 20 2017, Castro sent a picture of FRIAS to RODRIGUEZ and told

13  RODRIGUEZ, "Luis" had just arrived at the airport. From these conversations between

14  Castro and RODRIGUEZ, RODRIGUEZ seems to prefer his heroin in the form of

15  "stones" and not "powder" because the heroin is easier for RODRIGUEZ to sell in that

16  form.

17         56.     From these Facebook records, agents can account for Juan Castro supplying

18  RODRIGUEZ with no less than 247 grams of heroin in just over one month.

19         57.     <u>Tim CRAWFORD</u>: On December 22, 2017, Juan Castro messaged

20  CRAWFORD but never received a response. Castro referred to CRAWFORD as

21  "amigo," which is the same word Castro used to refer to the UC in this investigation; he

22  also referred to almost all of his drug customers as "amigos" or "amigas."

23         58.     <u>Blake HYNEK</u>: On November 28, 2017, Juan Castro sent a photograph of

24  court documents to HYNEK. These documents involved HYNEK and another person; it

25  seemed as though the court paperwork was documenting HYNEK's cooperation with

26  police regarding an apparent crime the other person had committed. As described above,

27  agents know Allex HUBLY provided Castro with these materials on November 24, 2017.

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

59.     On December 7, 2017, Juan Castro told HYNEK, "we have m-30 pills (fentanyl)." HYNEK then asked Castro for "pure fentanyl powder," but Castro told HYNEK "that is too dangerous." During a prior messaging conversation on December 4, 2017, HYNEK offered to provide Castro with fentanyl.

60.     From the review of Facebook messages between HYNEK and Juan Castro, and electronic surveillance of TV1, agents believe Castro's couriers often delivered directly to HYNEK's residence. On December 23, 2017, HYNEK complained to Castro about the quality of some of the heroin he had received from Castro. HYNEK sent Castro three photographs of suspected rock heroin, and he did not seem to like this form of the drug for distribution. Castro told HYNEK the heroin might look different but the quality was still excellent. HYNEK told Castro that his customers preferred the form of heroin that was easier to smoke. Castro sent HYNEK a photograph of suspected heroin powder as a way to confirm with HYNEK that his courier was about to deliver the right product to HYNEK. HYNEK confirmed the product was what he wanted. Castro subsequently directed HYNEK to a residence in Kent ("22919 112th Pl SE, Kent, WA 98031") in order to conduct a drug transaction and possible exchange. Castro called this residence "my house" and said it was "better" for doing the deal. Agents had watched TV1 travel to this location during surveillance operations. On January 1, 2018, HYNEK told Castro he had more "clientele" for Castro. He then said, "The clients [sic] name is Megan chapman [sic]." Castro subsequently informed HYNEK that he "added" CHAPMAN on Facebook.

61.     From these Facebook records, agents can account for Juan Castro supplying HYNEK with no less than 450 grams of heroin in one month's time.

62.     Megan CHAPMAN: On January 1, 2018, CHAPMAN introduced herself to Juan Castro as "blakes homegirl"; agents believe CHAPMAN was referring to Blake HYNEK, based on their knowledge of HYNEK's drug relationship with Castro, the large drug debt he owed to Castro, and HYNEK's association to CHAPMAN. On the following day, CHAPMAN provided her phone number to CASTRO as "253-433-9044"

1  and her address as "19914 80th St. Ct E, Bonney Lake, WA 98391." CHAPMAN's
2  conversation string with Castro confirmed agents' physical observations of TV1 on
3  January 3, 2018. This messaging string referred to CHAPMAN physically meeting
4  Castro's drug courier for a drug transaction in which CHAPMAN provided Castro's
5  courier with $630. This was one of the only captured exchanges between Castro and
6  CHAPMAN via Facebook Messenger due to the timing of agents' search warrant
7  execution; CHAPMAN introduced herself to the organization in January 2018, shortly
8  before Facebook provided this data to agents.

9      63.    Shalesha Renee [HUDSON]:  Agents positively identified Shalesha Renee
10  as Shalesha Renee HUDSON from her Facebook and WADOL photographs. From these
11  messages, it looks like HUDSON and Juan Castro's drug relationship began around mid-
12  November 2017. HUDSON typically ordered multiple pieces of heroin from Castro and
13  did so on a regular basis. On November 27, 2017, Castro sent HUDSON a photograph of
14  the court document involving HYNEK and another person, and told her to "beware of
15  Blake." Castro also asked HUDSON if she was familiar with a man with the initials L.Y.
16  HUDSON said she was not familiar with that person.

17      64.    HUDSON provided 35703 16th Avenue South, Federal Way, Washington,
18  as a safe address at which she and Juan Castro's courier could conduct their heroin
19  transactions; HUDSON indicated this address belonged to one of HUDSON's friends.

20      65.    From December 19 to December 22, 2017, Juan Castro confronted
21  HUDSON about her buying heroin from other people, which HUDSON acknowledged.
22  She then ordered one and a half pieces of heroin (approximately 38 grams) from Castro
23  and had his courier deliver the drugs to her hotel room in Tacoma. Castro sent her a
24  picture of his "new cousin," FRIAS. After the deal, HUDSON complained to Castro
25  about the quality of the product and Castro assured her it was "the same." HUDSON
26  then inquired as to "how much" Castro would charge "for 10 pieces" (approximately 250
27  grams). Castro replied, "9k," which I believe meant $9,000.00.
28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    66.    On December 22, 2017, HUDSON told Juan Castro to send his courier to
2  HUDSON's "house on 43rd." From the messages that followed, agents determined
3  HUDSON was referring to a residence near 43rd Street and Portland Avenue East, in
4  Tacoma, Washington. Agents had seen TV1 travel to this area on several occasions, and
5  remain in place for short durations of time, consistent with drug trafficking activity.

6    67.    From these Facebook records, agents can account for Juan Castro supplying
7  HUDSON with no less than 675 grams of heroin over the course of a month and a half.

8    68.    <u>Charles JOSLYN</u>: On December 27, 2017, Juan Castro and JOSLYN
9  initiated their Facebook Messenger conversation. JOSLYN told Castro he lived in
10  Bonney Lake, Washington and said he was "Jessie's cousin." Agents believe JOSLYN
11  was referring to an individual with the initials J.J.K., based on J.J.K.'s Facebook
12  friendship with Castro. JOSLYN attempted to call Castro, but Castro did not answer.
13  Castro then told JOSLYN he does not understand English but is able to use Google
14  translate. JOSLYN asked Castro if he could supply crystal methamphetamine in addition
15  to heroin. Castro told him he could only supply "dark," meaning heroin. JOSLYN asked
16  about Castro's working hours and Castro told JOSLYN that he distributes drugs between
17  the hours of 8:00 a.m. and 9:30 p.m. JOSLYN and Castro also arranged a drug deal on
18  this date (one that occurred at the Target store located at 26301 104th Ave. SE, Kent),
19  during which JOSLYN explained it would be better to do the deal in TV1 because
20  JOSLYN had brought his children with him and they were in his car already, occupying
21  space. JOSLYN described his vehicle as a "dark blue 92 Acura legend."

22    69.    On December 30, 2017, JOSLYN provided his address to Juan Castro as
23  "209 21st Ave. SW, Puyallup, Washington"; the conversation suggested the drug
24  transaction occurred at JOSLYN's residence. JOSLYN seemed to typically receive 12 to
25  50 grams of heroin at a time from Castro, though on December 30, 2017, JOSLYN
26  inquired about Castro's pricing on "quarter pounds" or "100 grams." Castro told
27  JOSLYN it would be $4,300 and JOSLYN thought that price was too much. JOSLYN
28  tried to negotiate with Castro and bargain him down to $3,600 for 100 grams of heroin.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   From the messaging data agents received, it did not look like Castro ever responded to

2   that request. TV1 was once again referenced in this conversation string.

3       70.     From these Facebook records, agents can account for Juan Castro supplying

4   JOSLYN with no less than 65 grams of heroin in the span of one week.

5       71.     Since execution of the search warrant on the Katherine Thomas account in

6   January 2018, agents have obtained search warrants for eleven Facebook accounts used

7   by the Castro brothers: Katherine Thomas, Juan Andres Castro Valenzuela, Florencio

8   Castro Valenzuela, Annel Baker,[3] Rebeca Spencer, Alissa Keyser, Gina Morris, Chris

9   Holdford,[4] Rudy Jackson, Steve Larson, and Tom Ryan. All of the accounts were linked

10  to each other and/or the Castros by information either from CS1, data indicating they

11  were accessed by the same electronic device, common "friends" lists, or some

12  combination of the above. All of the search warrants were issued by federal Magistrate

13  Judges in this District.

14      e.      ***Agents Identify Juan Castro's New Courier and Conduct another***

15              ***Undercover Purchase***

16      72.     Juan Castro sent a picture of SARMIENTO's replacement (whom he called

17  "Luis") to many of his Washington-based distributors, via Facebook Messenger. These

18  Facebook records also showed Castro searched for "Luis Ortiz Zavala," "Arturo Zavala,"

19  and "Arturo Ortiz Zavala," all on the same day, in early December 2017. Agents

20  suspected these searches reflected Castro's attempts to locate "Luis" on Facebook.

21  Agents searched law enforcement databases using these names as a way to compare any

22  photos they found to the photos of "Luis" which Castro had provided to his Washington

23

24

---

25  [3] Agents did not receive any results from the search warrant of this account. Facebook representatives said they
    could not process the request because the "Annel Baker" account no longer existed and no historical data was
26  available.

27  [4] Agents did not receive any messages in the returned materials from Facebook for the Chris Holdford account.
    Facebook support personnel stated that one explanation for the absence of data would be that the user deleted all of
28  his/her conversations over Facebook Messenger.

1  distributors.  Agents were able to identify "Luis" as Arturo FRIAS Ceballos from this
2  process.

3       73.     Agents soon found FRIAS was living with LOPEZ at the DTO's stash
4  house, **22025 100th Ave. SE, Kent, Washington**, and was driving TV1 just as
5  SARMIENTO previously had.  Agents conducted another undercover purchase of
6  powder heroin from the DTO at the end of January 2018.  FRIAS showed up to the
7  purchase in TV1 and delivered 87.5 gross grams (with packaging) of suspected heroin to
8  the UC.  This substance field-tested positive for the presence of heroin.

9       74.     About a week later, Juan Castro contacted the UC from a new Mexico-
10  based phone number (52-668-168-7860), but then did not respond to the UC's subsequent
11  messages.  Agents continued to conduct physical and electronic surveillance of FRIAS
12  and LOPEZ during this time.  Agents watched FRIAS make suspected deliveries to many
13  of the already-identified Washington-based distributors for the DTO, and watched
14  LOPEZ make routine trips to locations in Seattle and Everett, Washington.  Agents
15  conducted research on these locations and found that one of them, **314 N 133rd St.,**
16  **Seattle, Washington**, belonged to Rolando ESPINDOLA Hernandez and Jessica
17  JOHNSON, and the other previously belonged to Jaime HEREDIA Castro.

18       75.     Working with their law enforcement counterparts in Snohomish County,
19  Washington, agents learned ESPINDOLA and JOHNSON had been identified as money
20  launderers in several prior and unrelated investigations involving Mexican DTOs
21  operating in Western Washington.  Agents also learned HEREDIA was identified during
22  a previous police investigation as a heroin supplier to several Mexican DTOs operating in
23  Snohomish and King Counties (in Washington).

24       76.     Agents attempted to have the UC purchase fentanyl pills from Juan Castro
25  in February 2018, but that deal ultimately fell through.  Castro also told the UC he would
26  be traveling up to Washington, through Arizona, in the middle of February 2018.  The
27  UC planned to meet Castro in person during his visit to Washington.  Things were
28  progressing nicely for the UC, considering his/her relatively new status within the DTO.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  Unfortunately, Castro stopped talking to the UC in mid-February 2018, right after they
2  made their loose arrangements to meet.

3         77.     Agents continued their physical and electronic surveillance of the DTO
4  members in Washington throughout February, March, and April 2018.  They watched
5  LOPEZ continue to make routine trips up to ESPINDOLA/JOHNSON's residence, **314**
6  **N 133rd St., Seattle, Washington,** and HEREDIA's previous residence in Everett.
7  These trips were always of short duration and often LOPEZ would drive directly back to
8  his residence after these trips.  As time went on, FRIAS moved to an apartment complex
9  in Kent, Washington, and LOPEZ moved to an apartment in Auburn, Washington.  The
10 two continued to use the identified DTO stash house, **22025 100th Ave. SE, Kent,**
11 **Washington**.

12        78.     In March and April 2018, agents executed another search warrant on the
13 Katherine Thomas Facebook account as well as search warrants on five additional
14 accounts used by the CASTRO DTO, including accounts in the names of "Gina Morris,"
15 "Alissa Keyser," "Florencio Castro Valenzuela," and "Juan Andres Castro Valenzuela."
16 The data retrieved from these Facebook accounts proved to be just as useful as agents'
17 initial search of the Katherine Thomas account.  These records showed the CASTRO
18 DTO was using the Florencio and Juan Castro Facebook accounts in conjunction with
19 several other Katherine Thomas-equivalent accounts (i.e., the Gina Morris and Alissa
20 Keyser accounts) to communicate with local distributors.  Agents also executed a search
21 warrant on TV2 after it broke down and found documentation linking LOPEZ to
22 HEREDIA inside the abandoned vehicle.

23        79.     Agents continued their investigative efforts in this manner for about two
24 months.  The combination of physical and electronic surveillance used in conjunction
25 with telephone tolls analysis and Facebook research provided agents with a basic
26 understanding of the CASTRO DTO's operations.

27        80.     In April 2018, Juan Castro gave CS1 a phone number for his cousin
28 "Carlos," and had CS1 assist "Carlos" and FRIAS with registering a vehicle (**a white**

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   **2008 Honda Accord now bearing Washington license BJN4395, i.e., TV3**) in

2   Washington. In exchange for helping "Carlos" and FRIAS with the vehicle registration,

3   CS1 received about 50 grams of heroin from them. Through AZ licensing records for the

4   vehicle (prior to its registration in Washington) and a photograph associated with a 2013

5   CBP arrest, agents identified "Carlos" as Juan Jose HIGUERA Gonzalez. By the end of

6   April 2018, the DTO had again cycled out its local members and Daniel ROCHA

7   replaced Carlos LOPEZ, and Juan HIGUERA replaced FRIAS. In May 2018, agents

8   identified HIGUERA's phone number (TT19) through tolls analysis, and in June 2018

9   conducted another UC purchase of heroin from the DTO. HIGUERA, using TT19 and in

10   **TV3**, delivered the drugs to the UC. Thus began the wiretap phase of the investigation

11      **VI.   AUTHORIZED INTERCEPTIONS OF CASTRO DTO MEMBERS**

12      81.   On June 27, 2018, the Honorable Ronald B. Leighton, United States

13   District Judge for the Western District of Washington, signed an Order authorizing the

14   initial interception of wire and electronic communications over TT19, used by Juan

15   HIGUERA Gonzalez. The interception of TT19 began on June 27, 2018, and ended on

16   July 9, 2018. These interceptions helped gather evidence against several local

17   distributors for the DTO and helped agents obtain court authorization to intercept one of

18   ROCHA's phones.

19      82.   On July 10, 2018, the Honorable Ronald B. Leighton, United States District

20   Judge for the Western District of Washington, signed an Order authorizing the initial

21   interception of wire and electronic communications over TT24, a phone used by ROCHA

22   (at that time, referred to as Jorge Robles Perez). The interception of TT24 began on July

23   11, 2018, and ended on July 16, 2018, when ROCHA stopped using TT24 following an

24   unsuccessful surveillance event on July 14, 2018. Despite the short duration of the

25   interception period, the intercepted communications over TT24 showed ROCHA was

26   clearly using TT24 to facilitate drug trafficking activities for the CASTRO DTO.

27      83.   Agents were able to intercept suspected drug-related communications

28   between ROCHA (TT24) and other CASTRO DTO members including HEREDIA

1  (TT25), a man then known only as "Manuel," but later identified as Manuel LOYA Soto

2  (TT27), and a man then known only as "Leo" but later identified as Leonel Sillas

3  Berrelleza (TT28).  These intercepted communications clearly identified Sillas as

4  ROCHA's Mexico-based manager and a coordinator for the DTO.  The intercepted

5  communications over TT24 helped agents observe a delivery of at least nine kilograms of

6  heroin, 12,000 pills, and an undetermined amount of crystal methamphetamine to

7  ROCHA on July 13, 2018.  Agents used the intercepted communications over TT24 in

8  conjunction with physical and electronic surveillance to watch ROCHA, HEREDIA, and

9  LOYA during suspected heroin and pill deliveries.  Agents also used intercepted

10  communications over TT24 to anticipate and then observe the activities of these same

11  individuals with great success.  Unfortunately, during one such attempt at the coordinated

12  use of intercepted communications over TT24 with surveillance, ROCHA detected an

13  agent's presence.  ROCHA then stopped using TT24 entirely at Sillas' direction, changed

14  the location of his drug stash (at least temporarily), and most likely notified HIGUERA,

15  HEREDIA, and LOYA of this incident since HIGUERA and LOYA got new vehicles

16  and phone numbers shortly thereafter.

17       84.      On August 20, 2018, the Honorable Ronald B. Leighton, United States

18  District Judge for the Western District of Washington, signed an Order authorizing the

19  initial interception of wire and electronic communications over TT25, TT31, and TT32,

20  used by Jaime HEREDIA, Daniel ROCHA, and Manuel LOYA, respectively.  The

21  interception of wire and electronic communications over TT25 began on August 20,

22  2018, and ended on August 23, 2018.  Agents did not activate the interceptions of TT31

23  and TT32 because data from pen registers/trap and trace devices and location monitoring

24  indicated ROCHA and LOYA, respectively, were not using those phones by the time

25  agents received court authorization to intercept them.  Agents gained little additional

26  information from such a short period of interception over TT25 (HEREDIA).  However,

27  agents were able to identify further HEREDIA's position within the DTO, and confirmed

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   some of the unidentified individuals using pre-paid phone numbers in contact with

2   HEREDIA were for drug trafficking purposes.

3       85.     After HEREDIA stopped using TT25, agents located a new phone number

4   used by HEREDIA and began intercepting wire and electronic communications over

5   another of ROCHA's phones, TT43.  On August 28, 2018, the Honorable Ronald B.

6   Leighton, United States District Judge for the Western District of Washington, signed an

7   Order authorizing the initial interception of wire and electronic communications over

8   TT43 (ROCHA).  The interception of TT43 began on August 29, 2018, and ended on

9   September 4, 2018, though agents believe ROCHA likely stopped using the device on the

10  morning of September 1, 2018.  These interceptions, even for this brief period, greatly

11  helped agents in their investigation in that they helped identify several previously

12  unidentified or unknown members of the DTO, and helped identify their roles in the

13  DTO.  These interceptions helped agents anticipate Carlos LOPEZ's return to Western

14  Washington—and then observe his pick-up at the Seattle-Tacoma International Airport.

15  Intercepted communications over TT43 also helped agents identify Oscar Humberto

16  CARRILLO Salcedo (using TT50 at that time) as a bulk cash smuggler for the CASTRO

17  DTO and served to identify previously unknown high-volume drug distributors for the

18  DTO such as Hector Manuel URIAS Moreno (then known only as "Teto") and Michael

19  John SCOTT and his wife, Esther La Rena SCOTT.

20      86.     The intercepted communications between the distribution hub for Western

21  Washington (ROCHA, TT43) and the distribution manager in Mexico (Sillas) provided

22  agents with a detailed understanding of what types and how much of each drug ROCHA

23  maintained during the time agents were intercepting communications over TT43.  The

24  intercepted conversations also provided agents with detailed knowledge of how much

25  money the DTO earned from the sale of their drugs.  On one day, ROCHA and Sillas

26  even carried out a meticulous accounting of all the drugs and money ROCHA was

27  supposed to have delivered, maintained, or transferred to others over the past month or

28  so.  This meticulous accounting allowed agents to seize those same accounted-for drugs

AFFIDAVIT OF JEREMY TAN - 36

1  and money from ROCHA' residence when he and LOPEZ were not present.[5]  Agents

2  recovered over a kilogram of suspected heroin, some suspected crystal

3  methamphetamine, over 3,200 genuine or counterfeit oxycodone pills, and over $160,000

4  in cash from this seizure.  Agents believe this seizure, on August 31, 2018, is what

5  ultimately caused ROCHA to stop using TT43 during the morning of September 1, 2018.

6    87.    LOPEZ then took over ROCHA's job duties for the DTO in Western

7  Washington, and ROCHA returned to Mexico shortly thereafter.  On September 11,

8  2018, the Honorable Ronald B. Leighton, United States District Judge for the Western

9  District of Washington, signed an Order authorizing the initial interception of wire and

10  electronic communications over HEREDIA's then-current phone (TT46), just after

11  LOPEZ had reclaimed his role as distribution hub for the DTO in Western Washington.

12  Interceptions over TT46 began on September 13, 2018, and ended on October 11, 2018.

13  These intercepted communications almost mirrored the intercepted communications over

14  TT25 (HEREDIA).  HEREDIA used TT46 to facilitate his drug trafficking activities, like

15  taking heroin and pill orders from his customers and speaking with the Western

16  Washington distribution hub (Carlos LOPEZ, TT51) about his supply needs.  HEREDIA

17  also used TT46 to speak with other suspected higher-level members of the DTO in

18  Mexico and money launderers who were previously unknown to agents.

19    88.    On September 24, 2018, the Honorable Ronald B. Leighton, United States

20  District Judge for the Western District of Washington, signed an Order authorizing the

21  initial interception of wire and electronic communications over URIAS' phone (TT48),

22  CARRILLO's phone (TT50) and LOPEZ's phone (TT51).  Interceptions over TT48 and

23  TT51 began the same day, and ended on October 17, 2018.  Interceptions over TT50

24  began on September 26, 2018, and ended on September 28, 2018 (although agents

25

26

27  [5] Agents obtained a delayed-notice search and seizure warrant for ROCHA's residence from the Honorable David
W. Christel, United States Magistrate Judge for the Western District of Washington, on August 31, 2018, and

28  executed the warrant that same evening.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   believe CARRILLO stopped using his telephone on September 26, 2018). The

2   intercepted communications over TT48 and TT51 helped agents identify over 20

3   additional members of the DTO, including high-volume heroin, crystal

4   methamphetamine, and pill distributors in Western Washington; solidify the connection

5   between Sillas and other high-ranking members of the DTO in Mexico; identify and

6   gather evidence against bulk drug smugglers from Arizona and California; and, most

7   notably, identify CARRILLO's new phone (TT62).

8       89.    On October 18, 2018, the Honorable Ronald B. Leighton, United States

9   District Judge for the Western District of Washington, signed an Order authorizing the

10  initial interception of wire and electronic communications over CARRILLO's current

11  phone (TT62). Interceptions began on October 18, 2018, and ended on November 17,

12  2018. Interceptions over TT62 helped agents identify, or begin to identify, additional

13  members of the DTO in Western Washington and elsewhere.

14      90.    On November 2, 2018, the Honorable Ronald B. Leighton, United States

15  District Judge for the Western District of Washington, signed an Order authorizing the

16  initial interception of wire and electronic communications over Juan Carlos AVILES

17  Berrelleza's telephone (TT66). Interceptions over TT66 began on November 6, 2018,

18  and ended on November 8, 2018, when AVILES stopped using the phone.

19      91.    On November 14, 2018, the Honorable Ronald B. Leighton, United States

20  District Judge for the Western District of Washington, signed an Order authorizing the

21  initial interception of wire and electronic communications over Carlos Alejandro

22  CASTRO Perez's phone (TT69) and Carlos LOPEZ's current phone (TT70), as well as

23  the initial interception of wire communications over Gregory WERBER's phone (TT37).

24  Interceptions began on that same day and, with respect to TT37 and TT69, are ongoing.

25  Carlos LOPEZ stopped using his phone (TT70) on or about November 16, 2018, after

26  Sillas advised him of the police search warrant that was executed on Cesar LOYA's

27  residence on November 15, 2018.

28

AFFIDAVIT OF JEREMY TAN - 38

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

92.     On November 19, 2018, the Honorable Ronald B. Leighton, United States
District Judge for the Western District of Washington, signed an Order authorizing the
initial interception of wire and electronic communications over Martin GONZALEZ's
phone (TT63), and the initial interception of wire communications over Ramon
PUENTES' phone (TT64).  Interceptions over TT63 began on November 20, 2018, and
ended on November 28, 2018, when law enforcement arrested GONZALEZ as he was on
his way to deliver multiple kilograms of heroin to the CASTRO DTO.  Interceptions over
TT64 began on November 26, 2018, and are ongoing.

## VII.     PROBABLE CAUSE FOR THE LOCATIONS TO BE SEARCHED

93.     During the instant investigation, agents have identified several locations
and vehicles in Western Washington that are believed to be used in the facilitation of the
CASTRO DTO's drug-trafficking activities.  The following paragraphs are offered in
support of my belief that probable cause exists to believe that these residences, including
outbuildings and vehicles located within the curtilage of same (whether among the
separately listed vehicles above or not), contain evidence, fruits and/or instrumentalities
of drug trafficking and money laundering crimes committed by the CASTRO DTO in
violation of Title 21, United States Code, Sections 841(a)(1), 843(b), 846, and 952, and
Title 18, United States Code, Sections 1956 and 1957.

94.     As stated above, the intercepted calls, surveillance observations, real-time
tracking data, confidential source information, and enforcement activities described
herein do not encompass all of the information agents have collected concerning the
instant investigation.  Rather, I have set forth only the facts that I believe are essential to
establish the necessary foundation for the issuance of the requested search warrants.  As
such, I have included in this Affidavit several examples of drug-trafficking activity as
they relate to each location.  Some of these examples also encompass drug-trafficking
activity as it relates to particular vehicles which investigators seek authorization to
search.  The examples below are only a representative sample of the evidence gathered
during the entire investigation.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

a) **Location 1.**  Suspected drug and money stash location and prior residence of Carlos Eduardo LOPEZ Hernandez: **a mobile trailer located at 22025 100th Ave. SE, Kent, Washington.**

95.     This trailer has been Carlos Eduardo LOPEZ Hernandez's primary residence throughout the majority of this investigation.  At the time DEA and SOG began working together on this investigation, LOPEZ was residing at this location, with SARMIENTO.  FRIAS replaced in December 2017, and then FRIAS lived with LOPEZ at **22025 100th Ave. SE, Kent, Washington** for over a month.  During the first quarter of 2018, agents noticed LOPEZ moved to a condominium complex in Auburn, Washington (this was the Emerald Pointe Condos where agents executed a delayed-notice search warrant in August 2018).  Shortly after LOPEZ moved out of the trailer at **22025 100th Ave. SE, Kent, Washington**, agents noticed FRIAS also moved out. FRIAS began living at **10545 SE 238th St., Unit 8, Kent, Washington**; every low-level courier for the DTO (SARMIENTO, FRIAS, and HIGUERA) has lived at that apartment (Unit 8) while they worked for the DTO in Washington since that time.  ROCHA replaced LOPEZ just after he (LOPEZ) had moved to the condominium in Auburn.

96.     Even though LOPEZ and FRIAS moved out of the trailer at **22025 100th Ave. SE, Kent, Washington**, agents still continued to see ROCHA visit the trailer from time to time, from April to September 2018.  Agents believe ROCHA was using the trailer as an additional stash location for DTO money and drugs during that time.  Agents intercepted communications between ROCHA and Sillas that indicated the trailer was still being used by the DTO in July 2018 (Sessions 73 and 76 over TT24).  These sessions were intercepted on July 13, 2018; Sillas and ROCHA were trying to determine a safe place to unload and potentially store large amounts of heroin and pills.  Sillas suggested using the "little trailer" in each of these sessions, which agents believe was a reference to the trailer at **22025 100th Ave. SE, Kent, Washington**.

97.     On July 14, 2018, ROCHA detected police surveillance during a transaction with Monique GREEN and immediately called Sillas to alert him.  After hearing this,

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   Sillas instructed ROCHA to take a number of precautionary countermeasures during
2   Session 273 on TT24. One of those countermeasures was for ROCHA to head directly to
3   "the trailer" instead of going home. Based on tracking data for TV5 (ROCHA's vehicle,
4   a silver Toyota Corolla) agents know he did not completely listen to Sillas' instructions—
5   since he went back to his own residence in Auburn and then to AVILES' residence.

6       98.     ROCHA lived in the DTO condo in Auburn from March 2018, to August
7   31, 2018—when agents executed their delayed-notice search warrant on the location and
8   seized fentanyl pills, heroin, suspected crystal meth, marijuana, and over $160,000 in
9   cash from the residence. This confirmed agents' suspicions about that residence being
10  used as a stash location, and it furthered their belief that the trailer at **22025 100th Ave.**
11  **SE, Kent, Washington** was previously used in that same manner, since that is where
12  LOPEZ used to live. By the time of agents' search warrant on the Auburn condominium,
13  LOPEZ had returned to Western Washington and was living with ROCHA at that
14  condominium. After this search warrant execution, ROCHA returned to Mexico and
15  LOPEZ moved back into the trailer located at **22025 100th Ave. SE, Kent, Washington.**
16  Agents believe the DTO maintained control of this trailer throughout the investigation—
17  as a safe space for its members to reside and as a stash house for drugs and money—this
18  is what allowed LOPEZ to move back into this trailer so quickly after the DTO's condo
19  in Auburn had been compromised. LOPEZ lived at the trailer from September to
20  November 2018, at which point he moved to the **Pasa Fino II Apartments, 12212 SE**
21  **310th St., AA303, Auburn, Washington.** LOPEZ's use of the AA303 residence is
22  discussed in Section VII (b) of this Affidavit.

23      99.     From the start of the investigation, agents have observed LOPEZ,
24  SARMIENTO and other members of the CASTRO DTO (including HEREDIA,
25  ROCHA, FRIAS, and AVILES), through both physical and electronic surveillance,
26  traveling to and from **22025 100th Ave. SE, Kent, Washington** before and after
27  engaging in drug trafficking activities. Agents have logged the number of times these
28  DTO members have traveled to **22025 100th Ave. SE, Kent, Washington.** Physical and

AFFIDAVIT OF JEREMY TAN - 41

1  electronic surveillance data shows these DTO members made over 500 visits to **22025**
2  **100th Ave. SE, Kent, Washington** throughout the course of this investigation.

3      100.    For example, agents conducted several controlled purchase utilizing an
4  Undercover Agent (UC).  During the first purchase on November 16, 2017, the UC used
5  a combination of communications over Facebook Messenger (with the Katherine Thomas
6  account), TT1, and TT3 to complete the transaction.  Agent saw SARMIENTO, via a
7  mounted surveillance camera, leaving the **22025 100th Ave. SE, Kent, Washington**,
8  residence prior to this purchase.  Via a mounted surveillance camera, agents then saw
9  SARMIENTO entering **Soltero's Market Mexican Store, 24202 104th Ave. SE, Unit**
10  **104, Kent, Washington**, before conducting the purchase with the UC.  SARMIENTO
11  delivered about 49.5 grams (net weight) of a substance analyzed by the DEA Western
12  Regional Laboratory (WRL) and found to be 30-34% pure heroin.  Via GPS tracking,
13  agents followed SARMIENTO back to **22025 100th Ave. SE, Kent, Washington**
14  following the completion of the purchase via a GPS tracking device.  This was one of the
15  earliest instances where agents observed a courier for the CASTRO DTO utilizing this
16  residence.  Another, more recent, example of the DTO's use of this residence follows.

17      101.    On October 9, 2018, at 2:20 p.m., agents intercepted an incoming call,
18  Session 1365 on TT51 (LOPEZ), from the user of TT68, Cesar LOYA.  During Session
19  1365, Cesar LOYA asked if LOPEZ could supply him with at least 4,000, but preferably
20  7,000, counterfeit oxycodone pills.  Based on other intercepted communications over
21  TT51, agents did not think LOPEZ actually had that many pills on hand at that time.
22  During Session 1365, LOPEZ (TT51) told Cesar LOYA (TT68) that he (LOPEZ) was
23  going to have a hard time getting even 4,000 pills, but would check and see how many he
24  could get for Cesar LOYA and then call Cesar LOYA back.  Cesar LOYA promised he
25  would be able to pay cash up front for up to 7,000 pills if LOPEZ could get them.

26      102.    This call ended and, twenty seconds later, agents intercepted an outgoing
27  call (Session 1367 on TT51) from LOPEZ to Carlos CASTRO (TT69).  Agents had
28  previously identified Carlos CASTRO as the user of TT69 based on physical and

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  electronic surveillance.  Agents have identified Carlos CASTRO as a high-volume

2  distributor or potential distribution hub, similar to LOPEZ, based on intercepted

3  communications over TT51 and physical/electronic surveillance.  TT69 is subscribed to

4  Carlos CASTRO at his apartment in Federal Way, and agents positively identified Carlos

5  CASTRO based on his WADOL photograph.

6       103.   On October 9, 2018, during Session 1367, LOPEZ (TT51) had asked Carlos

7  CASTRO (TT69) if CASTRO had 4,000 pills because LOPEZ had a client who needed

8  them ("the guy needs four ... buttons").  Carlos CASTRO said he had just gotten some

9  pills in, so he would check.  This call ended and agents intercepted several additional

10  communications (Sessions 1368, 1369, 1372, and 1373) between LOPEZ (TT51) and

11  Cesar LOYA (TT68), and LOPEZ (TT51) and Carlos CASTRO (TT69).  These

12  communications all pertained to the logistics of this multi-thousand pill transaction.

13  Session 1369 was a text message from LOPEZ (TT51) to Carlos CASTRO (TT69),

14  which read, "What's up do I start heading over or not yet?"

15       104.   Following the text message in Session 1369, agents intercepted an

16  incoming call on TT51 (LOPEZ) from Carlos CASTRO (TT69), at 2:39 p.m.  During this

17  call, I believe CASTRO told LOPEZ that the pills he had currently available were more

18  expensive than the typical pills they had exchanged in the past.  CASTRO clarified for

19  LOPEZ by saying the pills he could get would be the "lighter blue ones."  The two then

20  discussed pricing.  LOPEZ said he typically sold the pills for $7.00 and made fifty cents

21  per pill.  LOPEZ told CASTRO if he (LOPEZ) were to raise his price even to $7.50, his

22  customers would go elsewhere.  CASTRO then told LOPEZ that he was also getting the

23  pills for $7.00 each, so he (CASTRO) was not sure he could sell LOPEZ the pills at a

24  cheaper rate, but said he (CASTRO) would check with his boss ("him") to see if the boss

25  would drop the price.  CASTRO went on to say if his boss dropped the price then

26  CASTRO and LOPEZ could "do business" (referring to the previously discussed drug

27  transaction).

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

105.   About 45 minutes later, agents intercepted Session 1377 on TT51, at 3:24 p.m.  Session 1377 was an incoming call from TT69 (Carlos CASTRO) to LOPEZ during which Carlos CASTRO told LOPEZ that he could only supply 3,000 pills because the person he was getting the pills from wanted to keep 1,000 on hand for his own distribution ("It's going to be three milpas, dude … It's going to be three thousand because, honestly, the guy doesn't want to stay dry; he wants to keep one milpa").  The word "milpa" literally translates to "cornfield," but agents and linguists know drug traffickers commonly use this word as a code word for "thousand" or "one thousand," because the Spanish word "mil" (the first three letters of "milpa") literally translates to 1,000.

106.   At 4:02 p.m. on October 9, 2018, agents intercepted Session 1388 on TT51, an incoming call from Cesar LOYA (TT68).  During this call, LOPEZ (TT51) told Cesar LOYA he would only be able to provide Cesar LOYA with 3,000 pills.  Cesar LOYA agreed to buy that amount and the two men agreed to meet at the Everett Mall.  From this call, agents believed LOPEZ would first meet with Carlos CASTRO to obtain the pills, then meet with Cesar LOYA to give the pills to Cesar LOYA and receive payment for the pills, and then meet with Carlos CASTRO again, to deliver the money LOPEZ owed for the pills.

107.   At 4:26 p.m., agents intercepted another incoming call, Session 1398 on TT51, from Carlos CASTRO (TT69).  During this call, LOPEZ (TT51) and Carlos CASTRO agreed to meet "in Shoreline, on 175th," where they had "met before."  Agents believe the person who supplied Carlos CASTRO with the 3,000 pills lives in the Everett or Shoreline area since Carlos CASTRO referred to "here" multiple times during the call, indicating he was likely in the Shoreline or Everett area, as opposed to the area of his own residence in Federal Way.  The content of the call also suggested Carlos CASTRO (TT69) had just received the 3,000 pills he intended to give to LOPEZ (TT51) and was pleased he did not have to drive all the way to Kent or Federal Way to deliver them to LOPEZ.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

108.   One minute after this call with Carlos CASTRO ended, at 4:28 p.m., LOPEZ left the trailer at **22025 100th Ave. SE, Kent, Washington**, in **a red 2006 Ford Ranger bearing Washington license C04697M (TV4)**, and drove to Shoreline, Washington.   During his drive to Shoreline, agents intercepted Session 1406, an incoming call from Carlos Castro (TT69) over TT51.   In this call, LOPEZ (TT51) and Carlos CASTRO agreed to meet at the Goodwill in Shoreline.   At 5:26 p.m., just as LOPEZ was exiting Interstate 5, he called Carlos CASTRO on TT69 (Session 1408). During this call, Carlos CASTRO changed their original meeting location from the Goodwill to a location on 8th Avenue Northeast, right on the side of the road.   Two minutes later, agents intercepted another outgoing call on TT51 (Session 1410), in which LOPEZ and Carlos CASTRO specifically talked about meeting near 151st Street.   Carlos CASTRO even warned LOPEZ during this call to be careful because there were many kids at the nearby park.

109.   Two minutes after that call, agents on physical surveillance saw LOPEZ meet with Carlos CASTRO in a **green 2005 BMW X5 bearing Washington license BJM0956 (TV9)** at the intersection of 151st Street and 8th Avenue Northeast, in Shoreline.   LOPEZ parked **TV4** near **TV9** and got in as the front passenger.   After another two minutes, LOPEZ got out of **TV9** and got back into **TV4**.   Based on the content of the communications referenced above, agents believe LOPEZ received 3,000 counterfeit oxycodone pills during this brief meeting on October 9, 2018, which took place inside **TV9**.

110.   From there, LOPEZ contacted Cesar LOYA (TT68) and arranged to meet Cesar LOYA to deliver the pills LOPEZ had just received from Carlos CASTRO. During Session 1413 on TT51, LOPEZ and Cesar LOYA (TT68) agreed to meet at the Shell Gas Station located at 6602 220th Street Southwest in Mountlake Terrace, Washington.   At 5:47 p.m., LOPEZ (**TV4**) arrived at that Shell station.   Cesar LOYA arrived at the Shell gas station less than ten minutes after LOPEZ had arrived in **TV4**. Agents saw LOPEZ and Cesar LOYA meet at the gas pumps briefly.   Agents believe

1   LOPEZ provided Cesar LOYA with the pills he had received from Carlos CASTRO

2   during this brief meeting because both LOPEZ and Cesar LOYA left the Shell gas station

3   immediately after.

4        111.    Agents believe Cesar LOYA did not have the money to pay LOPEZ at that

5   time, because LOPEZ did not start driving back toward his residence (or to Carlos

6   CASTRO's) after this meeting at the Shell station.  Instead, LOPEZ went to a nearby

7   casino.  LOPEZ remained at the casino until shortly after 7:00 p.m., when he received a

8   call (Session 1414) from Cesar LOYA (TT68).  During Session 1417, LOPEZ and Cesar

9   LOYA referenced an address that Cesar LOYA had supposedly sent to LOPEZ.  Agents

10  believe Cesar LOYA sent the address to LOPEZ through some alternative

11  communications means since agents did not intercept any text message or call over TT51

12  with the address in it.

13       112.    LOPEZ then left the casino in **TV4**, and tracking data showed the vehicle

14  drove to Cesar LOYA's residence in Mountlake Terrace, Washington.  **TV4** arrived at

15  this location at 7:30 p.m., and remained there for a few minutes before departing (based

16  on tracking data associated with **TV4**).  Agents believe LOPEZ received money from

17  LOYA during this brief stop at LOYA's residence.  Based on intercepted

18  communications and tracking data, agents know LOPEZ then traveled to Federal Way,

19  Washington to meet with CASTRO (and deliver the drug proceeds that were owed for his

20  portion of the pills).  After LOPEZ delivered the money to CASTRO in Federal Way,

21  tracking data showed LOPEZ traveled back to Kent, Washington, stopped at an

22  apartment complex, and then continued on to the DTO's trailer at **22025 100th Ave. SE,**

23  **Kent, Washington**.

24       113.    On November 2, 2018, agents used the real-time tracking of **TV4** and the

25  mounted surveillance camera at **22025 100th Ave. SE, Kent, Washington** to watch

26  LOPEZ leave the trailer at 11:13 a.m., and travel (in **TV4**) to meet Oscar CARRILLO.

27  Agents knew LOPEZ was traveling to meet CARRILLO based on intercepted

28  communications over CARRILLO's phone, TT62.  LOPEZ drove **TV4** directly from the

1  trailer to CARRILLO's location in Seattle.  Based on agents' knowledge of

2  CARRILLO's role in the DTO, they believe LOPEZ traveled to meet him on November

3  2, 2018, in order to deliver drug proceeds.  Based on intercepted communications over

4  ROCHA and LOPEZ's phones, agents believe those two couriers have delivered over

5  $300,000 of drug money to CARRILLO over the past few months.  I believe this pattern

6  of travel (from **22025 100th Ave. SE, Kent, Washington**, directly to CARRILLO's

7  location) shows the DTO stores large amounts of drug proceeds at **22025 100th Ave. SE,**

8  **Kent, Washington**.  This is why LOPEZ was—and has been on several other

9  occasions—able to leave directly from the trailer and deliver drug proceeds to

10  CARRILLO.

11      114.    Over the course of the investigation, intercepted communications, mounted

12  surveillance camera footage, tracking data, and physical observations have all shown

13  multiple members of the DTO are using this residence for drug trafficking purposes.

14  Intercepted communications have indicated the DTO stores at least a portion of its drugs

15  and drug proceeds at this location.  Agents have seen many members of the DTO come

16  and go from this residence, before and after suspected drug and money transactions.

17  Agents believe evidence of the CASTRO DTO's drug trafficking activities, such as drugs

18  and drug proceeds, will be located inside the trailer at **22025 100th Ave. SE, Kent,**

19  **Washington**.

20      **b)    Location 2.**  Residence of Carlos Eduardo LOPEZ Hernandez:  **Pasa**
        **Fino II Apartments, 12212 SE 310th St., AA303, Auburn,**
21      **Washington.**

22

23      115.    Agents had initially identified Carlos LOPEZ as "Octavio Cota Lopez"

24  through physical/electronic surveillance, Facebook research, and telephone

25  tolls/subscriber records analysis.  When agents first saw LOPEZ, he was living at the

26  same stash house in Kent, where SARMIENTO lived (the trailer at **22025 100th Ave.**

27  **SE, Kent, Washington**).  Agents initially thought LOPEZ would be SARMIENTO's

28  replacement, but later determined that LOPEZ held a supervisory role in the DTO.

1   LOPEZ subsequently moved to an apartment in Auburn associated with Cindy
2   SOLTERO through her credit report.  During execution of a delayed-notice search
3   warrant at that apartment (then the DTO stash house) on August 31, 2018, agents found a
4   Mexican passport bearing Cota's photograph in the name Carlos Eduardo LOPEZ
5   Hernandez; LOPEZ had returned to Western Washington that same weekend to resume
6   his duties as a DTO distribution hub.  LOPEZ has been the subject of two wiretap orders
7   (using TT51 and TT70).  Intercepted communications regarding LOPEZ's work for the
8   DTO in Western Washington are described throughout this Affidavit.

9       116.    On October 24, 2018, agents received court authorization to activate real-
10  time tracking for LOPEZ's then-current cellular phone TT70.  For several days in
11  November 2018, tracking data for TT70 indicated LOPEZ was living in Auburn,
12  Washington.  Subsequently, agents set out on surveillance to identify LOPEZ's possible
13  new residence.  On November 8, 2018, agents observed TV4 (LOPEZ's known vehicle)
14  parked out in front of the BB building of the **Pasa Fino II Apartments** located at **12212**
15  **SE 310th St., Auburn, Washington.**  On November 13, 2018, agents observed LOPEZ
16  return to **Apartment AA303** at the **Pasa Fino II Apartments** in TV4.  Subsequently
17  agents continued to observe LOPEZ at the **Pasa Fino II Apartments, 12212 SE 310th**
18  **St., AA303, Auburn, Washington**, during physical surveillance; agents believe he is
19  currently living there.

20      117.    On November 15 and November 16, 2018, agents conducted physical and
21  electronic surveillance of LOPEZ.  On both of those days, agents saw LOPEZ meet with
22  CARRILLO for two separate money drops that occurred at the Southcenter Mall.

23      118.    Agents intercepted a number of communications between LOPEZ and
24  CARRILLO on November 15, 2018.  Based on physical and electronic surveillance
25  during that day, agents knew CARRILLO was with Gregory WERBER, in Western
26  Washington, and the two were there to rent an apartment for CARRILLO in Tukwila,
27  Washington.  In the intercepted communications, LOPEZ and CARRILLO agreed to
28  meet at the Southcenter Mall for LOPEZ to deliver drug proceeds to CARRILLO.

AFFIDAVIT OF JEREMY TAN - 48

119.    Prior to this money drop, agents had watched LOPEZ leave the **Pasa Fino II Apartments, 12212 SE 310th St., AA303, Auburn, Washington** and drive (in **TV4**) to meet with other members of the DTO, including SCOTT, URIAS, VALENZUELA, and a newly identified member of the DTO, known only at this time by his nickname: "WILSON." Based on previous intercepted communications over ROCHA and LOPEZ's phones, agents know the two distribution hubs (ROCHA and LOPEZ) would typically make such a trip to visit these other members of the DTO before meeting with CARRILLO in order to pick up large sums of cash from these other DTO members. Agents believe that is what LOPEZ did on November 15, 2018, prior to meeting with CARRILLO; specifically, I believe LOPEZ combined whatever cash he already had at the **Pasa Fino II Apartments, 12212 SE 310th St., AA303, Auburn, Washington** with the additional funds he received from other DTO members. LOPEZ drove right from his last meeting with one of the other DTO members to his meeting with CARRILLO.

120.    While LOPEZ and CARRILLO were together at the mall, they walked out to LOPEZ's vehicle (**TV4**) in the parking lot and LOPEZ retrieved a small black bag from his TV4's back seat. LOPEZ gave that bag to CARRILLO and CARRILLO returned to the hotel where WERBER was located. Based on intercepted communications over TT70 agents believe LOPEZ delivered $59,000 to CARRILLO during this meeting at the Southcenter Mall. LOPEZ drove back to the **Pasa Fino II Apartments, 12212 SE 310th St., AA303, Auburn, Washington** after this money drop.

121.    On November 16, 2018, LOPEZ met with CARRILLO once again and the two conducted a very similar set of activities at the Southcenter mall. Tracking data and physical surveillance showed LOPEZ left from the **Pasa Fino II Apartments, 12212 SE 310th St., AA303, Auburn, Washington** and drove to his meeting with CARRILLO at the mall. LOPEZ once again used **TV4** to store and transport the cash and, based on intercepted communications over TT70, agents believe LOPEZ delivered $96,000 to CARRILLO during this meeting.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

122.    After LOPEZ met with CARRILLO on November 16, 2018, agents intercepted an incoming call on TT70, Session 245, during which Jesus MORA called LOPEZ and told him that he (MORA) had to give LOPEZ some "pills" and "stuff." At that time, agents did not have MORA identified, but they later identified him through physical surveillance. During Session 245 over TT70, MORA told LOPEZ that he could meet him on November 16 or the day after—whatever LOPEZ preferred. LOPEZ told MORA that he had not heard anything about this delivery, but he would check and see what "they" had to say.

123.    Agents believed LOPEZ would likely call his manager, Sillas, and inquire about the legitimacy of this supposed delivery. Agents intercepted Session 249 over TT70 shortly thereafter, which was an incoming call from Sillas. During this call, LOPEZ told Sillas that he had just received a call. Sillas sounded excited and said he had forgotten to tell LOPEZ about the delivery. Sillas said this was supposed to be a delivery of pills ("buttons")—just like MORA had said during Session 245—and one suspected kilogram of heroin ("churrito"). Sillas instructed LOPEZ to pay MORA $2,500 for the transport.

124.    After this call, agents intercepted an outgoing call over TT70, Session 250, from LOPEZ to MORA. During this call, LOPEZ told MORA that he had just received "confirmation" from Sillas regarding the delivery. MORA told LOPEZ that he was bringing LOPEZ "many bundles." MORA also told LOPEZ that he was located "on 405, at Exit 7." In this call, the two agreed to meet the following day because LOPEZ said Exit 7 on I-405 was far away from his location.

125.    About ten minutes after this call, agents intercepted Session 254 over TT70—another call with MORA—during which LOPEZ told MORA that "they" told LOPEZ to take delivery on November 16 instead of the next day. MORA told LOPEZ that he was located at "the Denny's" at Exit 7, and promised to send LOPEZ the address; agents never intercepted any message with MORA's location, just as they never intercepted communications from Sillas (or any other DTO manager) that directed

1  LOPEZ to take delivery specifically on November 16, 2018.  Agents believe LOPEZ may

2  have used another means of communication to receive these messages.

3      126.   At 7:07 p.m., tracking data for **TV4** showed LOPEZ left the apartment

4  complex he was at in Kent and drove directly to Exit 7 on I-405.  This was 12 minutes

5  after agents had intercepted Session 254 on TT70.  Agents on physical surveillance were

6  able to confirm LOPEZ's movements.  Once **TV4** took the exit, agents intercepted

7  Session 255 on TT70 (an outgoing call to MORA).  LOPEZ was unable to find the

8  Denny's Restaurant MORA had mentioned in Session 254.  MORA spent some time

9  directing LOPEZ to his location, and eventually the two agreed to meet at a nearby

10  Subway restaurant LOPEZ had managed to find.  **TV4's** tracking data and physical

11  surveillance confirmed LOPEZ's confusion.

12      127.   Agents watched LOPEZ arrived at the Subway restaurant at 7:31 p.m.

13  LOPEZ walked inside the restaurant.  Three minutes later, agents saw MORA (in a white,

14  hooded sweatshirt) walk up to **TV4** and place a bag into the bed of **TV4**.  MORA walked

15  away from **TV4** and then returned to the vehicle and retrieved the bag.  After that, he

16  brought the bag into the Subway restaurant.  MORA spent a minute in Subway, with

17  LOPEZ, and then he walked out of the restaurant and walked over to the nearby Denny's

18  restaurant where he met with several other Hispanic males.

19      128.   Agents later watched MORA access a white truck that was in a nearby

20  motel parking lot.  That vehicle was registered to him at an address in Arizona.  Agents

21  identified the room number MORA had accessed and later obtained rental records from

22  the motel regarding the occupants of MORA's room.  MORA was the registered

23  occupant of the room, according to rental records, and had used a Mexican identification

24  card to reserve the room.  Agents positively identified MORA from that identification

25  card.

26      129.   LOPEZ left this delivery and conducted a brief counter-surveillance

27  maneuver before returning to the **Pasa Fino II Apartments, 12212 SE 310th St.,**

28  **AA303, Auburn, Washington.**  Tracking data for **TV4** showed LOPEZ arrived at the

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  **Pasa Fino II Apartments, 12212 SE 310th St., AA303, Auburn, Washington** at 8:18

2  p.m. LOPEZ parked **TV4** away from his actual apartment building and, a few minutes

3  later, made an outgoing call to Sillas. Agents intercepted that call as Session 272 on

4  TT70. During this call, LOPEZ told Sillas that he had received "big churros" and

5  "eleven lines of buttons." Agents believe LOPEZ was referring to kilogram quantities of

6  heroin when he said "big churros" and 11,000 pills when he said "eleven lines of

7  buttons." Sillas reiterated that LOPEZ should change his phone number and then send

8  his new number to Sillas. LOPEZ said he would turn TT70 off that night and Sillas said

9  he would also change his phone number.

10       130.    Session 272 was the last outgoing communication agents intercepted over

11  TT70. Real-time tracking of TT70 showed the device was powered off immediately after

12  Session 272 and has not been used since. From this call, agents believe LOPEZ

13  unpackaged the drugs he had just received from MORA once he (LOPEZ) was inside the

14  **Pasa Fino II Apartments, 12212 SE 310th St., AA303, Auburn, Washington**, and

15  believe he is storing at least a portion of the DTO's drugs inside the **Pasa Fino II**

16  **Apartments, 12212 SE 310th St., AA303, Auburn, Washington**.

17       131.    Based on the length of time LOPEZ has been distributing drugs for the

18  CASTRO DTO, the many times agents have observed LOPEZ conduct suspected drug

19  transactions, the many times LOPEZ has delivered bulk cash (drug proceeds) to

20  CARRILLO, the many times LOPEZ has met with suspected bulk drug transporters to

21  deliver drug proceeds and/or retrieve bulk drug shipments, and the fact that the DTO has

22  utilized LOPEZ's prior residences, **22025 100th Ave SE, Kent, Washington** and the

23  condominium in Auburn, as a means to stash suspected drugs and drug proceeds, I

24  believe evidence of LOPEZ's suspected drug trafficking activities and the proceeds

25  thereof will be located at his current residence: the **Pasa Fino II Apartments, 12212 SE**

26  **310th St., AA303, Auburn, Washington**.

27       132.    Carlos LOPEZ has no known criminal history.

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

    **c)**    **Location 3.**  Business location for Cindy SOLTERO Jimenez:  **Soltero's Market Mexican Store, 24202 104th Ave. SE, Unit 104, Kent, Washington.**

133.    This location is referenced in bold throughout Section V and VII of this Affidavit.  This has been the location of Cindy SOLTERO's business during the course of this investigation.  LOPEZ, ROCHA, SARMIENTO, FRIAS, HIGUERA, HEREDIA, and other suspected members of the CASTRO DTO have been seen traveling to and from this location before and after engaging in drug trafficking activities.  Based on intercepted communications, physical and electronic surveillance observations, and agents' interviews of other drug traffickers, I believe Cindy SOLTERO has used this business for a number of years to launder—and more specifically conduct illegal transfers of —drug proceeds from the US to Mexico.

134.    Agents have observed couriers for the CASTRO DTO frequenting **Soltero's Market Mexican Store, 24202 104th Ave. SE, Unit 104, Kent, Washington,** immediately following suspected drug transactions.  For example on January 25, 2018, agents set up surveillance of Arturo FRIAS Ceballos, a previous courier for the CASTRO DTO who agents believe is currently working for the DTO in another part of the United States.  At 6:42 p.m., agents observed FRIAS enter his red Volkswagen Jetta bearing Washington license BFX7429 (Target Vehicle 1 or TV1) and leave **22025 100th Ave. SE, Kent, Washington**.  Agents maintained surveillance on TV1 as FRIAS drove to the addresses of several local drug redistributors for the CASTRO DTO.  At 7:15 p.m., TV1 stopped at Jerry Austin RODRIGUEZ Jaime's previous residence.  FRIAS then drove TV1 to Megan CHAPMAN's previous residence.  Both CHAPMAN and RODRIGUEZ were friends with the Katherine Thomas Facebook account, an account specifically used by the CASTRO DTO for the purposes of conducting drug transactions.  Both of these stops lasted less than ten minutes, which I know from my training and experience is consistent with short stay traffic associated with drug transactions.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

135.    Immediately following these two stops, agents followed TV1 back to **Soltero's Market Mexican Store, 24202 104th Ave. SE, Unit 104, Kent, Washington**. Once FRIAS arrived at **Soltero's Market Mexican Store**, he got out of TV1 and entered the market.  Prior to this instance, agents had seen SARMIENTO conduct the exact same type of behavior.  During more than one of the controlled purchases with CS1 and the UC, SARMIENTO came directly from **Soltero's Market Mexican Store** and went directly back to **Soltero's Market Mexican Store**.  Juan HIGUERA has also frequented this establishment around the times of suspected drug transactions.  I believe that couriers are frequenting **Soltero's Market Mexican Store, 24202 104th Ave. SE, Unit 104, Kent, Washington**, after drug transactions in order to drop off drug proceeds received from those transactions.

136.    The activation of court-authorized interceptions of phones used by the CASTRO DTO has shown the DTO is using **Soltero's Market Mexican Store, 24202 104th Ave. SE, Unit 104, Kent, Washington**, as a money laundering location.  For example on September 29, 2018, agents intercepted a call (Session 278 on TT51) between Jesus SARMIENTO over his cellular phone, 206-775-1053, and LOPEZ and SOLTERO, who were both using TT51.  Session 278 was originally in Spanish and was transcribed by DEA-contracted linguists as detailed below:

- LOPEZ:            What's up, relative?
- SARMIENTO:     Are you on your way already?
- LOPEZ:            I'm on my way over there.  I just counted …

[VOICES OVERLAP]

- SARMIENTO:     You're at the …
- LOPEZ:            … some tickets because I was here at the store.  Yeah.
- SARMIENTO:     Listen, well, if you're at the store so you can bring me something.
- LOPEZ:            I'm on the way.  Or send me the …

1  [VOICES OVERLAP]

2  •    SARMIENTO:    There …

3  •    LOPEZ:    … message.

4  •    SARMIENTO:    Are you at the store?

5  •    LOPEZ:    Yeah.

6  •    SARMIENTO:    Oh, look, ask Cindy for the cream.  She already
7  knows.  Is she there?

8  •    LOPEZ:    Yeah, she's here [U/I] … [U/I] they're …

9  •    SOLTERO:    [U/I].

10 [VOICES OVERLAP]

11 •    SARMIENTO:    Tell her to give you …  that … that I need cream.  I
12 don't know how you sell it, Cindy.

13 •    SOLTERO:    Mexica—the Mexican one, right?

14 •    SARMIENTO:    Yeah, the Mexican one.  But what is it?  It's a little
15 package of how many?

16 •    SOLTERO:  No, it's whatever …

17 [VOICES OVERLAP]

18 •    SARMIENTO:    Small one …

19 •    SOLTERO:    … it's—I sell it to order, it's whatever you want.

20 •    SARMIENTO:    Oh. Bring me a—[STAMMERS] … I don't know, it's
21 a liter bottle, half liter bottle, I would think so, right?

22 •    SOLTERO:    Okay.  Uh-huh.

23 •    SARMIENTO:    Yeah, a liter one.

24 •    SOLTERO:    Alright then.

25 •    SARMIENTO:    Half to test it out.  And send me a bag of shrimp, if
26 you have it.

27 •    SOLTERO:    Okay.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  • SARMIENTO:      Are you guys going to come tonight?

2  • SOLTERO:        Well, with what you said that shrimp we weren't

3  planning on going but since you already said the magic word we are.

4  • SARMIENTO:      I'm …

5  [VOICES OVERLAP]

6  • SOLTERO:   [LAUGHS]

7  • SARMIENTO:      … I'm telling you [LAUGHS] … I'm telling you that

8  my wife wants to make … uh, these shrimp rolls?

9  • SOLTERO:        No, you didn't tell me, dude.

10  • SARMIENTO:      Read the message, don't be—read the messages, listen

11  to it.

12  • SOLTERO:        Okay, I haven't seen it but I'll check it right now.

13  • SARMIENTO:      There you go.  Now you are going to come—you

14  didn't want to come?  You'll see, I'm going to close the door on you.

15  • SOLTERO:        [LAUGHS]

16  • SARMIENTO:      [LAUGHS] Send me a bag of shrimp then and the, and

17  the, and the lard … the …

18  [VOICES OVERLAP]

19  • SOLTERO:        Alright.

20  • SARMIENTO:      … cream.  Cream, cream.

21  • SOLTERO:        Yeah, that's fine.

22  • SARMIENTO:      And bring me … send me the ticket so I can pay you.

23  • SOLTERO:        Alright.

24  • SARMIENTO:      Alright then.

25  • SOLTERO:        Okay. Bye.

26  [END OF CONVERSATION]

27

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

137.   During this call, SARMIENTO asked LOPEZ if he was on his way to meet
SARMIENTO.  LOPEZ responded by telling SARMIENTO that he (LOPEZ) was on his
way and that he "just counted some tickets because I was here at the store."  Tracking
data for **TV4** and LOPEZ's phone indicated LOPEZ was at **Soltero's Market Mexican**
**Store, 24202 104th Ave. SE, Unit 104, Kent, Washington**, at the time of this call.
"Tickets" is a term commonly used by the CASTRO DTO to refer to cash drug proceeds.
I believe that during this call, LOPEZ was counting cash drug proceeds at **Soltero's**
**Market Mexican Store, 24202 104th Ave. SE, Unit 104, Kent, Washington**, because
the DTO intended to use SOLTERO to send that money to other DTO members in
Mexico through the wire remittance businesses she operates at the store.  SOLTERO was
in LOPEZ's presence during this call and could clearly hear his conversation with
SARMIENTO, which included his use of the word "tickets" as a code word for money.

138.   Agents intercepted several more conversations that involved mentions or
references to Cindy SOLTERO.  Many of these conversations were between ROCHA
and Sillas, and LOPEZ and Sillas.  During Session 2 over TT43 (ROCHA's phone),
intercepted on August 29, 2018, Sillas directed ROCHA to collect drug money from
several of the DTO's customers in Western Washington (including Monique GREEN).
Sillas wanted ROCHA to "send" the money once he had collected it, and asked ROCHA
to let him (Sillas) know once he "had the names."  ROCHA told Sillas he (ROCHA) had
already spoken with "Cindy."  In this call, agents believe Sillas was asking ROCHA to
pass him whatever names Cindy SOLTERO intended to use on her illegal wire transfers
to people in Mexico, so those people in Mexico would be ready at the appropriate money
remitting businesses, with the correct names of the transferees.  Once ROCHA told Sillas
that he had already spoken to SOLTERO ("Cindy"), Sillas sounded relieved.

139.   From subsequent intercepted communications on that same day, agents
determined there must have been an error with one of the transactions SOLTERO set up.
In Session 53 on TT43, ROCHA told Sillas that "Cindy" had already "straightened out"
the problem they had been experiencing.  ROCHA told Sillas that the people in Mexico

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  would be able to cash out their transfers in two hours' time.  From this series of

2  transactions, agents believed the DTO was using SOLTERO and her money services

3  business to transfer a portion of the DTO's drug proceeds that were earned in Western

4  Washington to other DTO members in Mexico, and that on this particular occasion

5  SOLTERO had made an error on one of the transfers, causing a slight problem for

6  Sillas—one that ROCHA and SOLTERO resolved relatively quickly.

7       140.    Another more recent example of SOLTERO's involvement in the CASTRO

8  DTO's operations came from agents' interception of Session 1353 on TT51 (one of

9  LOPEZ's phones).  This was a 43-minute long call between LOPEZ and Sillas, during

10  which Sillas and LOPEZ conducted a detailed accounting of the DTO's inventory of

11  drugs and drug money that LOPEZ had handled, including drugs LOPEZ had received

12  from bulk transporters, cash LOPEZ had paid those transporters, drugs LOPEZ had sold

13  to clients, and cash LOPEZ had received from those clients.  Part of this accounting had

14  to do with what LOPEZ had done with the DTO's drug proceeds on various dates and

15  times.  This accounting indicated the quantities of drugs being delivered to various DTO

16  members and the amounts of money these members had paid or owed.  It also detailed

17  the money LOPEZ had given to bulk transporters and money launderers like CARRILLO

18  and SOLTERO.

19       141.    With specific regard to SOLTERO and **Soltero's Market Mexican Store,**

20  **24202 104th Ave. SE, Unit 104, Kent, Washington**, LOPEZ told Sillas that he had

21  brought $5,000 to "Cindy" at "the store" on Thursday, September 20, 2018; another

22  $5,000 "to the lady who owns the store" on Saturday, September 22, 2018; and $10,000

23  to the "lady who owns the store" on Saturday, September 29, 2018.  Based on agents'

24  knowledge of the DTO's use of Orlando BARAJAS' business in Burlington, Washington

25  (detailed in Subsection (x) of this Affidavit), intercepted communications such as these,

26  and the wealth of physical and electronic surveillance observations of DTO members at

27  **Soltero's Market Mexican Store, 24202 104th Ave. SE, Unit 104, Kent, Washington,**

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  agents believe SOLTERO is using her business in the exact same way BARAJAS is

2  using his, to launder cash drug proceeds for the DTO.

3      142.    Agents believe SOLTERO is taking these $5,000 and $10,000 deliveries of

4  drug money and fraudulently transferring these funds to members of the CASTRO DTO

5  in Mexico.  Sillas, LOPEZ, ROCHA, and HEREDIA have often referred to "lists of

6  names" when talking about money transfers for the DTO.  Based on agents' knowledge

7  of this particular organization (through intercepted communications and observations)

8  and their post-arrest and proffer interviews of other drug traffickers in other

9  investigations, agents believe SOLTERO is using fictitious names or a list of pre-

10  recorded names she receives from the DTO to send money to drug traffickers in

11  Mexico—for a fee.  Agents believe SOLTERO uses these names to separate the

12  CASTRO DTO's $5,000 or $10,000 transactions into five, ten, or twenty smaller

13  transactions of $1,000 or less, so as not to attract attention of regulators or law

14  enforcement.  This allows the DTO to essentially send drug money from the US to

15  Mexico in less than one days' time, and SOLTERO takes a percentage of the money as

16  her fee for conducting these illegal transfers.

17      143.    Agents have observed, through physical and electronic surveillance,

18  couriers for the CASTRO DTO stop at **Soltero's Market Mexican Store, 24202 104th**

19  **Ave. SE, Unit 104, Kent, Washington**, over 500 times since the start of the

20  investigation.  During many of these stops, agents have observed couriers for the DTO

21  enter **Soltero's Market Mexican Store, 24202 104th Ave. SE, Unit 104, Kent,**

22  **Washington**, immediately following suspected drug transactions.  Agents have also

23  observed couriers for the DTO conduct drug transactions in the parking lot of **Soltero's**

24  **Market Mexican Store, 24202 104th Ave. SE, Unit 104, Kent, Washington**, as

25  described in Section V and Section VII (f) of this Affidavit.  Based on the length of time

26  **Soltero's Market Mexican Store, 24202 104th Ave. SE, Unit 104, Kent, Washington**,

27  has been a suspected money laundering location for the CASTRO DTO, agents believe

28  evidence of the DTO's money laundering activities and possibly drug proceeds will be

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   located inside **Soltero's Market Mexican Store, 24202 104th Ave. SE, Unit 104, Kent,**

2   **Washington**.  At the very least, agents believe SOLTERO's business records (or lack

3   thereof for the DTO's transfers on specific dates) will demonstrate her use of her business

4   to facilitate drug trafficking for the CASTRO DTO.

5        144.   SOLTERO has no known criminal history.

6        **d)**   **Location 4**.  Residence of Cindy SOLTERO Jimenez:  **31600 126th Ave.**

7              **SE, Space 106, Auburn, Washington.**

8        145.   SOLTERO's involvement in the CASTRO DTO's illegal activities is

9   discussed in Section VII (c) of this Affidavit.  Throughout the course of this

10   investigation, agents have observed SOLTERO driving to and from **31600 126th Ave.**

11   **SE, Space 106, Auburn, Washington**, to and from **Soltero's Market Mexican Store,**

12   **24202 104th Ave. SE, Unit 104, Kent, Washington**.  In October 2018, agents observed

13   Cindy SOLTERO's registered vehicle (a **2016 Nissan Frontier bearing Washington**

14   **plate C30123H**) parked in Space 106 of the trailer park located at **31600 126th Ave. SE,**

15   **Space 106, Auburn, Washington**.  Based on physical and electronic surveillance, and

16   intercepted calls, I believe **Soltero's Market Mexican Store, 24202 104th Ave. SE,**

17   **Unit 104, Kent, Washington**, is a suspected money laundering business used by the

18   CASTRO DTO and other DTOs in Western Washington.  Several intercepted calls

19   indicating SOLTERO's involvement in suspected money laundering and drug trafficking

20   for the CASTRO DTO are referenced in the previous section of this Affidavit.

21   SOLTERO is the owner of **Soltero's Market Mexican Store**, and based on my training

22   and experience it is common practice amongst money launderers to keep drug proceeds

23   and/or records at their residences and businesses.  I believe SOLTERO may be storing

24   financial records and business documents at her residence (**31600 126th Ave. SE, Space**

25   **106, Auburn, Washington**) as well as her business.  I believe one of the only ways

26   agents will have to prove SOLTERO is laundering money for the DTO is through careful

27   review of these records.  Agents believe these records and receipts, when coupled with

28   surveillance footage, will show that many of the people SOLTERO claims to have

AFFIDAVIT OF JEREMY TAN - 60

1   entered her business and conducted money transfers (money agents know belonged to the

2   CASTRO DTO) never actually set foot in the business.  In this case, of equal importance

3   to the business records are any lack thereof for the DTO's transfers on specific dates.  A

4   search of SOLTERO's residence will ensure agents have the complete universe of

5   SOLTERO's business records, wherever she may store them.  Agents also believe

6   SOLTERO may be in possession of a portion of the DTO's drug proceeds, since she is

7   responsible for a portion of the DTO's money transfers to Mexico.  Based on training and

8   experience, I believe a search of SOLTERO's residence, **31600 126th Ave. SE, Space**

9   **106, Auburn, Washington**, and business, **Soltero's Market Mexican Store, 24202**

10  **104th Ave. SE, Unit 104, Kent, Washington**, is the only way to secure evidence of

11  SOLTERO's involvement in this drug trafficking and money laundering conspiracy since

12  she likely stores at least a portion of her business records or cash at both her residence

13  and business.

14        **e)      Location 5.**  Residence of Jesus Rene SARMIENTO Valenzuela: **10545**

15                **SE 238th St., Unit 8, Kent, Washington.**

16        146.   This was Arturo FRIAS' primary residence, Juan Jose HIGUERA

17  Gonzalez's primary residence, and is currently Jesus SARMIENTO's primary residence.

18  SARMIENTO, FRIAS, and HIGUERA have all worked as low-level drug and money

19  couriers for the CASTRO DTO in Western Washington.  Those couriers and other

20  members of the CASTRO DTO have been seen traveling to and from this residence

21  before and after engaging in drug trafficking activities on numerous occasions.

22        147.   For example on June 28, 2018, between 6:41 p.m. and 6:43 p.m., agents

23  intercepted a series of text messages (Sessions 19 and 21 over TT19) between Allex

24  HUBLY (253-320-6619) and HIGUERA (TT19).  During this text messaging exchange,

25  HUBLY asked HIGUERA, "Hey what time do you think you will be there?" to which

26  HIGUERA replied, "I'll be at your house in 45 mins."  At 7:07 p.m., agents observed

27  **TV3** (driven by HIGUERA at that time) leave from **10545 SE 238th St., Unit 8, Kent,**

28  **Washington**.  At 7:30 p.m. and 7:31 p.m., agents intercepted an additional text

1  messaging exchange (Sessions 23 and 25) between HIGUERA and HUBLY. HUBLY

2  asked HIGUERA how far away he was and HIGUERA said he was ten minutes away.

3  At 7:42 p.m., agents observed **TV3** arrive at 723 18th St. SW, Puyallup, Washington,

4  HUBLY's residence at that time. **TV3** (HIGUERA) was at 723 18th St SW, Puyallup,

5  Washington for about one minute before leaving. Based on the Facebook records

6  described above indicating HUBLY receives heroin from the CASTRO DTO, I believe

7  HIGUERA's short-stay visit at HUBLY's then-residence was a drug transaction.

8     148.   After HIGUERA's brief visit with HUBLY, agents observed **TV3** begin to

9  make several turns in the same direction and change its driving speed, indicating to

10  agents HIGUERA was likely conducting counter surveillance in order to detect any

11  police presence. Through my training and experience, I recognize this kind of behavior

12  associated with someone who has recently conducted a drug delivery. I also know drug

13  traffickers to behave in this manner prior to returning to their residence and/or stash

14  house in order to prevent law enforcement from knowing where they store drugs.

15     149.   This was just one instance where agents observed couriers for the CASTRO

16  DTO traveling to and from **10545 SE 238th St., Unit 8, Kent, Washington**, prior to and

17  following suspected drug transactions. In July 2018, agents watched ROCHA travel to

18  this location in order to resupply HIGUERA with drugs (based on intercepted

19  communications between ROCHA and HIGUERA). Agents physically watched ROCHA

20  carry a plastic bag from his residence in Auburn, into his vehicle, and then drive to **10545**

21  **SE 238th St., Unit 8, Kent, Washington**. Agents watched ROCHA (via physical and

22  electronic means) get out of his car with that same bag and walk into **10545 SE 238th**

23  **St., Unit 8, Kent, Washington**. ROCHA later emerged from **10545 SE 238th St., Unit**

24  **8, Kent, Washington**, without the plastic bag. Based on the intercepted communication

25  and surveillance observations, agents believe ROCHA very clearly delivered drugs to

26  HIGUERA at **10545 SE 238th St., Unit 8, Kent, Washington**.

27     150.   Real-time tracking data for the vehicles operated by CASTRO DTO

28  couriers, like SARMIENTO, HIGUERA and FRIAS, indicates these couriers have

1   stopped at **10545 SE 238th St., Unit 8, Kent, Washington**, over 500 times since the start

2   of the investigation.  Based on Facebook records, physical and electronic surveillance,

3   and intercepted communications, agents believe the low-level couriers for the DTO are

4   storing a portion of the DTO's drugs and drug proceeds at this residence.  This has

5   allowed FRIAS, HIGUERA, and SARMIENTO to be quickly dispatched to drug

6   deliveries by the CASTRO brothers.  Agents intercepted wire and electronic

7   communications over HIGUERA's phone during the summer of 2018, and saw him leave

8   directly from this residence to go to drug transactions, and often times saw him return

9   directly to this residence afterward.  HIGUERA even conducted two drug transactions

10  with the DEA UC in which he left from **10545 SE 238th St., Unit 8, Kent, Washington**,

11  before the deal and returned to **10545 SE 238th St., Unit 8, Kent, Washington**,

12  afterward.  In more recent months, SARMIENTO replaced HIGUERA, but the travel and

13  behavior pattern has remained the same.

14      151.   Agents have seen SARMIENTO (through physical and electronic

15  surveillance) leave **10545 SE 238th St., Unit 8, Kent, Washington**, and travel to

16  suspected drug transactions with Martin GREGORY, Allex HUBLY, Jerry

17  RODRIGUEZ, and others in Pierce County, Washington.  Based on my training and

18  experience, this long, consistent pattern of behavior—across three different couriers—

19  clearly shows this residence is being used to store drugs and drug proceeds.  Based on the

20  length of time SARMIENTO and HIGUERA have been suspected of being couriers for

21  the CASTRO DTO, agents believe evidence of SARMIENTO's drug trafficking

22  activities and the proceeds thereof will be located inside SARMIENTO's home, **10545**

23  **SE 238th St., Unit 8, Kent, Washington**.

24      152.   SARMIENTO appears to have had a March 2018 encounter with CBP in

25  Nogales, Arizona (disposition unknown), but has no other criminal history.

26      **f)**   **Location 6**.  Residence of Jaime HEREDIA Castro and Jose Luis
          SIERRA Barrientos:  **350 S Burlington Blvd., Burlington, Washington**.

27

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

153.   When agents first discovered HEREDIA's involvement in this investigation, he lived at the Olin Fields apartment complex in Everett, Washington. During the summer of 2018, agents intercepted a call between HEREDIA and ROCHA, during which HEREDIA explained how he thought he had discovered a tracking device on his vehicle at that time (a beige Ford pickup truck).  HEREDIA told ROCHA that he had immediately abandoned that vehicle and his residence at the Olin Fields complex. Physical and electronic surveillance of HEREDIA confirmed this information.

154.   Physical and electronic surveillance of HEREDIA after that call showed HEREDIA replaced his pickup truck with a **2002 red Honda Civic bearing Washington license BKS2788**.  WADOL records listed this vehicle as being registered to "Jaime HEREDIA Castro" at "10115 Holly Drive, Apartment B106, Everett, Washington," the address to HEREDIA's previous residence at the Olin Fields apartment complex.

155.   On July 13, 2018, at 6:08 p.m., agents intercepted an incoming call (Session 106 over TT24) from Sillas (TT28) to ROCHA (TT24).  During this call, Sillas told ROCHA to give some instructions to HEREDIA.  According to Sillas, HEREDIA was to travel down to ROCHA's area, at which point ROCHA was to provide HEREDIA with 500 pills.  Immediately following this call, agents intercepted an outgoing call on TT24 (Session 107 over TT24) from ROCHA to HEREDIA (TT25).  During this call, ROCHA conveyed Sillas' instructions to HEREDIA and HEREDIA agreed to travel to ROCHA's location in order to obtain 500 "buttons" (pills).  HEREDIA asked ROCHA to count out "100," and ROCHA said he (ROCHA) could put "the five" into separate bags of 100—just as he had done in the past at HEREDIA's house.  ROCHA then asked HEREDIA how long it would take HEREDIA to be to ROCHA's area and HEREDIA said he thought it would take about an hour and 20 minutes without traffic.

156.   On July 13, 2018, at 6:56 p.m., agents intercepted an outgoing call (Session 109 over TT24) to HIGUERA from ROCHA.  ROCHA asked where HIGUERA was and told him, "It already arrived.  A car and some buttons."  HIGUERA acknowledged and said he was "at home."  ROCHA then told HIGUERA he would come over soon.  Shortly

1  after 7:00 p.m., agents used physical and electronic surveillance to watch ROCHA drive

2  to and stop at **10545 SE 238th St., Unit 8, Kent, Washington**, (HIGUERA's "home,"

3  now occupied by SARMIENTO). I believe the purpose of ROCHA traveling to the

4  previously mentioned address was to resupply HEGUERA with a kilogram of heroin ("a

5  car") and an unknown amount of counterfeit oxycodone pills ("buttons").

6      157.    On July 13, 2018, at 8:05 p.m., agents intercepted an incoming call

7  (Session 120 over TT24) from HEREDIA to ROCHA. During the call, ROCHA told

8  HEREDIA he (ROCHA) was on his way home to drop off the money and pick up the

9  "buttons." ROCHA asked HEREDIA if he (HEREDIA) was "there" (referring to a

10  location the two had previously met at that was closer to ROCHA's house than

11  HEREDIA's), and HEREDIA said he was "there" already. HEREDIA asked ROCHA

12  how long it would take ROCHA to get to HEREDIA's location, just in case HEREDIA

13  "needed to move." ROCHA said he would be able to meet with HEREDIA in twenty

14  minutes, and HEREDIA agreed to wait at that location.

15      158.    True to his word, ROCHA spent a brief amount of time at his apartment

16  and then drove directly to **Soltero's Mexican Market Store, 24202 104th Ave. SE,**

17  **Kent, Washington**. ROCHA arrived at about 8:30 p.m. Just before ROCHA arrived at

18  the market parking lot, agents intercepted an outgoing call on TT24 (Session 127 over

19  TT24) from ROCHA to HEREDIA. During this call, ROCHA asked HEREDIA where

20  he was located in the parking lot. HEREDIA described the vehicle he was parked next to

21  and ROCHA asked if HEREDIA was in the "**red Honda**." HEREDIA affirmed and

22  ROCHA told HEREDIA he would park next to HEREDIA.

23      159.    Special Agent DelVecchio used the mounted surveillance camera at

24  **Soltero's Mexican Market Store, 24202 104th Ave. SE, Kent, Washington,** to watch

25  TV5 drive through the parking lot. Initially, TV5 drove in the opposite direction of

26  HEREDIA's **2002 red Honda Civic bearing Washington license BKS2788** but, after

27  Session 127, ROCHA (TV5) changed positions in the parking lot and moved over to

28  HEREDIA's **red Honda Civic bearing Washington license BKS2788**. Agent

1   DelVecchio watched as TV5 parked on the driver's side of the **red Honda Civic bearing**
2   **Washington license BKS2788**. HEREDIA got out of the **red Honda Civic bearing**
3   **Washington license BKS2788** and got into TV5 as the front passenger. After about one
4   minute, HEREDIA got out of TV5 and got back into his own vehicle. The two vehicles
5   left the parking lot in separate directions.

6       160.    From these intercepted calls and surveillance observations, combined with
7   my training, experience, and specific knowledge of the CASTRO DTO, I believe
8   ROCHA traveled to **Soltero's Mexican Market Store, 24202 104th Ave. SE, Kent,**
9   **Washington**, to meet with HEREDIA in order to give HEREDIA 500 pills—likely pills
10  that are made to look like Oxycodone but are actually made with fentanyl. From this
11  same combination of factors, I believe HEREDIA subsequently went and delivered those
12  pills to customers or distributors of his who were waiting on a resupply. In fact, about an
13  hour after this transaction, at 9:33 p.m., agents intercepted an incoming call (Session 148
14  over TT24) from HEREDIA to ROCHA. During this call, HEREDIA asked ROCHA for
15  "another 500," indicating to agents that HEREDIA had very quickly distributed the 500
16  pills ROCHA had given him at **Soltero's Mexican Market Store, 24202 104th Ave. SE,**
17  **Kent, Washington**, and was asking for 500 more pills. I believe these intercepted calls
18  clearly demonstrate HEREDIA's work as a drug trafficker and his use of the **red Honda**
19  **Civic bearing Washington license BKS2788** to facilitate his drug trafficking activities.

20      161.    Months later, on September 20, 2018, at 4:04 p.m., agents intercepted an
21  incoming call (Session 365 over TT46) to HEREDIA. This call was from a man agents
22  have identified only as "Guerito" based on the context of other intercepted
23  communications. Guerito is a suspected manager/coordinator for the DTO, much like
24  Sillas. During this call, Guerito arranged for HEREDIA to receive a load of drugs and
25  for HEREDIA to pay the load driver who was transporting these drugs $5,000 for his
26  transportation services. Based on the coded language used in the call, agents believe "the
27  guy" (the suspected load driver, whom agents identified as Martin GONZALEZ) was
28  going to bring some "buttons" and "four of the chocolate ones" to HEREDIA. I believe

1  these terms are coded references to an unknown number of pills and four kilograms of

2  heroin, based on my training and experience.

3      162.   Following the call described above (Session 365), on September 20, 2018,

4  at 5:28 p.m., agents intercepted an outgoing call (Session 370 over TT46) to 619-718-

5  0533 (TT63). Agents later identified the user of TT63 as Martin GONZALEZ Jimenez.

6  During this call, HEREDIA and GONZALEZ discussed the particulars about when and

7  where the two would meet, ultimately deciding to meet at a place where the two had met

8  in the past, which HEREDIA indicated was 45 minutes south of Mount Vernon,

9  Washington. HEREDIA even told GONZALEZ "the guy said, he said it was five,"

10  referring to the $5,000 that Guerito had instructed HEREDIA to pay GONZALEZ for the

11  delivery of suspected pills and heroin.

12      163.   Through a law enforcement database, Special Agent Samuel Landis

13  conducted a search of 619-718-0533 (TT63). After then contacting DEA agents in San

14  Diego, Special Agent Landis learned GONZALEZ is employed as a truck driver and uses

15  his tractor-trailer as a means to transport bulk quantities of suspected heroin to Western

16  Washington, specifically, to the Tulalip, Washington area. DEA San Diego also sent

17  agents pictures of GONZALEZ and his suspected vehicles (including a tractor-trailer),

18  which were then disseminated to agents conducting surveillance. Due to the intercepted

19  communications described above and the information provided by DEA San Diego,

20  agents planned to conduct surveillance in the Snohomish County area in anticipation of

21  HEREDIA and GONZALEZ's suspected drug-related meeting.

22      164.   Agents then intercepted two additional calls over TT46 (Sessions 371 and

23  376) between HEREDIA (TT46) and GONZALEZ (TT63). During these calls,

24  GONZALEZ and HEREDIA made plans to meet at a truck stop north of Seattle. Based

25  on HEREDIA's description of his location in Session 370, in conjunction with the

26  communications during Session 371, agents believed HEREDIA and GONZALEZ would

27  likely meet at a truck stop in the Snohomish County area. Agents familiar with Donna's

28  Travel Plaza, the largest truck stop in Snohomish County, have had many past drug-

1   related investigations take place at this location.  From this, agents then began conducting

2   surveillance at Donna's Travel Plaza, Inc. (3104 116th Street NE, Tulalip, Washington)

3   in hopes of observing the meeting between HEREDIA and GONZALEZ.

4          165.   On September 20, 2018, at 9:05p.m., agents conducting surveillance

5   observed HEREDIA arrive at Donna's Travel Plaza in his **red Honda Civic bearing**

6   **Washington license BKS2788**.  At 9:13 p.m., agents intercepted an incoming call

7   (Session 391 over TT46) from GONZALEZ (TT63) to HEREDIA (TT46).  HEREDIA

8   told GONZALEZ he had arrived "at the store" and subsequently described his vehicle as

9   the "red one."  Minutes later, agents physically observed HEREDIA and GONZALEZ

10  meet inside the **red Honda Civic bearing Washington license BKS2788**, during which

11  GONZALEZ brought a large, weighted backpack to HEREDIA.  At approximately 9:23

12  p.m., agents watched GONZALEZ exit the red Honda, carrying the same red and black

13  backpack; however, the bag seemed noticeably lighter when GONZALEZ exited

14  HEREDIA's Honda.  GONZALEZ then walked into the truck stop gas station/restaurant

15  and HEREDIA left the parking lot in his **red Honda Civic bearing Washington license**

16  **BKS2788**.  After HEREDIA left the area, agents watched GONZALEZ get inside a

17  tractor-trailer truck bearing Arizona license plate AH87591.  Arizona DOL records list

18  this vehicle as registered to GONZALEZ.  Based on my training and experience, the

19  intercepted communications described above, agents' observations and the meeting

20  between GONZALEZ (TT63) and HEREDIA (TT46), I believe GONZALEZ delivered

21  four kilograms of heroin and an unknown amount of counterfeit oxycodone pills to

22  HEREDIA on behalf of Guerito, and used his tractor-trailer truck to do so.  After

23  HEREDIA took delivery of these suspected drugs, tracking data for TT46 showed

24  HEREDIA drove directly back to his residence—**350 S Burlington Blvd., Burlington,**

25  **Washington**.

26          166.   HEREDIA still lives at this location based on agents' physical and

27  electronic surveillance observations.  During the course of this investigation, HEREDIA

28  has made numerous drug deliveries directly from **350 S Burlington Blvd., Burlington,**

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  **Washington** to customers such as Michael and Karen SURYAN, and he has used his **red**

2  **Honda Civic bearing Washington license BKS2788** to do so.  Agents believe

3  HEREDIA is likely storing drugs and drug proceeds at **350 S Burlington Blvd.,**

4  **Burlington, Washington**, based on intercepted communications over HEREDIA's

5  phones, physical and electronic surveillance, and their knowledge of HEREDIA's drug

6  trafficking activities.

7       167.    HEREDIA appears to have a 2012 arrest out of Arizona for possession of

8  narcotics for sale (disposition unknown).  SIERRA has no known criminal history.

9       **g)    Location 7.**  Residence of Juan AVILES Berrelleza:  **the La Mirage**
         **Apartments, 11247 SE 258th Pl., Apartment D306, Kent,**
10       **Washington.**

11

12      168.    Based on physical observations and tracking data, I believe AVILES has

13  worked for the CASTRO DTO since at least mid-2018.  ROCHA and AVILES met

14  regularly between June and August 2018, often times for relatively short durations, and

15  most often at AVILES' residence (**the La Mirage Apartments, 11247 SE 258th Pl.,**

16  **Apartment D306, Kent, Washington**).  Additionally, based on physical surveillance

17  observations and tracking data, I know ROCHA and AVILES were both using a 2006 red

18  Ford Ranger (**TV4**) and a 2005 silver Toyota Corolla (**TV5**) during this period.

19      169.    I believe AVILES was one of ROCHA's subordinates in the CASTRO

20  DTO for several reasons.  **TV4** was originally ROCHA's vehicle.  In June, agents noticed

21  ROCHA was no longer parking **TV4** in his assigned parking spot at the apartment

22  complex; instead, he began parking TV5 there.  Around this same time, agents began

23  seeing ROCHA and AVILES interacting with each other more and more, mostly at **the**

24  **La Mirage Apartments, 11247 SE 258th Pl., Apartment D306, Kent, Washington**.

25  Initially, agents believed ROCHA had simply sold or traded **TV4** to AVILES, but noticed

26  ROCHA still used **TV4** occasionally, almost as if he retained authority over the vehicle.

27  ROCHA and AVILES continued to meet up almost daily, and I believe these meetings

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   were in furtherance of the CASTRO DTO's illegal enterprise, based on my training and
2   experience

3       170.    On July 3, 2018, tracking data showed TV5 traveled to **TV4's** location at
4   **the La Mirage Apartments, 11247 SE 258th Pl., Apartment D306, Kent,**
5   **Washington**, and remained there for about 25 minutes before TV5 traveled directly to
6   **Soltero's Market Mexican Store**, a suspected money laundering business used by the
7   CASTRO DTO and other DTOs in Western Washington.  Based on this travel pattern,
8   agents believe ROCHA received cash from AVILES that he (ROCHA) then took to
9   **Soltero's Market Mexican Store** to transfer to his co-conspirators in Mexico.

10       171.    On October 12, 2018, at 9:18 p.m., agents intercepted an outgoing call
11   (Session 1826 over TT51) to AVILES (TT66) from LOPEZ (TT51).  During this call,
12   AVILES asked LOPEZ what he thought of the "churromino," and LOPEZ responded that
13   he had given it to a few people and they said it was very good.  AVILES asked if they
14   had a lot, because he needed some samples for customers that buy "three, four, two, one."
15   LOPEZ asked AVILES to clarify that he was talking ounces, and AVILES affirmed he
16   was.  LOPEZ said he usually got it for "8," and they agreed that AVILES would
17   "sponsor" him (LOPEZ) with something after distributing the samples.  The call ended
18   after LOPEZ agreed to meet up with AVILES to provide the sample.  Based on the coded
19   language used in the call, agents believe "churromino" was heroin LOPEZ had received
20   from an unidentified contact, and that AVILES wanted samples for his redistributors that
21   normally buy between 1-4 ounces.  AVILES said his redistributors get "three, four, two,
22   one" respectively, which agents believe meant AVILES would need 10 total ounces of
23   heroin.  When LOPEZ told AVILES he usually got it for "8," agents believe LOPEZ was
24   saying he could get 10 ounces of heroin for the price of eight.  Agents believe LOPEZ
25   was using the term "sponsor" as a way of asking how much money AVILES is going to
26   give him (LOPEZ) for the deal.

27       172.    Agents intercepted an additional incoming call on October 12, 2018, at 9:22
28   p.m., over TT51 (Session 1827) between LOPEZ (TT51) and AVILES (TT66).  During

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   this call, LOPEZ and AVILES discussed whether the "30's" had arrived already. LOPEZ

2   told AVILES they had not, and asked if he (AVILES) needed some. AVILES responded

3   that he needed 1,000, which LOPEZ acknowledged. AVILES ended the call by telling

4   LOPEZ they would talk soon. Based on the coded language used in the call, agents

5   believe the "30's" are referring to imitation oxycodone pills, and that AVILES wanted to

6   get 1,000 pills from LOPEZ.

7        173.   Real-time tracking data associated with vehicles driven by couriers for the

8   DTO indicates that couriers have stopped at **the La Mirage Apartments, 11247 SE**

9   **258th Pl., Apartment D306, Kent, Washington**, over 600 times during the course of the

10   investigation. As with the other courier's locations discussed thus far in this Affidavit, I

11   believe AVILES is using **the La Mirage Apartments, 11247 SE 258th Pl., Apartment**

12   **D306, Kent, Washington**, in a similar manner, i.e., to store drugs and drug proceeds.

13        174.   Tracking data and physical surveillance shows AVILES does not have a

14   storage unit or additional residence he consistently visits. He occasionally visits the

15   DTO's trailer in Kent (**22025 100th Ave. SE, Kent, Washington**), but not nearly often

16   enough to be utilizing it as a stash location. His travel patterns to and from his residence

17   are more consistent with all of the other couriers involved in this investigation. I believe

18   AVILES is using his own residence, **the La Mirage Apartments, 11247 SE 258th Pl.,**

19   **Apartment D306, Kent, Washington,** as a stash location, just like HIGUERA, FRIAS,

20   SARMIENTO, ROCHA, and LOPEZ have used theirs. Tracking data for AVILES'

21   vehicle has shown he makes frequent short-stay stops at residences and parking lots—just

22   like HIGUERA, SARMIENTO, FRIAS, and other identified couriers for the DTO. After

23   these stops, AVILES often returns directly to his residence (also just like these

24   aforementioned couriers). Agents believe these short-stay stops are drug transactions

25   based on their knowledge of AVILES' position in the DTO, and their training and

26   experience.

27        175.   For instance, AVILES left **the La Mirage Apartments, 11247 SE 258th**

28   **Pl., Apartment D306, Kent, Washington in a beige 2001 Jeep Grand Cherokee**

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   bearing Washington license BKG1931 (TV8) on November 7, 2018, and drove to a

2   nearby parking lot in Kent, Washington.  TV8 remained there for two minutes before

3   departing.  On that same day, AVILES drove TV8 to a residential neighborhood in

4   Auburn, Washington, remained there for seven minutes, and then left; he returned to his

5   residence after this short stop as well.  After these trips, AVILES traveled from his

6   residence to Soltero's Market Mexican Store—again, just like HIGUERA, FRIAS,

7   SARMIENTO, and LOPEZ have done throughout this investigation.  I believe AVILES

8   took drug proceeds he had stored at his residence and delivered them to SOLTERO, at

9   her business, for her to transfer to other members of the DTO in Mexico.

10         176.    Later that same night (around 10:15 p.m.), AVILES left the La Mirage

11  Apartments, 11247 SE 258th Pl., Apartment D306, Kent, Washington in TV8

12  (according to tracking data) and drove all the way to a parking lot in Renton,

13  Washington.  AVILES remained in the parking lot for about fifteen minutes and then

14  returned to the La Mirage Apartments, 11247 SE 258th Pl., Apartment D306, Kent,

15  Washington.  Again, this behavior is consistent with drug trafficking, based on my

16  training and experience.  I believe AVILES took a portion of the drugs he has stored at

17  his residence and delivered to one of his customers at this particular parking lot.  After

18  the deal was completed, I believe AVILES took the proceeds from the transaction back to

19  his residence.

20         177.    Agents recently received a United States Postal Service mail cover

21  response, which showed AVILES is receiving mail at this location.  This did not come as

22  a surprise to agents, since they have seen him at this residence throughout the majority of

23  this investigation.  What *was* surprising was the fact that the mail cover at the La Mirage

24  Apartments, 11247 SE 258th Pl., Apartment D306, Kent, Washington, showed

25  Daniel ROCHA is also receiving mail at this residence.  Agents believe this shared

26  address between ROCHA and AVILES shows the DTO is using the location for more

27  than just housing purposes.  They have trusted this location to receive mail in the true

28  names of two members of the organization—and agents know ROCHA was responsible

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  for managing wholesale distribution quantities of heroin and fentanyl pills for the DTO.

2  Agents believe AVILES is likely storing drugs and/or drug proceeds at **the La Mirage**

3  **Apartments, 11247 SE 258th Pl., Apartment D306, Kent, Washington**, based on

4  intercepted communications, physical and electronic surveillance, and their knowledge of

5  AVILES' suspected drug trafficking activities.

6      178.   AVILES has no known criminal history.

7      **h)**   **Location 8.** Residence of Hector Manuel URIAS Moreno: **428 105th St.**
8           **SW, Everett Washington**

9      179.   On August 30, 2018, agents intercepted an outgoing call (Session 74 over

10  TT43) to Sillas from ROCHA (TT43). During that call, Sillas told ROCHA "Teto"

11  wanted 6,000 pills. Immediately following Session 74, Sillas also provided ROCHA

12  with "Teto's" cellular phone number, 360-429-9060 (TT48). Agents later identified

13  "Teto" as Hector Manuel URIAS Moreno by comparing photographs taken of "Teto"

14  during surveillance to URIAS' WADOL photograph. Based on intercepted

15  communications over TT43, agents know ROCHA successfully delivered 6,000 pills to

16  URIAS, and URIAS paid ROCHA $34,850 in drug money later that same day.

17      180.   On September 12, 2018, Special Agent DelVecchio received authorization

18  from the Honorable David W. Christel, United States Magistrate Judge for the Western

19  District of Washington, to activate real-time tracking of TT48. On September 24, 2018,

20  Task Force Officer (TFO) Anthony Nisco and I followed tracking data for TT48 and

21  simultaneously observed **a black 2007 Kia Rondo bearing Washington license**

22  **BLE9305 (TV7)** at several locations near TT48. Subsequently, TFO Nisco and I

23  identified URIAS as the user of TT48. **TV7** came back registered to URIAS at **428**

24  **105th St. SW, Everett Washington**. Physical surveillance further identified **428 105th**

25  **St. SW, Everett Washington**, as URIAS' residence.

26      181.   On September 24, 2018, United States District Court Judge Ronald B.

27  Leighton (Western District of Washington) signed an Order authorizing the initial

28  interception of wire and electronic communications for TT48. Agents subsequently

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   observed URIAS utilizing **TV7** and TT48 to coordinate and execute drug transactions for
2   the CASTRO DTO during the authorized period of interception.

3       182.    For example, on September 28, 2018, at 8:06 p.m., agents intercepted an
4   outgoing call (Session 531 over TT48) from URIAS to Carlos LOPEZ (TT51), which
5   was right after LOPEZ had received a bulk drug resupply from a suspected bulk drug
6   smuggler, Hector JACOBO Chairez.  During Session 531, URIAS told LOPEZ, "I was
7   told to give you a call to go over there, so you can give me something."  URIAS went on
8   to say he was instructed to, "make the arrangements and get some paste."  LOPEZ
9   sounded slightly confused upon hearing this, but once URIAS clarified by saying, "of the
10  same ones that I get," LOPEZ seemed to understand.  Agents believe URIAS was
11  referring to counterfeit oxycodone pills during this conversation, based on Sillas' past
12  comments to ROCHA (i.e., Session 74 over TT43, referenced above) and physical and
13  electronic surveillance.  URIAS and LOPEZ agreed to meet at a Wal-Mart in Renton,
14  Washington.

15      183.    Agents observed URIAS (**TV7**) arrive at the previously agreed-upon
16  Renton Walmart.  Agents then observed LOPEZ, through physical and electronic
17  surveillance, drive **TV4** to the same Walmart.  After LOPEZ arrived, I observed him exit
18  **TV4** and walk over to **TV7** (URIAS' vehicle), at which point he got into URIAS'
19  passenger seat carrying a bag.  Shortly after, I observed LOPEZ exit **TV7** and return to
20  **TV4**.  Both **TV4** and **TV7** then left the Walmart.  Agents maintained surveillance on
21  **TV7** utilizing physical and electronic means, as it returned to **428 105th St. SW, Everett**
22  **Washington**.  After receiving this suspected drug resupply from LOPEZ, URIAS went
23  on to conduct suspected drug-related deliveries to some of his associates, including
24  Andrew KRISTOVICH and Brian LIVELY, that very same night, based on intercepted
25  communications over his phone (TT48) in conjunction with physical and electronic
26  surveillance.  Further details regarding these deliveries can be found in Sections VII (z)
27  and (ww) of this Affidavit.

28

184.   This was just one occasion where URIAS was observed driving **TV7** to and from the **428 105th St. SW, Everett Washington**, residence.  Real-time tracking data for **TV7** indicates that URIAS has stopped at the **428 105th St. SW, Everett Washington**, residence many times throughout almost every day, since agents installed their court-authorized tracking device on **TV7**, on October 17, 2018.  Agents believe URIAS is likely using **428 105th St. SW, Everett Washington**, in furtherance of his suspected drug trafficking activities based on intercepted communications, physical and electronic surveillance, and my training and experience.

185.   URIAS has no known criminal history.

    **i)**    **Location 9.**  Suspected stash location for Hector Manuel URIAS Moreno: **8503 8th Ave. W, Everett, Washington.**

186.   Throughout September and October 2018, agents watched URIAS conduct numerous suspected drug transactions, many of which were supported by wire and electronic communications interceptions.  Agents watched URIAS frequently travel between his primary residence, **428 105th St. SW, Everett Washington**, and **8503 8th Ave. W, Everett, Washington**.  On many of these occasions, URIAS traveled to **8503 8th Ave. W, Everett, Washington**, before and/or after suspected drug transactions with his distributors.

187.   For example, on September 25, 2018, agents watched URIAS travel to **8503 8th Ave. W, Everett, Washington**, while he was in communication with Andrew Cain KRISTOVICH, one of URIAS' highest-volume pill distributors.  Agents intercepted many calls and text messages between KRISTOVICH and URIAS that day (and several days afterward) regarding some pills URIAS had recently sold to KRISTOVICH that KRISTOVICH believed were of poor quality.  KRISTOVICH was relentless in his attempts to get URIAS to take back his "bad mints" and replace them with good ones.  At 1:35 p.m. on September 25, 2018, agents intercepted an incoming call on TT48 (Session 154), from URIAS' suspected manager in Mexico—someone in a similar position to Sillas.  During this call, URIAS complained that KRISTOVICH was continually trying to

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   contact him about the bad product.  URIAS' suspected manager told URIAS that he was
2   working on a solution to this problem and thought more pills were on their way up to
3   Washington.  URIAS' suspected manager was aware of KRISTOVICH and referred to
4   him as the "thousand guy," indicating to agents that KRISTOVICH likely bought pills
5   from the DTO by the thousands.  In the end, URIAS said he would "bring that back,"
6   which agents believe meant he would take KRISTOVICH's return of the bad pills.  Right
7   before the call ended, URIAS told his suspected manager "I have to go pick up
8   anyways."  Agents believe this was a reference to having to pick up additional drug
9   product from a stash location.

10          188.    Once this call ended, agents used physical and electronic surveillance
11   means to follow URIAS to **8503 8th Ave. W, Everett, Washington**.  This residence
12   looks practically abandoned.  URIAS arrived there at about 1:57 p.m. and remained there
13   until 2:10 p.m.  From my training and experience, I know such short-duration trips to
14   residences that do not appear to be lived in are indicative of drug activity.  I believe
15   URIAS visited **8503 8th Ave. W, Everett, Washington**, on September 25, 2018, in order
16   to see if he had any different pills to give to KRISTOVICH in exchange for the poor
17   quality ones KRISTOVICH wanted to return; hence, URIAS' reference to a "pick up"
18   during the aforementioned conversation with his suspected manager in Mexico.

19          189.    Again, during the course of their investigation into URIAS' activities,
20   agents have seen him access **8503 8th Ave. W, Everett, Washington**, many times and
21   remain there for short durations of time.  Real-time tracking data for **TV7** indicates that
22   URIAS has stopped at **8503 8th Ave. W, Everett, Washington**, more frequently than he
23   has at his own residence since at least October 17, 2018, when agents installed the
24   tracking device on **TV7**.  Agents believe URIAS resides at **428 105th St. SW, Everett**
25   **Washington**, but uses the residence at **8503 8th Ave. W, Everett, Washington**, strictly
26   as a stash location for his drugs and drug proceeds, based on the combination of
27   intercepted communications over URIAS' phone with physical and electronic
28   surveillance.

AFFIDAVIT OF JEREMY TAN - 76

190.   I believe this explains why **TV7**'s tracking data shows more frequent stops at this location. URIAS stays at **428 105th St. SW, Everett Washington**, for longer periods and remains there overnight; thus, agents' tracking data shows fewer stops at this location. URIAS makes more frequent short-stay stops at **8503 8th Ave. W, Everett, Washington**, because he is not *living* at this residence. I believe he is only using **8503 8th Ave. W, Everett, Washington**, to store drugs and potentially drug proceeds; so he travels to this location (and stops here) more frequently because he visiting this site before and after drug deals, i.e., he is traveling here beforehand to obtain his drug product and afterward to deposit any cash or unused drug product he has. My training and experience has shown this is a common method drug traffickers use to secure their drugs and drug proceeds from being stolen by other drug traffickers or located by the police. Maintaining a standalone stash house and a primary residence separates the trafficker (such as URIAS) from his drug stash in the event that law enforcement executes a search warrant on only one of the locations. In one location, officers may find drugs, but no person to associate to those drugs; and in another, they may find the trafficker, but with no corresponding evidence of drug trafficking. I am seeking authorization to search both locations used by URIAS because I believe that is the only way to secure his drugs, drug proceeds, and other evidence of his drug trafficking crimes.

**j)    Location 10.** Residence of Jorge VALENZUELA Armenta: **4416 S 137th St., Tukwila, Washington.**

191.   On October 1, 2018, at 11:37 a.m., agents intercepted an incoming text message (Session 368 over TT51) from Sillas (TT52) to LOPEZ (TT51). Sillas told LOPEZ, "5416565883 that's the one man." LOPEZ replied to Sillas (Session 370 over TT51) by saying "excuse me?", indicating to agents that LOPEZ was unaware of or possibly not understanding what Sillas was referring to in the text message. Then, at 11:42 a.m., agents intercepted an incoming call (Session 373 over TT51) from Sillas (TT52) to LOPEZ. During this call, agents believe Sillas instructed LOPEZ to contact an unknown male—later identified at Jorge VALENZUELA Armenta, as further described

1  below—who was using telephone number 541-656-5883 (TT61). Sillas told LOPEZ

2  "Hey, would you be able to give … uh, is this youngster the one that you gave two

3  thousand buttons the other day?" to which LOPEZ acknowledged he had been familiar

4  with the "youngster." I believe this also indicated LOPEZ had met with this person (the

5  youngster) in the past for a suspected drug transaction that included 2,000 "buttons,"

6  which I know through my training and experience to be a coded reference to counterfeit

7  oxycodone pills. Sillas then told LOPEZ, "And so you take him one thousand five

8  hundred and he's, and he's going to give you some money." I believe Sillas' intention

9  for having LOPEZ contact TT61 (VALENZUELA) was to have LOPEZ orchestrate a

10  meeting with VALENZUELA (TT61) for a suspected drug transaction. Specifically, I

11  believe LOPEZ was supposed to bring VALEZUELA 1,500 "buttons (or counterfeit

12  oxycodone pills) to VALENZUELA in exchange for an unknown amount of money.

13      192.   On October 1, 2018, at 11:44 a.m., agents intercepted an outgoing call

14  (Session 374 over TT51) to VALENZUELA (TT61) from LOPEZ (TT51), in which

15  LOPEZ and VALENZUELA agreed to meet. At about the same time, real-time tracking

16  on LOPEZ's red Ford Ranger (**TV4**) indicated LOPEZ was leaving his residence. Based

17  on agents' training and experience, and their knowledge of this investigation, agents

18  believed the meeting between LOPEZ and VALENZUELA would likely occur at the

19  Auburn Outlet Collection Mall.

20      193.   In anticipation of the meeting between LOPEZ and VALENZUELA, agents

21  began conducting surveillance at the mall, while also monitoring real-time tracking on

22  **TV4**. At 12:30 p.m., agents intercepted an incoming call (Session 378 over TT51) from

23  VALENZUELA (TT61) to LOPEZ (TT51). VALENZUELA told LOPEZ he was at the

24  door. LOPEZ said he was nearby as well. Agents noticed real-time tracking on **TV4** was

25  located in the parking lot near the Burlington clothing store in Auburn, Washington.

26  Agents subsequently located LOPEZ and VALENZUELA, and observed them meeting

27  for what I believe to have been for the suspected 1,500 counterfeit oxycodone pill drug

28  transaction. Following the meeting, agents observed VALENZUELA leave the area in a

1  **grey Volkswagen Jetta**; however, agents were unable to obtain the license plate

2  information at that time.

3      194.    On October 3, 2018, at 1:50 p.m., agents intercepted an incoming call

4  (Session 693 over TT51) from VALENZUELA (TT61) to LOPEZ (TT51).

5  VALENZUELA told LOPEZ he wanted to meet again, to which LOPEZ agreed, but told

6  VALENZUELA, "later would be fine."  At 2:30 p.m., LOPEZ (TT51) sent a text

7  message (Session 694 over TT51) to VALENZUELA (TT61) that included an address of

8  "25633 102nd Pl SE, Kent, WA 98030" (an address to the Azteca Mexican restaurant).

9  Immediately following that text message, agents intercepted an outgoing call (Session

10  969 over TT51) from LOPEZ (TT51) to VALENZUELA.  LOPEZ told VALENZUELA

11  he was free and indicated that he wanted to meet with VALENZUELA at the address he

12  previously sent.  VALENZUELA agreed.

13     195.    At 2:35 p.m., agents intercepted an incoming call (Session 705 over TT51)

14  from Sillas (TT52) to LOPEZ (TT51).  LOPEZ told Sillas, "the button guy called," which

15  I believe to a reference to VALENZUELA, and that he would be meeting him in order to

16  collect a "ticket" for the "last 1,500."  Based on my training and experience and my

17  knowledge of this investigation, I believe LOPEZ told Sillas he was going to meet

18  VALEZUELA in order to collect money—or a "ticket"—VALENZUELA owed from the

19  previous suspected 1,500 pill drug transaction conducted at the Burlington clothing store.

20     196.    At 3:01 p.m., agents intercepted an outgoing call (Session 711 over TT51)

21  to VALENZUELA (TT61) from LOPEZ (TT51).  LOPEZ told VALENZUELA he was

22  on his way to meet him.  VALENZUELA then told LOPEZ he was close by.

23     197.    At 3:10 p.m., agents conducting surveillance observed **a grey Volkswagen**

24  **Jetta bearing Oregon license plate 902KTS** enter the parking lot of the Azteca

25  restaurant.  Agents noticed the vehicle, and the driver of the vehicle, were the same

26  person and vehicle they observed during the above-described meeting at the Burlington

27  store on October 1, 2018.  An Oregon DMV search listed the vehicle as being registered

28  to Jorge VALENZUELA with an address of 515 SW 13th Pl, Apt H-3, Hermiston,

AFFIDAVIT OF JEREMY TAN - 79

1   Oregon. From this, agents then obtained a picture of Jorge VALENZUELA from a law

2   enforcement database. Agents subsequently compared surveillance photos with the photo

3   obtained from the law enforcement database and determined VALENZUELA was indeed

4   the person who met with LOPEZ on October 1, 2018, and was the person meeting

5   LOPEZ on October 3, 2018.

6        198.   Based on my training and experience, the intercepted communications

7   described above and the meetings between LOPEZ and VALENZUELA, I believe

8   LOPEZ delivered VALENZUELA 1,500 counterfeit oxycodone pills on October 1, 2018.

9   Furthermore, I believe LOPEZ and VALENZUELA met again on October 3, 2018, so

10   VALENZUELA could give LOPEZ suspected drug proceeds gathered from the

11   previously mentioned 1,500 pills.

12        199.   From these intercepted communications and surveillance observations,

13   agents obtained court authorization to track VALENZUELA's phone (TT61). Tracking

14   data for TT61 showed VALENZUELA routinely stayed overnight at **4416 S 137th St.,**

15   **Tukwila, Washington**. Agents confirmed the **grey Volkswagen Jetta bearing Oregon**

16   **license plate 902KTS** was regularly at this residence as well. Based on my training and

17   experience, and general knowledge of normal human behavior, I believe VALENZUELA

18   parked his vehicle at this location and his phone remained there overnight because **4416 S**

19   **137th St., Tukwila, Washington** is VALENZUELA's residence.

20        200.   On November 4, 2018, at 5:59 p.m., agents intercepted an outgoing call

21   (Session 51 over TT62) from Oscar CARRILLO to a male, later identified as

22   VALENZUELA, using 253-981-5568 (TT77). CARRILLO told VALENZUELA he was

23   calling on behalf of the "electrician," and needed to pick up some "documents" (i.e., bulk

24   cash/drug proceeds) from VALENZUELA. VALENZUELA asked where CARRILLO

25   was, and CARRILLO said he was downtown. VALENZUELA said he was in Tukwila,

26   and he would send CARRILLO an address. CARRILLO said he did not have a car.

27   VALENZUELA said he would talk to his boss, but doubted anything could be done.

28   Shortly thereafter, VALENZUELA sent a text to CARRILLO asking for his

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   (CARRILLO's) address.  Immediately after that text, CARRILLO sent VALENZUELA

2   (TT77) a text message that included an address of "1214 harrison street, 98109," the

3   same address he sent Edgar CABRERA on October 21, 2018, so CABRERA could meet

4   CARRILLO to give him (CARRILLO) suspected drug-proceeds.

5       201.   At 6:05 p.m., agents intercepted an incoming text (Session 64 over TT62)

6   from VALENZUELA (TT77) to CARRILLO that read, "I'm on my way." About 20

7   minutes later, at 6:23 p.m., agents intercepted an incoming text (Session 71 over TT62)

8   from VALENZUELA (TT77) to CARRILLO that read, "Gray Jetta." Then, at 6:24 p.m.,

9   agents intercepted an incoming text (Session 75 over TT62) from VALENZUELA

10  (TT77) to CARRILLO that read, "I'm arriving now." Based on my training and

11  experience, I believe that CARRILLO received money from VALENZUELA (TT77) on

12  November 4, 2018. I believe CARRILLO's use of the term "documents" was coded

13  language referring to money. I also believe, when VALENZUELA provided his vehicle

14  description as a "grey Jetta" he was referring to his **2005 grey Volkswagen Jetta**

15  **bearing Oregon license 902KTS**. I believe VALENZUELA has used this vehicle to

16  transport drugs and drug proceeds based on intercepted communications and surveillance

17  observations.

18      202.   On November 7, 2018, agents received authorization from the Honorable

19  David W. Christel, United States Magistrate Judge for the Western District of

20  Washington, to activate real-time tracking of TT77.  Agents consistently observed

21  tracking data for TT77 placing the device at **4416 S 137th St., Tukwila, Washington**.

22  On November 15, 2018, agents intercepted several calls between LOPEZ (TT70) and

23  VALENZUELA (TT77). During one of those calls (Session 41), LOPEZ asked

24  VALENZUELA if he was going to return 3,000 pills and VALENZUELA stated that he

25  would explain later.  As a result, agents set out on surveillance of TT77 in order to

26  observe this meeting.  Agents were later able to confirm VALENZUELA as the user of

27  TT77 when agents observed him (VALENZUELA) entering **TV4** in order to conduct a

28  meeting with LOPEZ in the same area tracking data placed TT77. Based on intercepted

1   communications involving LOPEZ, Sillas, and VALENZUELA, as well as my (and other

2   agents') physical and electronic observations of LOPEZ and VALENZUELA's meetings,

3   I believe VALENZUELA is a drug trafficker, more specifically, a high-volume pill

4   redistributor.  Based on physical and electronic surveillance, I believe VALENZUELA

5   resides at **4416 S 137th St., Tukwila, Washington**, and likely stores drugs and drug

6   proceeds at this location.

7       203.    VALENZUELA appears to have been removed from the United States

8   several times by Immigration and Customs Enforcement (ICE) in Phoenix, Arizona, in

9   2004, by Customs and Border Protection (CBP) in Douglas Arizona, in 2005, and by

10   CBP in McAllen, Texas, in 2014.  He also appears to have a felony conviction in 2003

11   for narcotic drug—possession for sale.

12       **k)    Location 11.**  Residence of Michael John and Esther La Rena SCOTT:
13               **8024 150th St. SE, Snohomish, Washington.**

14       204.    Agents first became aware that Michael John SCOTT and Esther La Rena

15   SCOTT were members of the CASTRO DTO as the result of intercepted communications

16   on August 30, 2018, between ROCHA, using TT43 and Esther SCOTT, using TT53.

17   During that conversation, ROCHA and Esther SCOTT spoke in Spanish and agreed to

18   meet at "the office," later identified as **Wired-in Networks, 18421 Highway 99, Suite B,**

19   **Lynnwood, Washington,** in two hours.  Agents believe Esther SCOTT acted as a

20   translator between Michael SCOTT and ROCHA during this conversation.  Later on

21   August 30, during Session 74 over TT43, Sillas instructed ROCHA to bring 5,000 pills to

22   SCOTT on that day ("take five if the guy from the office answers you").  On August 30,

23   2018, agents watched ROCHA and LOPEZ meet with Michael SCOTT at **18421**

24   **Highway 99, Suite B, Lynnwood, Washington.**  ROCHA and LOPEZ drove TV5 to

25   this meeting and Michael SCOTT drove his **black Honda Civic bearing Washington**

26   **license BFZ2558.**

27       205.    From additional intercepted communications between Sillas and ROCHA,

28   and then SCOTT and ROCHA, agents believe SCOTT gave ROCHA $150,000 in drug

1  proceeds on August 30, 2018, at **18421 Highway 99, Suite B, Lynnwood, Washington**,

2  either as payment on a past drug debt or as payment for the 5,000 pills he had just

3  received from ROCHA and LOPEZ.  Specifically, after Sillas asked ROCHA to find out

4  how much money SCOTT, "the office guy," had given him (during an intercepted call

5  over TT43), ROCHA sent a text message to SCOTT that asked how much money

6  SCOTT had given to him and LOPEZ (when they had met at SCOTT's business).

7  Agents intercepted SCOTT's response, in Spanish, as Session 105 on TT43: "one

8  hundred and fifty thousand dollars."

9       206.   After that meeting, agents attempted to conduct physical surveillance of

10  SCOTT in an effort to confirm his residence, and identify additional co-conspirators or

11  other locations that might have been pertinent to the investigation.  SCOTT conducted a

12  number of counter surveillance maneuvers after he left the suspected transaction with

13  ROCHA and LOPEZ.  Agents attempted to maintain surveillance, but decided to

14  discontinue their attempts after SCOTT made multiple suspicious driving maneuvers in

15  his **black Honda sedan bearing Washington license BFZ2558**.  Agents conducted

16  physical surveillance of SCOTT's residence, **8024 150th St. SE, Snohomish,**

17  **Washington**, on several other days in the months that followed and they saw SCOTT's

18  **Honda Civic bearing Washington license BFZ2558** at the residence on those

19  occasions.  Though they did not see Michael SCOTT drive directly back to his residence

20  after conducting the suspected drug transaction with ROCHA and LOPEZ on August 30,

21  2018, agents did see Esther La Rena SCOTT conduct a drug transaction with LOPEZ in

22  October 2018.  On this occasion, agents *were* able to see the clear route of travel between

23  the SCOTTs' business, **Wired-in Networks, 18421 Highway 99, Suite B, Lynnwood,**

24  **Washington**, and their residence, **8024 150th St. SE, Snohomish, Washington**.

25       207.   On October 5, 2018, I observed a meeting between Esther SCOTT and

26  LOPEZ at **Wired-in Networks, 18421 Highway 99, Suite B, Lynnwood, Washington**.

27  Esther SCOTT arrived driving a **silver 2013 Toyota Highlander bearing Washington**

28  **license AQB8456**, registered to the **8024 150th St SE, Snohomish, Washington,**

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  residence.  At around 12:15 p.m., Esther SCOTT entered **18421 Highway 99, Suite B,**

2  **Lynnwood, Washington**, and turned the lights on.  Moments later, LOPEZ arrived at

3  **18421 Highway 99, Suite B, Lynnwood, Washington**, driving **TV4**.  LOPEZ then

4  exited **TV4**, carrying a black Armani Exchange bag, and entered **18421 Highway 99,**

5  **Suite B, Lynnwood, Washington**.  LOPEZ had driven directly from a suspected drug

6  resupply with DTO transporter Ramon PUENTES (where agents saw PUENTES give

7  LOPEZ a large black bag) to this meeting with Esther SCOTT.

8      208.   At 12:28 p.m., while LOPEZ was inside the SCOTT's business, agents

9  intercepted a conversation (over TT51) between LOPEZ and Sillas.  During that call,

10  Sillas instructed LOPEZ to give Esther SCOTT "everything," which agents believe was a

11  reference to all of the drugs LOPEZ had just received from PUENTES.  Based on the size

12  of the bag LOPEZ carried into the business, this was a large amount of drugs.  Sillas then

13  asked LOPEZ how much money Esther SCOTT was giving to LOPEZ.  LOPEZ asked

14  Esther SCOTT and then told Sillas, "142,500."  I believe LOPEZ gave Esther SCOTT all

15  of the drugs, or possibly all of a certain type of drug, he had just received from

16  PUENTES, and Esther SCOTT gave LOPEZ a large sum of cash.  Originally, agents *and*

17  LOPEZ believed Esther had given LOPEZ $142,500.  Based on subsequent (and almost

18  frantic) interceptions over TT51 (LOPEZ's phone), agents believe Esther SCOTT only

19  gave LOPEZ $95,000 instead of $142,000.  This ended up causing quite a commotion

20  among LOPEZ's managers in Mexico.

21      209.   After LOPEZ delivered the drugs and received his cash from Esther

22  SCOTT, LOPEZ exited **18421 Highway 99, Suite B, Lynnwood, Washington**.  He was

23  no longer carrying the black bag he had entered with.  LOPEZ returned to **TV4** and drove

24  away.  Shortly after LOPEZ left, Esther SCOTT exited **18421 Highway 99, Suite B,**

25  **Lynnwood, Washington**, with a pink bag in her hands.  She locked up the business and

26  entered her **2013 silver Toyota Highlander bearing Washington license AQB8456,**

27  and departed **18421 Highway 99, Suite B, Lynnwood, Washington.**

28

1    210.    Agents maintained surveillance on Esther SCOTT and observed her return
2 to her and Michael SCOTT's residence at **8024 150th St. SE, Snohomish, Washington,**
3 after a brief stop at a nearby grocery store.  Based on intercepted communications,
4 tracking data, and physical observations, I believe LOPEZ received a large resupply of
5 drugs from Ramon PUENTES and then brought those drugs to Esther SCOTT at **18421**
6 **Highway 99, Suite B, Lynnwood, Washington**.  There, I believe LOPEZ and Esther
7 SCOTT exchanged drugs and money (though Esther SCOTT did not provide LOPEZ
8 with the correct amount of money).  Once that exchange was made, I believe Esther
9 SCOTT took the drugs she had received from LOPEZ back to **8024 150th St. SE,**
10 **Snohomish, Washington,** using the **2013 silver Toyota Highlander bearing**
11 **Washington license AQB8456.**  Tracking data for **TV3** and **TV4** showed both vehicles
12 traveled to **8024 150th St. SE, Snohomish, Washington** (the SCOTT residence) later
13 that day, at the same time.  I believe LOPEZ (**TV4**) and SARMIENTO (**TV3**) traveled to
14 this location, in tandem, as a way for SARMIENTO to provide security for LOPEZ—
15 since Esther SCOTT had essentially received all of the drugs but had not paid for them.  I
16 believe this series of events clearly demonstrates Michael and Esther SCOTT's use of
17 their business (**Wired In Networks, 18421 Highway 99, Suite B, Lynnwood,**
18 **Washington**) and residence (**8024 150th St. SE, Snohomish, Washington**) to facilitate
19 drug trafficking.

20    211.    Michael SCOTT's criminal history consists of a 2014 VUCSA conviction
21 for manufacture/deliver cocaine (12 months + 1 day prison term).  Esther SCOTT has no
22 known criminal history.

23    l)    **Location 12.**  Business of Michael and Esther SCOTT: **Wired in**
24         **Networks, 18421 Highway 99, Suite B, Lynnwood, Washington.**

25    212.    The SCOTT's use of **Wired in Networks, 18421 Highway 99, Suite B,**
26 **Lynnwood, Washington**, for drug trafficking purposes is discussed above in Subsection
27 (k).  It is the known business location of Michael and Esther SCOTT; Esther SCOTT is
28 the registered owner.  I believe this business is merely a "front" for criminal activity, i.e.,

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  a business that is purposely made to look like it is operating when it actually is not, or a

2  business operating in a certain, typically legal, manner in appearance only, but is truly

3  being used to facilitate or outright commit crimes.  Agents have conducted physical

4  surveillance at **Wired in Networks, 18421 Highway 99, Suite B, Lynnwood,**

5  **Washington**, on multiple occasions and they have never seen the business open other

6  than when members of the CASTRO DTO (such as ROCHA or LOPEZ) travel to the

7  business.  During these visits from ROCHA and LOPEZ, agents have seen Michael and

8  Esther SCOTT first open, then close and lock up the business premises after their

9  suspected drug transactions with ROCHA and LOPEZ have been completed.    In

10  addition to the two instances described above in Subsection (k), agents have observed

11  ROCHA and LOPEZ, through physical and electronic surveillance, make short-stay visits

12  to **Wired in Networks, 18421 Highway 99, Suite B, Lynnwood, Washington**, 13

13  additional times.  I believe, based on my knowledge of this investigation and the two

14  instances described in Subsection (k), that **Wired in Networks, 18421 Highway 99,**

15  **Suite B, Lynnwood, Washington**, is being used for drug trafficking and money

16  laundering (i.e., storing bulk cash drug proceeds), and that evidence of the same will be

17  found inside.

        **m)**    **Location 13.**  Residence of Gerald Keith RIGGINS:  **5824 152nd St. E,**
              **Puyallup, Washington.**

20       213.    On July 2, 2018, at 8:20 p.m., agents intercepted an outgoing call (Session

21  163 over TT19) from HIGUERA (TT19) to ROCHA (TT24).  ROCHA said he was going

22  to see "the guy" (later identified as RIGGINS) right now, at the meeting location, at 8:40

23  p.m.  At approximately 8:30 p.m., agents, via electronic surveillance, were able to

24  observe ROCHA travel to and stop near a Chevron gas station (1402 Outlet Collection

25  Way in Auburn).  At 8:39 p.m., agents then intercepted an incoming call (Session 164

26  over TT19) from ROCHA (TT24) to HIGUERA (TT19). During Session 164, ROCHA

27  told HIGUERA he had already met with "the guy" (RIGGINS).

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    214.    On July 5, 2018, Special Agent Anthony DelVecchio obtained surveillance
2 footage from the Chevron at 1402 Outlet Collection Way from the night of July 2, 2018.
3 On the surveillance footage, at 8:32 p.m., agents saw a black Cadillac XTS bearing WA
4 license BHC6348 (registered to Gerald RIGGINS at **5824 152nd St. E, Puyallup,**
5 **Washington**) arrive at the gas station store entrance.  At 8:33 p.m. (on the surveillance
6 footage), agents observed a black male get out of the Cadillac on the front passenger's
7 side and walk into the store where he bought several items.  The Cadillac then moved to
8 another location in the parking lot, away from the front door of the store.  At 8:34 p.m.
9 (on the surveillance footage), a bald black male got out of the driver's seat of the Cadillac
10 and opened the trunk.  Agents believe was Gerald RIGGINS, based on a comparison with
11 his WADOL photo.  Surveillance cameras then captured RIGGINS as he opened a box in
12 his trunk and emptied it out, then placed a different package/item into the box he had just
13 emptied.
14    215.    Agents suspect the package RIGGINS placed in the box was money
15 ("tickets") for ROCHA, as ROCHA and HIGUERA discussed in Session 164.  At 8:35
16 p.m. (on the surveillance footage), RIGGINS shut the trunk of the Cadillac and returned
17 to the driver's seat with the newly stuffed box in hand.  At 8:37 p.m. (on the surveillance
18 footage), TV5 (ROCHA) appears at the Chevron station.  Agents matched the real-time
19 tracking of TV5 with the Chevron surveillance footage, and confirmed the vehicle's
20 arrival.  TV5 then parked just outside of the gas station boundaries.  Almost immediately
21 upon TV5's arrival, the Cadillac drove out of the parking lot and over to TV5's location.
22 At 8:38 p.m. (on the surveillance footage), the Cadillac parked at a nearby, adjacent
23 parking lot to the Chevron and TV5 parked next to it.  Someone from the Cadillac
24 (believed to be RIGGINS) got into the passenger side of TV5 and then quickly got out.
25 At 8:39 p.m., the Chevron surveillance footage showed TV5 and the Cadillac leaving the
26 area in tandem, which was the same time ROCHA called HIGUERA (Session 164 over
27 TT19) and told him he had just met "the guy," indicating RIGGINS was likely "the guy."
28

1   216.   On July 11, 2018, agents intercepted several text messages between
2   ROCHA (TT24) and RIGGINS, using number 253-999-7313 (TT38).  During those
3   messages, ROCHA and RIGGINS talked about meeting at a Chevron in Auburn,
4   Washington.  Agents believed this proposed meeting was to conduct a drug transaction,
5   based on the previous meeting of RIGGINS and ROCHA at the very same gas station.

6   217.   At 1:26 p.m., on July 11, 2018, agents observed ROCHA, via physical and
7   electronic surveillance, arrive at the Chevron in TV5.  Simultaneously, agents watched
8   RIGGINS pull into the same parking lot while driving **a Harley Davidson motorcycle**
9   **bearing Washington License 3E8988**, registered to RIGGINS.  About a minute later,
10  agents observed TV5 leave the Chevron.  The meeting was so brief that agents do not
11  believe RIGGINS actually got into TV5.  They believe RIGGINS and ROCHA
12  conducted the transaction while RIGGINS stood at the window of TV5.  RIGGINS left
13  the area on his **Harley Davidson motorcycle bearing Washington License 3E8988**;
14  due to traffic restrictions at that time, agents were unable to follow RIGGINS after he left
15  the gas station.

16  218.   About an hour later, ROCHA called Sillas and said "the guy" (RIGGINS)
17  was supposed to give him $7,000 but only gave him $6,750.  ROCHA (at Sillas'
18  direction) texted RIGGINS about the shortage, and RIGGINS replied, "Okay I will give
19  you that over on the next one up on top of the 27."  I believe this pricing structure (adding
20  the $430 to the $27,000 RIGGINS already owed) is consistent with a heroin transaction.
21  I further believe RIGGINS paid $7,000 to ROCHA on July 11, 2018, and still owed
22  ROCHA $27,000, for a total of $34,000, consistent with a debt for a kilogram of heroin.

23  219.   On August 30, 2018, Special Agent DelVecchio received authorization
24  from the Honorable David W. Christel, United States Magistrate Judge for the Western
25  District of Washington, to activate real-time tracking of TT38 (RIGGINS).  In September
26  2018, agents confirmed RIGGINS was the user of TT38 by following TT38's movements
27  and confirming RIGGINS' movements matched those of TT38.  Several vehicles
28  registered to RIGGINS, including **the Harley Davidson motorcycle bearing**

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   **Washington License 3E8988** observed on July 11, 2018, have **5824 152nd St. E,**

2   **Puyallup, Washington,** listed as their registered address.  Tracking data for TT38

3   indicated RIGGINS remained overnight at **5824 152nd St. E, Puyallup, Washington,**

4   almost every evening during the authorized period of tracking.

5       220.    The residence located at **5824 152nd St. E, Puyallup, Washington,** is

6   ideal for a drug trafficker.  A large mechanical gate provides access control at the

7   driveway of the dwelling.  The home is set far back from the road and is blocked from

8   public view by trees and other foliage.  There are also several signs posted at the

9   residence that warn possible trespassers about the various surveillance cameras on the

10  property.  Agents have also observed a silver Cadillac DTS with no rear license plate at

11  this property.  Agents believe this vehicle was the same one they observed on September

12  30, 2018, during a suspected drug transaction between RIGGINS and LOPEZ.

13      221.    On that date, RIGGINS drove a 2008 silver Cadillac DTS with no license

14  plates to a meeting with LOPEZ.  Agents positively identified RIGGINS as the driver of

15  the vehicle on that date.  Surveillance units observed RIGGINS drive to the vicinity of

16  the Panda Express and park.  LOPEZ, in **TV4,** was parked nearby.  Agents were unable

17  to view the meet between LOPEZ and RIGGINS due to traffic, but observed both

18  vehicles depart the area shortly after.  At 4:06 p.m., agents intercepted a call (Session 344

19  over TT51) that talked about RIGGINS paying LOPEZ $24,935.  Agents believe

20  RIGGINS met with LOPEZ to deliver $24,935 to pay off a drug debt.

21      222.    Agents' review of Washington DOL records showed RIGGINS registered a

22  2008 silver Cadillac DTS at the very end of August 2018, and eventually received the

23  license plate BMD8360 for the vehicle.  From my training and experience, I believe this

24  was the same vehicle agents saw at RIGGINS' registered address, **5824 152nd St. E,**

25  **Puyallup, Washington,** and I believe he has used his **Harley Davidson motorcycle**

26  **bearing Washington License 3E8988** and various Cadillac sedans (among other

27  vehicles) to conduct drug transactions.  I believe he uses his residence to store at least a

28  portion of his drugs and drug proceeds, since it is a secure location.

1    223.    RIGGINS' criminal history consists of a 2013 conviction in this District for

2  Distribution of Heroin and Felon in Possession (CR12-207 MJP) with a 35-month (less

3  two days) prison term; a felony drug trafficking conviction in 1999 (34 months prison);

4  two gross misdemeanor convictions for assault 4 (1996 & 1994) resulting in two no

5  contact order violations (2000 & 1997), and multiple DWLS convictions (to include one

6  as an "habitual traffic offender").  He was arrested in 2012 in Oregon for delivery and

7  possession of cocaine (both dismissed), and has a 1991 probation disposition in

8  California for carrying a firearm in a vehicle.

9          n) **Location 14.**  Residence of Julian Gauge ORDONEZ:  **34402 28th Pl. SW,**

10             **Federal Way, Washington,** and

11         o) **Location 15.**  Residence of Julian Gauge ORDONEZ:  **34235 18th Pl. S,**

12            **Federal Way, Washington.**

13    224.    After ROCHA received a resupply of drugs on July 13, 2018, he began to

14  distribute those drugs to other members of the DTO in Western Washington, at Sillas'

15  direction.  At 7:07 p.m., agents intercepted an outgoing call (Session 112 over TT24) to

16  Sillas (TT28) from ROCHA (TT24).  During this call, Sillas and ROCHA sorted out

17  logistics for their suspected pill distribution, after ROCHA had just received LOPEZ's

18  suspected bulk drug delivery.  ROCHA informed Sillas he had recently spoken with

19  Manuel LOYA and told Sillas he (ROCHA) did not have enough pills to accommodate

20  Manuel LOYA's requested pill resupply.  Sillas then told ROCHA they would find a

21  separate drug source of supply to provide pills for LOYA.  However, Sillas then told

22  ROCHA "but, in the meantime, go see 'Cuate' (HIGUERA), 'Carteras' (HEREDIA), and

23  the other guy, the one of the 200 pills," to which ROCHA replied, "… I'll go to Carteras,

24  and from Carteras, I'll go to 'Guero's.'"

25    225.    After agents on surveillance observed ROCHA make both of his suspected

26  pill deliveries to HIGUERA and HEREDIA, at 8:15 p.m., agents intercepted the

27  following outgoing call (Session 126 over TT24) from ROCHA (TT24) to Julian Gauge

28  ORDONEZ (TT40).  At the time of that call, agents did not have ORDONEZ positively

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   identified. They later were able to identify ORDONEZ based on the subsequent events

2   of July 13, 2018, and information obtained by the DEA UC in this investigation. In

3   Session 126, ROCHA told ORDONEZ, "Right now, I'm taking you the blues … 200."

4   From this, agents believe ORDONEZ was "the other guy, the one of the 200 pills" Sillas

5   referred to in his conversation with ROCHA (Session 112), as described above. I believe

6   ROCHA (who in turn referred to "the other guy, the one of the 200 pills" as "Guero")

7   was telling ORDONEZ he was going to bring ORDONEZ 200 counterfeit oxycodone

8   pills made with fentanyl when he said, "… I'm taking you the blues … 200." From my

9   training, experience, and knowledge of this investigation (and others) I know imitation or

10  legitimate oxycodone pills can be blue in color and are often referred to as "blues."

11          226.    At 8:57 p.m., agents on surveillance followed ROCHA to **34402 28th Pl.**

12  **SW, Federal Way, Washington**. After observing ROCHA stop at that address for a

13  couple of minutes and then leave, agents intercepted an outgoing call (Session 134 over

14  TT24) from ROCHA (TT24) to Sillas (TT28). ROCHA told Sillas that ORDONEZ was

15  not answering his phone calls, so he (ROCHA) left. At 9:10 p.m., agents intercepted an

16  outgoing call (Session 145 over TT24) from ROCHA (TT24) to ORDONEZ (TT40),

17  during which ROCHA and ORDONEZ agreed to meet. At 9:14 p.m., agents on

18  surveillance watched ROCHA drive back to **34402 28th Pl. SW, Federal Way**, for what

19  I believe was ROCHA's delivery of 200 pills to ORDONEZ, as mentioned in their

20  previous conversation. After ROCHA's suspected drug delivery, ROCHA told Sillas

21  (Session 150 over TT24) that he was going to "count Guero's [ORDONEZ's] money,"

22  indicating ROCHA had met with ORDONEZ, delivered drugs to him, and received

23  money from ORDONEZ.

24          227.    On August 16, 2018, a DEA undercover agent (UC) purchased 148.3 gross

25  grams (including packaging) of a substance that field-tested positive for the presence of

26  methamphetamine from ORDONEZ, for $1,000, in Federal Way, Washington. Prior to

27  meeting with ORDONEZ, agents gave the UC an electronic recording device. When the

28  UC and ORDONEZ met, ORDONEZ introduced himself to the UC as "Gauge,"

1   ORDONEZ's middle name.  ORDONEZ then spoke to the UC and described the two

2   kinds of methamphetamine he had to offer for purchase.  The first type, which agents

3   believe was in ORDONEZ's truck (a **tan Chevy Silverado bearing Washington license**

4   **C67402H**) or on his person at that time, ORDONEZ described as "baby shards."  The

5   second type he described as "bigger crystals," but said that type was in his house.  The

6   UC decided on the baby shards and ORDONEZ went to his **tan Chevy Silverado**

7   **bearing Washington license C67402H**.  When ORDONEZ returned to the UC with the

8   drugs, the UC negotiated a purchase price of $1,000 for a quarter-pound of suspected

9   methamphetamine.  After the two agreed on the price and completed the transaction, the

10  UC obtained two phone numbers for ORDONEZ (TT40 and TT41).  The UC also learned

11  from ORDONEZ that if he/she needed to buy more methamphetamine, he/she could use

12  TT40 and TT41 interchangeably to contact ORDONEZ for that purpose.  After this

13  transaction, agents followed as ORDONEZ drove his **tan Chevy Silverado bearing**

14  **Washington license C67402H** back to **34402 28th Pl. SW, Federal Way, Washington.**

15        228.   Agents installed a mounted surveillance camera at **34402 28th Pl. SW,**

16  **Federal Way, Washington** and watched ORDONEZ come and go from this residence

17  daily.  Agents then activated real-time tracking on ORDONEZ's phones; this showed

18  ORDONEZ also frequented **34235 18th Pl. S, Federal Way, Washington**.  This tracking

19  more specifically showed ORDONEZ frequently remained at **34235 18th Pl. S, Federal**

20  **Way, Washington** overnight.  From this, agents believe **34235 18th Pl. S, Federal Way,**

21  **Washington** may be a secondary or new residence for ORDONEZ.  During the end of

22  October 2018 and as recently as November 3, 2018, tracking data associated with **TV4**

23  showed the device traveled to **34235 18th Pl. S, Federal Way, Washington** several

24  times and stayed there for short amounts of time on each instance, consistent with drug

25  transactions.  On one such instance, on October 19, 2018, agents traveled to **34235 18th**

26  **Pl. S, Federal Way, Washington** —just after **TV4** had left the residence—and saw

27  ORDONEZ's **tan-colored Chevy Silverado bearing Washington license C67402H**

28  parked at the residence.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

229.    I believe ORDONEZ certainly utilizes both locations to store drugs and drug-proceeds. I believe he is currently residing at **34235 18th Pl. S, Federal Way, Washington**, and using that location to conduct drug transactions with the CASTRO DTO based on physical and electronic surveillance.

230.    ORDONEZ has criminal history in California and Washington, dating back to 2009. In 2016, ORDONEZ was convicted of third degree possession of stolen property and driving under the influence; in 2017, he was convicted of first-degree criminal trespass, second-degree vehicle prowling, and making a false or misleading statement to a public servant. All of these convictions were gross misdemeanors and were in Washington. ORDONEZ was most recently arrested in October 2018 for attempt to elude, hit and run-attended-property damage, possession of a stolen firearm, and theft of a motor vehicle.

p)    **Location 16.** Residence of Monique GREEN: **1020 SW 305th St., Federal Way, Washington.**

231.    Agents identified DTO redistributor Monique GREEN through a combination of telephone tolls analysis and WADOL research. The phone GREEN has used to contact ROCHA is subscribed to "Nikki Green" at the address where public records list Monique GREEN has lived previously. Additionally, internet research identified a Facebook account that positively matches physical surveillance of GREEN and her WADOL driver's license photograph.

232.    On July 14, 2018 agents intercepted several text messages between Sillas (TT28) and ROCHA (TT24). At 4:48 p.m., Sillas messaged (Session 172) ROCHA stating, "Pick up paper is the dark skinned girl." "Dark skinned girl" or "morenita" has been a consistent term used to refer to GREEN. At 4:49 p.m., ROCHA messaged (Session 174) Sillas stating, "Just to pick up paper, are you going to give her anything?" A minute later, Sillas messaged (Session 176) ROCHA stating, "Just paper. It's a little bit, like 3,500." A lone agent went out to conduct surveillance of this meeting of his own accord. That agent observed ROCHA park TV5 in Walmart parking lot in Federal Way

1   before exiting TV5 and entering the Walmart. About fifteen minutes later, ROCHA

2   exited the Walmart, returned to TV5, and left the Walmart. Shortly after GREEN was

3   observed in TV5 with ROCHA. Agents believe ROCHA and GREEN conducted their

4   transaction while GREEN was inside TV5. Once the transaction was completed,

5   ROCHA immediately called Sillas to say he had spotted a suspicious vehicle and

6   described the lone agent's vehicle exactly. Sillas directed ROCHA to get a new phone

7   immediately, and there were no further communications over ROCHA's phone.

8      233.   On August 29, 2018, agents intercepted Sillas asking ROCHA to check up

9   on GREEN because she was going to bring ROCHA a "ticket." On August 30, 2018,

10   ROCHA told Sillas he just met GREEN and she gave him "8" ($8,000); this was part of a

11   series of money pick-ups from DTO redistributors that took place on August 30, 2018, as

12   discussed throughout this Affidavit. ROCHA also told Sillas that he had given GREEN

13   "10 pieces" during Session 180, on August 31, 2018, indicating GREEN had received

14   250 grams of heroin from ROCHA on a prior occasion. A "piece" is a slang term for a

15   25-gram increment of heroin, and is typically only used to refer to that drug. Intercepted

16   communications indicate GREEN typically receives 250 grams of heroin from ROCHA

17   and/or LOPEZ.

18      234.   On August 30, 2018, agents intercepted conversation between ROCHA

19   (TT43) and Sillas (TT33). During that conversation, ROCHA told Sillas that he would

20   be meeting with GREEN later that day. Agents later intercepted text messages between

21   ROCHA (TT43) and GREEN, using phone number 253-431-8583 (TT39). Through

22   those text messages, GREEN negotiated when to meet ROCHA. Agents subsequently

23   observed ROCHA, driving TV5, meet GREEN. Immediately following that meeting,

24   agents intercepted a call between ROCHA and Sillas. During that call ROCHA told

25   Sillas that he met with GREEN and she "gave him 8," believed to be a reference to

26   $8,000. This is just one instance where GREEN arranged to meet with members of the

27   CASTRO DTO that agents observed through physical and electronic surveillance.

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   235. On August 30, 2018, Special Agent DelVecchio received authorization
2 from the Honorable David W. Christel, United States Magistrate Judge for the Western
3 District of Washington, to activate real-time tracking of TT39.  In September 2018,
4 tracking data indicated that GREEN was residing at **1020 SW 305th St., Federal Way,**
5 **Washington**.  Tracking data for TT39 has continuously indicated GREEN remained
6 overnight and (during many days) at **1020 SW 305th St., Federal Way, Washington**.
7 TT39's tracking has also been helpful to agents conducting surveillance of GREEN's
8 suspected drug trafficking activities with the CASTRO DTO.  For example, on
9 September 14, 2018, tracking data showed GREEN left **1020 SW 305th St., Federal**
10 **Way, Washington**, and traveled directly to her meeting with LOPEZ (which was
11 observed by agents on physical surveillance).  On October 10, 2018, after 1:30 p.m.,
12 agents intercepted many communications between GREEN and LOPEZ (over TT51) that
13 indicated the two would soon be meeting to conduct a drug transaction.  TT39's tracking
14 indicated GREEN was at **1020 SW 305th St., Federal Way, Washington**, during many
15 of these communications.  At 5: 42 p.m., GREEN sent the following meeting location to
16 LOPEZ, via text message: "2005 South 320th, 98003."  This is the address to the
17 Commons Mall in Federal Way.

18   236. TT39's tracking indicated GREEN was at **1020 SW 305th St., Federal**
19 **Way, Washington**, during this intercepted communication as well.  In subsequent
20 messages, LOPEZ and GREEN agreed to meet at the mall around 6:45 p.m.  Real-time
21 tracking associated with TT39 indicated GREEN left **1020 SW 305th St., Federal Way,**
22 **Washington**, and traveled to the mall to meet LOPEZ.  Though the two had quite a
23 confusing experience while trying to meet, agents on physical surveillance confirmed
24 GREEN and LOPEZ eventually found each other and met for a suspected drug
25 transaction.  TT39's tracking showed GREEN then traveled back to **1020 SW 305th St.,**
26 **Federal Way, Washington**.  I believe GREEN is storing drugs and drug proceeds at
27 **1020 SW 305th St., Federal Way, Washington**, based on intercepted communications
28 in conjunction with physical and electronic surveillance.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   237.   GREEN's criminal history consists of an infraction for no valid operator's
2   license and DWLS 3.

3       **q)   Location 17.** Residence of Rolando ESPINDOLA Hernandez and Jessica
4           JOHNSON: **314 N 133rd St., Seattle, Washington.**

5   238.   Rolando ESPINDOLA Hernandez and Jessica JOHNSON each maintain a
6   Washington driver's license in their names, which lists their address as **314 N 133rd St.,**
7   **Seattle, Washington.**  Physical and electronic surveillance of several CASTRO DTO
8   members, including LOPEZ, HEREDIA, ROCHA, JOHNSON, and ESPINDOLA, has
9   confirmed this information.

10   239.   When agents first identified Carlos LOPEZ as a member of this
11   organization, they began using physical and electronic surveillance means to follow his
12   movements.  Toward the end of 2017 and the beginning of 2018, agents began to notice
13   LOPEZ's regular trips to **314 N 133rd St., Seattle, Washington**.  Once agents
14   determined LOPEZ (sometimes accompanied by FRIAS) was meeting ESPINDOLA
15   and/or JOHNSON, they checked with their federal, state, and local law enforcement
16   counterparts regarding ESPINDOLA and JOHNSON and learned an HSI agent had
17   identified ESPINDOLA and JOHNSON as money launderers for a number of local drug
18   trafficking groups.  HSI believed ESPINDOLA and JOHNSON were using funnel bank
19   accounts to transfer a portion of the CASTRO DTO's drug proceeds from Washington to
20   Mexico.

21   240.   HSI provided DEA with information that showed ESPINDOLA and
22   JOHNSON's ties to these other organizations, mostly in the form of their making
23   deposits into an array of "funnel" bank accounts.  The sole purpose of a "funnel" account
24   is to rapidly input (or "funnel") large sums of money, usually from a variety of input
25   sources and typically under the $10,000 bank reporting requirement, to one account; then
26   just as rapidly (if not all at once) remove that money from the same account, but in a
27   different location.  In this instance, ESPINDOLA and JOHNSON were two of over a
28   dozen individuals in Washington HSI agents identified who were depositing money into

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  accounts that were mostly at Wells Fargo Bank.  Until recently, Wells Fargo Bank was
2  the only US-based bank that allowed individuals to deposit cash into an account without
3  providing any form of identification.  As the deposits flowed into these Wells Fargo
4  accounts in Washington, similar amounts were withdrawn in Wells Fargo Bank branches
5  in Arizona and California.  HSI and DEA investigations have linked ESPINDOLA,
6  JOHNSON, and others to funnel accounts that have moved tens of millions of dollars.
7  Agents have reviewed bank surveillance footage at a number of branches in Western
8  Washington that showed ESPINDOLA and JOHNSON making cash deposits into these
9  aforementioned funnel accounts.

10      241.    During the end of 2017 and the first quarter of 2018, physical and
11  electronic surveillance of LOPEZ and (eventually) ROCHA showed they both made
12  regular, short-stay trips to **314 N 133rd St., Seattle, Washington**.  Physical and
13  electronic surveillance also showed HEREDIA made frequent trips to **314 N 133rd St.,**
14  **Seattle, Washington**.  Banking records have shown ESPINDOLA and his wife
15  (JOHNSON) made a number of cash deposits into several "funnel" bank accounts
16  identified by financial investigators, and that some of these deposits were made around
17  the same times LOPEZ, ROCHA, and HEREDIA had briefly visited **314 N 133rd St.,**
18  **Seattle, Washington**.

19      242.    A "funnel" account is a bank account that exploits the multiple branch
20  locations of a financial institution.  It involves illegal funds, usually cash, deposited into
21  an account in a geographical location outside of where that account was opened; the
22  deposits are made by individuals with no relationship to the account owner.  The deposits
23  in one location provides immediate access to the money by the account owner, in another
24  location, via withdrawals or bank wires.  To avoid further detection by law enforcement,
25  individual deposits are made in amounts less than $10,000; however, multiple deposits
26  can be made to the same account at different branches or days.

27      243.    On May 8, 2018, Wells Fargo Bank enacted a new policy regarding cash
28  deposits.  Wells Fargo will "only accept cash for deposit when presented by an account

AFFIDAVIT OF JEREMY TAN - 97

1  owner or signer on the Wells Fargo consumer checking or savings deposit account."

2  According to Wells Fargo, they created this policy to reduce criminal activity and protect

3  customer's accounts.

4      244.   Financial records received as a part of this investigation confirm

5  ESPINDOLA resides at **314 N 133rd St., Seattle, Washington**.

6      245.   As stated above, investigators have identified ESPINDOLA as depositing

7  cash to Wells Fargo funnel accounts on numerous occasions during 2016, 2017, and

8  2018.  Surveillance photos have identified both ESPINDOLA and his girlfriend/wife,

9  Jessica JOHNSON, traveling to multiple branches of Wells Fargo on the same day; bank

10  records show both ESPINDOLA and JOHNSON made cash deposits to multiple accounts

11  on those days.

12      246.   Wells Fargo Bank records show ESPINDOLA has made at least 46

13  separate deposits to funnel accounts from July 2016 through February 2018.  JOHNSON

14  has been identified in at least 27 cash deposits between March 2017 and February 5,

15  2018.  ESPINDOLA and/or JOHNSON are identified as the individuals making these

16  deposits through bank surveillance photos or their driver's license information captured

17  at the time of deposit; any other deposits made by either ESPINDOLA or JOHNSON

18  would likely not be discovered by law enforcement if the individual deposit amount was

19  less than $10,000.

20      247.   The following transactions include known deposits by ESPINDOLA from

21  April 2017 to February 2018, into identified funnel accounts:

| Date & Time | Deposit information |
| --- | --- |
| 04/17/17 3:51 p.m. | Rolando Espindola Hernandez deposit to Alejandro Ortiz Reyna Wells Fargo Account 3558 Highlands AU 06936 |
| 04/18/17 1:35 p.m. | Rolando Espindola Hernandez deposit to Rogelio Gonzalez Murillo Wells Fargo Account 2162 Aurora AU 06899 |
| 04/19/17 3:50 p.m. | Either Rolando Espindola Hernandez or Erasmo Olvera Santos deposit to Rogelio Gonzalez Murillo Wells Fargo Account 2162 Highlands AU 06936 |
| 04/25/17 10:07 a.m. | Rolando Espindola Hernandez deposit to Alejandro Ortiz Reyna Wells Fargo Account 3558 Highlands AU 06936 |

| Date & Time | Deposit information |
| --- | --- |
| 05/25/17 2:56 p.m. | Rolando Espindola Hernandez $3,600 cash deposit to Adriana Martinez Wells Fargo Account 9822 Highlands AU 06936 |
| 06/08/17 1:59 p.m. | Rolando Espindola Hernandez $5,000 cash deposit to Juan J Wong Gonzalez Wells Fargo Account 3635883527 Kenmore AU13601 |
| 06/08/17 2:37 p.m. | Rolando Espindola Hernandez $4,000 cash deposit to Joel Wong Gonzalez Wells Fargo Account 2327213407 Seattle AU 6899 |
| 06/09/17 3:54 p.m. | Rolando Espindola Hernandez $1,000 cash deposit to Juan J Wong Gonzalez Wells Fargo Account 3635883527 Highlands AU 06936 |
| 06/10/17 1:54 p.m. | Rolando Espindola Hernandez $6,000 cash deposit to Marcos Alvarado Wells Fargo Account 3802 Edmonds AU 6921 |
| 06/20/17 1:22 p.m. | Rolando Espindola Hernandez $6,000 cash deposit to Rogelio Gutierrez Wells Fargo Account 2750 Lynnwood AU 06962 |
| 07/28/17 3:39 p.m. | Rolando Espindola Hernandez $5,000 cash deposit to Cesar Lazalde Wells Fargo Account 7441 Shoreline AU 6936 |
| 8/9/2017 | Rolando Espindola Hernandez $5,000 cash deposit Angel Valdez Wells Fargo Account 7846902638 to Highlands AU 06936 |
| 08/16/17 1:48 p.m. | Rolando Espindola Hernandez $7,000 cash deposit to Wells Fargo Account 9303 Chelan AU62918 |
| 8/26/2017 | Rolando Espindola Hernandez $5,000 cash deposit to Cesar Lazalde Wells Fargo Account 7441 Edmonds AU 6921 (posted 8/28) |
| 09/02/17 4:36 p.m. | Rolando Espindola Hernandez $5,000 cash deposit to Angel Valdez Wells Fargo Account 7846902638 AU6899 |
| 09/09/17 1:40 p.m. | Rolando Espindola Hernandez $5,000 cash deposit to Jorge Arce Grijalva Wells Fargo Account 8563435604 Seattle AU 6899 |
| 10/11/17 12:32 p.m. | Rolando Espindola Hernandez $5,000 cash deposit to Maria Fernando Bojorquez Wells Fargo Account 7699 Lynnwood AU 06962 |
| 10/11/17 1:23 p.m. | Rolando Espindola Hernandez $5,000 cash deposit to Maria Fernando Bojorquez Wells Fargo Account 2622707988 |
| 10/17/17 1:56 p.m. | Rolando Espindola Hernandez $1,500 cash deposit to Alejandra Duarte Wells Fargo Account 3686530571 Seattle AU 6899 |
| 11/20/17 3:32 p.m. | Rolando Espindola Hernandez $5,000 cash deposit to Eduardo Arturo Azuara Castro Wells Fargo Account 3686999867 Shoreline AU 6936 |
| 12/15/17 11:22 a.m. | Rolando Espindola Hernandez $5,000 cash deposit to Manuel G Servin Wells Fargo Account 2625617234 Lynnwood AU 62946 |
| 12/15/17 11:39 a.m. | Rolando Espindola Hernandez $5,000 cash deposit to Miguel A Guillen Palacios Wells Fargo Account 3594216172 Lynnwood AU 06962 |
| 01/05/18 4:46 p.m. | Rolando Espindola Hernandez $5,000 cash deposit to Mario Bracamonte Wells Fargo Account 6550764093 Seattle AU 1733 |

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

| Date & Time | Deposit information |
|---|---|
| 01/16/18 5:55 p.m. | Rolando Espindola Hernandez $3,000 cash deposit to Mario Bracamonte Wells Fargo Account 6550764093 Federal Way AU 1737 |
| 01/22/18 2:50 a.m. | Rolando Espindola Hernandez $4,000 cash deposit to Manuel G Servin Wells Fargo Account 2625617234 Seattle AU 6899 |
| 01/22/18 2:41 p.m. | Rolando Espindola Hernandez $4,000 cash deposit to Miguel A Guillen Palacios Wells Fargo Account 3594216172 Shoreline AU 6936 |
| 01/30/18 2:28 p.m. | Rolando Espindola Hernandez $2,500 cash deposit to Mario Bracamonte Wells Fargo Account 6550764093 Shoreline AU 6936 |
| 02/08/18 4:25 p.m. | Rolando Espindola Hernandez $4,500 cash deposit to Wells Fargo Account 2623857337 Manuel G Servin Lynnwood AU 62946 |

248.   Financial records showed Jessica JOHNSON also frequently structured cash deposits into Wells Fargo funnel accounts; below are known transactions for JOHNSON during 2017 and 2018:

| Date & Time | Deposit information |
|---|---|
| 3/23/2017 | Jessica Johnson $8,000 cash deposit to Jose Rueda Wells Fargo Account 3341802696 |
| 04/05/17 2:43 p.m. | Jessica Johnson $9,000 cash deposit to Sayda Santillanes Wells Fargo Account 0064 AU1683 |
| 04/06/17 2:34 p.m. | Jessica Johnson $6,500 cash deposit to Cesar J Ruiz Wells Fargo Account 4463 Seattle AU 6899 |
| 04/25/17 11:43 a.m. | Jessica Johnson deposits to Rogelio Gonzalez Murillo Wells Fargo Account 2162 Highlands AU 06936 |
| 04/27/17 3:45 p.m. | Jessica Johnson $5,000 cash deposit to Ernesto Sandoval Wells Fargo Account 5971 Lynnwood AU 06962 |
| 06/08/17 12:48 p.m. | Jessica Johnson $6,000 cash deposit to Juan J Wong Gonzalez Wells Fargo Account 3635883527 Highlands AU 06936 |
| 06/08/17 2:05 p.m. | Jessica Johnson $6,000 cash deposit to Joel Wong Gonzalez Wells Fargo Account 2327213407 Kenmore AU13601 |
| 06/20/17 10:23 a.m. | Jessica Johnson $6,000 cash deposit to Cesar J Ruiz Wells Fargo Account 4463 Seattle AU 6901 |
| 06/20/17 12:39 p.m. | Jessica Johnson $7,000 cash deposit to Mayra Aleman Wells Fargo Account 5731 Seattle AU 2426 |
| 06/20/17 1:35 p.m. | Jessica Johnson cash deposit to Sergio Juarez Martinez Wells Fargo Account 3120 West Lynnwood AU 62950 |
| 08/02/17 2:50 p.m. | Jessica Johnson $7,000 cash deposit to Joel Wong Gonzalez Wells Fargo Account 2327213407 Kenmore AU13601 |

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

| Date & Time | Deposit information |
|---|---|
| 8/9/2017 | Jessica Johnson $7,000 cash deposit to Cesar Lazalde Wells Fargo Account 7441 Aurora AU 06899 |
| 08/11/17 12:59 p.m. | Jessica Johnson $7,000 cash deposit to Eduardo R Quezada Wells Fargo Account 6959 Kenmore AU13601 |
| 09/11/17 12:03 p.m. | Jessica Johnson $5,000 cash deposit to Daniela Lozoya Martinez Wells Fargo Account 3553 Seattle AU 6899 |
| 10/10/17 10:54 a.m. | Jessica Johnson $8,000 cash deposit to Joel Wong Gonzalez Wells Fargo Account 2327213407 Seattle AU 2426 |
| 10/30/17 4:47 p.m. | Jessica Johnson $7,000 Cash deposit to Pedro G Garcia Wells Fargo Account 1035 Shoreline AU 6936 |
| 11/13/17 5:37 p.m. | Jessica Johnson $8,000 cash deposit to Joel Wong Gonzalez Wells Fargo Account 2327213407 Seattle AU 6899 |
| 11/13/17 5:45 p.m. | Jessica Johnson $7,000 cash deposit to Joel Wong Gonzalez Wells Fargo Account 2327213407 Shoreline AU 6936 |
| 11/20/17 3:30 p.m. | Jessica Johnson $6,500 cash deposit to Jesus Manuel Almanza Wells Fargo Account 8372481369 Seattle AU 6901 |
| 11/27/17 2:08 p.m. | Jessica Johnson $7,000 cash deposit to Andree R Robles Wells Fargo Account 7699 Edmonds AU 6921 |
| 11/29/17 4:04 p.m. | Jessica Johnson $5,500 cash deposit to Jose Guadalupe Perales Wells Fargo Account 3729752042 Shoreline AU 6936 |
| 12/05/17 10:26 a.m. | Jessica Johnson $7,000 cash deposit to Jose D Madrigal Wells Fargo Account 1104 Bothell AU 6913 |
| 01/03/18 1:48 p.m. | Jessica Johnson $8,000 cash deposit to Miguel A Guillen Palacios Wells Fargo Account 3594216172 Kent AU 6949 |
| 01/03/18 1:50 p.m. | Jessica Johnson $8,000 cash deposit to Luis G Garcia Wells Fargo Account 9397 Kent AU 6949 |
| 01/22/18 5:51 p.m. | Jessica Johnson $5,500 cash deposit to Miguel A Guillen Palacios Wells Fargo Account 3594216172 Everett AU 6924 |
| 01/23/18 10:53 a.m. | Jessica Johnson $5,500 cash deposit to Manuel G Servin Wells Fargo Account 2625617234 Federal Way AU 1737 |
| 02/05/18 5:17 p.m. | Jessica Johnson $5,000 cash deposit to Cesar Gonzalez Montero Wells Fargo Account 2626407837 Lynnwood AU 62946 |

249.   A comparison of the two tables shows—in addition to JOHNSON and ESPINDOLA structuring cash deposits in amounts of less than $10,000 to avoid triggering reporting requirements—they are also working together to spread those deposits across multiple days, Wells Fargo branch locations, and/or different bank

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   accounts. For example, on April 25, 2017, both JOHNSON and ESPINDOLA made cash

2   deposits at the Highlands Wells Fargo Branch (AU 06936).

3        250.   Further, on June 8, 2017, both JOHNSON and ESPINDOLA made cash

4   deposits totaling $11,000 to two different accounts at the Highlands branch of Wells

5   Fargo. The time of each deposit, 1:59 p.m. and 2:05 p.m., indicates both JOHNSON and

6   ESPINDOLA were likely in the branch together, but making separate deposits to two

7   different Wells Fargo funnel accounts; each of their deposits was less than $10,000 and

8   made to different accounts, therefore not triggering any reporting requirement.

9        251.   Agents have also seen ESPINDOLA conducting suspicious transactions

10  with other people after meeting with DTO members such as HEREDIA, ROCHA, and

11  LOPEZ. Agents believe ESPINDOLA and JOHNSON are coordinating their money

12  laundering efforts with others as an additional way to conceal the source of the funds as

13  well as their involvement in that concealment. For example, on March 20, 2018, agents

14  began a surveillance operation in the afternoon. At about 12:30 p.m., real-time tracking

15  data associated with TV2 showed the vehicle was at LOPEZ's residence at that time, Unit

16  I-101 at the Emerald Pointe Condominiums in Auburn, Washington. From there, GPS

17  tracking showed TV2 traveled directly to **314 N 133rd St., Seattle, Washington**.

18  Special Agent DelVecchio was able to physically follow TV2 for a period just before it

19  arrived at **314 N 133rd St., Seattle, Washington**, and confirmed LOPEZ was the driver

20  of TV2 and ROCHA (then unidentified) was the passenger.

21       252.   Special Agent DelVecchio used physical surveillance means as well as a

22  mounted surveillance camera at **314 N 133rd St., Seattle, Washington** to watch LOPEZ

23  and ROCHA's activities. ESPINDOLA was not actually at the residence when LOPEZ

24  and ROCHA arrived just after 1:20 p.m. Special Agent DelVecchio watched

25  ESPINDOLA arrive at the residence at 1:26 p.m. in a **red Mitsubishi Eclipse bearing**

26  **Washington license AEV9270** (registered to ESPINDOLA's wife, Jessica JOHNSON).

27  ESPINDOLA greeted LOPEZ and ROCHA and the three men went into **314 N 133rd**

28  **St., Seattle, Washington**. Agents saw ESPINDOLA, LOPEZ, and ROCHA walk out of

1    **314 N 133rd St., Seattle, Washington**, a few minutes later.  ESPINDOLA got back into

2    his vehicle and the other two men got into TV2; LOPEZ was once again driving TV2.

3        253.    Special Agent DelVecchio followed both vehicles as they left the residence

4    in the same direction.  At 1:38 p.m., TV2 turned toward Interstate 5 and ESPINDOLA

5    continued onto Westminster Way North and then onto Aurora Avenue North.  SOG

6    Detective Ejde and Special Agent DelVecchio continued to monitor the real-time

7    tracking data for TV2, but Agent DelVecchio physically followed ESPINDOLA.

8        254.    ESPINDOLA drove directly to the parking lot for "La Plaza Latina,"

9    located at 17034 Aurora Avenue North, Shoreline, Washington.  ESPINDOLA parked

10   near a silver Infiniti sedan bearing Washington license BIV2976, registered to Juan G

11   (Gabriel) Herrero Vazquez at 913 North 177th Street, Shoreline, Washington.  Special

12   Agent DelVecchio saw the driver of that sedan and positively identified him as Herrero

13   based on Herrero's WADOL photograph.  ESPINDOLA and Herrero met in the parking

14   lot of the aforementioned business and remained standing by Herrero's vehicle for the

15   duration of Agent DelVecchio's observations.  ESPINDOLA took a small bag out of his

16   **red Mitsubishi Eclipse bearing Washington license AEV9270** and placed it on the

17   trunk lid of Herrero's car.  The two conversed at Herrero's vehicle for some time, with

18   the bag between them, before Herrero took possession of the bag.  Special Agent

19   DelVecchio could not see where, exactly, Herrero put the bag due to traffic conditions at

20   that time, but it looked like he placed it in his Infiniti sedan, behind the driver's seat.

21   Agents believe this was likely either drugs or drug proceeds, based on their training and

22   experience, and knowledge of the CASTRO DTO.  Agents believe ESPINDOLA likely

23   received drug proceeds from ROCHA and LOPEZ, and then transferred a portion of

24   those proceeds to Herrero, for him to launder in addition to ESPINDOLA and

25   JOHNSON's own work.  However, agents did not rule out the possibility that

26   ESPINDOLA requested drugs from LOPEZ and ROCHA—on behalf of Herrero—and

27   then subsequently delivered those drugs to Herrero, once he had received them from

28

1  ROCHA and LOPEZ.  This parking lot exchange between ESPINDOLA and Herrero was

2  indicative of such drug trafficking behavior.

3      255.    As time went on, agents did not see members of the CASTRO DTO travel

4  to **314 N 133rd St., Seattle, Washington**, nearly as much.  HEREDIA still traveled there

5  for short-duration visits from time to time, but LOPEZ and ROCHA almost stopped

6  traveling there altogether.  At first, agents believed there might have been a falling-out

7  between these individuals, but then agents realized Wells Fargo's policy changed around

8  that same time.  In part, the policy change prevented people—such as ESPINDOLA and

9  JOHNSON—from making cash deposits into Wells Fargo bank accounts without

10  providing identification.  I believe this shift in regulations made it impossible for people

11  like ESPINDOLA and JOHNSON anonymously to deposit money into funnel accounts,

12  and it certainly made it more difficult for them to generally deposit money into DTO

13  bank accounts (thereby beginning the laundering process).

14      256.    At the very least, ESPINDOLA, JOHNSON, and other DTO members

15  realized the federal government and US banking system would be able to track

16  individuals making deposits in a way they had not previously.  I believe this changed the

17  DTO's money movement methods.  It was around this same time agents began seeing an

18  uptick in communications between CASTRO DTO members in Western Washington and

19  Gregory WERBER.  After March 2018, HEREDIA and ROCHA were in communication

20  with WERBER when, as far as agents know, they previously were not.  I believe this

21  shift in Wells Fargo's policy pushed ESPINDOLA and JOHNSON out of their money

22  laundering positions with the DTO and allowed WERBER to take a more prominent role,

23  since he was (and still is) using his cryptocurrency business to launder a portion of the

24  DTO's drug proceeds.  The DTO also continues to use the more traditional money

25  movement methods such as wire transfers from small Mexican markets (i.e., Cindy

26  SOLTERO and Orlando BARAJAS' stores) and bulk cash smuggling.  However, I

27  believe that based on ESPINDOLA and JOHNSON's previous money laundering activity

28

AFFIDAVIT OF JEREMY TAN - 104

1 with the CASTRO DTO and others, their residence at **314 N 133rd St., Seattle,**

2 **Washington**, still contains evidence of previous money laundering.

3     257.    ESPINDOLA's criminal history includes a 2004 conviction for Negligent

4 Driving in the First Degree, a 2008 misdemeanor arrest for DWLS, a 2008 arrest for

5 Alien Inadmissibility, a 2010 arrest for Alien Inadmissibility, and a 2010 arrest for

6 Patronizing a Prostitute.  JOHNSON's criminal history includes a misdemeanor arrest for

7 DUI and a misdemeanor conviction for Reckless Driving in 2005, misdemeanor

8 convictions for DUI and refusing a DUI test in 2008, and a 2015 arrest for misdemeanor

9 Reckless Driving and DUI, with no available disposition.

10     **r)**    **Location 18.**  Suspected stash location for Carlos Alejandro CASTRO

11         Perez and Nicolas CISNEROS:  **952 SW Campus Dr., Apartment 26E-**

12         **1, Federal Way, Washington**.

13     Agents identified Carlos Alejandro CASTRO Perez through physical surveillance

14 of him at his listed WADOL residence in Federal Way, and identified him as the user of

15 TT69 based on intercepted communications over TT51 (Carlos LOPEZ) in conjunction

16 with physical and electronic surveillance.  CASTRO appears to both receive drugs from

17 and provide drugs to Carlos LOPEZ.  Carlos CASTRO maintains a Washington driver's

18 license in that name, which lists his address as 952 Southwest Campus Drive, Apartment

19 29E-1, Federal Way, Washington.[6]  Agents have confirmed this is at least one of Carlos

20 CASTRO's residences, based on physical surveillance of CASTRO.  Agents first saw

21 Carlos CASTRO during surveillance of Carlos LOPEZ on October 3, 2018.  That night,

22 agents intercepted communications over LOPEZ's phone (TT51) indicating LOPEZ

23 would likely pick up a pound of crystal methamphetamine from the user of TT69.  After

24 intercepting these communications between TT51 and TT69, agents followed LOPEZ to

25 the **Fox Run Apartments, 34726 2nd Lane S, Federal Way, Washington**.  Agents saw

26 LOPEZ get into **TV9** empty-handed.  LOPEZ exited **TV9** with a brown paper bag a few

27

28 _____

[6] Although WADOL records show CASTRO's apartment as 29E-1, agents on physical surveillance saw CASTRO accessing Apartment 26E-1 and thus believe he resides in Apartment 26E-1.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   minutes later and, based on intercepted communications over TT51, agents believed

2   CASTRO had just supplied LOPEZ with crystal methamphetamine.

3          Carlos CASTRO and LOPEZ met the night after that as well (October 4, 2018),

4   only this time the intercepted communications between TT51 and TT69 indicated

5   CASTRO would be supplying LOPEZ with 2,000 pills and possibly also some

6   methamphetamine or cocaine.  Agents physically watched this meeting, which also took

7   place at the **Fox Run Apartments, 34726 2nd Lane S, Federal Way, Washington**, and

8   in **TV9**, and then followed Carlos CASTRO back to the Glen Park at West Campus

9   apartments located at **952 SW Campus Drive, Federal Way, Washington**.  Due to the

10  parking and traffic constraints in the apartment complex, agents were not able to follow

11  CASTRO directly to his door at that time.  During a subsequent surveillance operation in

12  October 2018, agents observed **TV9** parked near Building 26 of the apartment complex

13  located at **952 SW Campus Drive, Federal Way, Washington**.  On that day, agents

14  observed CASTRO exit the stairwell of Building 26 and enter **TV9**.  Agents believed

15  CASTRO had come from the E-1 apartment based on his movements on the stairwell, but

16  examined some additional data sources to confirm their suspicions.  Agents reviewed

17  utility information for Building 26, which showed Nicolas CISNEROS, a suspected

18  member of the CASTRO DTO and known associate of Carlos CASTRO (one of his most

19  frequent telephone contacts), was the utilities subscriber for **952 SW Campus Dr.,**

20  **Apartment 26E-1, Federal Way, Washington**.  None of the other utilities subscribers at

21  Building 26 had any association to CASTRO.  Based on agents' observations and utilities

22  records, agents believe CASTRO is using **952 SW Campus Dr., Apartment 26E-1,**

23  **Federal Way, Washington** for drug trafficking purposes—in addition to another nearby

24  apartment in Federal Way, Washington.

25         258.   On October 5, 2018, agents intercepted a call between CASTRO, using

26  TT69, and LOPEZ, using TT51.  During that conversation, LOPEZ told CASTRO that

27  the "soda" he received was already out and he (LOPEZ) would need another one.

28

1   LOPEZ and CASTRO also discussed a drug transaction where CASTRO shorted LOPEZ

2   by two grams of an unspecified drug.

3          259.   On October 13, 2018, agents intercepted two calls between CASTRO

4   (TT69) and LOPEZ (TT51).  During that call (Session 1851), LOPEZ told CASTRO that

5   he needed "some of the white one" and CASTRO told LOPEZ to "come over if you're

6   going to come".  During a subsequent call (Session 1900), CASTRO eventually told

7   LOPEZ to meet at the Glen Park apartment to eliminate the threat of police patrols.

8   Agents subsequently observed, through electronic surveillance, LOPEZ (in **TV4**) travel

9   to the Glen Park at West Campus Apartments located at **952 SW Campus Dr., Federal**

10  **Way, Washington**.  LOPEZ remained in the area of the Glen Park Apartments for

11  around one minute before departing the area.  This is only one instance where agents

12  have observed vehicles associated with the CASTRO DTO stop at the **952 SW Campus**

13  **Dr., Federal Way, Washington** apartments.  Tracking data indicates Carlos CASTRO is

14  likely using this residence as a stash house, since real-time tracking of one of his phones

15  (TT69) and one of his vehicles (**TV9**) show he spends the majority of his nights at the

16  **Fox Run Apartments, 34726 2nd Lane S, Unit C40, Federal Way, Washington**.  This

17  same tracking data shows CASTRO stops at **952 SW Campus Dr., Federal Way,**

18  **Washington** frequently, but does not remain there for extended periods.

19         260.   Based on intercepted communications between CASTRO and other

20  members of the CASTRO DTO including those described above, coupled with

21  observations made by agents through physical and electronic surveillance, I believe

22  CASTRO stores drugs and drug proceeds at **952 SW Campus Dr., Apartment 26E-1,**

23  **Federal Way, Washington**.

24         261.   CASTRO's criminal history consists of a January 2017 arrest for assault

25  and malicious mischief; no charges were filed.

26

27

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

     **s)**    **Location 19.**  Residence of Carlos Alejandro CASTRO Perez:  **Fox Run Apartments, 34726 2nd Ln. S, Unit C40, Federal Way, Washington.**

262.    Agents first became aware of CASTRO's residence at **34726 2nd Ln. S, Unit C40, Federal Way, Washington,** in October 2018 as the result of intercepted calls between CASTRO (TT69) and LOPEZ (TT51).  As described above in Subsection (r), agents saw two drug transactions, one on October 3 and one on October 4, 2018, take place between CASTRO and LOPEZ in the parking lot at **34726 2nd Ln. S, Federal Way, Washington.**

263.    Real-time tracking data for vehicles used by couriers for the CASTRO DTO indicates that couriers have stopped over 15 times at **34726 2nd Ln. S, Unit C40, Federal Way, Washington,** during the past three months.  Real-time tracking data associated with CASTRO's phone (TT69) has consistently shown the device remains overnight at **34726 2nd Ln. S, Unit C40, Federal Way, Washington.**  Agents on physical surveillance have seen CASTRO enter **Unit C40** using a key, and they have seen him come and go from this residence multiple times.

264.    Agents received authorization to intercept wire and electronic communications over Carlos CASTRO's phone (TT69) on November 14, 2018, and activated that intercept on that same day.  During the evening of November 14, agents intercepted communications over TT69, in which one of CASTRO's suspected redistributors requested at least a pound of crystal methamphetamine and a half-kilogram of heroin (using coded language).  The two agreed to conduct this transaction the next day, November 15, 2018, around 1:00 p.m.  Tracking data for TT69 showed CASTRO was at **34726 2nd Ln. S, Federal Way, Washington,** in the area of **Unit C40** during the time of these communications.

265.    After this call, agents intercepted an outgoing call on TT69 (Session 37), from CASTRO to CABRERA (on TT74).  During this call, CASTRO asked if he could meet with CABRERA early on November 15, 2018.  CABRERA asked him what the meeting was for and CASTRO said it was for "a cuadernito," which, based on the

1  training and experience of agents and DEA-contracted linguists, is a coded reference for a
2  pound. CABRERA then asked if CASTRO was asking for a pound of crystal
3  methamphetamine or something else ("of white paint?"). CASTRO confirmed he wanted
4  methamphetamine, and asked that the delivery be before one o'clock or around twelve in
5  the afternoon—which made sense, since he had made prior arrangements with his
6  suspected redistributor to deliver the drugs to that person around 1:00 p.m. CABRERA
7  told CASTRO he could make the delivery at any time and the two agreed to speak again
8  on November 15, 2018.

9          266.    On November 15, 2018, agents established physical surveillance on
10  CASTRO in the morning. As far as agents can tell, CASTRO has two vehicles he uses to
11  conduct his drug trafficking activities: **TV9** and **a 2012 white Hyundai Accent bearing**
12  **California license 7CQD771 (TV10)**. Agents located both of those vehicles on that
13  morning, at residences associated to CASTRO (**952 SW Campus Dr., Apartment 26E-**
14  **1, Federal Way, Washington**, and **34726 2nd Ln. S, Unit C40, Federal Way,**
15  **Washington**). At 11:36 a.m., agents intercepted an outgoing call on TT69 (Session 40)
16  to CABRERA (on TT74). During this call, CASTRO told CABRERA that he wanted to
17  meet in an hour at the Ross located at 13201 Aurora Avenue North, in Seattle. The two
18  agreed to meet and CABRERA told CASTRO to call him once he was fifteen minutes
19  away from the meeting location.

20          267.    About five minutes this call, agents saw two Hispanic males exit
21  CASTRO's apartment at **952 SW Campus Dr., Apartment 26E-1, Federal Way,**
22  **Washington**. Agents identified one of these males as CASTRO, but have not yet
23  identified the other. Agents believe the other Hispanic male is one of CASTRO's
24  couriers. This unidentified Hispanic male got into **TV9** and drove directly to the
25  aforementioned Ross store in Seattle.

26          268.    Once **TV9** arrived at the Ross store, agents watched CASTRO's suspected
27  courier get out of the vehicle and walk into the store. Agents noticed TT69's tracking
28  data showed CASTRO had not actually left Federal Way, Washington, indicating he had

1  not traveled with the courier to make this pick up.  Tracking data actually showed

2  CASTRO remained at **34726 2nd Ln. S, Unit C40, Federal Way, Washington.**

3       269.   Agents CASTRO's suspected courier make a phone call as he was entering

4  the store and agents believe this call was to CASTRO, on a different phone number from

5  TT69. Agents believe the suspected courier had specifically called CASTRO because,

6  only moments after they saw him make a short phone call, agents intercepted an outgoing

7  call on TT69 (Session 44) from CASTRO to CABRERA (TT74).  This call was

8  intercepted at 12:36 p.m.  During this call, CASTRO told CABRERA, "*we* are already at

9  Ross."  This indicated to agents that CASTRO was in possession of TT69 (which was in

10  Federal Way), so he could not possibly be at the Ross store in Seattle; and when he

11  referred to "we," he actually meant "his worker" who *was* present at the store.

12  CABRERA said he would be to the Ross in five minutes.

13       270.   CABRERA arrived at the Ross parking lot less than ten minutes later, in his

14  **grey Toyota Camry displaying Washington license plate BKD8497 (TV14).**

15  CASTRO's courier came out of the Ross store a few minutes later and got into **TV9**.

16  Agents believed the two were about to meet.  Instead, agents intercepted an outgoing call

17  (Session 51 on TT69) from CASTRO to CABRERA (TT74).  At the time of this call,

18  linguists could not clearly hear what was being said on the call, due to background noise

19  and technical glitches.  Once these issues were at least partially resolved, the content of

20  Session 51 provided agents with some insight into the events that unfolded afterward.

21  During this call, CASTRO told CABRERA that his worker (the Hispanic male in **TV9**)

22  had spotted surveillance personnel at the Ross store parking lot, and suggested the two

23  change their meeting location to the nearby Las Margaritas restaurant.  CABRERA

24  agreed and the call ended.

25       271.   Agents on surveillance watched CABRERA and CASTRO's courier do

26  exactly what had been discussed.  CABRERA drove out of the Ross parking lot and

27  moved to the restaurant parking lot.  Agents attempted to covertly follow this movement,

28  but were unsuccessful.  At 1:04 p.m., (two minutes after agents had intercepted Session

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1 51) agents intercepted Session 62 over TT69—another call from CASTRO to CABRERA

2 (TT74).  During this call, CASTRO told CABRERA that his worker had seen people

3 following him and CABRERA.  CASTRO said he worker did not feel comfortable doing

4 the transaction with CABRERA based on what he had seen at the Ross parking lot and

5 restaurant parking lot.  CASTRO and CABRERA agreed to wait and do the drug deal

6 later.  Before the call ended, CABRERA told CASTRO, "I'm going to change my

7 number today…"  CASTRO asked him to send the phone number to CASTRO once he

8 had changed it.  Clearly, agents had been spotted on surveillance.

9  272. At this point, CASTRO's courier drove to a nearby QFC grocery store

10 parking lot and agents stopped conducting surveillance of CASTRO and CABRERA.

11 From this call, it is very clear that CABRERA, CASTRO, and CASTRO's courier are all

12 adept at counter surveillance.  They detected covert police surveillance quite easily, and

13 then took the necessary precautions to make sure they were not followed (changing the

14 meeting location) and would not be followed in the future (changing their phone

15 numbers).  Minutes after Session 62 was intercepted, agents intercepted another outgoing

16 call on TT69 (Session 67), from CASTRO to CABRERA (TT74).

17  273. During this call, CASTRO said his courier was going to wait and see if he

18 was being followed.  CASTRO posited that it all might be in his courier's imagination,

19 but CABRERA assured him that there were certainly suspicious vehicles in the parking

20 lot at Ross—namely, a truck that was driving around and then parked in a strange way.

21 This matched the description of one of the surveillance vehicles that was attempting to

22 conduct covert surveillance of the meeting between CASTRO's worker and CABRERA

23 that day.  CASTRO said his courier would wait an hour and see if he was still being

24 followed, if not, then they could proceed with their transaction at that time.  CABRERA

25 agreed.

26  274. CABRERA also suggested they switch their communications over to

27 WhatsApp, rather than using traditional means.  CASTRO pointed out that WhatsApp is

28 more complicated and it is better to use a basic phone (one that does not have

1   applications) since it cannot be tracked like a smart phone can. CASTRO said he only
2   carries basic phones for that reason and those are the phones he uses for drug trafficking,
3   but he has a smart phone for personal things. The two agreed to meet in an hour if
4   everything looked okay and CABRERA said he would send his new phone number to
5   CASTRO.

6       275.    Real time tracking of TT74 showed CABRERA went to a Metro PCS store
7   located at 13027 Aurora Avenue North, Seattle, Washington just after 1:30 p.m. About
8   ten minutes later, at 1:43 p.m., agents intercepted an incoming text message from
9   CABRERA on TT74. This text message was intercepted as Session 68 and read,
10  "2067751821 nuevo numero" [new number]. These are the digits to TT84. From this
11  text message, agents believed CABRERA had sent CASTRO his new phone number
12  (TT84) just as he said he would in previous sessions. Based on TT74's tracking data at
13  about that same time, agents believe CABRERA traveled right to a Metro PCS store (a
14  subsidiary of T-Mobile) and obtained a new phone after talking about doing that very
15  thing with CASTRO.

16      276.    TT84 is a cellular phone with service provided by T-Mobile, subscribed to
17  Ramiro Ortega at 13530 Linden Avenue North, Seattle, Washington. T-Mobile's records
18  show this device was activated on November 15, 2018, consistent with CABRERA's text
19  message to CASTRO and the real-time tracking of TT74. Agents later reviewed the
20  video surveillance footage from that same Metro PCS location around the time
21  CABRERA was suspected to have visited the store. Sure enough, the footage showed
22  CABRERA in the store and it looked like he purchased a phone or conducted some type
23  of transaction at the store counter—once again consistent with his statements and
24  messages to CASTRO on TT69.

25      277.    At 1:44 p.m. on that same day, agents intercepted an outgoing call (Session
26  71 on TT69) from CASTRO (TT69) to the user of TT84. During that call, CASTRO
27  continued the previous conversation he was having with CABRERA, about the
28  suspicious trucks that were following CASTRO's courier and CABRERA. DEA-

AFFIDAVIT OF JEREMY TAN - 112

1    contracted linguists immediately recognized CABRERA's voice as the user of TT84.
2    During the call, CASTRO told CABRERA that he thought his worker had just gotten
3    scared. CASTRO said this in a way that conveyed he thought his worker was paranoid.
4    CABRERA told CASTRO that he also thought the truck in the parking lot was "really
5    weird" because it was "going around and around, all weird." From this call, agents
6    believed CABRERA was very serious about immediately changing his phone due to
7    police surveillance detection, and had done so less than an hour after the incident.
8    Clearly, CABRERA takes his tradecraft very seriously and does not take any risks when
9    it comes to his drug trafficking enterprise.

10        278.   At about 6:00 p.m. on November 15, TT74 stopped transmitting real-time
11   tracking data. Instead, it showed the result code "Absent Subscriber." This typically
12   means the user of a particular device is either out of the country, the phone is powered
13   off, or the device has been deactivated. Given the intercepted calls over TT69, agents
14   believed TT74 had clearly been deactivated. Based on subsequent physical surveillance
15   and intercepted communications over TT69, agents believe CASTRO's courier returned
16   to **34726 2nd Ln. S, Unit C40, Federal Way, Washington**. Based on my knowledge of
17   drug traffickers, I believe he likely returned the money he was supposed to give to
18   CABRERA in exchange for CABRERA's crystal methamphetamine, to CASTRO.

19        279.   Based on intercepted communications between CASTRO and other
20   members of the CASTRO DTO, coupled with observations made by agents through
21   physical and electronic surveillance, I believe CASTRO conducts his drug trafficking
22   coordination from this location and likely stores drugs and drug proceeds at **34726 2nd**
23   **Ln. S, Unit C40, Federal Way, Washington** as well, since agents watched him conduct
24   at least two drug transactions with LOPEZ at this very apartment complex.

25        t)     **Location 20.** Residence of Emmanuel REYES Perez: **2136 S 260th St.,**
26               **Apartment CC-201, Des Moines, Washington.**

27        280.   On August 30, 2018, at 3:02 p.m., agents intercepted an incoming call to
28   ROCHA on TT43 (Session 122), from 206-231-1862 (TT49). During this call, the male

1  using 206-231-1862 (later identified as REYES as further described below) spoke with

2  ROCHA, and ROCHA told REYES, "I'm calling on Perraca's behalf." ROCHA also

3  referred to picking up a "ticket" [cash drug proceeds] in this call. REYES (TT49) told

4  ROCHA he was located in Kent, Washington, and ROCHA told REYES he was located

5  in Auburn, Washington. The two agreed to meet and to speak further over WhatsApp;

6  REYES additionally told ROCHA he would send him an address over WhatsApp where

7  they could meet.

8      281.   Agents did not intercept any further communications between ROCHA and

9  REYES (TT49), likely because they moved their communications to WhatsApp. I

10 believe ROCHA needed to pick up drug money (or a "ticket") from REYES; hence, the

11 reason ROCHA told REYES he was calling to "pick up a ticket." I believe REYES

12 (TT49) is another drug distributor for the CASTRO DTO in Western Washington. In this

13 instance, I believe ROCHA was calling REYES (TT49) to collect the money owed from

14 ROCHA's prior delivery of high-quality heroin (or "perraca") to REYES.

15     282.   A few minutes after this call with REYES (TT49) on August 30, 2018,

16 agents intercepted another incoming call on TT43 (Session 123), from Sillas (TT33).

17 During this call, ROCHA discussed his upcoming travel plans with Sillas. ROCHA told

18 Sillas he was going to meet with REYES (or "the youngster"), then he was going to meet

19 with Monique GREEN (or "La Morena"), and that both meetings were for suspected drug

20 money pickups ("count that and what the youngster gave me"). ROCHA also told Sillas

21 he and Carlos LOPEZ were going to get a phone (or "calculator") for LOPEZ. TT43's

22 real-time tracking indicated ROCHA (and presumably Carlos LOPEZ) traveled from

23 Auburn to Kent, and went to a Fred Meyer grocery store parking lot in Kent, Washington.

24 I believe the purpose of this trip was for ROCHA and LOPEZ to meet with REYES

25 (TT49). Unfortunately, agents on physical surveillance were not able to observe the

26 meeting between ROCHA, LOPEZ, and REYES (TT49). Agents wanted to maintain the

27 clandestine nature of their surveillance efforts on ROCHA and LOPEZ, so they relied

28 more heavily on TT43's real-time tracking rather than closely maintaining physical

1   surveillance throughout that day.  Unfortunately, after this call with Sillas, agents

2   experienced some technical malfunctions with TT43's tracking data and fell too far

3   behind ROCHA's actual position.  Traffic conditions at that time and the fact that

4   ROCHA and REYES discussed the specifics of their meeting over WhatsApp, rather than

5   traditional wire/electronic communications methods, further exacerbated these

6   surveillance difficulties.

7        283.   Later that same day (August 30), at 4:51 p.m., agents intercepted an

8   incoming call on TT43, Session 127, from Sillas (on TT33).  During this call, ROCHA

9   told Sillas he had already met with REYES (referred to as "the youngster") and REYES

10  had given ROCHA money.  Sillas told ROCHA, "The youngster should have given you

11  thirty-seven.  Did he tell you?"  ROCHA replied, "He gave me thirty-six, he said."  Sillas

12  asked if REYES had specifically told ROCHA that information and ROCHA replied,

13  "Yes, he told me that it was thirty-six."  ROCHA then checked this information with

14  Carlos LOPEZ and could be overheard asking, "Thirty-six, he said?"  Then ROCHA

15  continued to speak with Sillas, saying, "Yes, because it was thirty-six, I haven't counted

16  it, I still need to go count it."  Here, I believe ROCHA and Sillas were discussing the

17  drug money ROCHA and Carlos LOPEZ had just picked up from REYES.  From this

18  conversation, ROCHA could have been referring to either $3,600 or $36,000 of cash he

19  received from REYES.  Based on my training and experience, $3,600 would likely mean

20  ROCHA had sold 100 grams of heroin to REYES at a price of $900 per 25-gram

21  increment; $36,000 would likely mean ROCHA sold REYES a kilogram of high-quality

22  heroin.

23       284.   I believe this "36" refers to $36,000 for a kilogram of heroin for several

24  reasons.  I do not believe it would take ROCHA and LOPEZ very long to count $3,600,

25  yet, by the time of Session 127 (almost an hour after ROCHA and LOPEZ met with

26  REYES), ROCHA told Sillas he still had to count the money REYES had given him.

27  This indicates to me there was probably a significant amount of money to be counted

28  (i.e., $36,000 rather than $3,600).  The DEA-contracted linguists also told me "El

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  Perraca" (the word ROCHA used in Session 122 to tell UM1862 who he was calling on

2  behalf of) literally means "bad-ass dog," and could refer either to someone's nickname or

3  to some very high quality drugs.  Based on my training and experience, I know the price

4  of a kilogram of heroin can range anywhere from $25,000 to almost $40,000 per

5  kilogram depending on the quantity of heroin purchased at one time and the quality of the

6  heroin itself.  If "El Perraca" is, in fact, a reference to some "bad-ass" or extremely high-

7  grade heroin, it is likely to be on the higher end of the pricing spectrum.  This would

8  mean $36,000 *is* a reasonable price for such a product, particularly if REYES is buying

9  one kilogram of heroin at a time.

10       285.   On the next day (August 31, 2018), the Honorable David W. Christel,

11  United States Magistrate Judge for the Western District of Washington, authorized the

12  execution of a delayed-notice search and seizure warrant for drugs, cash, and firearms at

13  ROCHA's then-residence in Auburn (31900 104th Avenue Southeast, Unit I-101).

14  Agents executed this warrant on August 31, 2018, while ROCHA was not at his

15  residence.  Agents recovered 560 grams of suspected marijuana, 41 grams of suspected

16  crystal methamphetamine, 950 net grams of heroin, an estimated 2,000 to 4,000 pills, and

17  $164,116.00 in cash drug proceeds.  Due to potential fentanyl contamination with these

18  drugs, agents did not unwrap or field-test any of these substances.  The DEA WRL later

19  confirmed the net weight of the heroin, and conducted a random, representative sampling

20  of the pills.  In the sample, chemists confirmed the presence of 370 net grams of a

21  substance containing fentanyl.  The word "PERRACA" was written on one of the

22  packages of heroin agents recovered, the same name ROCHA referenced to REYES in

23  Session 122 described above.

24       286.   On September 12, 2018, the Honorable David W. Christel, United States

25  District Court Judge for the Western District of Washington, authorized the activation of

26  real-time tracking of TT49 (REYES).  On October 5, 2018, agents set out on surveillance

27  on REYES in order to identify him as the user of TT49.  In the morning of October 5,

28  2018, real-time tracking data for TT49 placed the device at the Saddlebrook Apartments

1   located at **2136 S 260th St., Des Moines, Washington**.  At 3:55 p.m., agents followed

2   REYES to a restaurant located at 24817 Pacific Highway S. #206 in Kent.  Shortly after

3   REYES entered the restaurant, agents followed him inside and discovered REYES was

4   an employee at this restaurant.  Agents subsequently approached REYES and identified

5   themselves as police who were looking for a wanted person.  REYES provided agents

6   with his Mexican voting card, which listed his name as "Emmanuel Reyes Perez" and

7   listed his address as "Loc Charco Largo 81148, Guasave, Sinaloa."  Based on this,

8   physical and electronic surveillance, and the fact that TT49 is subscribed to Emmanuel

9   REYES, agents believe REYES was indeed the user of TT49.  Afterwards, agents were

10   able to follow REYES back to the Saddlebrook Apartments, **2136 S 260th St., Des**

11   **Moines, Washington**.

12       287.   On October 31, 2018, Sgt. Duane Dobbins observed REYES walk from the

13   second level of the CC building in the Saddlebrook Apartment complex, near where

14   apartment 201 is located.  On separate occasions, agents were only able to see PEREZ

15   walk to the CC building of the apartment complex.  Agents later obtained information

16   about the utilities subscribers in Building CC and learned Anayancy Reyes was the

17   utilities subscriber for Apartment CC-201.  Agents believe this is REYES' mother or

18   older relative based on open source database searches.  Based on agents' observations of

19   REYES appearing to exit the second level of the CC building, in conjunction with the

20   many other occasions agents have observed REYES at Building CC and the last name of

21   the person listed on the subpoenaed materials matching REYES last name, I believe

22   REYES lives in **Apartment CC-201 at 2136 S 260th St., Des Moines, Washington**.

23       288.   According to tracker data analysis, HIGUERA, ROCHA, LOPEZ and/or

24   SARMIENTO have all traveled REYES' place of employment and/or his residence (**2136**

25   **S 260th St., Des Moines, Washington**), for short visits on numerous occasions

26   throughout this investigation.  Additionally, for the majority of these occasions—during

27   the authorized period of real-time tracking on TT49—TT49 has been present for each of

28   these short stay visits.  From this, I believe REYES met with members of the CASTRO

1    DTO during these short stay visits at **2136 S 260th St., Apartment CC-201, Des**
2    **Moines, Washington**, for the purpose of purchasing drugs and/or delivering drug-
3    proceed to the DTO. For example, on October 19, 2018, at 9:59 p.m., tracking data
4    showed **TV3** stop at REYES' place of employment for a brief visit. During that same
5    time, real-time tracking data on TT49 showed REYES also present at the restaurant.
6    Unfortunately, agents have only intercepted REYES one time during the span of our
7    authorized periods of wire and electronic communications; however, I believe this was
8    because REYES had been communicating with other members of the CASTRO DTO
9    through WhatsApp.
10        289.    Tracking data for REYES' phone (TT49) also showed he made frequent
11   trips between his residence and his work location throughout most days—something that
12   is unusual for a typical cook or restaurant worker. Given CASTRO DTO couriers' short-
13   duration trips to REYES' work location, I believe this travel pattern indicates REYES is
14   storing drugs and drug proceeds at his residence in Des Moines and distributing those
15   drugs from his work location. I believe REYES returns to **2136 S 260th St., Apartment**
16   **CC-201, Des Moines, Washington**, throughout the day to drop off drug proceeds he has
17   earned and resupply himself with drugs. This routine travel to **2136 S 260th St.,**
18   **Apartment CC-201, Des Moines, Washington**, is otherwise very strange and atypical of
19   someone who works in the restaurant business. It is, however, common among drug
20   traffickers. They often do not want to travel around with large sums of cash *and* drugs
21   (or have those two items together in an unsecure location, such as a public place), for fear
22   of being robbed and losing both their drug product and the cash derived from the sale of
23   those products in one fell swoop.
24       290.    Based on intercepted communications between REYES and the CASTRO
25   DTO, as well as other intercepted communications between ROCHA and Sillas, coupled
26   with observations made by agents through physical and electronic surveillance, I believe
27   REYES is a high-volume heroin distributor. I believe REYES receives kilogram
28   quantities of heroin and distributes them in smaller increments. I believe he stores his

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   drugs and/or drug proceeds at **2136 S 260th St., Apartment CC-201, Des Moines,**

2   **Washington** based on the information above.

3       291.    REYES has no known criminal history.

4       **u)    Location 21.** Residence of Karen SURYAN:  **210 NW 107th St.,**

5       **Seattle, Washington.**

6       292.    HSI and DEA Seattle both had separate investigations that involved Karen

7   and Michael SURYAN for, among other things, drug trafficking.  Karen SURYAN

8   maintains a Washington driver's license in that name, which lists her address as 2548

9   Northeast 168th Street, Lake Forest Park, Washington.  However, based on physical and

10  electronic surveillance of HEREDIA and Karen SURYAN, agents believe she actually

11  resides at **210 NW 107th St., Seattle, Washington.**  Based on intercepted

12  communications over HEREDIA's phones, agents believe HEREDIA supplies Karen

13  SURYAN with drugs and that she is working for her cousin, Michael SURYAN, as a

14  drug/money courier.  Agents initially discovered Karen SURYAN's involvement with the

15  CASTRO DTO through telephone tolls analysis of TT25 (HEREDIA).  Members of HSI

16  were familiar with Karen SURYAN's phone number (425-770-1067) and recognized it

17  on HEREDIA's call detail records.  Tracking data for HEREDIA's phones (TT25 and

18  TT46) showed he traveled to **210 NW 107th St., Seattle, Washington,** quite often,

19  throughout the various periods of real-time tracking of HEREDIA's phones.

20      293.    According to real-time tracking on TT25 (HEREDIA), one such trip

21  occurred on July 27, 2018, and coincided with pen register data on TT25, which showed

22  communications to and from SURYAN's phone number.  Tracking data associated with

23  TT25 showed the device arrived at **210 NW 107th St., Seattle, Washington,** around

24  6:00 p.m., and remained there for less than fifteen minutes.  According to real-time

25  tracking of TT25, HEREDIA made another trip to **210 NW 107th St., Seattle,**

26  **Washington,** on August 8, 2018, which coincided with pen register data on TT25

27  showing communications to and from SURYAN's phone number.  Tracking data

28  associated with TT25 showed the device arrived at **210 NW 107th St., Seattle,**

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   **Washington**, around 2:15 p.m., and remained there for less than fifteen minutes.

2   According to real-time tracking of TT25, another of HEREDIA's trips to **210 NW 107th**

3   **St., Seattle, Washington**, occurred on August 9, 2018, and coincided with pen register

4   data on TT25 showing communications to and from SURYAN's phone number.

5   Tracking data associated with TT25 showed the device arrived at **210 NW 107th St.,**

6   **Seattle, Washington**, around 12:48 p.m., and remained there for less than fifteen

7   minutes.

8       294.   Even without factoring in Seattle traffic, it would take HEREDIA roughly

9   one hour to travel from the area of his suspected residence (**350 S. Burlington Blvd,**

10   **Burlington, WA**) to **210 NW 107th St., Seattle, Washington**.  HEREDIA has shown a

11   clear pattern of traveling over an hour to **210 NW 107th St., Seattle, Washington**, only

12   to remain there for less than fifteen minutes before leaving.  This type of short-stay

13   behavior is consistent with that of drug traffickers, especially considering how far away

14   HEREDIA and SURYAN live from each other and agents' knowledge of these

15   individuals' involvement in drug trafficking.

16       295.   On September 14, 2018, agents established surveillance at **210 NW 107th**

17   **St., Seattle, Washington**.  Early in the morning, agents intercepted several text messages

18   between HEREDIA (TT46) and Karen SURYAN, including text messages in which

19   SURYAN texted HEREDIA "1," and HEREDIA replied, "Ok."  At 1:52 p.m., agents

20   intercepted a call between HEREDIA (TT46) and Karen SURYAN (425-770-1067).

21   During that conversation, HEREDIA asked SURYAN if she would be ready in five

22   minutes.  SURYAN affirmed and said she would be "here."  At 1:57 p.m., agents on

23   surveillance observed HEREDIA driving his **red Honda Civic bearing Washington**

24   **license BKS2788** arrive in the neighborhood of **210 NW 107th St., Seattle,**

25   **Washington**.  HEREDIA was at **210 NW 107th St., Seattle, Washington**, for about

26   three minutes; a mounted surveillance camera at the residence captured him leaving.

27       296.   Three days later, on September 17, 2018, (Session 260 on TT46) SURYAN

28   called HEREDIA and asked him to come over for "one piece," but said if HEREDIA

AFFIDAVIT OF JEREMY TAN - 120

1  could bring two (for which SURYAN did not have the money), he would not "have to

2  come out as much." The two agreed to meet around 7:00 or 7:30 p.m. on that day, but

3  agents were unable to confirm whether this deal actually occurred.

4      297.    Based on tracking data for TT46 and additional intercepted

5  communications with Michael SURYAN (the suspected user of 206-531-5511 at the

6  time), agents believe HEREDIA actually met with Michael SURYAN (and possibly

7  Karen) at their "number two" meeting location, based on the arrangements they made

8  during Session 269 on TT46. Sessions 292, 296, and 297 over TT46 showed HEREDIA

9  spoke with Michael and the two met for a suspected drug transaction. Tracking data

10  associated with TT46 at the time of those communications, showed HEREDIA was near

11  the intersection of 164th St. S. and 36th Ave. W. in Lynnwood. Agents believe HEREDIA

12  and Michael SURYAN conducted their transaction near this intersection.

13      298.    Agents did not intercept any additional communications between Karen

14  SURYAN and HEREDIA on that day, particularly after their agreed-upon meeting time.

15  Based on training and experience, agents know a drug customer (such as SURYAN)

16  would contact his/her supplier (such as HEREDIA) if the two had agreed to meet at a

17  particular time, but the supplier failed to show up. Agents never intercepted any

18  additional communications between Karen and HEREDIA, and they believe HEREDIA

19  may have provided Michael with Karen's drugs at the time of their meeting at the

20  "number two" spot. Based on agents' knowledge of the familial relationship between

21  Michael and Karen SURYAN, agents believe drugs arrived at Karen's residence on

22  September 17, 2018, through this meeting at the "number two" location—either through a

23  subsequent delivery by Michael or because Karen was physically present at the "number

24  two" meeting. Agents believe Karen SURYAN ultimately brought these drugs and/or the

25  proceeds from their sale back to her residence at **210 NW 107th St., Seattle,**

26  **Washington** based on the consistent short-stay traffic they have observed at the residence

27  over the course of the investigation (which indicates she has at least some of her

28  customers come directly to her residence for drug transactions) and based on intercepted

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   communications over TT46—or in this instance, the lack of any intercepted complaints
2   from Karen SURYAN to HEREDIA about not following through on their business
3   arrangements.

4       299.   On September 22, 2018, agents intercepted Session 432 on TT46.  During
5   this call, SURYAN told HEREDIA, "This girl is getting ready to buy some blues,"
6   maybe in a few days; that she (SURYAN) would like "two pieces" but only had money
7   for one; and that she (SURYAN) was "out of black."  At the end of the call, SURYAN
8   summed up by saying, "let me see how much money I got together too, and see what I
9   want, and ... we go from there."  During this call, SURYAN provided HEREDIA (and
10  agents) with a variety of information.  SURYAN referenced one of her customers (this
11  girl) who was getting ready to buy an unspecified amount of counterfeit oxycodone pills
12  from SURYAN.  This indicated to agents that SURYAN had purchased these pills from
13  HEREDIA in the past, since she did not have to explain what she meant to HEREDIA.
14  When SURYAN told HEREDIA she was "out of black," she was referring to being out of
15  heroin based on my training and experience.  "Black" is a slang term for heroin,
16  historically based on the look of black tar heroin (which looks just like its name
17  suggests).  SURYAN also asked for 50 grams of heroin during this call when she asked
18  for "two pieces."  As noted above, "piece" is a 25-gram increment that usually takes the
19  place of an ounce.  It typically refers to heroin since that drug is distributed using the
20  metric system.  Twenty-five (grams) divides into 1,000 (a kilogram) easily—as opposed
21  to 28.35 grams in a true ounce.

22      300.   In the days that followed, SURYAN pestered HEREDIA for more drugs
23  and HEREDIA continued to put her off.  Finally, HEREDIA used Jose SIERRA to act as
24  an interpreter/translator between him and SURYAN.  During their three-way discussion
25  on September 27, 2018 (Session 696 over TT46), HEREDIA told SURYAN that she
26  needed to pay on her drug debt before he could give her any additional drugs.  SURYAN
27  agreed and the two seemingly moved forward with their drug trafficking relationship.
28  Real-time tracking for HEREDIA's phones and the surveillance camera footage from

1  SURYAN's residence showed HEREDIA continued to travel to **210 NW 107th St.,**
2  **Seattle, Washington**, albeit infrequently.  Based on the prior intercepted
3  communications and surveillance observations, agents believe HEREDIA traveled to **210**
4  **NW 107th St., Seattle, Washington** to conduct additional drug transactions.

5      301.  Based on intercepted communications between Karen SURYAN and
6  HEREDIA, coupled with observations made by agents through physical and electronic
7  surveillance, I believe Karen SURYAN stores drugs and drug proceeds at **210 NW 107th**
8  **St., Seattle, Washington**.

9      302.  Karen SURYAN's criminal history consists of a 2007 misdemeanor assault
10  4 conviction (5 days); a 2006 felony conviction for possession of stolen property 1 (20
11  days jail); and a 1990 felony VUCSA conviction (60 days jail).

12      v)  **Location 22.** Residence of Michael SURYAN: **16809 8th Ave. SW,**
13         **Normandy Park, Washington.**

14      303.  As referenced above, agents first became aware of Michael SURYAN
15  through coordination with HSI.  Michael SURYAN appears to be a very organized and
16  meticulous drug trafficker who uses very precise, predetermined coded language.

17      304.  For example, at around 3:00 p.m., on August 20, 2018, agents intercepted
18  an outgoing call on TT25 (Session 11) from HEREDIA to a male using telephone number
19  206-518-0042.  At that time, agents did not know who was using that phone number, but
20  later determined it was Michael SURYAN.  HSI agents provided DEA-contracted
21  linguists with undercover phone calls they had conducted with SURYAN; linguists used
22  those calls to conduct a voice comparison.  From this voice comparison, DEA-contracted
23  linguists determined the user of 206-518-0042 was Michael SURYAN.  HSI agents told
24  members of DEA that Michael SURYAN had used a number of phones and phone
25  numbers throughout the course of their investigation, so they were not surprised to learn
26  SURYAN had this apparently additional phone he was using to communicate with
27  HEREDIA.  During Session 11, SURYAN asked HEREDIA for "five brown," which I
28  believe was a coded reference to five pieces of heroin (i.e., 125 grams).  HEREDIA

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   affirmed the request and the two agreed to meet, though they did not talk about a specific

2   location. Agents believed the two had an established meeting location to conduct their

3   drug transactions, so there was no need for either party to explain *where* to meet on this

4   occasion.

5       305.   An hour after this call, agents intercepted another call on TT25 from

6   SURYAN (split over Sessions 31 and 32). During this call, Michael SURYAN told

7   HEREDIA, "I'm here," indicating to agents that SURYAN had arrived at the meeting

8   location. HEREDIA said he was five minutes away, indicating he was close to the

9   meeting location. Tracking data for TT25 showed HEREDIA was very close to Spruce

10  Park in Lynnwood, Washington, during this call; based on other intercepted

11  communications between HEREDIA and SURYAN, agents believe this is their "number

12  two" meeting location. Agents believe HEREDIA supplied SURYAN with 125 grams of

13  heroin during this meeting on August 20, 2018, based on intercepted communications and

14  their knowledge of HEREDIA and SURYAN's drug trafficking patterns.

15      306.   On October 7, 2018, agents intercepted another call (Session 1511) between

16  Michael SURYAN (now using 206-472-4037) and HEREDIA (TT46). During that call,

17  SURYAN arranged to meet HEREDIA for "three;" HEREDIA then asked Michael

18  SURYAN if he wanted to meet at "number two." Michael SURYAN told HEREDIA he

19  would like to meet at "number three." I believe "number two" and "number three" are

20  coded references to predetermined meeting locations Michael SURYAN has established

21  with HEREDIA in order to conceal his movements from law enforcement detection, and

22  believe Michael SURYAN's request to HEREDIA for "three" was a request for three

23  pieces (75 grams) of heroin. Subsequently agents later intercepted another call on

24  October 7, 2018 (Session 1519) between SURYAN and HEREDIA. During that call,

25  HEREDIA told SURYAN he was at location number three. Simultaneously real time

26  tracking data for TT46 placed HEREDIA at a public parking lot in Seattle. Agents were

27  unable to observe this meeting via physical surveillance and technical issues did not

28

1  allow for real time tracking data of SURYAN's cellular phone (206-472-4073) at this

2  time.

3      307.   In the summer of 2018, HSI had conducted an undercover meeting with

4  Michael SURYAN.  During that meeting, the undercover officer (the UC) asked Michael

5  SURYAN if he could get drugs.  Michael SURYAN was very reluctant to discuss

6  purchasing drugs with the UC, and stated that he was on federal probation.  However,

7  SURYAN did later tell the UC that the UC was being ripped off when the UC told him

8  what he/she was paying for methamphetamine.  SURYAN said that he paid $3,200 for 16

9  ounces of "clear" (crystal methamphetamine), and went on to explain that he had stopped

10 dealing drugs for a while.  According to Michael SURYAN, his Probation Officer told

11 him to move into a halfway house; SURYAN explained he could not keep drugs there as

12 he was subject to search as a condition of his probation.

13     308.   In July 2018, HSI agents acting in an undercover capacity arranged to meet

14 Michael SURYAN at a nightclub.  During that meeting, Michael SURYAN, unprompted,

15 offered to contact his "guy" to bring the undercover officers drugs.  Later that evening,

16 SURYAN's "guy" (whose name SURYAN provided to the UC and is known to me but

17 not included in this Affidavit) arrived with another male, and sold one of the UCs

18 approximately 5.7 grams of a white crystalline substance that later field-tested positive

19 for methamphetamine.  "The guy" also presented that particular UC with a small bottle

20 containing a liquid substance that the male described as GHB.  Michael SURYAN sat on

21 the other side of that particular UC and watched the whole transaction, but did not touch

22 the drugs.

23     309.   Also in the summer of 2018, HSI received court authorization to activate

24 real-time tracking on Michael SURYAN's phone (206-472-4073).  Through this tracking

25 information, agents identified **16809 8th Ave. SW, Normandy Park, Washington**, as

26 Michael SURYAN's residence.  Tracking data for SURYAN's phone consistently placed

27 it at **16809 8th Ave. SW, Normandy Park, Washington,** in October 2018.

28 Additionally, on October 31, 2018, TFO Eric Janson observed Michael SURYAN's

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   silver 2000 Toyota Camry bearing Washington license BKU5269 parked in the

2   driveway of 16809 8th Ave. SW, Normandy Park, Washington.  Based on the

3   intercepted communications between Michael SURYAN and HEREDIA, coupled with

4   information relayed to me by HSI agents and observations made by agents through

5   physical and electronic surveillance I believe Michael SURYAN stores drugs and drug

6   proceeds at 16809 8th Ave. SW, Normandy Park, Washington.

7        310.   Michael SURYAN's criminal history consists of a 2014 conviction in this

8   District for Bank Fraud and Aggravated Identity Theft (65 months' prison, followed by

9   five years of supervised release), a 2011 VUCSA conviction, a 2009 identity theft 2

10   conviction, a 2009 conviction for possession of cocaine while on community supervision,

11   and a 2007 conviction for possession of methamphetamine.

12      w)   Location 23.  Residence of Orlando BARAJAS:  310 N Anacortes St.,
             Burlington, Washington, and
13

14      x)   Location 24.  Business location of Orlando BARAJAS:  Taco El
             Antojito, 628 E Fairhaven Ave., Burlington, Washington.
15

16        311.   Agents identified Orlando BARAJAS through physical and electronic

17   surveillance at 310 N Anacortes St., Burlington, Washington, his listed WADOL

18   residence, and identified him as the user of TT54.  Agents have intercepted

19   communications over TT46 (HEREDIA) that involve BARAJAS and his money services

20   business located inside his store, Taco El Antojito.  Based on the content of these

21   conversations, agents believe BARAJAS wires and otherwise transfers money for the

22   DTO, through Taco El Antojito.

23        312.   For example, on September 14, 2018, at 7:52 p.m., agents intercepted an

24   outgoing text message (Session 60 over TT46) from HEREDIA to BARAJAS.

25   HEREDIA told BARAJAS, "Hey, I have 7 invitations."  At 8:28 p.m., BARAJAS

26   (TT54) responded to HEREDIA (Session 62 over TT46) and said, "Call me."  At 8:40

27   p.m., agents intercepted an incoming call (Session 65 over TT46) from BARAJAS

28   (TT54).  During this call, HEREDIA asked to meet BARAJAS to obtain "seven tacos"

1   because he had "seven invitations." I believe HEREDIA's reference to "tacos" was

2   coded language for names of seven people for BARAJAS to use for transferring

3   suspected drug proceeds. I further believe HEREDIA's reference to "seven invitations"

4   was coded language for $7,000. I know through my training and experience, when drug

5   traffickers acquire the proceeds from the sales of drugs, they then need to send the

6   proceeds to higher-ranking members of the DTO. In order to do this without alerting law

7   enforcement, drug traffickers will move proceeds from one bank account to another by

8   using fictitious names and lower dollar amounts (e.g., approximately $1,000 per

9   transaction). I believe HEREDIA intended to meet with BARAJAS to transfer suspected

10   drug proceeds to higher-ranking members of the CASTRO DTO.

11       313.   On September 15, 2018, agents intercepted two outgoing text messages

12   (Sessions 133 and 135 over TT46) to BARAJAS (TT54) from HEREDIA (TT46).

13   Included in these text messages were seven names, which I believe were the "tacos"

14   HEREDIA spoke of in Session 60. Then, on September 16, 2018, agents intercepted four

15   incoming text messages (Sessions 225, 227, 229 and 231) from BARAJAS (TT54) to

16   HEREDIA (TT46), which contained information about money transfers; the next day,

17   September 17, 2018, agents intercepted three incoming text messages (Sessions 231, 274

18   and 278) from BARAJAS (TT54) to HEREDIA (TT46), again containing information

19   about money transfers.

20       314.   Each of these seven text messages (Sessions 225, 227, 229, 231, 274, 276

21   and 278) included the following: a confirmation code referencing a money transfer; an

22   amount of money transferred; the name of the company utilized for the transfer

23   (specifically, Bansefi, Elektra or Famsa); and a statement explaining that a transfer had

24   been completed for each of the seven names HEREDIA sent BARAJAS on September

25   15, 2018. The total amount of money BARAJAS referenced in the seven text messages

26   added up to $126,902.50; however, I believe the currency BARAJAS was referring to

27   was Mexican Pesos, rather than US dollars.

28

315.     Based on my training and experience, I know that banks or services that provide money transfers, i.e., Bansefi, Elektra and Famsa, have low dollar amount transfer thresholds.  Through my training and experience and my knowledge of the CASTRO DTO, I know these drug traffickers typically take steps to avoid detection from law enforcement.  Thus, I believe HEREDIA and BARAJAS conducted seven small money transfers—utilizing the seven names or "invitations"— of between approximately $800 and $1,200 [USD] in effort to avoid detection from law enforcement.  I further believe HEREDIA and BARAJAS transferred suspected drug proceeds to the higher-ranking members of the CASTRO DTO, who are likely in Mexico, using the names of individuals who were not physically present in BARAJAS' store to make the transfers.

316.     On September 17, 2018 at 7:06 p.m., agents intercepted an incoming call (Session 280 over TT46) from BARAJAS (TT54) to HEREDIA (TT46).  During this call, BARAJAS (TT54) told HEREDIA, "I sent you everything," which I believe meant that BARAJAS sent HEREDIA the information regarding the suspected money transfers relayed during Sessions 225, 227, 229, 231, 274 and 278.  HEREDIA then asked if "Everything is good?"—indicating HEREDIA's interest in whether or not the money transfers had been successful—to which BARAJAS replied "yes."  Unrelated to the suspected money transfers, BARAJAS asked HEREDIA "Why aren't you answering?"  BARAJAS then said, "I was about to turn the fucking phone off."  Through my training and experience, I know drug traffickers stop using their phones and/or communication devices, if they suspect a law enforcement presence.  I believe, since HEREDIA did not immediately respond to BARAJAS' text messages (Sessions 225, 227, 229, 231, 274 and 278 over TT46) on September 16 and September 17, 2018, BARAJAS had contemplated discontinuing the use of his phone out of a concern law enforcement had detected their illegal activities.

317.     On September 24, 2018, the Honorable Theresa L. Fricke, United States Magistrate Judge for the Western District of Washington, authorized the real-time tracking of TT54.  On September 28, 2018, agents identified BARAJAS as the user of

1  TT54 through continued surveillance of common vehicles and individuals observed near

2  TT54's location.  On that day agents initially set out on surveillance near the real time

3  tracking data for TT54 at **310 N Anacortes St., Burlington, Washington**.  Once at the

4  address, Bremerton Police Department Det. Mike Nelson observed several vehicles

5  registered to BARAJAS parked near **310 N Anacortes St., Burlington, Washington**,

6  including a blue 2002 Audi A4 bearing Washington license BAV8551 and a grey 2004

7  Cadillac Escalade bearing Washington license ABB9030.

8      318.    On the same day, agents intercepted a call (Session 762) between

9  BARAJAS (TT54) and HEREDIA (TT46).  During that call, HEREDIA told BARAJAS

10  that he would come see him so they (HEREDIA and BARAJAS) could work.  BARAJAS

11  agreed to meet and then asked HEREDIA "how much is it."  HEREDIA told BARAJAS

12  "there are for like twelve invitations."  Based on my training and experience, I know

13  members of the CASTRO DTO to use terms such as "invitations," "tickets," and

14  "receipts" to refer to drug proceeds.  Based on this intercepted call, I believe that

15  HEREDIA was meeting with BARAJAS to give him (BARAJAS) $12,000.

16  Subsequently agents set out on surveillance of HEREDIA using real time tracking data

17  for HEREDIA's phone (TT46).  Agents later observed real time tracking data for TT54

18  (BARAJAS) and TT46 (HEREDIA) put HEREDIA and BARAJAS together near a Fred

19  Meyer in Burlington, presumably to conduct the transfer.  Agents also saw BARAJAS'

20  **red 2018 Chevy Silverado bearing Washington license C66267L** parked near TT54

21  (per tracking data).

22      319.    Agents maintained physical surveillance on the **red 2018 Chevy Silverado**

23  **bearing Washington license C66267L**.  At 12:36 p.m., TFO Eric Janson observed the

24  **red 2018 Chevy Silverado bearing Washington license C66267L** parked in front of

25  **Taco El Antojito, 628 E Fairhaven Ave., Burlington, Washington**.  A search of

26  corporations listed with the Washington Secretary of State listed BARAJAS as the

27  registered agent for Antojito II, Inc., at **628 E Fairhaven Ave., Burlington,**

28  **Washington.**  Subsequently, based on additional intercepted communications over TT46

AFFIDAVIT OF JEREMY TAN - 129

1  (HEREDIA), I believe BARAJAS transferred the $12,000 money to several different

2  people in Mexico using the names of people who were not present in his store at the time.

3      320.   Specifically, BARAJAS began text messaging HEREDIA several names

4  and confirmation codes for a money transfer system known as Elektra.  This system

5  would allow money to be transferred from person-to-person and withdrawn utilizing a

6  passcode.  At 1:19 p.m., BARAJAS (TT54) texted HEREDIA (Session 789 over TT46)

7  as follows: "Rodolfo talavera arias sends amanda lopez armenta through elektra the

8  passcode N246179852 $16,643.00."  Then at 1:42 p.m., BARAJAS (TT54) texted

9  HEREDIA (Session 797 over TT46) as follows: "Fabian rodarte rubio sends to fernando

10  noe rubio leyva through Elektra the passcode X2132003978511 $19,435.50."  I believe

11  both money references are to Mexican Pesos.  Based on these intercepted

12  communications, I believe that BARAJAS is conducting money-laundering operations

13  for the CASTRO DTO through his business located at **628 E Fairhaven Ave.,**

14  **Burlington, Washington**, and that evidence of the same will be found at that location.

15  Furthermore I believe that further evidence of BARAJAS' money laundering operations,

16  such as transfer paperwork, are also stored at his **310 N Anacortes St., Burlington,**

17  **Washington**, residence.

18      321.   BARAJAS' criminal record consists of an arrest in 2001 by CBP officers in

19  Blaine, with no disposition listed.

20      y)    **Location 25.**  Residence of Jose VELASCO:  **506 Tiger Lane,**
           **Burlington, Washington.**
21

22      322.   On September 16, 2018, at 12:29 p.m., agents intercepted an incoming text

23  message (Session 162 over TT46) to HEREDIA from a male (later identified as Jose

24  VELASCO through physical and electronic surveillance) using 206-302-8402 (TT55).

25  VELASCO asked HEREDIA to bring him "the two young ladies."  Through my training

26  and experience, I am aware that "ladies," or references to females, is common drug code

27  for heroin, and based on my familiarity with the investigation, I believe HEREDIA is a

28  heroin distributor for the CASTRO DTO.  Therefore, I believe that when VELASCO

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  referred to the "two young ladies," VELASCO was referring to a quantity of heroin.

2  HEREDIA then agreed to meet with VELASCO (Session 164 over TT46).  At 3:38 p.m.,

3  agents intercepted an incoming text message (Session 179 over TT46) from VELASCO

4  (TT55) to HEREDIA.  VELASCO asked HEREDIA, "Are you still at the same place?"

5  HEREDIA replied, "Yes" (Session 181 over TT46).  At 3:47 p.m., agents intercepted an

6  incoming text message (Session 183 over TT46) in which VELASCO told HEREDIA,

7  "Ok, I'll stop by in 10."

8       323.   I believe VELASCO utilized TT55 to communicate with HEREDIA to

9  orchestrate a suspected drug transaction.  Specifically, I believe VELASCO asked

10 HEREDIA for two ounces of heroin (or "two young ladies") on September 16, 2018.

11 Additionally, VELASCO asked HEREDIA, "Are you still at the same place?" indicating

12 VELASCO's knowledge of HEREDIA's location and the likelihood that VELASCO has

13 met HEREDIA at this "place" in the past for suspected drug transactions.

14      324.   On September 24, 2018, the Honorable Theresa L. Fricke, United States

15 Magistrate Judge for the Western District of Washington, authorized the real-time

16 tracking of TT55.  On October 1, 2018, agents identified VELASCO as the user of TT55

17 by observing similar vehicles and individuals seen within the vicinity of TT55's real-time

18 location data as the device moved about.  Agents saw VELASCO driving a **white 2001**

19 **Nissan Altima bearing Washington license AVW7517** registered to Cleotilde

20 VELASCO at 1400 N 30th St., Mount Vernon, Washington.  Agents then identified

21 VELASCO by comparing surveillance photographs of VELASCO to his WADOL

22 photograph listed at the same 1400 N 30th St., Mount Vernon address.  Later that day,

23 TFO Nisco continued to follow VELASCO and monitor the location for TT55 through

24 real-time tracking as VELASCO returned to **506 Tiger Lane, Burlington, Washington**.

25 In October 2018, agents observed that tracking data for TT55 consistently placed

26 VELASCO at **506 Tiger Lane, Burlington, Washington**.  Based on intercepted

27 communications between VELASCO and HEREDIA, coupled with observations made

28 by agents through physical and electronic surveillance, I believe VELASCO obtains

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  heroin for redistribution from the CASTRO DTO and stores his drugs and drug proceeds
2  at **506 Tiger Lane, Burlington, Washington**.

3    325.    VELASCO has no known criminal history.

4    **z)    Location 26.**  Residence of Brian LIVELY:  **8123 71st Pl. SE,**
5             **Snohomish, Washington.**

6    326.    Agents identified Brian LIVELY in September 2018 as the result of
7  intercepted text messages and calls between LIVELY, using 425-219-2805 and URIAS
8  (TT48).  Specifically, on September 28, 2018, agents intercepted several text messages
9  between LIVELY (425-219-2805), who was unidentified at the time, and URIAS (TT48).
10 During that conversation, LIVELY and URIAS discussed meeting later in the day at a
11 Denny's for "500."  Based on these intercepted messages and my training and
12 experience, I believe LIVELY had previously met URIAS at the aforementioned Denny's
13 in the past, likely for the purposes of conducting suspected drug transactions, and that this
14 meeting would for a 500-pill transaction.

15   327.    At 9:00 p.m. on September 28, 2018, agents observed URIAS meet Carlos
16 LOPEZ in a Walmart parking lot.  During that meeting, I observed LOPEZ arrive at the
17 Walmart and exit **TV4** carrying a paper bag.  LOPEZ then walked over to **TV7**, which
18 was occupied by URIAS.  LOPEZ then entered **TV7** before exiting less than five minutes
19 later and returning to **TV4**.  Shortly after, LOPEZ left the Walmart, again in **TV4**.
20 Agents then observed, via physical and electronic surveillance, URIAS return to his
21 residence at **428 105th St. SW, Everett, Washington,** and LOPEZ return to **Soltero's**
22 **Market Mexican Store, 24202 104th Ave. SE, Unit 104, Kent, Washington**.

23   328.    At 10:32 p.m., agents intercepted a call from URIAS (TT48) to LIVELY
24 (425-219-2805).  During that call, URIAS again confirmed the meeting with LIVELY at
25 the Denny's for "500," in five minutes.  Based on URIAS' call volume at this time and
26 subsequent surveillance, I believe he (URIAS) was arranging to distribute the suspected
27 drugs, specifically fentanyl pills, he recently received from LOPEZ at the Walmart.  At
28 10:41 p.m., I observed a **silver 2006 BMW bearing Washington license AYY7257**

AFFIDAVIT OF JEREMY TAN - 132

1 parked at a Denny's in Everett. The **silver 2006 BMW bearing Washington license**
2 **AYY7257** is registered to LIVELY at **8123 71st Pl. SE, Snohomish, Washington**. At
3 10:45 p.m., URIAS pulled into the Denny's in **TV7**. An unknown male, later identified
4 as LIVELY, exited the **silver 2006 BMW bearing Washington license AYY7257** and
5 entered **TV7**. Less than a minute later, I observed LIVELY exit **TV7** and return to the
6 **silver 2006 BMW bearing Washington license AYY7257**. Kitsap County Sheriff's
7 Office (KCSO) Detective Cory Manchester later identified LIVELY by comparing the
8 unknown male driving the **silver 2006 BMW bearing Washington license AYY7257** to
9 LIVELY's WADOL photograph. After LIVELY returned to the **silver 2006 BMW**
10 **bearing Washington license AYY7257**, both he and URIAS (in **TV7**) left the Denny's.
11     329. In October 2018, agents conducted surveillance at **8123 71st Pl. SE,**
12 **Snohomish, Washington**. Specifically, on October 31, 2018, KCSO Detective Troy
13 Graunke observed two vehicles parked in the driveway of **8123 71st Pl. SE, Snohomish,**
14 **Washington**: a silver 2004 Infiniti bearing Washington license AKR1965 (registered to
15 Kim LIVELY at the 8123 71st Pl. SE, Snohomish address and a **black Chevrolet**
16 **Silverado with no rear license plate**. On November 1, 2018, agents observed the same
17 two vehicles parked in the driveway of **8123 71st Pl. SE, Snohomish, Washington**. A
18 check of WADOL records for vehicles registered to LIVELY showed LIVELY had
19 registered a 2018 Chevrolet Silverado in October 2018, at his **8123 71st Pl. SE,**
20 **Snohomish, Washington** residence. I believe that the Silverado observed in the
21 driveway of **8123 71st Pl. SE, Snohomish, Washington** is LIVELY's newly-purchased
22 vehicle and he has not yet received or placed the license plates on the vehicle. Based on
23 intercepted communications between LIVELY and URIAS, coupled with observations
24 made by agents through physical and electronic surveillance, I believe LIVELY obtains
25 distribution quantities of counterfeit oxycodone pills from the CASTRO DTO and stores
26 drugs and drug proceeds at **8123 71st Pl. SE, Snohomish, Washington**.
27     330. LIVELY has no known criminal history.
28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    **aa)  Location 27.**  Residence of Uriel ZELAYA:  28527 37th Pl. S, Auburn,
2    Washington.

3    331.    Agents had initially identified Uriel ZELAYA through tolls analysis of
4    phones used by HEREDIA and ORDONEZ.  Agents noticed 206-880-5023 (ZELAYA)
5    was in contact with these two members of the DTO.  Agents subsequently researched the
6    subscriber information for 206-880-5023; the results showed the phone was subscribed to
7    a "Jose ZELAYA" at **28527 37th Pl. S, Auburn, Washington**.  Agents later identified
8    Uriel ZELAYA as the user of 206-880-5023, as described below.  According to WADOL
9    records, Jose is Uriel ZELAYA's middle name.  Additionally, agents later confirmed
10   ZELAYA lives at **28527 37th Pl. S, Auburn, Washington**, the same address listed under
11   subscriber records for his phone.

12   332.    Just before Carlos LOPEZ returned to Washington in late August 2018—
13   from Louisiana—telephone tolls analysis showed ZELAYA was in contact with a
14   Louisiana-based phone number subscribed to Carlos LOPEZ.  Agents suspected LOPEZ
15   might soon return to Washington due to this sudden communication spike with
16   ZELAYA.  Agents further believed LOPEZ might have been reaching out to steady
17   customers of the DTO in order to prepare them for his arrival.  Sure enough, LOPEZ
18   returned to Washington (from Louisiana) soon afterward and began conducting suspected
19   drug transactions with ZELAYA.

20   333.    Agents intercepted ZELAYA over TT51 several times.  From these
21   intercepted communications, agents believe ZELAYA is responsible for coordinating the
22   delivery of multiple pounds of crystal methamphetamine, over 100 grams of heroin, and
23   hundreds of pills made with fentanyl.  For example, on September 25, 2018, agents
24   intercepted an outgoing call (session 38 over TT51) from LOPEZ (TT51) to ZELAYA
25   (206-880-5023).  During that call, LOPEZ asked ZELAYA if he needed "half" and
26   ZELAYA told LOPEZ he was at his house.  ZELAYA then asked LOPEZ if he would
27   like to meet "Guerillo" (the white guy), and LOPEZ stated he would.  LOPEZ and
28   ZELAYA then arranged to meet at ZELAYA's residence.  LOPEZ stated that he would

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   bring "half" and some "buttons" (pills) ZELAYA could check out for free.   Real-time

2   tracking data for **TV4** later indicated that LOPEZ stopped at ZELAYA's residence at

3   **28527 37th Pl. S, Auburn, Washington**, for roughly seven minutes later that day.

4        334.   Agents intercepted additional communications between LOPEZ and

5   ZELAYA and confirmed the two met based on intercepted communications and tracking

6   data for TT51 and **TV4**.  LOPEZ quoted ZELAYA pricing on crystal methamphetamine

7   in October 2018 (for one-pound, half-pound, quarter-pound, and ounce increments).

8   ZELAYA was also intercepted asking LOPEZ for 75 to 100 grams of heroin in early

9   October 2018, and agents were able to watch a 25-gram heroin transaction between the

10  two on October 11, 2018.

11       335.   On October 11, 2018, agents intercepted a series of calls and text messages

12  between ZELAYA (206-880-5023) and LOPEZ (TT51), during which LOPEZ agreed to

13  sell ZELAYA "a whole one" of "morena" (Spanish word for dark, a coded reference to

14  heroin) for "800."  They agreed to meet at "405 Central Ave N, Kent, WA 98032" (the El

15  Sabor Mexican restaurant).  Through my training and experience, I believe LOPEZ

16  specifically agreed to sell ZELAYA an ounce ("a whole one") of heroin ("morena") for

17  $800 ("800").  Additionally, through my training and experience, I know the approximate

18  price range for an ounce of heroin (roughly 25 grams) in this District to be between $800

19  and $1,200.

20       336.   At 7:15 p.m., agents intercepted an additional call between LOPEZ and

21  ZELAYA.  LOPEZ told ZLEAYA he was five minutes away from the meet location.

22  Simultaneously, agents observed, through real-time tracking data, **TV4** leave the DTO's

23  suspected stash house, **22025 100th Ave SE, Kent, Washington**.  At 7:20 p.m.,

24  Bremerton Police Department Det. Mike Nelson observed **a black 1999 Toyota Corolla**

25  **bearing Washington license AXZ8671** in the parking lot of the restaurant.  Det. Nelson

26  noticed ZELAYA was the driver of the **black 1999 Toyota Corolla bearing**

27  **Washington license AXZ8671** based on comparing his observations of the driver with

28  ZELAYA's WADOL photograph.  A minute later, agents observed **TV4** pull in and park

1 next to the **black 1999 Toyota Corolla bearing Washington license AXZ8671.**

2 ZELAYA then exited the Corolla and entered **TV4.** Bremerton Police Department Sgt.

3 Billy Renfro then observed **TV4** drive to an adjacent lot before ZELAYA exited **TV4** and

4 returned to the **black 1999 Toyota Corolla bearing Washington license AXZ8671.**

5       337.   Based on my training and experience and the above-mentioned intercepted

6 communications, I recognize this short-stay visiting as being consistent with that of a

7 drug trafficker making a quick drug-related exchange. From this, I believe ZELAYA and

8 LOPEZ met for the purpose of ZELAYA purchasing 25 grams of heroin from LOPEZ on

9 October 11, 2018. Based on intercepted communications between ZELAYA and

10 LOPEZ, coupled with observations made by agents through physical and electronic

11 surveillance, I further believe ZELAYA stores drugs and drug proceeds at his residence

12 located at **28527 37th Pl. S, Auburn, Washington.**

13       338.   ZELAYA's criminal record includes felony convictions for take motor

14 vehicle without permission-2 in 2018 and 2015, a felony conviction for residential

15 burglary and another for attempted residential burglary in 2011, along with gross

16 misdemeanor convictions for criminal trespass-1 in 2016, theft-3 in 2015, and theft-3 in

17 2014. ZELAYA's criminal history includes 25 arrests, the most recent of which were in

18 2017 and 2018, for possession of a stolen vehicle and failure to comply.

19       **bb)  Location 28.** Residence of Omar VALTIERRA: **16508 SE 147th St.,**

20           **Renton, Washington.**

21       339.   Agents first identified VALTIERRA as a member of the DTO in October

22 2018 as a result of intercepted calls between LOPEZ (TT51) and VALTIERRA, using

23 425-628-7212. Specifically, on October 5, 2018, agents intercepted an outgoing call

24 (Session 1046 over TT51) from LOPEZ to VALTIERRA. During that call, LOPEZ told

25 VALTIERRA, "I was told you're going to give me a receipt." Based on my training and

26 experience and my knowledge of this investigation, I know the suspected drug traffickers

27 in this investigation to utilize references to paper materials (e.g., receipts, documents, or

28 tickets) as coded language for money. VALTIERRA subsequently confirmed and the

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  two arranged to meet in Renton at around 4:30 p.m. or 5:00 p.m.  Shortly after that

2  conversation VALTIERRA sent LOPEZ, via a text message (Session 1068), an address

3  of "16430 se 128th st renton."  At 5:57 p.m., GPS tracking data for **TV4** indicated that

4  LOPEZ stopped at the meeting location in Renton.  Simultaneously Bremerton Police

5  Department Det. Rodney Rauback observed an unknown male—later identified as

6  VALTIERRA—driving a **white 2012 Dodge Ram bearing Washington License**

7  **C50312M**, registered to VALTIERRA at **16508 SE 147th St., Renton, Washington**.

8  Det. Rauback identified VALTIERRA by comparing his recollection of the unknown

9  male observed meeting with LOPEZ to VALTIERRA's WADOL photograph.

10       340.    On two occasions in October 2018, agents set up surveillance at **16508 SE**

11  **147th St., Renton, Washington**, in order to verify it as VALTIERRA's residence.  On

12  October 30, 2018, TFO Justin Chohrach observed a black 2013 Chrysler 300 bearing a

13  Washington license starting with AKG.  On October 31, 2018, TFO Anthony Nisco

14  observed the same **black 2013 Chrysler 300 bearing Washington license AKG4277**

15  parked in front of **16508 SE 147th St., Renton, Washington**.  This Chrysler 300 is

16  registered to Omar and Nayeli VALTIERRA at **16508 SE 147th St., Renton,**

17  **Washington**.  In November 2018, agent McKenzie saw VALTIERRA's **white 2012**

18  **Dodge Ram bearing Washington License C50312M** parked at this residence, along

19  with the Chrysler 300.  Furthermore, VALTIERRA's listed WADOL address is **16508**

20  **SE 147th St., Renton, Washington**.

21       341.    Based on the totality of the above, I believe VALTIERRA's primary

22  residence is **16508 SE 147th St., Renton, Washington**.  I further believe VALTIERRA

23  utilizes **16508 SE 147th St., Renton, Washington** as a place to store his suspected drugs

24  and/or drug proceeds based on his interactions with LOPEZ on October 5, 2018.  During

25  the interception of communications over LOPEZ's most recent phones (TT51 and TT70),

26  and throughout the course of this investigation, almost every one of the DTO members

27  agents have identified changed their phone numbers regularly.  Based on the content of

28  the intercepted communications between LOPEZ and VALTIERRA, agents believe the

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  two are clearly familiar with each other.  Agents believe this is because the two have

2  conducted many transactions together in the past.  The fact that VALTIERRA is in

3  communication with LOPEZ—as opposed to SARMIENTO, FRIAS, or HIGUERA—

4  indicates that he is a higher-volume drug trafficker.  Based on intercepted

5  communications between Sillas and LOPEZ (and Sillas and ROCHA) agents believe

6  Sillas does not dispatch LOPEZ out to meet other Mexican DTO members in order to

7  pick up money from them unless it is a significant amount of money; typically, this

8  amount has been no less than $30,000 (e.g., pick-ups from URIAS, and HEREDIA as

9  confirmed through intercepted communications).  I believe this amount of money is

10  consistent with a trafficker who is moving either kilograms of heroin or thousands of

11  pills.

12       342.    Based on VALTIERRA's choice of meeting location with LOPEZ (which

13  was very close to VALTIERRA's residence at **16508 SE 147th St., Renton,**

14  **Washington**) agents believe VALTIERRA had the drug proceeds he delivered to LOPEZ

15  stored at **16508 SE 147th St., Renton, Washington**.  Based on my training and

16  experience, I believe VALTIERRA is likely storing his drugs at his residence as well.  I

17  know drug traffickers typically store their drugs and drug proceeds in the same location

18  (whether it is at a stash location or their residences).  This makes it easier to distribute

19  and organize their drugs and drug proceeds, since both items are within close proximity

20  to each other.  Again, since I believe VALTIERRA left **16508 SE 147th St., Renton,**

21  **Washington**, with drug proceeds and delivered those proceeds to LOPEZ, I believe he

22  also stores his drugs at this location.  Additionally, agents' surveillance and records

23  checks have not indicated VALTIERRA has any type of storage unit.

24       343.    VALTIERRA's criminal history includes a VUCSA felony conviction from

25  2001 and an arrest related to a VUCSA felony from 2004.  VALTIERRA also has two

26  gross misdemeanor convictions for obstructing a law enforcement officer and theft, from

27  2000 and 2001, respectively.  VALTIERRA also has a class B felony conviction from

28  1999 for burglary.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

cc)  **Location 29.** Residence of Jerry Austin RODRIGUEZ Jaime: **859 116th St, Tacoma, Washington.**

344.    As described above in Section V, during a Facebook Messenger conversation on November 27 and 28, 2017, Castro told RODRIGUEZ ("Jay Jaime") the "work" was "very slow" and he "needed more people." Agents believe this was Castro's way of telling RODRIGUEZ that he (RODRIGUEZ) needed to sell more heroin or find other redistributors to sell more of the DTO's heroin. RODRIGUEZ told Castro, "I have alot [sic] of customers undee [sic] me." Castro seemed to like RODRIGUEZ's claim of having many drug customers and then offered to provide RODRIGUEZ with a half-ounce of heroin on a "front." RODRIGUEZ provided Castro with a phone number (which corresponds to RODRIGUEZ's listed phone number in Facebook) and sent a picture of his house and address to Castro. Early estimates were that the Castros provided RODRIGUEZ with no less than 247 grams of heroin; conversations indicate that RODRIGUEZ prefers his heroin in the form of "stones," not "powder." As agents continued to gather Facebook records on the DTO, those additional records showed the Castros provided RODRIGUEZ with over 1,000 grams of heroin.

345.    On January 18, 2018, surveillance agents followed DTO courier FRIAS to 10723 59th Ave E, Puyallup, Washington, which WADOL records show is the registered address for Jerry Austin RODRIGUEZ Jaime. FRIAS was there for about 13 minutes. On January 25, 2018, surveillance agents again followed FRIAS to the 10723 59th Ave E, Puyallup, Washington residence, where FRIAS stayed for several minutes. Surveillance agents saw another short-stay meeting between RODRIGUEZ and FRIAS on February 1, 2018, this time at the Outlet Collection Mall in Auburn. RODRIGUEZ arrived for the transaction in his **blue 2004 Volvo S80 bearing Washington license plate BHK8013.**

346.    On February 14, 2018, at 4:43 p.m., while conducting surveillance on FRIAS (TV1), I observed FRIAS travel to 10723 59th Ave. E, Puyallup, Washington; this residence is located at the end of a dead-end street on 59th Ave. E. I was not able to

1   follow TV1 directly to the end of 59th Ave. E due to concerns of RODRIGUEZ or

2   FRIAS becoming aware of a police presence.  Instead, agents utilized real-time tracking

3   data for TV1 in order to follow FRIAS' whereabouts.  Real-time tracking placed FRIAS

4   at the 10723 59th Ave E, Puyallup, Washington, residence almost immediately after

5   agents lost sight of TV1.  Less than five minutes later, I reacquired visual of TV1 and

6   observed FRIAS departing the area of 10723 59th Ave. E, Puyallup, Washington.

7   Through my training and experience, I recognize short-stay visits as a common trait of a

8   drug trafficker.  Based on FRIAS' short stay visit at 10723 59th Ave. E, Puyallup,

9   Washington, and the aforementioned returned search warrant materials, I believe 10723

10   59th Ave E, Puyallup, Washington has been utilized to facilitate numerous suspected

11   drug transactions with RODRIGUEZ.  Real-time tracking data for vehicles the driven by

12   CASTRO DTO couriers indicates that couriers have stopped at the 10723 59th Ave. E,

13   Puyallup, Washington, residence over 20 times since the start of this investigation.

14       347.   In October 2018, agents began to suspect that RODRIGUEZ had moved

15   from his 10723 59th Ave. E, Puyallup, Washington, residence when couriers for the

16   CASTRO DTO stopped frequenting it.  A WADOL records check for RODRIGUEZ's

17   **blue 2004 Volvo S80 bearing Washington license plate BHK8013** indicated that the

18   Volvo was no longer registered at 10723 59th Ave E, Puyallup, Washington, and was

19   now registered at **859 116th St. S, Tacoma, Washington**.  Agents previously observed

20   RODRIGUEZ using this vehicle during the meeting with FRIAS at the Outlet Collection

21   Mall on February 1, 2018.  Subsequently, agents set up surveillance of **859 116th St. S,**

22   **Tacoma, Washington**, to verify it as RODRIGUEZ's new residence.  In November

23   2018, agents observed several vehicles registered to RODRIGUEZ parked near **859**

24   **116th St. S, Tacoma, Washington**, including a 2004 Volvo bearing Washington license

25   BHK8013, and a 2007 Infiniti G35 bearing Washington license BMS9633.  The 2004

26   Volvo bearing Washington license BHK8013 is currently registered to RODRIGUEZ at

27   the **859 116th St. S, Tacoma, Washington**, residence and the 2007 Infiniti G35 bearing

28   Washington license BMS9633 is currently registered to RODRIGUEZ at his previous

1  10723 59th Ave E, Puyallup, Washington, residence. I believe, based on RODRIGUEZ's

2  history of working with the CASTRO DTO as detailed in the Facebook records,

3  electronic and physical surveillance of him meeting with DTO couriers, and my

4  knowledge of the DTO, that RODRIGUEZ is storing drugs and/or drug proceeds at **859**

5  **116th St. S, Tacoma, Washington**.

6      348.    RODRIGUEZ's criminal history consists of four felonies, including a 2011

7  residential burglary (three counts) and theft 1 conviction (22 months prison); a 2018

8  gross misdemeanor for unlawful firearm possession 2 (364/355 suspended for 2 years and

9  2 years' probation); and a 2014 gross misdemeanor for possession of heroin (364/329

10  suspended, but order revoking suspended sentence filed 3/17/17). RODRIGUEZ also has

11  multiple DOC violations listed.

12      **dd)  Location 30.**  Residence of Jake WILSON:  **7111 193rd St. E,**
13              **Spanaway, Washington,** and

14      **ee)  Location 31.**  Residence of Joshua MENDIOLA:  **a fifth-wheel trailer**
15              **parked at 21515 111th Ave. Court E, Graham, Washington.**

16      349.    On December 23, 2017, MENDIOLA (using a Facebook account in that

17  name) sent a message to the Castro brothers through the Katherine Thomas Facebook

18  account that read, "I have been slowing down and laying low hese [sic] last couple days.

19  One of my dealers go [sic] caught so been taking it easy ...." Two days after this

20  messaging exchange, MENDIOLA sent additional communications that complained

21  about the quality of Castro's heroin. MENDIOLA also discussed heroin pricing, and

22  used coded language (saying he was "ready for dark"). During physical surveillance of

23  DTO courier Jesus SARMIENTO on December 26, 2017, agents saw him travel from the

24  DTO stash trailer at **22025 100th Ave. SE, Kent, Washington** to a Taco Bell in

25  Puyallup, where he appeared to meet with a male associated with a white sedan. As the

26  white sedan pulled out, detectives saw a male in the driver's seat; the vehicle is registered

27  to MENDIOLA. Agents followed the sedan to a smoke shop where they compared

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   observations of the white male driver to MENDIOLA's Facebook photos, making a

2   positive match.

3        350.   On January 3, 2018, agents following DTO courier FRIAS followed him

4   from a Day's Inn in Federal Way to a Walgreen's in Puyallup.  Agents then saw

5   MENDIOLA's vehicle pull in, but agents did not see FRIAS and MENDIOLA meet.  On

6   January 18, 2018, agents conducting surveillance of FRIAS followed him from **Soltero's**

7   **Market Mexican Store, 24202 104th Ave. SE, Unit 104, Kent, Washington,** to **22025**

8   **100th Ave. SE, Kent, Washington**, then to a suspected drug deal with RODRIGUEZ.

9   After that deal ended, agents followed FRIAS to a Chevron in Puyallup where, based on

10   prior surveillance activities in that area, they believe he met with MENDIOLA (although

11   they did not see a meeting).  Early estimates, based off the Facebook records, were that

12   the CASTROs provided MENDIOLA with no less than 330 grams of heroin in a month's

13   time.  As agents continued to gather Facebook records through search warrants, their

14   estimates of MENDIOLA's drug distribution increased substantially.  Agents now

15   estimate that the CASTROs supplied MENDIOLA with no less than 1,100 grams of

16   heroin between December 2017 and August 2018.

17        351.   Joshua Ray MENDIOLA maintains a Washington driver's license in that

18   name, which lists his address as 10502 141st St. Court East, Puyallup, Washington.

19   Agents believe MENDIOLA lived with Jake WILSON at **7111 193rd St. E, Spanaway,**

20   **Washington**, for part of this investigation, based on physical and electronic surveillance

21   and agents' court-authorized search of Facebook records associated with the CASTRO

22   DTO.

23        352.   Facebook records showed MENDIOLA introduced himself to Juan Castro

24   as "Jay's friend" on December 2, 2017.  Agents initially believed MENDIOLA was

25   referring to Jerry Austin RODRIGUEZ Jaime (whose Facebook account was "Jay

26   Jaime") based on MENDIOLA's description of RODRIGUEZ's residence.  However,

27   agents also believe MENDIOLA may have been referring to Jake WILSON in this

28   message ("Jay" being a nickname for "Jake"), based on other Facebook messages and

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  subsequent physical/electronic surveillance at **7111 193rd St. E, Spanaway,**
2  **Washington,** WILSON's residence.  MENDIOLA also provided Castro with a
3  description of his vehicle, a white Nissan Maxima, and his address at the time (**7111**
4  **193rd St. E, Spanaway, WA 98387**).  This information coincides with WILSON's
5  known address based on WADOL records and public records searches.
6      353.    Agents watched CASTRO DTO couriers make many short-stay trips out to
7  **7111 193rd St. E, Spanaway, Washington**, throughout the investigation, using a mix of
8  physical and electronic surveillance means.  From these initial Facebook records, agents
9  can account for the CASTRO DTO supplying MENDIOLA with no less than 330 grams
10  of heroin in one month's time, and agents believe these deliveries were made to
11  WILSON's residence, **7111 193rd St. E, Spanaway, Washington**, based on physical
12  and electronic surveillance of SARMIENTO and FRIAS during that same time.  Agents
13  believe MENDIOLA and WILSON may have lived together during that time, and
14  coordinated their drug delivery requests to WILSON's residence.  More recently, from
15  June 15, 2018, to November 6, 2018, **TV3** has traveled to WILSON's residence, **7111**
16  **193rd St. E, Spanaway, Washington**, for suspected drug transactions ten times.  I
17  believe **7111 193rd St. E, Spanaway, Washington** has been used, and continues to be
18  used, to facilitate drug transactions.  In this instance, I believe these drug deliveries have
19  gone to MENDIOLA and/or WILSON.  Based on these transactions, I believe
20  MENDIOLA and WILSON have stored (and store) drugs and drug proceeds at **7111**
21  **193rd St. E, Spanaway, Washington**.
22      354.    Based on more recent physical surveillance of MENDIOLA, agents believe
23  MENDIOLA now lives in a fifth-wheel trailer parked at **21515 111th Ave. Court E,**
24  **Graham, Washington.**  Agents have seen MENDIOLA's **1996 white Nissan Maxima**
25  **bearing Washington license BGR7720** at this residence, regularly, during the early
26  morning hours.  In November 2018, agents physically saw MENDIOLA at **21515 111th**
27  **Ave. Court E, Graham, Washington**.  Agents also spoke with members of the Pierce
28  County Sheriff's Office (PCSO) in October and November 2018, and learned

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   MENDIOLA has been conducting suspected drug transactions out of his **1996 white**

2   **Nissan Maxima bearing Washington license BGR7720** at several grocery store parking

3   lots and other public places in close proximity to **21515 111th Ave. Court E, Graham,**

4   **Washington**. I believe MENDIOLA is using **21515 111th Ave. Court East, Graham,**

5   **Washington**, to store drugs and drug proceeds, and meeting customers in his **1996 white**

6   **Nissan Maxima bearing Washington license BGR7720**. Investigators know, through

7   searches of CASTRO related Facebook accounts, that MENDIOLA typically purchased

8   around an ounce of heroin (25 grams) at a time. He also probably lived with Jake

9   WILSON in the past year. Based on my training and experience, drug dealers at

10   MENDIOLA's level, who are also unable to maintain permanent residences, do not have

11   stash houses. They store drugs and proceeds wherever they are living. Agents have seen

12   MENDIOLA recently at **21515 111th Avenue. Court E, Graham, Washington**, and

13   have seen his **1996 white Nissan Maxima bearing Washington license BGR7720**

14   parked there on multiple occasions. I believe MENDIOLA is residing at that location.

15   355.   From the physical and electronic surveillance operations conducted

16   throughout the investigation, as well as agents' review of the data received from several

17   Facebook search warrants, agents believe MENDIOLA and WILSON are heroin

18   redistributors for the CASTRO DTO. MENDIOLA's criminal history includes a felony

19   conviction for Second Degree Robbery in 2014, gross misdemeanor convictions for First

20   Degree Criminal Trespass in 2015 and 2016, and Making a False Statement to a Public

21   Servant in 2016, as well as misdemeanor convictions for Second Degree Criminal

22   Trespass and Fail or Neglect to Apply for a Transfer of Ownership in 2016. Law

23   enforcement databases show MENDIOLA is suspected of check fraud after depositing an

24   apparently fraudulent check for $9,000 at a BECU ATM in October 2017. Following the

25   deposit and numerous withdrawals from the account over the next week, there was a

26   negative balance in MENDIOLA's account of $9,846.74. WILSON's criminal history

27   includes a felony conviction for Manufacture/Deliver Schedule I/II/III Controlled

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  Substance in 2012, an arrest for Fourth Degree Assault in 2015, and an arrest for Driving

2  Without a License in 2017.

3      **ff)  Location 32.** Residence of Allex and David HUBLY: **713 S Yakima**
4            **Ave., Apartment 9, Tacoma, Washington.**

5      356.   Agents initially identified Allex and David HUBLY through their review of

6  the Castro brothers' "fake" Facebook accounts. The HUBLYs, along with many others

7  in Washington, were consistently listed as a "friend" on these accounts used by the

8  Castro s. The HUBLYs' pictures matched their WADOL photographs and

9  physical/electronic surveillance of SARMIENTO, FRIAS, and HIGUERA showed each

10  of these couriers made multiple short-stay visits to the HUBLYs' residence.

11      357.   On December 14, 2017, Allex HUBLY asked Castro about the "blue pills,"

12  and if she could have more of those pills from him. Castro said he was sold out but

13  would have more on "Saturday." Allex HUBLY asked if the pills were "for sure real"

14  and Castro replied, "llok [sic], this pills are manufactured in clandestine laboratories,

15  these are not pharmaceutical." Estimates based off the Facebook materials alone showed

16  the CASTROs provided the HUBLYs with over 1,500 grams of heroin from June 2017 to

17  August 2018. During the interception of HIGUERA's phone (TT19), it appeared that

18  Allex HUBLY was continuing to place her drug orders through Facebook, as the

19  intercepted communications related to the timing of HIGUERA's arrival for drug

20  deliveries. For example, on July 1, 2018, Allex HUBLY asked HIGUERA, "how far

21  away are you?" Electronic surveillance showed HIGUERA (in TV3) arrived at the

22  HUBLY residence for a two-minute visit. Facebook records showed Allex HUBLY's

23  account was the main account used by the HUBLYs, but those records also showed Allex

24  made references to David Jozeph HUBLY's involvement (referring to him as "DJ").

25  Agents on physical surveillance saw David and Allex HUBLY, together, during multiple

26  interactions with Castro DTO couriers; and they saw David HUBLY meet with

27  HIGUERA for a suspected drug transaction at the HUBLY residence on at least two

28  occasions.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   358.   In October 2018, agents, through physical and electronic surveillance,

2   observed **TV3** travel to a location near Yakima Ave. in Tacoma.  At that time, agents

3   were unable to confirm where exactly it stopped.  On October 29, 2018, I observed, via

4   electronic surveillance, **TV3** drive to a residence located at **713 S Yakima Ave.,**

5   **Tacoma, Washington**.  **TV3** stopped at the residence at 5:52 p.m. and remained there for

6   about seven minutes before departing.  This is just one instance where agents have

7   observed (through electronic tracking) CASTRO DTO couriers travel to and from **713 S**

8   **Yakima Ave., Tacoma, Washington**.  In September and October of 2018, agents

9   observed, utilizing real-time tracking data, couriers for the CASTRO DTO stop at **713 S**

10   **Yakima Ave., Tacoma, Washington**, over twenty five times and conduct short stay

11   visits.  As stated above, I recognize this short stay traffic to be a type of behavior

12   consistent with behaviors displayed by drug traffickers.

13   359.   On October 30, 2018, TFO Anthony Nisco went to the **713 S Yakima**

14   **Ave., Tacoma, Washington** residence to determine who lived there.  While there, TFO

15   Nisco observed the name "HUBLY" written on a piece of paper affixed to the mailbox of

16   **Apartment 9**.  Additionally, TFO Nisco observed a black 2009 Kia Spectra bearing

17   Washington license BDF8264 registered to David HUBLY parked in the parking lot

18   behind the apartment complex near the entrance to **Apartment 9**.  Based on my training

19   and experience, real-time tracking data over TV3, agents' observations and the

20   conversations obtained from the Facebook search warrant materials, I believe Allex and

21   David HUBLY are residing at **713 S Yakima Ave., Apartment 9, Tacoma,**

22   **Washington**.  I further believe Allex and David HUBLY are utilizing **7713 S Yakima**

23   **Ave., Apartment 9, Tacoma, Washington** to aid in the facilitation of their suspected

24   drug trafficking activities.

25   360.   Allex HUBLY has a lengthy criminal history, consisting most notably of

26   convictions in 2014 for two counts of possession of a controlled substance .

27   (methamphetamine & suboxone), two counts of forgery, and two counts of controlled

28   substance—false information (attempted to obtain oxycodone) (12 months jail); and in

1    2013 for theft 3 (four days jail). She appears to have been arrested in 2016 on probation

2    violations, and has a litany of other arrests for which the dispositions are unknown.

3    David HUBLY's criminal record consists of three arrests in 2008 for driving with a

4    suspended/revoked license, drug paraphernalia/use, and telephone harassment.

5         **gg)  Location 33.**  Residence of Charles JOSLYN:  **8422 214th Ave. E,**

6              **Bonney Lake, Washington.**

7         361.    As described above in Section V, on December 27, 2017, JOSLYN and

8    Castro initiated their Facebook conversation. The two arranged a drug transaction

9    (which, according to the Facebook messages, occurred that date at a Target store in

10   Kent). JOSLYN explained it would be better to do the deal in TV1 because JOSLYN

11   had brought his children with him and they were in his car already, occupying space.

12        362.    On December 31, 2017, JOSLYN contacted Castro through the Katherine

13   Thomas Facebook account concerning another potential drug transaction. JOSLYN

14   arranged to purchase 17 grams of heroin for $300, and Castro agreed to front some of the

15   heroin to JOSLYN. Castro then established that JOSLYN would owe an additional $500.

16   JOSYLN then discussed the potential meeting location. JOSLYN told Castro that he was

17   in Puyallup, Washington; Castro requested an address and JOSLYN sent 209 21st Ave.

18   SW, Puyallup, Washington.

19        363.    JOSLYN seemed to typically receive 12 to 50 grams of heroin at a time

20   from Castro, though on December 30, 2017, JOSLYN inquired about pricing on "quarter

21   pounds" or "100 grams." Castro told JOSLYN it would be $4,300 and JOSLYN thought

22   that price was too much. JOSLYN tried to negotiate and bargain Castro down to $3,600

23   for 100 grams of heroin. Castro did not respond to those efforts. Agents observed four

24   scheduled meetings between JOSLYN and the CASTRO DTO couriers, arranged via the

25   Katherine Thomas Facebook account, from December 2017 to January 2018. As a result

26   of those four transactions agents estimate JOSLYN purchased 65 grams of high purity

27   heroin from the DTO.

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

364. Further records analysis identified Apartment N104 as JOSLYN's apartment at the 209 21st Ave SW, Puyallup, residence. Two vehicles registered to JOSYLN were listed in WADOL records at 209 21st Ave SW, Apt N104, Puyallup, Washington: a red 1993 Nissan Maxima bearing Washington license BIP9732 and a black 1993 Acura Integra bearing Washington license BKB5179.

365. In November 2018, agents conducted an undercover purchase of a non-drug item from JOSLYN, who was advertising the item for sale on a social media marketplace, in order to confirm his home address. An undercover agent met with JOSLYN at a McDonald's in Tacoma. JOSLYN drove a red 1991 Ford Ranger bearing Washington license A13382Y to the McDonald's. Prior to this operation, agents were informed by local law enforcement that Brittany Stapleton is JOSLYN's girlfriend. This 1991 Ranger is registered to Brittany Stapleton at **8422 214th Ave. E, Bonney Lake, Washington**. Additionally Stapleton was observed by the UC riding in the Ranger with JOSLYN during this meeting. During subsequent surveillance of JOSLYN and the Ranger, agents observed JOSLYN and Stapleton drive to **8422 214th Ave. E, Bonney Lake, Washington**.

366. On November 28, 2018, agents received data from Facebook regarding the execution of a search warrant on the Tom Ryan account, another account used by the CASTRO DTO for the sole purpose of conducting drug transactions. JOSYLN is a listed friend with this account. On November 6, 2018, JOSYLN contacted the CASTRO DTO via the Tom Ryan account. During that conversation, JOSYLN stated that he had lost all his big suppliers in the area but that he did not have the money to start out on his own. JOSLYN went on to state that he is living in "Bonney lake at my girl's house." The CASTRO DTO responded by asking if JOSLYN wanted to start with "half (12g)" and requested an address from JOSLYN. JOSLYN sent his girlfriend's **8422 214th Ave. E, Bonney Lake, Washington**, address. Later that day, at 11:54 am, GPS tracking data indicated that **TV3** traveled to the **8422 214th Ave. E, Bonney Lake, Washington**, residence and stopped for less than five minutes. Based on my training and experience,

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    agents' observations, the fact that JOSYLN told Castro he lived at **8422 214th Ave. E,**
2    **Bonney Lake, Washington**, on November 6, 2018, and a DTO courier's subsequent trip
3    to that residence, I believe JOSLYN lives at **8422 214th Ave. E, Bonney Lake,**
4    **Washington**, and is likely storing drugs and drug proceeds at this location.

5        367.   JOSLYN's criminal history consists of three felony convictions, two for
6    unlawful possession of a firearm (2018, 4 months imposed & 2015 (work release)), and
7    one for burglary 1 (1998, 15 months).

8        **hh)  Location 34.**  Residence of Timmy Jay CRAWFORD:  **3435 Auburn**
9            **Way S, Apartment 38, Auburn, Washington.**

10       368.   Timmy Jay CRAWFORD possesses a Washington driver's license in that
11   name, which lists his address as **3435 Auburn Way S, Apartment 38, Auburn,**
12   **Washington**.  Agents have confirmed this information through physical and electronic
13   surveillance, as well as a review of subscriber records for CRAWFORD's cellular phone.
14   Agents initially identified CRAWFORD through their review of the various Facebook
15   accounts used by the Castro brothers.  Agents' subsequent review of returned search
16   warrant materials from Facebook furthered their beliefs regarding CRAWFORD and his
17   drug association to the Castros.  CRAWFORD was listed as a "friend" on these Facebook
18   accounts and agents were able to link CRAWFORD's Facebook account with a phone
19   number subscribed to him, using telephone tolls analysis of SARMIENTO's tolls.
20   Additionally, all of the CASTRO DTO couriers in Washington have routinely stopped at
21   **3435 Auburn Way S, Apartment 38, Auburn, Washington**, for short durations
22   throughout the investigation.

23       369.   On December 22, 2017, Castro messaged CRAWFORD (whom he referred
24   to as "amigo"), but never received a response.  Castro called the UC "amigo," and
25   referred to almost all of his Facebook drug associates as amigos or amigas.  During the
26   interception of HIGUERA's phone (TT19), it appeared that CRAWFORD was
27   continuing to place his drug orders through Facebook, as the intercepted communications
28   related to the timing of HIGUERA's arrival for drug deliveries.  For example, on July 1,

1   2018, HIGUERA and CRAWFORD exchanged text messages about HIGUERA's

2   "ETA." HIGUERA (in TV3) arrived at CRAWFORD's apartment complex (**3435**

3   **Auburn Way S, Auburn, Washington**) consistent with HIGUERA's estimated arrival

4   time.

5        370.    CRAWFORD's communication history with the DTO has shown he talks

6   with Juan Castro via telephone and Facebook, and also communicates with CASTRO

7   DTO couriers when he has their contact information. While CRAWFORD does not

8   appear to communicate via Facebook as frequently as other CASTRO DTO

9   redistributors, the Facebook interactions agents have found indicate CRAWFORD does

10  use telephone communications (both wire and electronic) to talk to other members of the

11  DTO, namely CASTRO and his couriers, such as HIGUERA and FRIAS.

12       371.    Prior to intercepting communications over one of HIGUERA's phones

13  (TT19), agents believed these communications between CRAWFORD and the DTO's

14  low-level couriers were likely to finalize drug transaction planning or to help

15  CRAWFORD and the DTO's couriers find one another once one or both arrived at a deal

16  location. Once agents began intercepting communications over HIGUERA's phone

17  (TT19), agents intercepted several text messages between HIGUERA and CRAWFORD.

18  For example, on July 1, 2018, from 8:45 p.m. to 9:17 p.m., agents intercepted Sessions

19  138, 140, 142, and 144 between CRAWFORD and HIGUERA. Those messages are as

20  follows:

21      •    CRAWFORD: Park next to me my friend and come to my house [8:45

22          p.m.]

23      •    HIGUERA: Ok [8:48 p.m.]

24      •    CRAWFORD: ETA [9:16 p.m.]

25      •    HIGUERA: 3 mins [9:17 p.m.]

26       372.    At 9:21 p.m., tracking data for **TV3** showed HIGUERA arrived at **3435**

27  **Auburn Way South, Apartment 38, Auburn, Washington**. HIGUERA stopped at

28

1   CRAWFORD's apartment and stayed for around ten minutes. I believe HIGUERA's
2   short visit to CRAWFORD was a drug transaction. I believe HIGUERA delivered heroin
3   and/or pills to CRAWFORD at **3435 Auburn Way South, Apartment 38, Auburn,**
4   **Washington**. I also believe CRAWFORD is storing drugs and drug proceeds at his
5   residence, based on physical and electronic surveillance of suspected drug transactions
6   such as these. CASTRO DTO couriers have consistently gone to **3435 Auburn Way**
7   **South, Apartment 38, Auburn, Washington**, to make their deliveries to CRAWFORD,
8   and CRAWFORD always seems to have money readily available at that location.

9      373.   After this event, tracking data confirmed CASTRO DTO couriers
10   HIGUERA and SARMIENTO traveled (in **TV3**) to **3435 Auburn Way S, Apartment**
11   **38, Auburn, Washington**, at least 47 more times from July 7, 2018, to November 3,
12   2018. Agents have also seen SARMIENTO, FRIAS, and HIGUERA travel to **3435**
13   **Auburn Way S, Apartment 38, Auburn, Washington**, prior to July 2018, which puts
14   his number of suspected drug transactions with the DTO likely close to or in the triple
15   digits over the past year. Agents have seen CRAWFORD at **3435 Auburn Way South,**
16   **Apartment 38, Auburn, Washington** during the beginning of November 2018, which
17   coincides with **TV3**'s recent tracking data.

18      374.   CRAWFORD has a lengthy criminal history, consisting most notably of a
19   conviction in 2000 for four VUCSA possession with intent charges (6 months jail); in
20   2004 for hit & run—attended—property damage (60 months prison); and subsequent
21   probation violations/DUI offenses.

22      **ii)   Location 35.** Residence of Kurtis and Lindsay NEMEYER: **9119 114th**
23      **St. E, Puyallup, Washington.**

24      375.   Agents initially identified Lindsay and Kurtis NEMEYER through
25   Facebook research. Several of Juan Castro's Facebook accounts, including those in the
26   names Katherine Thomas, Gina Morris, and Chris Holdford, have all consistently been
27   friends with Lindsay and Kurtis NEMEYER's shared Facebook account, using the
28   Facebook name "Kurt Lindsay Nemeyer." Agents know it is common for couples to use

1   a joint Facebook account to share online communication information with each other.

2   Like a joint bank account, a joint social media account allows both members of the

3   relationship to see all of the activities on the account and freely use the account.

4   Facebook records also showed the Castros are familiar with Lindsay and Kurtis.

5       376.    On June 29, 2018, at 6:11 p.m., agents intercepted Session 44 over TT19

6   (HIGUERA).   In that session, HIGUERA sent a text message to 206-388-8864, a phone

7   subscribed to Lindsay NEMEYER, and believed to be used by both Kurtis and Lindsay

8   NEMEYER, based on their criminal histories and surveillance observations.   Session 44

9   read, "This is Carlos.   I'll be there at Burlington in 9 mins."   At 6:12 p.m., agents

10  intercepted Session 46 on TT19.   This was an incoming text message that read, "Im

11  here."   Tracking data for **TV3** showed the vehicle was, in fact, at the Burlington clothing

12  store at the Auburn Outlet Collection at 6:23 p.m.   Agents believed HIGUERA and one

13  of the NEMEYERs had likely conducted a drug transaction.

14      377.    After this suspected transaction, agents intercepted several more text

15  messages between HIGUERA (TT19) and the NEMEYER phone.   In Session 51,

16  HIGUERA told one of the NEMEYERs, "You only gave me $245."   The unknown

17  NEMEYER seemed apologetic and claimed it was an honest mistake.   The unknown

18  NEMEYER then sent a message saying he/she would return to the mall to fix the mistake

19  and give HIGUERA his money.   HIGUERA then asked (in Session 57), "Can I see you at

20  your house instead?   I already left from there."   Agents intercepted Session 61 over TT19

21  at 6:40 p.m.   This was an incoming text message on TT19, from the NEMEYERs, which

22  read, "Yes but my kids are there now so not tell [sic] later im [sic] not going there right

23  now but will be later text me when your [sic] in my area."

24      378.    Several hours went by and then agents intercepted additional

25  communications between the NEMEYERs and HIGUERA.   At 9:57 p.m., agents

26  intercepted an incoming text message on TT19, from the NEMEYERs, which read: "hey

27  are you not coming to get this cash??"   HIGUERA's response was in Sessions 102 and

28  105, and read, "I did not go.   I am at home."   Agents intercepted the NEMEYERs'

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  response as Session 107 over TT19, a text that read, "I have been waiting with the cash

2  ... And I need more ... Tomorrow morning?" According to tracking data for **TV3**,

3  HIGUERA did not travel to NEMEYER's residence, **9119 114th St. E, Puyallup,**

4  **Washington**, on the following day, June 30, 2018. However, **TV3** did travel to **9119**

5  **114th St. E, Puyallup, Washington,** just after 10:00 p.m. on July 1, 2018, according to

6  tracking data.

7      379.   From this series of text messages and tracking data, I believe HIGUERA

8  delivered drugs to the NEMEYERs on June 29, 2018. I believe the NEMEYERs

9  underpaid HIGUERA by mistake and then offered to pay what they owed later that same

10 night. NEMEYER said he/she was "waiting with the cash" at **9119 114th St. E,**

11 **Puyallup, Washington**, and then asked for more drugs to be delivered to that residence.

12 From the intercepted communications over TT19, I believe the NEMEYERs store drugs

13 and drug proceeds at their residence, and conduct drug transactions with HIGUERA at

14 **9119 114th St. E, Puyallup, Washington**.

15     380.   On July 2, 2018, agents were able to physically observe HIGUERA drive to

16 the NEMEYER residence, **9119 114th St. E, Puyallup, Washington**. At 3:41 p.m. on

17 that day, **TV3** arrived at that residence and stayed for only four minutes. Agents saw a

18 blue 2006 Ford Escape bearing Washington license AJD1511 parked at the residence at

19 that time and later found the vehicle was registered to Lindsay NEMEYER. Based on my

20 training and experience, and the lack of any other identified vehicles registered to

21 Lindsay NEMEYER, I believe this is likely the vehicle she has used to conduct drug

22 transactions with the couriers for the CASTRO DTO—particularly those transactions that

23 take place at locations other than **9119 114th St. E, Puyallup, Washington**.

24     381.   On July 10, 2018, agents, again, used the tracking device associated with

25 **TV3** to watch the vehicle travel from HIGUERA's residence in Kent to **9119 114th St.**

26 **E, Puyallup, Washington**. Tracking data showed **TV3** was at the NEMEYERs'

27 residence for two minutes, similar to the many short-stay visits I have seen HIGUERA

28 and SARMIENTO (in **TV3**) make to other suspected heroin redistributors for the DTO,

1   and similar to the length of time it took for the UC's several heroin transactions with

2   SARMIENTO, FRIAS, and HIGUERA.

3       382.   Between just June 4, 2018, and October 31, 2018, tracking data for **TV3**

4   has shown the vehicle traveled to **9119 114th St. E, Puyallup, Washington**, about 28

5   times.  HIGUERA, FRIAS, and SARMIENTO's only job while they have separately

6   been in Washington has been to deliver drugs to local redistributors such as the

7   NEMEYERs.  All of these 28 trips to **9119 114th St. E, Puyallup, Washington**, were of

8   short durations and I believe all of these trips were suspected drug transactions, based on

9   intercepted communications, my training and experience, and my knowledge of how this

10  DTO operates.  Agents have confirmed the NEMEYERs are still living at **9119 114th St.**

11  **E, Puyallup, Washington**, as of November 2018.  Agents physically observed Lindsay

12  NEMEYER's **blue 2006 Ford Escape bearing Washington License AJD1511** parked

13  at the residence and an agent observed Kurtis NEMEYER exit **9119 114th St. E,**

14  **Puyallup, Washington**, get into the **blue 2006 Ford Escape bearing Washington**

15  **License AJD1511**, and drive away.

16      383.   Agents received information from their local counterparts about prior

17  investigations involving both of the NEMEYERs.  Those investigations showed both

18  Lindsay and Kurtis NEMEYER were distributing drugs.  Lindsay NEMEYER's criminal

19  history consists of 2017 convictions for possession of a controlled substance (heroin), and

20  two counts of identity theft 2 (3 months jail, 12 months community custody).  Kurtis

21  NEMEYER's criminal history shows the same 2017 convictions for controlled substance

22  possession (though his is listed for methamphetamine) and two counts of identity theft 2

23  (6 months jail, 12 months community custody).  These two were arrested together on the

24  same day; they were convicted on the same day as well.  I believe this is further evidence

25  of the NEMEYERs' criminal activity as a couple.

26

27

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

**jj)  Location 36.** Residence of Natasha DJORDJEVIC: **1001 E 63rd St., Tacoma, Washington.**

384.    Agents have identified Natasha DJORDJEVIC as one of the CASTRO DTO's longest-standing customers.  Members of the Bremerton Police Department had already identified DJORDJEVIC as a suspected heroin distributor for the DTO before they began working together with DEA.  Physical surveillance showed SARMIENTO traveled to one of DJORDJEVIC's residences in Tacoma throughout the earlier portion of this investigation.  During the course of the investigation, agents believe DJORDJEVIC moved at least one time, to a different address in Tacoma.

385.    Tacoma Police Department (TPD) also became aware of DJORDJEVIC (since she was operating in their jurisdiction) and conducted a separate drug investigation.  During that investigation, TPD discovered that DJORDJEVIC was calling phone numbers in Mexico and having heroin delivered to her then-residence, 8820 Highland Ave SW, Tacoma, Washington.

386.    On June 7, 2016, TPD conducted a search warrant on DJORDJEVIC's prior residence located at 8820 Highland Ave SW, Tacoma, Washington, and her white 1996 Honda Prelude bearing Washington license ART8630.  During the execution of that search warrant, officers seized 42.7 grams of heroin, 21 30 mg OxyContin pills, five Suboxone strips, and $2,000 of suspected drug proceeds.  During a subsequent interview, DJORDJEVIC stated that she had been using heroin for eight years and sold heroin to support her habit.  DJODJEVIC also stated that the $2,000 was her money she was planning to use to purchase more drugs.  DJORDJEVIC was otherwise uncooperative with police and did not provide any information about the Castros.  DJORDJEVIC was released at the scene following the execution of this search warrant.

387.    Since the start of DEA's investigation, DJORDJEVIC has been friends with many of the Facebook accounts used by the Castro DTO, including the Katherine Thomas account, the Gina Morris account, the Rudy Jackson account, the Steve Larson account, the Rebecca Spencer account, and the Alissa Keyser account, but there have

1    been no communications between DJORDJEVIC and the Castros on any of these

2    accounts in the returned materials.  However, tracking data for **TV3** showed it traveled to

3    DJORDJEVIC's current residence, **1001 E 63rd St Tacoma Washington**, for more than

4    20 short-stay trips from October 2017 to November 2018.  Agents estimate the Castros

5    have supplied DJORDJEVIC with over 1,000 grams of heroin over the entire scope of

6    their relationship, based on TPD's investigation, Bremerton's surveillance of

7    DJORDEJVIC, and electronic surveillance of TV1 and **TV3**.  Even an extremely

8    conservative estimate of the heroin DJORDJEVIC has received from the CASTROs

9    would still be over 500 grams, given the length of time she has been in contact with the

10   DTO and the frequency with which couriers have visited her residences.

11          388.    On October 31, 2018, agents set up surveillance to confirm

12   DJORDJEVIC's residence at **1001 E 63rd St., Tacoma, Washington**.  At 2:47 p.m., HSI

13   Special Agent Drew Rodman observed a red 2005 Acura MDX bearing Washington

14   license BHC6971, registered to DJORDJEVIC, parked in the driveway of **1001 E 63rd**

15   **St., Tacoma, Washington**.  Additionally, real-time tracking data for the vehicles the

16   CASTRO DTO couriers utilize indicates the couriers have stopped at **1001 E 63rd St.,**

17   **Tacoma, Washington**, three times this month, most recently on November 27, 2018.

18   Based on my training and experience, I believe **1001 E 63rd St., Tacoma, Washington**,

19   to be DJORDJEVIC's primary residence.  I further believe, based on her history of

20   communication with the CASTRO DTO and subsequent meetings with DTO couriers at

21   her home at **1001 E 63rd St., Tacoma, Washington**, DJORDJEVIC stores drugs and

22   drug proceeds at this location.

23          389.    DJORDJEVIC's criminal history includes two controlled substance felony

24   convictions (one for manufacture/deliver schedule I/II-narcotic/schedule IV, with the

25   listed drug as "oxycodone," and the other for controlled substance possession) in 2017.

26   DJORDJEVIC was sentenced to 12 months (and a day) and six months concurrent

27   confinement for these convictions.  Additionally, DJORDJEVIC's criminal history shows

28

AFFIDAVIT OF JEREMY TAN - 156

1  arrests for 12 counts of identity theft-2 in 2016, and controlled substance felonies in

2  2007.

3      **kk)  Location 37.  Residence of Corey RILEY:  9121 Washington Hwy 162,**

4            **Puyallup, Washington.**

5      390.    Agents initially identified RILEY through the Castros' Rudy Jackson

6  Facebook account.  RILEY was a listed friend on the account and agents were able to

7  compare his Facebook photographs to RILEY's photograph in the WADOL database.

8  During a Facebook messaging conversation between the Rudy Jackson account and

9  Corey RILEY that took place on August 6, 2018, the two agreed to conduct a transaction

10 at RILEY's residence in Puyallup, Washington.  Agents believe RILEY provided Castro

11 with his home address (using a separate means of communication) and the two agreed to

12 meet there.  However, in the Facebook messaging conversation, Castro sent RILEY a

13 Google Maps pin with the precise location of a residence in Puyallup—9121 162nd Street

14 East.  Agents believe RILEY actually resides at **9121 Washington Hwy 162**, and Castro

15 had mistakenly identified RILEY's address based on the similarity between the numbers

16 and streets.

17     391.    On August 6, 2018, at 5:17 p.m., Castro sent RILEY a message which read,

18 "8 minutes away."  At that time, tracking data for **TV3** (HIGUERA) showed the vehicle

19 was in close proximity to the (incorrect) residence Castro provided via Google Maps, on

20 162nd Street East.  About ten minutes later, tracking data for **TV3** showed the vehicle

21 arrived at that residence.  Around that same time, Castro tried to contact RILEY via

22 Facebook messaging and said, "I finding the house … I driving a white Honda Accord."

23 Agents believe this was a reference to **TV3**, because **TV3** is a white Honda Accord.

24 From subsequent messages, agents believed Castro thought HIGUERA was either lost or

25 at the wrong residence.  Castro repeatedly tried to contact RILEY and eventually asked

26 RILEY for his location.  RILEY provided a more thorough description of his physical

27 address and explained his residence was on **Washington Hwy 162**, not 162nd Street

28 East.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    392.   After the exchange of those messages, tracking data for **TV3** showed the

2    vehicle left the (incorrect) residence on 162nd Street and traveled to **9121 Washington**

3    **Hwy 162, Puyallup, Washington**.  From other Facebook messaging conversations

4    between Castro and RILEY, agents believe RILEY typically receives 25 to 50 grams of

5    high-purity heroin during each transaction with Castro.  Agents believe he received at

6    least 25 grams on this occasion.  Agents reviewed another conversation in the Facebook

7    messaging records that took place on August 12 and 13, 2018, between RILEY and

8    Castro.  **TV3**'s tracking data showed the vehicle traveled to RILEY's residence on

9    August 13, 2018, and remained there for about three minutes before leaving.  This type of

10    travel pattern is consistent with HIGUERA's other drug deliveries—including those to

11    the DEA UC.

12    393.   Based on the Facebook messaging conversation and **TV3**'s tracking data,

13    agents believe HIGUERA delivered more heroin to RILEY, at **9121 Washington Hwy**

14    **162, Puyallup, Washington**, on August 13, 2018, and used **TV3** to do so.  Tracking data

15    shows **TV3** traveled to **9121 Washington Hwy 162, Puyallup, Washington**, 35 times

16    between August 6, 2018, and November 4, 2018.  Agents believe each of these instances

17    was drug-related in nature.  More specifically, agents believe **TV3** traveled to **9121**

18    **Washington Hwy 162, Puyallup, Washington**, to deliver heroin and/or counterfeit

19    oxycodone pills to RILEY in exchange for money.

20    394.   Agents traveled to **9121 Washington Hwy 162, Puyallup, Washington**,

21    on October 29, 2018, and observed RILEY and a tan 2002 Audi A6 bearing Washington

22    license BIA2136, registered to RILEY, at the residence.  Based on my training and

23    experience, Facebook records, physical and electronic surveillance, agents believe

24    RILEY is a redistributor for the CASTRO DTO.  As Facebook records and surveillance

25    has shown with many of the lower-level (but high frequency) DTO redistributors, agents

26    believe CASTRO DTO couriers like HIGUERA and SARMIENTO have supplied

27    RILEY with drugs at **9121 Washington Hwy 162, Puyallup, Washington**, and possibly

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1 | elsewhere on dozens of occasions, bringing the estimated amount of heroin RILEY has
2 | received from the Castro DTO to well over 100 grams.

3 |      395.   RILEY's criminal history includes a controlled substance felony conviction
4 | for possession of oxycodone in 2011, as well as an arrest shortly thereafter (in 2012) for
5 | another controlled substance felony, though no charges were filed on this 2012 arrest.
6 | RILEY's criminal history also includes a conviction for burglary 2 in 2008, and theft 2 in
7 | 1996. RILEY has two driving under the influence gross misdemeanor convictions in
8 | 2010 as well. RILEY also has two additional controlled substance arrests in 2009.

9 |     **ll)**    **Location 38.** Residence of Julia CAMMEL: **7002 224th St. E,**
10 |            **Graham, Washington.**

11 |      396.   Following the execution of the Chris Holdford Facebook account search
12 | warrant, agents identified Julia CAMMEL as a "friend" of the account. As noted above,
13 | agents did not receive any messaging data from this account, but did receive other
14 | account information. Agents have identified friends of this account and others used by
15 | the Castros (i.e., the Katherine Thomas, Rudy Jackson, Rebeca Spencer, Gina Morris,
16 | accounts) as local drug redistributors in Western Washington. Agents have reviewed
17 | Facebook communications between Castro and many friends of these subject accounts.
18 | Subsequently, agents have observed, through physical and electronic surveillance,
19 | couriers for the CASTRO DTO travelling to addresses provided by those friends to the
20 | subject accounts and conducting short stay traffic consistent with drug transactions.

21 |      397.   CAMMEL's WADOL listed address is **7002 224th St. E, Graham,**
22 | **Washington.** I have observed, through analysis of real-time tracking data for vehicles
23 | utilized by the CASTRO DTO, that couriers stopped at **7002 224th St E, Graham,**
24 | **Washington**, three times in May 2018 during the time that the Chris Holdford account
25 | was active. Though agents did not receive any stored communications from the Chris
26 | Holdford account, I believe that CAMMEL was likely in direct contact with one of the
27 | couriers for the CASTRO DTO at this time. During the UC's interactions with the
28 | Castros and/or the couriers, agents learned that some of the more trusted local

1  redistributors for the DTO are in direct conversation with couriers and do not always
2  communicate with the Castros through Facebook.
3      398.   A separate DEA investigation in September 2018 identified **7002 224th St.**
4  **E, Graham, Washington**, as a stash house for another drug distributor in Western
5  Washington.  During that investigation, agents identified Travis Rawlings as a
6  methamphetamine and heroin distributor who was having packages of methamphetamine
7  delivered to **7002 224th St. E, Graham, Washington**.  FedEx has confirmed that
8  Rawlings was receiving packages at **7002 224th St. E, Graham, Washington**, and also
9  mailing packages out to a P.O. Box in San Diego.  Julia CAMMEL's Facebook account
10 is listed under "Julia Lynn Cammel-Rawlings."  Under this account, CAMMEL listed her
11 employment as a caretaker at "My Grandma's House."  Based on information gathered
12 from the separate DEA investigation mentioned above, agents have identified
13 "Grandma's House" as a storage facility for multiple local drug distributors.
14 Additionally, a Carrol Lynn Cammel has a listed WADOL address of **7002 224th St.**
15 **E, Graham, Washington**.  Carrol Cammel's criminal history includes a felony
16 conviction for Violation of the Uniformed Controlled Substances Act for possession with
17 intent to distribute in 2004.
18     399.   Furthermore, a Pierce County Sheriff's Office investigation from 2016 led
19 to the execution of a search warrant on March 10, 2017 at **7002 224th St. E, Graham,**
20 **Washington**.  Officers recovered a pound of methamphetamine, 3.5 pounds of heroin,
21 and $30,000 in drug proceeds, and Carrol Cammel was found to be in possession of a
22 user amount of drugs.  These additional investigations show that **7002 224th St.**
23 **E, Graham, Washington** has previously been used to store drugs and drug proceeds, and
24 I believe the tracking data placing CASTRO DTO couriers at **7002 224th St.**
25 **E, Graham, Washington**, combined with Julia CAMMEL's "friendship" with an
26 identified Castro Facebook account, shows the residence is still being used for drug
27 trafficking purposes.  Agents believe evidence of CAMMEL's drug trafficking activities
28

1  and the proceeds thereof will be located inside CAMMEL's home, **7002 224th St.**

2  **E, Graham, Washington**.

3      400.    In November 2018, U.S. Postal Inspector James Kilgallen ran a records

4  check for Julia CAMMEL.  That check of postal records indicated that Julia CAMMEL

5  received mail at **7002 224th St. E, Graham, Washington**, as recently as August 2018.

6      401.    Julia CAMMEL's criminal history consists of a 2012 felony VUCSA

7  conviction (possession of methamphetamine), gross misdemeanor convictions for escape

8  3, theft 3, and making a false statement (2 convictions) in 2014, 2013, 2012,  and 2011,

9  respectively, a 2013 misdemeanor conviction for drug paraphernalia/use, and a 2011

10  misdemeanor conviction for trespass 2.

11      **mm)Location 39.**  Residence of Blake HYNEK:  **1908 92nd Ave. E,**

12                  **Edgewood, Washington.**

13      402.    Agents first identified Blake HYNEK as an associate of the CASTRO DTO

14  following the execution of a search warrant on the Katherine Thomas Facebook account.

15  The Katherine Thomas account, as previously discussed in this Affidavit, is one of many

16  accounts that the Castros have used to conduct suspected drug transactions.  HYNEK was

17  friends with both the Katherine Thomas account and the Rebecca Spencer account.

18  Agents have also seen communications between HYNEK and the Castros over the

19  Katherine Thomas account.  During one specific communication on January 2, 2018,

20  HYNEK contacted Castro in order to purchase "one."  Based on my training and

21  experience and knowledge of these suspected drug traffickers—specifically, the retail

22  level redistributors who communicate with Castro over Facebook—I believe HYNEK

23  was referring to a 25 gram piece (one ounce) of high purity heroin.  Castro then

24  responded by stating the price was $1,150.  HYNEK subsequently renegotiated for 11

25  grams of suspected heroin for $500 instead.  During this communication, HYNEK also

26  told Castro he was going to introduce a new client to the DTO.  HYNEK told Castro

27  Megan CHAPMAN was interested in purchasing a piece (or 25 grams of high purity

28  heroin) a day.  Castro then asked if HYNEK was at his house.  HYNEK affirmed.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   HYNEK then attempted to renegotiate for 12 grams for $500, and stated that Shalesha

2   (HUDSON) gets her heroin for $925. Following this statement, Castro told HYNEK the

3   price was $1,000 and HUDSON ordered a different quality of heroin that is not 100%

4   pure. HYNEK subsequently agreed to purchase 11 grams for $500. This is just one

5   instance of suspected drug trafficking between HYNEK and the Castros observed over

6   the Katherine Thomas account.

7       403.    Agents saw communications about 13 such meetings arranged over the

8   Katherine Thomas account between December of 2017 and February 2018, resulting in a

9   suspected 450 grams of heroin purchased by HYNEK. During those meetings, HYNEK

10  met with couriers for the CASTRO DTO at public gas stations and at two of his previous

11  residences: one that was unknown to law enforcement and only referred to as HYNEK's

12  "house" and another residence located at 22919 112th Pl SE, Kent, Washington.

13      404.    HYNEK was also the target of another, independent DEA investigation. In

14  September 2018, agents arrested HYNEK during a buy-bust operation between a

15  confidential source and another DTO in Western Washington. During that buy-bust

16  operation, HYNEK acted as a courier, transporting three-quarters of a pound of

17  methamphetamine, on behalf of a suspected drug trafficker unknown to agents. During a

18  post-arrest interview, HYNEK told agents he lives at **1908 92nd Ave. E, Edgewood,**

19  **Washington**.

20      405.    Investigators know through searches of CASTRO DTO-related Facebook

21  accounts that HYNEK obtains an average of two ounces of high purity heroin from the

22  CASTRO DTO at a time and that HYNEK had requested deliveries at two separate

23  residences over a three-month span from December 2017 to February 2018. From

24  agents' review of the data received from several Facebook search warrants, as well as

25  information gathered from additional investigations agents believe HYNEK is a heroin

26  redistributor for the CASTRO DTO. Based on the information gathered from this

27  separate investigation and HYNEK's previous interactions with the Castros over

28

1   Facebook, I believe that HYNEK stores drugs and drug proceeds at **1908 92nd Ave. E,**
2   **Edgewood, Washington**.

3        406.    HYNEK's criminal history includes a felony conviction for Theft from
4   2012, felony arrest for Residential Burglary in 2008, a felony arrest for Robbery in 2008,
5   a felony conviction for Residential Burglary 2007, and two felony arrests for Controlled
6   Substance Manufacture Delivery Possession with Intent to distribute from 2011 and
7   2006.

8        **nn)  Location 40.** Residence of Larry SWEITZER: **75 Brookdale Lane,**
9               **Apartment E102, Bremerton, Washington.**

10       407.    Agents identified Larry SWEITZER as a redistributor for the CASTRO
11  DTO following the execution of the Katherine Thomas Facebook account search warrant.
12  Agents observed multiple conversations between the Castros, using the Katherine
13  Thomas account and SWEITZER, using his "Larry Sweitzer" Facebook account.  To
14  date, agents have identified eleven Facebook "Subject Accounts" believed to be used by
15  CASTRO under various aliases, including Katherine Thomas, Rudy Jackson, and Gina
16  Morris, and obtained search warrants to review their contents.  A review of Facebook
17  records revealed SWEITZER is a "friend" in multiple accounts, primarily to set up drug
18  deals.  Specifically, from March 14, 2018 to March 27, 2018, SWEITZER contacted
19  Castro seven times through the Gina Morris account.  During those conversations,
20  SWEITZER asked to meet a member of the DTO.  Castro confirmed someone would
21  meet with SWEITZER, and established a public location for the transaction.  Prior to
22  meeting the courier, SWEITZER consistently maintained contacted with Castro via the
23  Gina Morris account and further confirmed the suspected drug-related meeting.  Agents
24  estimate SWEITZER purchased approximately 288 grams of heroin over that 13-day
25  period.

26       408.    Analysis of the Facebook accounts used by the CASTRO DTO has shown
27  that the CASTRO brothers typically send a "thumbs up" emoticon to their drug associates
28  following each successful drug transaction.  The UC received a "thumbs up" emoticon

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  following each successful controlled purchase from the CASTRO DTO.  During the

2  instances described in the paragraph above, Castro sent a "thumbs up" emoticon,

3  indicating to agents that SWEITZER had successfully completed a drug transaction with

4  Castro.

5       409.   In addition to the Gina Morris account activity, agents analyzed various

6  date ranges in the Katherine Thomas account and determined between November 2017

7  and December 2017, SWEITZER met CASTRO couriers eight times for approximately

8  79 grams of heroin.

9       410.   Search warrants executed on several other accounts used by the Castros,

10  including the Rudy Jackson and the Steve Larson accounts, indicate that SWEITZER has

11  maintained his drug trafficking operations with the CASTRO DTO.  Information from

12  these two accounts indicated that SWEITZER met with a courier for the CASTRO DTO

13  14 times from July 22, 2018 to October 12, 2018.  SWEITZER again scheduled to meet

14  couriers at public locations, and typically ordered an ounce of heroin (25 grams) at a

15  time.  During several conversations between SWEITZER and the CASTRO DTO through

16  the Steve Larson account on September 11, 2018, September 20, 2018, and September

17  30, 2018, SWEITZER requested further instructions on where to meet.  I know that many

18  trusted redistributors for the CASTRO DTO are in direct contact with the couriers.  I

19  believe, considering SWEITZER's history of trafficking with the DTO, that couriers

20  were either contacted by the Castros and instructed to get in touch with SWEITZER,

21  SWEITZER contacted those couriers directly, or agents were unable to recover the entire

22  conversation between the DTO and SWEITZER over Facebook regarding these

23  meetings.   Agents estimate that SWEITZER purchased an additional approximately 300

24  grams of heroin from the CASTRO DTO based on Information gathered from the Rudy

25  Jackson and Steve Larson accounts.

26       411.    WADOL records list SWEITZER's address as **75 Brookdale Lane,**

27  **Apartment E102, Bremerton, Washington.**  On November 7, 2018, agents conducted

28  surveillance on **75 Brookdale Lane, Apartment E102, Bremerton, Washington.**  Upon

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

arriving at the residence, Det. Ejde observed **a blue Ford focus bearing Washington License BER8834**, registered to Nicole Duke at **75 Brookdale Lane, Apartment E102, Bremerton, Washington**. I have observed conversation between SWEITZER and Castro over the Rudy Jackson Facebook account pertaining to this vehicle. For example, on July 28, 2018, during a conversation with Castro over the Rudy Jackson Facebook account concerning the arrangement of a drug transaction, SWEITZER stated he was in a **"blue Ford focus."** After this specific conversation, Castro sent SWEITZER a "thumbs up" icon, indicating a successful drug transaction. This **"blue Ford focus"** is consistent with the vehicle Det. Ejde observed in front of **75 Brookdale Lane, Apartment E102, Bremerton, Washington**. At 11:15 a.m. on November 7, 2018, Det. Ejde observed SWEITZER leaving a recessed entryway to **Apartment E102**.

412.    Based on SWEITZER's previous communications with the CASTRO DTO over Facebook, I believe SWEITZER is a heroin redistributor for the CASTRO DTO. I further believe, based on training and experience, that SWEITZER is storing drugs and drug proceeds at his **75 Brookdale Lane, Apartment E102, Bremerton, Washington** residence.

413.    SWEITZER's criminal history consists of two felony VUCSA convictions (2011 and 2010), a felony theft 1 conviction (2011; 8 months' jail), and ten gross misdemeanor convictions, including one for a dangerous weapon violation.

      **oo)   Location 41.** Storage unit of Gregory WERBER:  **Unit 248B at 1st Avenue Self Storage, 2400 1st Ave. South, Seattle, Washington.**

414.    On August 30, 2018, agents intercepted multiple communications between ROCHA (TT43) and Sillas, and then ROCHA and the user of TT50. Agents did not know who the user of TT50 was when they first intercepted that number. Agents later positively identified the user of TT50 as Oscar Humberto CARRILLO Salcedo. From these intercepted communications and physical/electronic surveillance that followed, agents believe ROCHA and LOPEZ collected drug money from several of the DTO's high-volume distributors and associates on August 30, 2018, and then delivered that

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  money to CARRILLO on two separate occasions that same day.  Based on this same
2  information, agents believe ROCHA and Carlos LOPEZ delivered a total of $140,850 of
3  drug proceeds to CARRILLO on that day.

4      415.    During the first delivery, agents believe ROCHA and LOPEZ delivered
5  $106,000 to CARRILLO.  After CARRILLO received this money, he conducted several
6  counter surveillance maneuvers with his vehicle (a rental vehicle) and lost surveillance
7  agents immediately.  When ROCHA and LOPEZ met CARRILLO for the second time (at
8  a different location from their first meeting), agents noticed CARRILLO had changed
9  clothing.  At that point, agents believed CARRILLO was a trained and experienced
10  member of the DTO.  Based, once again, on intercepted communications and
11  physical/electronic surveillance, agents believe ROCHA and LOPEZ delivered $34,850
12  to CARRILLO on their second meeting of the day (this meeting occurred at the Bellevue
13  Square Mall).

14      416.    Agents used electronic surveillance means to observe another meeting
15  between CARRILLO (TT50) and Carlos LOPEZ (TT51) on the night of September 18,
16  2018.  On that day, agents monitoring TT50's real-time tracking, noticed the device
17  traveled from Memphis, Tennessee (where the device was the prior day as well) to
18  Newark, New Jersey, and then from Newark to Seattle, Washington.  Real-time tracking
19  of TT50 showed CARRILLO landed at SeaTac International Airport at 7:20 p.m. and
20  then traveled to the rental car section of the airport (arriving there at 8:05 p.m.).  Based
21  on the next day's physical surveillance, agents know CARRILLO rented a black Nissan
22  sedan from Enterprise during that time.  By 8:20 p.m. on September 18, 2018, TT50's
23  real-time tracking showed CARRILLO was at the "Hotel Interurban" located at 223
24  Andover Park East, Tukwila, Washington.  CARRILLO did not waste much time before
25  meeting with LOPEZ, as the real-time tracking for TT50 (CARRILLO), TT51 (LOPEZ)
26  and **TV4** (LOPEZ's vehicle) showed they were all at the same location (the Red Robin
27  restaurant at 17300 Southcenter Parkway, Tukwila) at the same time (8:49 p.m.) on
28  September 18, 2018.  LOPEZ (according to **TV4**'s tracking) only remained there for a

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1 | few minutes after 8:49 p.m. before leaving and driving back to his residence in Kent.
2 | TT50's real-time tracking indicated CARRILLO had also left the location before 9:00
3 | p.m. and returned to his nearby hotel.  Based on agents' previous observations of
4 | ROCHA (with LOPEZ) and CARRILLO, and the intercepted communications between
5 | ROCHA and CARRILLO (TT50) discussed below, I believe Carlos LOPEZ (TT51) and
6 | CARRILLO (TT50) met for just a few minutes on September 18, 2018, in order for
7 | LOPEZ to give CARRILLO drug proceeds.  I believe it is CARRILLO's job to transport
8 | those proceeds or see that they are otherwise laundered and received by higher-level
9 | members (including leaders) of the DTO.

10 |    417.    The following morning, September 19, 2018, agents followed CARRILLO
11 | (in his rental vehicle) from his hotel to a FedEx shipping center in Tukwila, Washington.
12 | There, agents watched CARRILLO bring a white FedEx box into the store and ship it.

13 |    418.    Agents continued to follow CARRILLO throughout the day on September
14 | 19, 2018 (via physical and electronic surveillance means).  They also monitored the
15 | tracking data for **TV4** and TT51 (LOPEZ) throughout that day and the pen registers
16 | associated with TT48 (URIAS), TT50 (CARRILLO), and TT51 (LOPEZ).  At 2:00 p.m.,
17 | agents saw **TV4** (LOPEZ) was traveling north and shortly after that, the pen register data
18 | showed TT51 (LOPEZ) was in communication with TT48 (URIAS).  Agents believed
19 | LOPEZ was likely traveling to meet with URIAS based on these communications.

20 |    419.    **TV4** (LOPEZ) traveled north of Lynnwood and made several stops
21 | between 3:45 p.m. and 5:15 p.m.  Pen register data for TT51 showed LOPEZ was in
22 | contact with URIAS multiple times after LOPEZ's 2:00 p.m. departure from the Kent
23 | area.  The pen register data also showed LOPEZ was in contact with Michael SCOTT;
24 | one of the places LOPEZ traveled to between 3:45 p.m. and 5:15 p.m. was **SCOTT's**
25 | **business at 18421 Highway 99, Suite B, Lynnwood, Washington**.  Agents believe
26 | LOPEZ met with at least URIAS and SCOTT while he was in the Lynnwood area, based
27 | on the stops LOPEZ made (according to **TV4**'s tracking) and the pen register data.
28 |

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

420.    After LOPEZ had driven to SCOTT's office, pen register data for TT51 (LOPEZ) showed the device was in contact with TT50 (CARRILLO). Tracking data for **TV4** showed LOPEZ drove directly from his stops in Lynnwood to the Cost Plus World Market located at 17680 Southcenter Parkway, Tukwila, Washington. LOPEZ arrived in the parking lot at 6:40 p.m., according to physical and electronic surveillance. LOPEZ was in contact with CARRILLO (TT50) multiple times throughout his journey from Lynnwood to Tukwila, according to pen register data. Agents following CARRILLO watched him drive to the Cost Plus World Market parking lot referenced above, where he arrived three minutes after LOPEZ. Pen register data showed TT50 (CARRILLO) and TT51 (LOPEZ) were in contact with each other right up until the time CARRILLO and LOPEZ physically met.

421.    Agents watched as LOPEZ got out of **TV4** with a black bag, seemingly once he saw CARRILLO's vehicle park in the parking lot. CARRILLO parked his rental vehicle and LOPEZ brought the bag over to the driver's side of the vehicle. CARRILLO put his driver's side window down and LOPEZ gave CARRILLO the black bag through that window opening. Agents believe this bag contained a large sum of money based on their previous observations of ROCHA, his associated vehicle and telephone tracking data, and the interceptions over one of ROCHA's prior phones (TT43) involving SCOTT, URIAS (TT48), and CARRILLO (TT50). These past interactions, observations and interceptions involving ROCHA were extremely similar to what agents saw LOPEZ take part in with the same people (in ROCHA's place), i.e., with URIAS, SCOTT, and CARRILLO.

422.    Based on tracking data, LOPEZ drove **TV4** directly back to his residence in Kent. Physical surveillance confirmed CARRILLO drove his rental vehicle back to his hotel. CARRILLO arrived at the hotel at 6:50 p.m. and took the black bag LOPEZ had just given him into the hotel.

423.    Tracking data showed CARRILLO (TT50) had traveled to **1st Avenue Self-Storage** located at **2400 1st Ave. South, Seattle, Washington**, on September 19 and

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    20, 2018.  During the first week of October 2018, Special Agent DelVecchio and I visited

2    this location and obtained records from the business regarding CARRILLO's activities

3    there.  This business is a secured-access facility; this means each tenant has a specific and

4    unique entry code he/she must enter in order to gain access to the secure storage portion

5    of the facility.  Access records show someone accessed **Unit 248B** on September 19 and

6    September 20, 2018, at the very same time CARRILLO (TT50) was at the location.

7    Based on this information alone, I believed CARRILLO accessed **2400 1st Avenue**

8    **South, Unit 248B, Seattle, Washington,** during his visit to this location.  My review of

9    **Unit 248B's** rental agreement and other records furthered my suspicion.

10        424.    My review of **Unit 248B's** rental records showed the unit is a small, 3' x 5'

11   x 4' unit rented in Gregory WERBER's name, using an address in Tempe, Arizona.

12   These rental records showed WERBER first began renting **Unit 248B** in February 2018

13   and has paid cash every month since for this rental.  Someone has frequently accessed

14   **Unit 248B** every month since WERBER began renting it.  WERBER's pen-and-ink

15   signature is not on the rental documentation for **Unit 248B**; the documentation was

16   signed with an electronic signature instead.  This means either WERBER opted not to use

17   his actual signature or he was not physically present when the account was established.

18   **Unit 248B** is too small to store a large number of items inside of it, but it is more than

19   large enough to store a significant quantity of cash—whether permanently or temporarily.

20        425.    As noted, CARRILLO visited this location on the two dates in September,

21   both of which were after he met with LOPEZ for suspected money pickups.  Based on

22   tracking data for TT50 (CARRILLO's phone), TT51 (LOPEZ's phone), and **TV4**

23   (LOPEZ's vehicle), agents believe CARRILLO met with LOPEZ on September 18, 2018,

24   after CARRILLO landed in Seattle.  CARRILLO visited **2400 1st Ave. South, Seattle,**

25   **Washington,** the following morning (September 19, 2018) and, based on storage access

26   records, I believe he accessed **Unit 248B**.  Based on physical and electronic surveillance,

27   agents know CARRILLO and LOPEZ met on the evening of September 19, 2018, and

28   LOPEZ gave CARRILLO a large black bag of suspected drug money.  Based on physical

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  and electronic surveillance, CARRILLO visited **2400 1st Ave. South, Seattle,**

2  **Washington,** the following day and, based on storage access records, I believe he

3  accessed **Unit 248B** once again.  Agents believe both of these visits to WERBER's

4  Seattle-based storage unit, **2400 1st Ave. South, Unit 248B, Seattle, Washington,** were

5  related to these drug money pickups with LOPEZ.

6      426.  On October 18, 2018, agents initiated the court-authorized interception of

7  wire and electronic communications over Oscar CARRILLO's phone (TT62).  In

8  intercepted communications over TT62 on October 20, 2018, CARRILLO arranged to

9  meet a suspected drug trafficker in Western Washington the following day (October 21,

10  2018) for a money pickup.  This person was later identified as Edgar CABRERA.

11      427.  At 8:31 a.m., on October 21, 2018, agents intercepted an incoming call

12  (Session 81) on TT62 from LOPEZ (TT70).  During this call, LOPEZ told CARRILLO

13  he would be done running "errands" in about 20 minutes (likely referring to picking up

14  drug money based on the history of interactions between LOPEZ and CARRILLO and

15  ROCHA and CARRILLO), and could go to CARRILLO's location after that.

16  CARRILLO told LOPEZ, "All right … I'll send you the address."  A few minutes after

17  this call, agents intercepted Session 83 on TT62, an outgoing text message to TT70,

18  which read, "1214 harrison street, 98109."  Based on this series of communications,

19  agents believed LOPEZ and CARRILLO would likely meet at or near 1214 Harrison

20  Street in Seattle, Washington, close to the apartment building where CARRILLO was

21  staying at the time.

22      428.  Ultimately, CARRILLO ended up meeting with CABRERA first on

23  October 21, 2018, and then with LOPEZ.  Agents watched CABRERA give CARRILLO

24  a weighted, white bag during their brief meeting.  CARRILLO brought that bag back into

25  the Chroma Apartments.  After that meeting, agents intercepted Session 101 on TT62.

26  This was an outgoing text message from CARRILLO to LOPEZ (TT70), which read,

27  "What's up Gordo [fat man], how's it going [?]"  LOPEZ replied in Session 103 on

28  TT62, "I'll be there in 30 min."  Agents intercepted Session 103 at 9:39 a.m.  LOPEZ did

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  not arrive at CARRILLO's location until 10:34 a.m.  LOPEZ's timing estimation in

2  Session 103 was slightly off, though LOPEZ (TT70) did call CARRILLO back at 10:35

3  a.m. (Session 108 on TT62) to let CARRILLO know he was very close to the location

4  CARRILLO had sent him via text message.

5       429.  At 10:35 a.m., agents saw CARRILLO walk out of the Chroma

6  Apartments.  CARRILLO was empty-handed when he walked out of the building.

7  CARRILLO saw LOPEZ's vehicle (**TV4**) on the street; CARRILLO got in as the front

8  passenger.  LOPEZ drove **TV4** a short distance away from the Chroma Apartments

9  before he stopped to let CARRILLO out of the vehicle.  CARRILLO was carrying a

10  green duffel bag when he got out of **TV4**.  Agents estimated the bag weighed around 30

11  pounds based on its size and the way CARRILLO seemed to strain while carrying it.

12  LOPEZ left the area in **TV4** and CARRILLO brought the bag back into the apartment

13  building.

14       430.  Twenty minutes after this meeting, CARRILLO left the apartment building

15  and drove to **1st Avenue Self-Storage, 2400 1st Ave. South, Seattle, Washington**.  Five

16  days earlier, on October 16, 2018, agents executed a delayed-notice search warrant at **1st**

17  **Avenue Self-Storage, 2400 1st Ave. South, Seattle, Washington**, specifically on **Unit**

18  **248B**.  The only items in the storage unit at the time of agents' search were FedEx

19  packaging materials, a large white plastic bag with the FedEx logo on it, and a money

20  counter.  The money counter was in the large white plastic bag when agents found it.

21  Agents photographed all of the items in the storage unit during their search and then put

22  all of those items back just as they had found them, so as not to alert CARRILLO or

23  WERBER.

24       431.  CARRILLO was at the storage facility for around ten minutes on October

25  21, 2018.  When he left, agents saw him carrying the same, large, white FedEx plastic

26  bag that had contained the money counter when agents conducted their court-authorized

27  search of **Unit 248B** less than a week before.  Agents noticed the bag appeared to be

28

1  weighted; CARRILLO loaded the bag into the trunk of his rental vehicle and drove back

2  to the Chroma Apartments.

3    432.    Agents believe CARRILLO traveled to **Unit 248B** on October 21, 2018, to

4  retrieve the money counter and bring it back to the apartment he was using in Seattle, in

5  order to count the drug money he received from LOPEZ (TT70) and CABRERA earlier

6  that morning.  Agents believe CARRILLO and WERBER are using **Unit 248B** to

7  facilitate their money transportation and money laundering activities for the CASTRO

8  DTO and others, based on physical and electronic surveillance, intercepted

9  communications, and agents' prior execution of a delayed-notice search warrant at this

10  very storage unit.  Agents believe a subsequent search of this unit may yield additional

11  evidence, including the same money counter.

12    **pp) Location 42.** Residence of Frances and Agustin JUAREZ Castillo:
13         **20707 106th Pl. SE, Kent, Washington**

14    433.    On multiple occasions throughout the course of this investigation, agents

15  have observed couriers for the CASTRO DTO traveling to and from **20707 106th Pl. SE,**

16  **Kent, Washington**, following drug transactions.  Specifically on July 13, 2018, agents

17  were intercepting communications over TT24 (ROCHA), while other agents

18  simultaneously conducted physical surveillance of ROCHA.  ROCHA (in TV5) left his

19  residence in Auburn shortly before 4:00 p.m.  At 4:09 p.m., ROCHA arrived at the

20  Auburn Outlet Collections mall and parked near the Burlington Coat Factory.  ROCHA

21  moved his position in the parking lot several times before he stopped near a black Dodge

22  Ram bearing Arizona license BRX8985, registered to EAN Holdings LLC (i.e., an

23  Enterprise rental vehicle).

24    434.    TV5 and this Dodge Ram drove in tandem, away from the Burlington Coat

25  Factory, and over to the Wal-Mart at the Auburn Outlet mall.  ROCHA and the

26  unidentified Hispanic male (UHM) passenger from the Dodge Ram walked into the Wal-

27  Mart separately, but came out within less than one minute of each other and were only in

28  the store for about five minutes.  ROCHA returned to TV5 and the UHM went back to

AFFIDAVIT OF JEREMY TAN - 172

1  the Dodge Ram.  The UHM got into the truck bed of the Dodge Ram and began

2  manipulating the tailgate.  At that time, ROCHA was sitting in TV5, waiting.  Agents

3  suspected the UHM was manipulating an access panel to a natural void or hiding place in

4  the Dodge Ram's tailgate.  The UHM spent about two minutes manipulating the tailgate

5  of the Dodge Ram before he hopped out of the truck bed and got back into the Dodge

6  Ram as the front passenger.  Once the UHM was back in the Dodge Ram, ROCHA drove

7  TV5 out of its parking spot in the Wal-Mart parking lot; the female driver of the Ram

8  (identified through rental records as Cindy Lopez) and the UHM followed ROCHA.

9       435.    TV5 and the Dodge Ram drove directly to **20707 106th Pl. SE, Kent,**

10  **Washington**, and arrived at 4:46 p.m.  Cindy Lopez backed the Dodge Ram into the

11  driveway of the residence and ROCHA parked TV5 on the street.  106th Place Southeast

12  is a small cul-de-sac, so agents were not able to see exactly what ROCHA, Cindy Lopez,

13  and the UHM were doing.  However, within five minutes, TV5 and the Dodge Ram drove

14  out of 106th Place Southeast and onto the next street over, 105th Place Southeast,

15  indicating to agents that the exchange was completed.  Both vehicles drove north on

16  105th Place Southeast and then made separate U-turns.  ROCHA drove TV5 directly

17  back to his residence in Auburn and Lopez drove the Dodge Ram to a nearby Mexican

18  restaurant.  Agents determined, through records checks, that the **20707 106th Pl. SE,**

19  **Kent, Washington**, residence is the residence of Frances and Agustin JUAREZ Castillo.

20       436.    This is just one instance where agents observed, through physical and

21  electronic surveillance, couriers for the CASTRO DTO stopping at **20707 106th Pl. SE,**

22  **Kent, Washington**.  Real-time tracking data for vehicles utilized by couriers for the

23  DTO indicates that couriers have stopped at **20707 106th Pl. SE, Kent, Washington**,

24  residence over 300 times since the start of this investigation.  On November 9, 2018, Det.

25  Graunke observed a white 2004 Chevy Express bearing Washington license C27437J

26  registered to Agustin JUAREZ Castillo parked in the driveway of **20707 106th Pl. SE,**

27  **Kent, Washington**.  I believe, based on observations of agents from physical

28  surveillance on July 13, 2018, and other dates, and the frequency of stops made by

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   couriers for the CASTRO DTO at **20707 106th Pl. SE, Kent, Washington**, that drugs
2   and/or drug proceeds are stored at this location.

3       437.    Agustin JUAREZ has no known criminal history.

4       **qq)  Location 43.**  Residence of Carlos HERNANDEZ:  **521 S Henderson**
5              **Street, Seattle, Washington.**

6       438.    Agents first became aware of a Hispanic male suspected to be Carlos
7   HERNANDEZ on September 27, 2018, as the result of intercepted calls between URIAS
8   (TT48) and 253-893-9855.  During a call (session 414 over TT48) from HERNANDEZ
9   (253-893-9855) to URIAS (TT48), URIAS told HERNANDEZ, "I was told that you were
10  going to give me the paper back and I'm returning that shit to you."  From this, I believe
11  that URIAS had been instructed by his handlers to return some narcotics that he had
12  previously received from HERNANDEZ ("that shit") and to get his money ("paper")
13  back.  Agents continued to intercept communications between URIAS and
14  HERNANDEZ regarding scheduling a meeting.  During Session 487 over TT48, on
15  September 28, 2018, URIAS asked HERNANDEZ for an address.  HERNANDEZ then
16  sent URIAS a text message containing the address "9525 14th ave S Seattle wa 98108."
17  This address is a gas station within two miles of **521 S Henderson St., Seattle,**
18  **Washington**.  URIAS then called HERNANDEZ (Session 490 over TT48) and stated he
19  would be at the meeting location around 1:30 p.m.  At approximately 1:15 p.m., URIAS
20  called HERNANDEZ again and asked him if he was in his truck.  HERNANDEZ
21  affirmed.

22      439.    Agents set up physical surveillance in the area of 9525 14th Ave. S, Seattle,
23  in anticipation of the meeting between URIAS and HERNANDEZ.  Subsequently agents
24  observed URIAS pull into a nearby gas station while driving **TV7**.  Shortly after, URIAS
25  exited **TV7** and entered the passenger side of a **grey 2004 Hummer H2 bearing**
26  **Washington license ADH9133**.  Less than five minutes later URIAS exited the
27  **Hummer H2** and returned to **TV7**.  As the **grey 2004 Hummer H2 bearing**
28  **Washington license ADH9133** left the gas station parking lot, I took several

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   photographs of the driver.  Based on the comparison of said photographs to Carlos

2   HERNANDEZ's WADOL photograph, agents believe HERNANDEZ was the driver of

3   the **grey 2004 Hummer H2 bearing Washington license ADH9133** during this meeting

4   with URIAS on September 27, 2018.

5       440.    Agents believed HERNANDEZ was the user of 253-893-9855 based on

6   intercepted communications over TT48 in conjunction with that physical and electronic

7   surveillance described above.  Agents then maintained physical surveillance on the **grey**

8   **2004 Hummer H2 bearing Washington license ADH9133** as it drove to **521 S**

9   **Henderson S., Seattle, Washington**.  According to WADOL records, the **grey 2004**

10  **Hummer H2 bearing Washington license ADH9133** is registered to Salvador P.

11  HERNANDEZ, whose listed WADOL address is **521 S Henderson St., Seattle,**

12  **Washington**.  Carlos HERNANDEZ also has a listed WADOL listed address of **521 S**

13  **Henderson St., Seattle, Washington**.

14      441.    This instance of suspected drug trafficking between URIAS and

15  HERNANDEZ is just one of several interactions between the two that agents have

16  become aware of through of interceptions over TT48.  On October 5, 2018, agents

17  intercepted a call (Session 1001 over TT48) between URIAS and HERNANDEZ.

18  During that call, HERNANDEZ arranged to meet URIAS at the same address where they

19  previously met on September 27, 2018; URIAS also told HERNANDEZ to text him the

20  address again, "just to make sure."  Shortly after that call, agents intercepted a text

21  message (Session 1004 over TT48) from HERNANDEZ to URIAS stating "9525 14th ave

22  S Seattle wa 98108," the same address at which agents observed the two meeting on

23  September 27, 2018.  HERNANDEZ then called URIAS (Session 1014 over TT48) and

24  told URIAS he was driving a white Chevy Silverado.  HERNANDEZ then asked URIAS

25  if he (URIAS) wanted to get in and meet with him in the vehicle.  Based on the casual

26  nature of these intercepted communications and URIAS' reference to returning suspected

27  drugs to HERNANDEZ I believe that HERNANDEZ and URIAS have been conducting

28  drug transactions for some time.

AFFIDAVIT OF JEREMY TAN - 175

442.     Furthermore, I believe that HERNANDEZ is a high-level drug redistributor who deals at least quarter-pound quantities of heroin or hundreds of pills when he meets with URIAS. I know URIAS to purchase drugs from other high-level distributors such as Carlos LOPEZ in pound quantities (of heroin) or the thousands (of pills), and to redistribute those drugs to others in large quantities.

443.     Moreover, HERNANDEZ and members of his family have previously been subject of an HSI narcotics-related investigation. During that investigation, HSI investigated five members of HERNANDEZ's family for crimes related to drug trafficking. Based on the above-mentioned intercepted communications, agents' observations of meetings between URIAS and HERNANDEZ during physical surveillance, and HSI's independent investigation into the HERNANDEZ family for their suspected drug trafficking activities, I believe Carlos HERNANDEZ is storing drugs and drugs proceeds at **521 S Henderson St., Seattle, Washington**.

444.     Agents' search for Carlos HERNANDEZ's criminal history yielded too many matched results based on his name and date of birth for agents to determine his criminal history. Agents also performed similar searches of Carlos' brother (Alejandro) and father (Salvador)—both of whom were also subjects of the aforementioned HSI investigation—and those searches also yielded a large number of results. Currently, agents do not know whether Carlos HERNANDEZ has a criminal history.

    **rr)   Location 44.** Residence of Edgar CABRERA:  **900 NE 65th St., Apartment 609, Seattle, Washington.**

445.     On November 11, 2018, during the early hours of the morning, agents noticed real-time tracking over TT63 (Martin GONZALEZ's phone) showed GONZALEZ was traveling westbound from Spokane, Washington. GONZALEZ is a suspected bulk drug transporter for the DTO, based on intercepted communications with HEREDIA, physical and electronic surveillance, pen register data, and his arrest on November 28, 2018, with approximately 15 pounds of heroin hidden in his tractor-trailer. At 9:59 a.m., TT63's pen register showed TT63 (GONZALEZ) had contacted 206-751-

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   0005 (TT74), a phone believed to be used by Edgar CABRERA.  Based on the real-time

2   tracking of TT63 and the coinciding pen register data at around the same time between

3   TT63 and TT74, agents anticipated GONZALEZ would likely meet with CABRERA.

4   Based on real-time tracking of TT74, agents began conducting surveillance in the area of

5   the apartment complex located at **900 NE 65th Street, Seattle, Washington,**

6   CABRERA's suspected residence based on prior surveillance observations and tracking

7   data associated with CABRERA's phone (TT74).  Upon arriving at **900 NE 65th Street,**

8   **Seattle, Washington**, agents saw a **grey Toyota Camry bearing Washington license**

9   **BKD8497 (TV14)** in space number 56 of the complex's parking garage.  Agents had

10   already observed **TV14** during surveillance of Oscar CARRILLO on October 21, 2018,

11   during a suspected drug money delivery.

12       446.   On November 11, 2018, at 11:15 a.m., agents saw Edgar CABRERA get

13   into **TV14** and depart the area of **900 NE 65th Street, Seattle, Washington**.  Agents

14   subsequently followed **TV14** while simultaneously using real-time tracking of TT74, and

15   confirmed the person using TT74 was indeed driving **TV14**.  At 11:46 a.m., TT63's pen

16   register showed TT74 contacted GONZALEZ (TT63) again.  At 11:48 a.m., real-time

17   tracking showed TT63 (GONZALEZ) was located at the North Bend Truck Stop in North

18   Bend, Washington.  At 11:56 a.m., pen register data showed TT74, again, contacted

19   GONZALEZ (TT63).

20       447.   At 12:03 p.m., agents observed **TV14** arrive at the North Bend Truck Stop,

21   get fuel, and park in between the Shell gas station and restaurants at the truck stop.

22   Moments later, agents saw GONZALEZ walk from a tractor-trailer displaying Arizona

23   license plate AH87591 (the same tractor-trailer agents saw during GONZALEZ's

24   suspected drug delivery to HEREDIA on September 20, 2018).  GONZALEZ was

25   carrying a grey-colored 5-gallon bucket—which appeared to be heavily weighted due to

26   the way GONZALEZ was carrying it (dropping his shoulder to one side and heaving the

27   bucket with his leg on occasion while he walked)—as he walked over to **TV14**.

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

448.    At 12:07 p.m., agents saw CABRERA and GONZALEZ meet at the trunk of **TV14**, where GONZALEZ heaved the 5-gallon bucket into the trunk. CABRERA gave a medium-sized red bag and a paint sprayer to GONZALEZ (which he took from the trunk of **TV14**), walked back to his tractor-trailer. Two minutes later, CABRERA left the truck stop parking lot in **TV14**. Agents then watched GONZALEZ access the engine compartment of his tractor-trailer and deliberately place the red bag somewhere inside the engine compartment. Agents suspect GONZALEZ has a hidden compartment somewhere in his tractor-trailer based on these observations. In addition, agents noticed GONZALEZ's tractor-trailer was the only truck that parked in the opposite manner from the rest of the trucks in the parking lot. All of the other trucks were backed-in to their parking stalls; GONZALEZ parked his the opposite way, which would keep any of his activities at the front of his vehicle out of view. At 12:18 p.m., agents watched GONZALEZ get inside his tractor-trailer and depart the truck stop. GONZALEZ drove east on I-90, back in the direction he had come from, indicating this visit to North Bend was not related to any type of legitimate product delivery, pickup, or service stop.

449.    After watching GONZALEZ leave the truck stop, agents conducting surveillance followed **TV14** back to **900 NE 65th Street, Seattle, Washington**. CABRERA drove all the way to his apartment complex, but pulled **TV14** over to the side of the street, just before his apartment complex. Agents believe this was CABRERA's attempt to detect police surveillance or anyone who may have been following him, since NE 66th Street in Seattle is a small roadway. After he pulled to the side of the road and stopped for about two minutes, CABRERA drove **TV14** into the gated garage area of **900 NE 65th Street, Seattle, Washington**. Special Agent DelVecchio, on foot, followed **TV14** into the garage and saw CABRERA retrieve the same grey colored 5-gallon bucket GONZALEZ gave him from **TV14**. Judging by the way that CABRERA lifted the bucket out of the vehicle, Special Agent DelVecchio estimated it probably weighed around 40 pounds. CABRERA entered the apartment complex, but Special Agent DelVecchio was not able to follow him at that time.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

450.    Minutes later, agents observed a small U-Haul truck arrive at garage entrance of **900 NE 65th Street, Seattle, Washington**.  The U-Haul attempted to pull into the garage, but then backed out.  The U-Haul truck pulled to the side of the road, near the garage entrance, and double-parked.  Shortly after the U-Haul truck had parked, agents saw CABRERA exit the apartment building and meet with the occupants of the U-Haul truck.  At that point, Special Agent DelVecchio was able to see the U-Haul was full of belongings such as boxes and furniture items—indicating the occupants of the U-Haul truck were likely moving into **900 NE 65th Street, Seattle, Washington**.  CABRERA and the occupants of the U-Haul truck seemed to be discussing the logistics of moving some of the larger objects into the apartment building.  Special Agent DelVecchio then approached CABRERA and the occupants of the U-Haul and offered to help them move their belongings into their apartment, which they accepted.

451.    Special Agent DelVecchio moved some of the belongings out of the truck with CABRERA.  CABRERA did not speak much English, but was able to convey simple instructions to Agent DelVecchio.  Agent DelVecchio, CABRERA, and the other two individuals took several items up to the sixth floor of the apartment building, on the south side of the complex.  When the group arrived on the sixth floor, CABRERA removed a set of keys from his pocket and handed them to Agent DelVecchio, indicating for Agent DelVecchio to pass the keys to the other Hispanic male.  Agent DelVecchio could see a Toyota key on the key ring and recognized it as the same set of keys (with the elevator access fob) he had previously seen CABRERA use to access the elevators.  The other Hispanic male used the key to open **Apartment 609**.  Special Agent DelVecchio helped CABRERA and his associates move these large furniture items into **Apartment 609** and saw the same grey colored 5-gallon bucket he and other agents observed GONZALEZ giving to CABRERA at the truck stop at the entrance.  The bucket was in the main hallway of **Apartment 609**.

452.    After helping CABRERA, the unidentified female, and unidentified male move some of their belongings into the apartment, Special Agent DelVecchio introduced

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  himself and bid them farewell.  The person seen driving **TV14** and meeting with

2  GONZALEZ earlier that same day introduced himself as "Edgar."  Of note, the listed

3  subscriber for 206-751-0005 (TT74) is "Edgar Cabrera."  From this and the fact that the

4  driver of **TV14** told Special Agent DelVecchio that his name is "Edgar," agents believe

5  Edgar's full name to be Edgar CABRERA.

6        453.    Agents believe CABRERA is a high-volume drug distributor for the DTO,

7  and that he stores drugs and drug-proceeds at **900 NE 65th Street, Apartment 609,**

8  **Seattle, Washington**, based on agents' training and experience and observations on

9  November 11, 2018.

10       454.    Currently, agents do not know CABRERA's criminal history.  They do not

11  know CABRERA's true date of birth at this time, which makes narrowing their search for

12  his potential criminal record very difficult.  There are too many individuals named

13  "Edgar Cabrera" listed in criminal database records for agents to determine if the

14  CABRERA they are investigating is one of those people and has a criminal history.

15       **ss)**  **Location 45.**  Residence of Constantino MARES Garcia:  **1312 80th Ave**
                  **SE, Lake Stevens, Washington.**
16

17       455.    On November 3, 2018, at 5:34 p.m., agents intercepted an outgoing call

18  (Session 24 over TT62) from CARRILLO to a male later identified as Constantino

19  MARES using 206-249-5690 (TT76).  During this call, CARRILLO and MARES agreed

20  to meet on November 4, 2018, so CARRILLO could pick up "some documents" (i.e.,

21  bulk cash/drug proceeds) from MARES.  Immediately after this call, CARRILLO sent

22  MARES (TT76) a text message that included an address of "1214 harrison street, 98109,"

23  the same address he sent CABRERA on October 21, 2018, so CABRERA could meet

24  CARRILLO to give him (CARRILLO) suspected drug-proceeds.  However, shortly after,

25  agents intercepted a series of phone calls and text messages (Sessions 25, 28 and 31 over

26  TT62) between CARRILLO and MARES (TT76), which indicated to agents that

27  CARRILLO and MARES rescheduled their meeting to occur that same day (November

28  3, 2018).  At 5:35 p.m., CARRILLO (TT62) sent a text message (Session 33) to MARES

1   (TT76) in which he told MARES, "please let me know when you are about 10 min,"

2   meaning CARRILLO wanted 10 minutes notice before MARES arrived at the meeting

3   location.

4       456.   On November 3, 2018, between 6:27 p.m. and 6:36 p.m., agents intercepted

5   an additional series of text messages (Sessions 33, 35, 37, 40, 42 and 44 over TT62)

6   between CARRILLO (TT62) and MARES (TT76).   During these communications,

7   MARES told CARRILLO, "I'll arrive in 10 min."   Subsequently, CARRILLO asked

8   MARES, "what car," to which MARES responded, "White Honda I'll arrive in 3 min."

9   From this, I believe MARES was on his way to meet CARRILLO, in a white Honda, and

10  he was close to the address CARRILLO had previously given him.   At 6:42 p.m., agents

11  intercepted an incoming text message (Session 46 over TT62) from MARES (TT76) to

12  CARRILLO (TT62).   MARES told CARRILLO "I already saw you man," which I

13  believe to have meant MARES was letting CARRILLO know he (MARES) had located

14  CARRILLO.   At 6:43 p.m., agents conducting surveillance in the area of 1214 Harrison

15  Street, Seattle, observed CARRILLO get into a **white 1998 Honda bearing Washington**

16  **license BKC6466**, registered to MARES per WADOL records.   Agents then watched the

17  **white 1998 Honda bearing Washington license BKC6466** drive around the block;

18  however, due to logistics, agents were not able to follow.

19      457.   On November 4, 2018, agents intercepted an outgoing text message

20  (Session 49) from CARRILLO (TT62) to MARES (TT76).   CARRILLO told MARES,

21  "Hey there were 31,005."   Based on the communications described above, agents'

22  observations, my training and experience and my knowledge of the CASTRO DTO, I

23  believe MARES met with CARRILLO on November 3, 2018, and delivered $31,005 in

24  suspected drug proceeds to him.   I believe that MARES meets with CARRILLO or other

25  money transporters for the CASTRO DTO regularly, and has been doing so for some

26  time, based on the nature of this observed meeting and the conversation leading up to it.

27  The meeting occurred very quickly, and MARES did not have to determine if he

28  (MARES) was meeting with the correct person.   In fact, MARES indicated he had

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   "already seen" CARRILLO before CARRILLO got into MARES' **white 1998 Honda**

2   **bearing Washington license BKC6466**.

3        458.   On November 7, 2018, agents received authorization from the Honorable

4   David W. Christel, United States Magistrate Judge for the Western District of

5   Washington, to activate real time tracking of TT76.  On November 8, 2018, agents set out

6   on surveillance in order to determine the user of TT76.  During that operation, agents set

7   up surveillance at **1312 80th Ave. SE, Lake Stevens, Washington**, which was TT76's

8   location based on real-time tracking data at that time.  Agents observed the **white 1998**

9   **Honda bearing Washington license BKC6466** parked on the street in front of **1312**

10  **80th Ave. SE, Lake Stevens, Washington**.  Agents also observed a **blue 2016 Toyota**

11  **Tacoma bearing Washington license C08613M**, registered to MARES per WADOL

12  records, parked in the driveway of **1312 80th Ave. SE, Lake Stevens, Washington**.

13  Based on agents' observations during physical surveillance, including the above-

14  mentioned instances, and the frequency of calls intercepted between MARES and Target

15  Telephone numbers in this investigation, I believe MARES is a significant redistributor

16  for the CASTRO DTO who has direct access to CARRILLO (unlike, e.g., URIAS, who

17  provides his drug proceeds to ROCHA and/or LOPEZ, who then pass them along to

18  CARRILLO).  I further believe drugs and/or drug proceeds are stored at **1312 80th Ave.**

19  **SE, Lake Stevens, Washington**.

20       459.   MARES has no known criminal history.

21       **tt)**    **Location 46.**  Residence of Oscar CARRILLO:  **Airmark Apartments,**

22                 **229 Andover Park E, Apartment 409, Tukwila, Washington.**

23       460.   I have discussed Oscar CARRILLO throughout this Affidavit, and

24  specifically in Subsection (oo).  On November 14, 2018, agents intercepted a call

25  (Session 162 over TT62) between CARRILLO and an employee of the **Airmark**

26  **Apartments**, using 206-988-8866.  During that call, CARRILLO identified himself as

27  Greg WERBER and scheduled an appointment for a walk-through in one of the

28  apartments.  Additionally, CARRILLO provided his number (TT62) to **Airmark** as a

1  good contact number. CARRILLO scheduled his appointment for 2:00 p.m. on

2  November 15, 2018.

3  461.    In anticipation of the scheduled appointment, agents began conducting

4  surveillance in the area of the **Airmark Apartments, 229 Andover Park E, Tukwila,**

5  **Washington**. At 1:57 p.m., agents noticed real-time tracking data for TT37 (WERBER)

6  was near the **Airmark Apartments, 229 Andover Park E, Tukwila, Washington**.

7  Moments later, agents on physical surveillance observed CARRILLO and WERBER

8  meeting in the lobby of the apartment complex with one of the employees. At that time,

9  WERBER and CARRILLO appeared to be filling out paperwork, indicating to agents this

10  location would likely be a new residence for CARRILLO.

11  462.    At 2:24 p.m., agents on physical surveillance observed CARRILLO talking

12  on his cellular phone. Simultaneously, agents intercepted a call (session 220 over TT62)

13  from an unidentified male (UM8553) using 52-331-175-8553 to CARRILLO. During

14  that call, UM8553 and CARRILLO discussed an issue UM8553 was encountering

15  depositing money for CARRILLO to use towards a studio apartment at the **Airmark**

16  **Apartments, 229 Andover Park E, Tukwila, Washington**. The two eventually agreed

17  to talk later when UM8553 resolved the issue. Shortly after, CARRILLO called Puget

18  Sound Energy (888-225-5773) to set up an account in order to have electric power

19  activated at **229 Andover Park E, Apartment 409, Tukwila, Washington**.

20  CARRILLO gave his name, date of birth, phone number, and email to Puget Sound

21  Energy as his personal identifiers to be associated with his account.

22  463.    As noted above in Subsection (oo), CARRILLO has accessed WERBER's

23  storage unit where a money counter is stored. Based on the small size of WERBER's

24  storage unit, it is highly unlikely CARRILLO uses the money counter there. I believe

25  CARRILLO takes the money counter to his location (previously, various hotel rooms and

26  apparent short-stay rentals) to count the suspected drug proceeds. Based on agents'

27  observations during physical and electronic surveillance, in conjunction with intercepted

28  communications, I believe CARRILLO likely stores at least a portion of the DTO's illicit

1  earnings at the **Airmark Apartments, 229 Andover Park E, Apartment 409, Tukwila,**

2  **Washington,** until he is able to pass them on.  Based on my experience and training, he

3  may also have some sort of ledger indicating how much money he received from whom

4  and when, and where he then sent the money.  While CARRILLO may not be directly

5  involved in the trafficking of drugs, his actions throughout this investigation have

6  facilitated the drug trafficking activities for the CASTRO DTO as a whole.

7      464.   CARRILLO has no known criminal history.

8      **uu)  Location 47.**  Residence of Martin Dean GREGORY:  **204 18th St. SE,**
9          **Puyallup, Washington**

10      465.   Agents first learned of Martin GREGORY's involvement with the DTO

11  following a suspected drug transaction with HIGUERA (**TV3**) at a Jack in The Box

12  parking lot in Tacoma, Washington, on July 5, 2018.  On this day, when HIGUERA

13  arrived he parked next to a **spray-painted red 2001 Lexus IS bearing Washington**

14  **license 419ZVA,** registered in WADOL records to Martin Dean GREGORY at 1006 W

15  Main, Puyallup, Washington, and a black 2015 Ford F-150 bearing Washington license

16  C70294E.  Special Agent Anthony DelVecchio observed a white male, later identified as

17  GREGORY, exit the **spray-painted red 2001 Lexus IS bearing Washington license**

18  **419ZVA** and enter **TV3**.  Shortly after, agents observed GREGORY exit **TV3**, and get

19  into the black Ford F-150.  I believe GREGORY got into **TV3** to ensure that HIGUERA

20  had the drugs before retrieving the money for the drugs from the occupant of the black

21  Ford F-150.  I further believe GREGORY then went back to HIGUERA, obtained drugs

22  from HIGUERA, and returned to the black Ford F-150 in order to supply the occupant of

23  the black Ford F-150 with said drugs.  HIGUERA departed the area shortly thereafter.

24  This sequence with GREGORY moving between the **spray-painted red 2001 Lexus IS**

25  **bearing Washington license 419ZVA, TV3,** and the black Ford F-150 occurred in less

26  than five minutes.

27      466.   Shortly after **TV3** left the Jack in the Box, agents observed GREGORY

28  meet with several other individuals.  Approximately twenty minutes later, agents

1  observed GREGORY meeting with a person occupying a Nissan Altima.  Agents then

2  observed GREGORY walk up to and lean into the passenger side of the black Ford F-150

3  before returning to the **spray-painted red 2001 Lexus IS bearing Washington license**

4  **419ZVA**.  Based on this continued interaction between GREGORY and the driver of the

5  black Ford F-150, I believe the driver is a criminal associate of GREGORY's, possibly

6  providing security for GREGORY and/or potentially watching for the presence of law

7  enforcement.  GREGORY then left the Jack in the Box in the **spray-painted red 2001**

8  **Lexus IS bearing Washington license 419ZVA**, followed by the black Ford F-150.

9         467.    Agents maintained physical surveillance on the **spray-painted red 2001**

10  **Lexus IS bearing Washington license 419ZVA** and the black Ford F-150 as they drove

11  directly to **204 18th St. SE, Puyallup, Washington**.  Based on the above described

12  interactions with HIGUERA and GREGORY's suspected drug customers, I believe

13  GREGORY obtained drugs from HIGUERA, sold a portion of these drugs, and

14  immediately drove to **204 18th St. SE, Puyallup, Washington**, where GREGORY likely

15  stored a portion of his suspected drug proceeds and/or a portion of the suspected drugs he

16  obtained from HIGUERA at the Jack In The Box.

17         468.    At around midnight of July 6, 2018, agents observed the **spray-painted red**

18  **2001 Lexus IS bearing Washington license 419ZVA** and the black Ford F-150 leave

19  **204 18th St. SE, Puyallup, Washington**.  Agents followed the **spray-painted red 2001**

20  **Lexus IS bearing Washington license 419ZVA** to a nearby Safeway parking lot in

21  Puyallup, Washington, where Special Agent Samuel Landis observed GREGORY

22  conduct several suspected drug transactions with the occupants of several vehicles in the

23  parking lot of the Safeway.  During one suspected drug transaction, agents observed

24  GREGORY counting money as he returned to his **spray-painted red 2001 Lexus IS**

25  **bearing Washington license 419ZVA** and then retrieve something from the center

26  console of the **spray-painted red 2001 Lexus IS bearing Washington license 419ZVA**

27  before returning to the suspected customer's vehicle.  During the subsequent surveillance

28  of GREGORY in the **spray-painted red 2001 Lexus IS bearing Washington license**

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  **419ZVA** and the black Ford F-150, agents observed GREGORY conducting multiple

2  unusual driving maneuvers, indicative of counter surveillance driving, and were unable to

3  continue following him.  However, agents believe GREGORY returned to **204 18th St.**

4  **SE, Puyallup, Washington**, since that is his registered address with WADOL and agents

5  have since seen the vehicle at the residence during the late night/early morning hours.

6  Based on these observations, along with training and experience, agents believe

7  GREGORY is likely storing at least a portion of his drugs and/or drug proceeds at this

8  location.

9      469.    Agents observed this interaction between GREGORY and the CASTRO

10  DTO in July 2018; I believe at this time that GREGORY had yet to establish himself as a

11  trustworthy local distributor for the DTO and was likely conducting most of his drug

12  resupplies from the DTO at public parking lots.  Presently, I believe that GREGORY has

13  established himself as a trustworthy retail level distributor for the DTO, which is agents

14  have recently observed couriers for the DTO traveling directly to GREGORY's residence

15  at **204 18th St. SE, Puyallup, Washington**.  From September 2018 through November

16  2018, agents have observed, via electronic surveillance, vehicles driven by couriers for

17  the CASTRO DTO stop at **204 18th St. SE, Puyallup, Washington** over 20 times.

18  Based on this consistent interaction between GREGORY and the CASTRO DTO, I

19  believe GREGORY maintains at least a portion of his drugs and/or drug-proceeds at **204**

20  **18th St. SE, Puyallup, Washington**.

21      470.    GREGORY's criminal history includes 9 felony convictions, 18 gross

22  misdemeanor convictions, and 49 arrests.  GREGORY's felony convictions include

23  attempt to elude in 2016 and 2015, controlled substance possession and theft-2 in 2014,

24  identity theft-2 in 2013, residential burglary and assault-3 in 2010, robbery-1 in 2007, and

25  taking a motor vehicle without permission in 2004.  GREGORY served 14 months in

26  prison starting in 2015 (attempt to elude), 13 months starting in 2010 (residential

27  burglary), and an unknown amount of time in 2007 (robbery-1).

28

**vv) Location 48.** Residence of Jose RANGEL Ortega: **11007 Paine Field Way, Everett, Washington.**

471. On September 29, 2018, at 2:30 p.m., agents intercepted an incoming text message to LOPEZ (Session 244 on TT51) from Sillas (TT52). This message read, "4259488579 on behalf of the mechanic and he will pay them at 8 man." The number in this text message (425-948-8579) is TT67.

472. At 2:51 p.m., agents intercepted an incoming call to LOPEZ (TT51), Session 247, from Sillas (TT52). During this call, Sillas asked LOPEZ, "I sent you a message, did you get it?" LOPEZ replied, "I'm looking at it, the one that was on behalf of the mechanic." Sillas then said, "Yes, give him 200 buttons and then mark them, already... he is going to pay eight for them." From this call, agents believed Sillas was instructing LOPEZ to ready 200 counterfeit oxycodone pills (made with fentanyl) for sale to a person associated to another DTO member with the nickname "the mechanic." Agents believe this associated individual was going to pay $8.00 per pill, based on Sillas' statements during this call.

473. At 3:34 p.m., agents intercepted an outgoing call, Session 253, from LOPEZ (TT51) to the user of TT67, later identified as Jose Alfredo RANGEL Ortega based on physical/electronic surveillance and WADOL records. During the call, LOPEZ told RANGEL, "What's up man? I need to give you some buttons on behalf of the mechanic." RANGEL asked LOPEZ what area he was in, and LOPEZ said he was in the Renton area. RANGEL told LOPEZ he (RANGEL) would call LOPEZ once he was free because he was "here, by Everett" at that time. The two agreed to meet later. Agents believe LOPEZ was referring to counterfeit oxycodone pills (made with fentanyl) when he used the word "buttons" in this call. The sale of these pills has become a mainstay of the CASTRO DTO's operations in Western Washington.

474. At 4:54 p.m., agents intercepted Session 255, an incoming call on TT51 (LOPEZ) from RANGEL (TT67). During this call, RANGEL confirmed LOPEZ was working for Sillas and then asked LOPEZ for an additional 1,000 pills, on top of the 200

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  for "the mechanic." RANGEL told LOPEZ to tell Sillas these extra thousand pills were
2  on behalf of "Pañal," and that the order had already been placed. Agents believe "Pañal"
3  may be RANGEL's manager in Mexico, similar to the relationship between Sillas and
4  DTO members LOPEZ and ROCHA. RANGEL also asked LOPEZ not to tell "the
5  mechanic" of this arrangement. LOPEZ told RANGEL that he (LOPEZ) would check on
6  whether he (LOPEZ) could supply that amount of pills to RANGEL.

7      475.    After this call, LOPEZ (TT51) immediately called Sillas (TT52), Session
8  256. During the call, Sillas instructed LOPEZ to give RANGEL "one thousand two
9  hundred and he will give you an additional ten bucks." Sillas more explicitly told
10  LOPEZ to give RANGEL the 1,000 pills at a price of $6.50 per pill, and the other 200
11  pills for the mechanic at a price of $8.00 per pill. Sillas said RANGEL would give
12  LOPEZ an additional $10,000 on top of the cost of these pills. Twenty minutes later,
13  LOPEZ provided RANGEL (TT67) with the address to the Auburn Outlet Collection
14  Mall in a text message (intercepted as Session 261). Agents believe it took LOPEZ
15  twenty minutes to send that message because he had to count the pills he was going to
16  sell to RANGEL at the Auburn Outlet Collection Mall.

17      476.    Between 5:33 p.m. and 5:56 p.m., agents intercepted Sessions 266, 268,
18  270 on TT51, all of which coincided with tracking data for LOPEZ's vehicle, **TV4**. **TV4**
19  left **22025 100th Ave. SE, Kent, Washington** (which was LOPEZ's residence at the
20  time) at 5:35 p.m. Just before that, in a call intercepted as Session 266, LOPEZ sounded
21  flustered (like he was rushing out the door) and told RANGEL he was 20 minutes away
22  from the meeting location. **TV4's** tracking showed LOPEZ traveled directly to the
23  Auburn Outlet Collection Mall from **22025 100th Ave. SE, Kent, Washington**.

24      477.    At 5:52 p.m., agents intercepted Session 268 on TT51, during which
25  LOPEZ told RANGEL (TT67) that he was almost at the mall. RANGEL said he was
26  pumping gas nearby, but would be right over. Surveillance footage at the mall showed a
27  grey Scion TC (that matched WADOL records showing **a grey Toyota Scion TC**
28  **bearing Washington license BGH6676 (TV13)** registered to RANGEL) parked in the

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1 mall's parking lot, south of the Burlington store. RANGEL got out of **TV13** and began

2 walking toward the mall. **TV4** arrived at the mall at 5:55 p.m. and approached the front

3 of the Burlington. At 5:56 p.m., agents intercepted Session 270 over TT51. During this

4 call, RANGEL (TT67) confirmed LOPEZ was driving a red Ford Ranger truck (**TV4**)

5 and told LOPEZ that he could see that very truck driving in the parking lot. RANGEL

6 said he was walking right behind LOPEZ's truck at the time of the call. Surveillance

7 footage showed RANGEL got into **TV4** as the front passenger at that same time.

8     478.   **TV4** then drove east across the front of the mall, turned around, and drove

9 west across the mall parking lot. After this, LOPEZ drove **TV4** close to where RANGEL

10 had parked **TV13** in the parking lot. LOPEZ stopped to let RANGEL out of **TV4** and

11 then drove away. **TV4** drove directly out of the mall parking lot. RANGEL got into

12 **TV13** and drove around the entire mall before he eventually exited onto 15th Street.

13 Agents believe this was possibly a counter-surveillance maneuver, since it was otherwise

14 unnecessary for RANGEL to drive in this manner. Based on intercepted

15 communications, surveillance footage, my training and experience, I believe LOPEZ

16 delivered 1,200 counterfeit oxycodone pills to RANGEL during this meeting, in

17 exchange for over $15,000 in cash—$6,500 for RANGEL's 1,000 pills, $1,600 for the

18 mechanic's 200 pills, and an extra $10,000, as described by Sillas.

19     479.   Agents have seen additional suspected drug/money transactions between

20 LOPEZ and RANGEL during this investigation. Agents positively identified RANGEL

21 as the user of TT67 through physical surveillance conducted during those additional

22 meetings. Intercepted communications supported the physical surveillance observations,

23 and showed RANGEL used TT67 to facilitate the transactions. Agents have observed

24 RANGEL driving **TV13** to meetings with couriers for the CASTRO DTO. **TV13** is

25 registered to RANGEL at **11007 Paine Field Way, Everett, Washington**. RANGEL's

26 WADOL listed address is also **11007 Paine Field Way, Everett, Washington**.

27 Additionally, on November 18, 2018, agents observed **TV13** parked near **11007 Paine**

28 **Field Way, Everett, Washington** during physical surveillance.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    480.    Agents do not believe RANGEL has a storage unit nor do agents believe he

2  has a stash house/secondary residence.  Based on this and my training and experience, I

3  believe the only feasible place for RANGEL to store his drug and/or drug proceeds is in

4  his vehicle (**TT13**) and/or his residence, **11007 Paine Field Way, Everett, Washington**.

5    481.    RANGEL's criminal history appears to consist of driving-related offenses

6  in Georgia.

7  **VIII.    PROBABLE CAUSE FOR THE VEHICLES TO BE SEARCHED**

8    482.    I have described many of the vehicles this Application requests

9  authorization to search throughout Sections V and VII of this Affidavit.  Where those

10  vehicles have already been discussed and probable cause established, I have indicated

11  below where.  I have not yet discussed some of the vehicles, and have provided a brief

12  description of the probable cause to search each of those vehicles below.

13    483.    During the instant investigation, which has spanned over a year, agents

14  have identified many vehicles that are believed to be used in the facilitation of the

15  CASTRO DTO's drug-trafficking activities in Western Washington, including vehicles

16  other than those described in this Affidavit.  The use of many vehicles is consistent with a

17  practice commonly known as "icing" vehicles, which is the practice of parking one

18  vehicle for an extended period while driving another.  Drug traffickers typically do this,

19  based on my training and experience, in an attempt to prevent any one vehicle from being

20  used regularly during drug transactions for a long period.  This is done in an attempt to

21  thwart the efforts of law enforcement who might try to conduct physical and/or electronic

22  surveillance of the DTO's commonly used vehicles.  In the case of the CASTRO DTO,

23  this has been done on a few occasions in direct response to law enforcement efforts

24  targeting particular CASTRO DTO vehicles.  This application seeks permission to search

25  35 specific vehicles identified as having been used in the CASTRO DTO's activities,

26  whether or not they are within the curtilage of the residential locations described in this

27  Affidavit and Attachments A and A1 through A48.

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

a.   **A red 2006 Ford Ranger bearing Washington license C04697M and/or Vehicle Identification Number (VIN) 1FTYR44E66PA14670, registered to Gerardo Arias at 1020 SW 126th St, Apt 214, Burien, Washington.**

484.   This vehicle is referenced in bold, as **TV4**, throughout Section VII of this Affidavit.  LOPEZ, ROCHA, and AVILES have each used **TV4** since April 2018.

b.   **A white 2008 Honda Accord bearing Washington license BJN4395 and/or VIN 1HGCP26808A009967, registered to Shawn Shaputis at 8188 Graystone Way NW, Silverdale, Washington.**

485.   This vehicle is referenced in bold, as **TV3**, throughout Section VII of this Affidavit.  HIGUERA and SARMIENTO have used **TV3** since April 2018.

c.   **A red 2002 Honda Civic bearing Washington license BKS2788 and/or VIN 1HGEM22912L053228, registered to Jaime HEREDIA Castro at 10115 Holly Drive, Apt B106, Everett, Washington.**

486.   This vehicle is referenced in bold as a **red Honda Civic bearing Washington license BKS2788**, in Sections VII(f) and (u) of this Affidavit.  HEREDIA has used this **red Honda Civic bearing Washington license BKS2788** throughout the instant investigation.

d.   **A beige 2001 Jeep Grand Cherokee bearing Washington license BKG1931 and/or VIN 1J4GW58N01C666831, registered to Juan Carlos AVILES at 11239 SE 260th St, Apartment D306, Kent, Washington.**

487.   This vehicle is registered to and used by Juan Carlos AVILES, a suspected drug redistributor for the CASTRO DTO in Western Washington as described in Section VII (g).  Though this vehicle has not been specifically mentioned in this Affidavit, agents have seen AVILES use this vehicle on several occasions, including leading up to and following a meeting with LOPEZ at the **22025 100th Ave. SE, Kent, Washington** stash residence.  Specifically, on October 25, 2018, agents observed AVILES drive the **beige 2001 Jeep Grand Cherokee bearing Washington license BKG1931 to 22025 100th**

1    Ave. SE, Kent, Washington residence where **TV4** was also parked. I believe the **beige**

2    **2001 Jeep Grand Cherokee bearing Washington license BKG1931** is AVILES'

3    primary vehicle, based on surveillance observations from October 2018. Based on what I

4    know about drug traffickers, I know it would be completely normal for AVILES to keep

5    a portion of his drugs or drug proceeds in his vehicle, in order to help him quickly

6    facilitate drug transactions with one of his customers if the need arises.

7        e.    **A 2016 Nissan Frontier bearing Washington license C30123H**
8              **and/or VIN 1N6AD0EV0GN768584, registered to Cindy**
9              **SOLTERO Jimenez at 31600 126th Ave. SE, Space 106, Auburn,**
             **Washington.**

10       488.   This vehicle is referenced in bold as a **2016 Nissan Frontier bearing**

11   **Washington plate C30123H,** in Section VII (d) of this Affidavit. SOLTERO has used

12   this **2016 Nissan Frontier bearing Washington plate C30123H** during the instant

13   investigation.

14       f.    **A black 2007 Kia Rondo, bearing Washington license BLE9305**
15             **and/or VIN KNAFG525477034596, registered to Hector URIAS**
16             **Moreno at 428 105th St. SW, Everett, Washington.**

17       489.   This vehicle is referenced in bold, as **TV7,** throughout Section VII of this

18   Affidavit. **TV7** has been URIAS' principle mode of transportation throughout this

19   investigation.

20       g.    **A green 2005 BMW X5 bearing Washington license BJM0956**
21             **and/or VIN 5UXFA13595LY22689, registered to Alma Yesenia**
             **Moran Reyes at 125 SW Campus Dr., Apartment 4-205, Federal**
22             **Way, Washington.**

23       490.   This vehicle is referenced in bold, as **TV9,** in Section VII of this Affidavit.

24   Carlos CASTRO has used **TV9** during the instant investigation.

25

26

27

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

h.   **A 2008 black Honda Civic bearing Washington License BFZ2558 and/or VIN 2HGFG21538H701703, registered to Adonia Melendez at 8024 150th St SE, Snohomish, Washington.**

491.   This vehicle is referenced in bold as **a 2008 black Honda Civic bearing Washington License BFZ2558**, in Section VII (k) of this Affidavit.  Michael SCOTT has used this **2008 black Honda Civic bearing Washington License BFZ2558** during the instant investigation.

i.   **A 2000 tan Chevy Silverado bearing Washington license C67402H and/or VIN 1GCEK19T7YE110772, registered to Jason Reed at 1228 Crowe St. SE, Lacey, Washington.**

492.   This vehicle is referenced in bold as **a 2000 tan Chevy Silverado bearing Washington license C67402H** in Sections VII(n) and (o) of this affidavit.  Julian Gauge ORDONEZ has used this **2000 tan Chevy Silverado bearing Washington license C67402H** during the instant investigation.

j.   **A silver 2013 Toyota Highlander bearing Washington license AQB8456 and/or VIN 5TDBK3EH8DS272785, registered to Michael and Esther SCOTT at 8024 150th St. SE, Snohomish, Washington.**

493.   This vehicle is referenced in bold as **a silver 2013 Toyota Highlander bearing Washington license AQB8456**, in Section VII (k) of this Affidavit.  Esther SCOTT has used this **silver 2013 Toyota Highlander bearing Washington license AQB8456** during the instant investigation.

k.   **A grey Toyota Camry bearing Washington license BKD8497 and/or VIN 4T1BE46K49U323365, registered to Aureliano De Jesus-Bazante at 2010 Front St., Trailer 7, Lynden, Washington.**

494.   This vehicle is referenced in bold as **a grey Toyota Camry bearing Washington license BKD8497** in Section VII (rr) of this Affidavit.  Edgar CABRERA has used this **grey Toyota Camry bearing Washington license BKD8497** during the instant investigation.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

l.      A red 1995 Mitsubishi Eclipse bearing Washington license AEV9270 and/or VIN 4A3AK44YXSE181939, registered to Jessica JOHNSON at 314 N 133rd St., Seattle, Washington.

495.    This vehicle is referenced in bold as **a red Mitsubishi Eclipse bearing Washington license AEV9270**, in Section VII (q) of this Affidavit.  Rolando ESPINDOLA has used this **red Mitsubishi Eclipse bearing Washington license AEV9270** during the instant investigation.

m.      A 2010 Harley Davidson motorcycle bearing Washington License 3E8988 and/or VIN 1HD1FR419AB631070, registered to Gerald RIGGINS at 5824 152nd St. E, Puyallup, Washington.

496.    This vehicle is referenced in bold as **a 2010 Harley Davidson motorcycle bearing Washington License 3E8988**, in Section VII (m) of this Affidavit.  Gerald RIGGINS has used this **Harley Davidson motorcycle bearing Washington License 3E8988** during the instant investigation.

n.      A silver 2000 Toyota Camry bearing Washington license BKU5269 and/or VIN 4T1BG22K8YU641962, registered to Michael SURYAN at 2131 Freestad Rd., Arlington, Washington.

497.    This vehicle is referenced in bold as a **silver 2000 Toyota Camry bearing Washington license BKU5269**, in Section VII (v) of this Affidavit.  The **silver 2000 Toyota Camry bearing Washington license BKU5269** is registered to Michael SURYAN and has been observed in the driveway of his **16809 8th Ave SW, Normandy Park, Washington** residence during the instant investigation.

o.      A grey 2007 Toyota Scion, bearing Washington license BGH6676 and/or VIN JTKDE177170159625, registered as sold to Josafat RANGEL at 11007 Paine Field Way, Everett, Washington.

498.    This vehicle is reference in bold as **TV13**, in Section VII (vv) of this Affidavit.  **TV13** is registered as sold to Josafat RANGEL, suspected to be an alias used by Jose RANGEL Ortega, at **11007 Paine Field Way, Everett, Washington** and has

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   been observed in the vicinity of that residence.  RANGEL has used **TV13** during the

2   instant investigation.

3         p.      **A white 1998 Honda bearing Washington license BKC6466 and/or**

4                   **VIN 1HGCG2258WA023530, registered to Constantino MARES**

                  **Garcia at 16717 Alderwood Mall Pkwy, Apartment K304,**

5                   **Lynnwood, Washington.**

6       499.    This vehicle is referenced in bold as **a white 1998 Honda bearing**

7   **Washington license BKC6466**, in Section VII (ss) of this Affidavit.  This **white 1998**

8   **Honda bearing Washington license BKC6466** is registered to MARES and has been

9   observed near MARES' **1312 80th Ave SE, Lake Stevens, Washington** residence.

10   MARES has used this **white 1998 Honda bearing Washington license BKC6466**

11   during the instant investigation.

12         q.      **A blue 2016 Toyota Tacoma bearing Washington license**

13                   **C08613M and/or VIN 3TMCZ5AN2GM006576, registered to**

                  **Constantino MARES Garcia at 2510 164th St. SW, Apartment**

14                   **B105, Lynnwood, Washington**

15

16       500.    This vehicle is referenced in bold as **a blue 2016 Toyota Tacoma bearing**

17   **Washington license C08613M**, in Section VII (ss) of this Affidavit.  This **blue 2016**

18.   **Toyota Tacoma bearing Washington license C08613M** is registered to MARES and

19   has been observed in the driveway of his **1312 80th Ave SE, Lake Stevens, Washington**

20   residence during the instant investigation.

21         r.      **A red 2018 Chevrolet Silverado, bearing Washington license**

                  **C66267L and/or VIN 3GCUKSEC7JG172100, registered to**

22                   **Wenceslao BARAJAS-Barajas at 628 East Fairhaven Ave.,**

23                   **Burlington, Washington.**

24       501.    This vehicle is referenced in bold as a **red 2018 Chevrolet Silverado**

25   **bearing Washington license C66267L**, in Sections VII (w) and (y) of this Affidavit.

26   Orlando BARAJAS has used this **red Chevrolet Silverado bearing Washington license**

27   **C66267L** during the instant investigation.

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1
2
3

    s.      **A spray-painted red 2001 Lexus IS bearing Washington license 419ZVA and/or VIN JTHBD182410010023, registered as sold to Martin Dean GREGORY at 1006 W Main, Puyallup, Washington.**

4
5
6
7

502.    This vehicle is referenced in bold as **a spray-painted red 2001 Lexus IS bearing Washington license 419ZVA**, in Section VII (uu) of this Affidavit.  GREGORY has used this **spray-painted red 2001 Lexus IS bearing Washington license 419ZVA** during the instant investigation.

8
9

    t.      **A white 2012 Dodge Ram 1500 truck bearing Washington license C50312M and/or VIN 1C6RD7KP8CS278496, registered to Omar VALTIERRA at 16508 SE 147th St., Renton, Washington.**

10
11
12
13

503.    This vehicle is referenced in bold as a **2012 white Dodge Ram 1500 bearing Washington license C50312M**, in Section VII(bb) of this Affidavit. VALTIERRA has used this **2012 white Dodge Ram 1500, Washington license C50312M** during the instant investigation.

14
15
16

    u.      **A 2013 black Chrysler 300 sedan bearing Washington license AKG4277 and/or VIN 2C3CCAAG4DH533206, registered to Omar VALTIERRA at 16508 SE 147th St., Renton, Washington.**

17
18
19
20

504.    This vehicle is referenced in bold as a **2013 black Chrysler 300 sedan bearing Washington license AKG4277**, in Section VII (bb) of this Affidavit. VALTIERRA has used this **2013 black Chrysler 300 sedan bearing Washington license AKG4277** during the instant investigation.

21
22
23

    v.      **A 2005 grey Volkswagen Jetta bearing Oregon license 902KTS and/or VIN 3VWPG71K75M643370, registered to Jorge VALENZUELA Armenta at 515 SW 13th Place, Apartment H3, Hermiston, Oregon.**

24
25
26
27

505.    This vehicle is referenced in bold as **a 2005 grey Volkswagen Jetta, bearing Oregon license 902KTS**, in Section VII (j) of this Affidavit.  VALENZUELA has used this **2005 grey Volkswagen Jetta, bearing Oregon license 902KTS** during the instant investigation.

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1

2

3

      w.     **A 2001 white Nissan Altima bearing Washington license AVW7517 and/or VIN 1N4DL01D41C121162, registered to Cleotilde Velasco at 1400 North 30th St. 167, Mount Vernon, Washington.**

4

5

6

    506.   This vehicle is referenced in bold as **a 2001 white Nissan Altima bearing license AVW7517**, in Section VII (y) of this Affidavit. Jose VELASCO has used this **2001 white Nissan Altima bearing license AVW751** during the instant investigation.

7

8

9

      x.     **A 2000 black Mercedes 5004D bearing Washington license BLY6302 and/or VIN WDBNG75J9YA056681, registered to Brenden K Freitas at 3201 228th St. SW, Brier, Washington.**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

    507.   This 2000 black Mercedes 5004D bearing Washington license BLY6302 is further referenced as **Target Vehicle 11 or TV11**. **TV11** is registered to Brenden K. Freitas and used by Andrew KRISTOVICH, a suspected drug distributor in Western Washington. Though **TV11** has not specifically been mentioned in this Affidavit, agents observed KRISTOVICH use it to possibly meet drug customers in Lynnwood, Washington. Specifically, on November 18, 2018, agents observed KRISTOVICH drive **TV11** to an abandoned parking area and wait. Based on my training and experience, I believe KRISTOVICH was meeting a customer to sell drugs. Additionally, KRISTOVICH is a target in a separate DEA investigation that has identified **TV11** as one he (KRISTOVICH) has used to distribute drugs. As described in Section VII (ww) of this Affidavit, KRISTOVICH does not have a fixed residence, but rather moves from hotel to hotel. Given this, and based on what I know about drug distributors, I know it would be completely normal for KRISTOVICH to keep a portion of his drugs or drug proceeds in his vehicle, in order to help him quickly facilitate drug transactions with one of his customers.

25

26

27

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1

2

y.      **A 2002 silver Mercedes 3204D bearing Washington license AYT2335 and/or VIN WDBRF64J92F203530, registered to Gabor Kallai at 3055 Burris Road Lot 148, Davie, Florida.**

3

4

508.    This vehicle is referenced in bold as **Target Vehicle 12 or TV12**, in

5    Section VII (w) of this Affidavit.  Andrew KRISTOVICH has used **TV12** during the

6    instant investigation.

7

z.      **A 2012 white Hyundai Accent bearing California license 7CQD771 and/or VIN KMHCT4AE9CU170677, registered to Victoria Mendez at 2629 Lincoln Way, D14, Lynnwood City, Washington.**

8

9

10

509.    This vehicle is referenced in bold as **a 2012 white Hyundai Accent**

11   **bearing California license 7CQD771 (TV10)**, in Section VII(s) of this Affidavit.

12   Carlos CASTRO has used this **2012 white Hyundai Accent bearing license 7CQD771**

13   during the instant investigation.

14

aa.     **A grey 2004 Hummer H2 bearing Washington license ADH9133 and/or VIN 5GRGN23U94H115275, registered to Salvador HERNANDEZ at 2014 S 26th Ave, Yakima, Washington.**

15

16

17

510.    This vehicle is referenced in bold as **a grey 2004 Hummer H2 bearing**

18   **Washington license ADH9133**, in Section VII (qq) of this Affidavit.  Carlos

19   HERNANDEZ has use this **grey 2004 Hummer H2 bearing Washington license**

20   **ADH9133** during the instant investigation.

21

bb.     **A black 1999 Toyota Corolla bearing Washington license AXZ8671 and/or VIN 1NXBR12E6XZ168642, registered to Juan Cervantes Falfan at 11315 26th Ave. S, Apartment 5-208, Burien, Washington.**

22

23

24

511.    This vehicle is referenced in bold as **a black 1999 Toyota Corolla bearing**

25   **Washington license AXZ8671**, in Section VII (aa) of this Affidavit.  Uriel ZELAYA has

26   used this **black 1999 Toyota Corolla bearing Washington license AXZ8671** during the

27   instant investigation.

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

cc.   **A 2010 red tractor-trailer truck bearing California license XP09765 and/or VIN 1XKAD49X8AJ271744, registered to Southwester Carriers Corporation at 8684 Avenida De La Fuente, San Diego, California.**

512.   Though this **2010 red tractor-trailer truck bearing California license XP09765** has not been mentioned in this Affidavit, it has been used by Ramon PUENTES during the instant investigation for the purposes of transporting drugs and/or drug proceeds for the CASTRO DTO.  For example, on October 12, 2018, at 6:58 p.m., agents intercepted an incoming call (Session 1799 over TT51) from PUENTES (TT64) to LOPEZ (TT51).  During Session 1799, PUENTES told LOPEZ he was on "Highway 90," which I believe was likely a reference to Interstate 90.  PUENTES then asked LOPEZ if he was going to bring some "receipts" to him.  Based on my training and experience and my knowledge of this investigation, I know these drug traffickers to utilize references to paper materials (e.g., receipts) as coded language for money.  From the conversation described below, agents also learned PUENTES was the likely "gusano" (truck driver) referred to in LOPEZ's earlier communications.

513.   At 7:01 p.m., agents intercepted an incoming text message (Session 1802 over TT51) from PUENTES (TT64) to LOPEZ (TT51).  This text message contained an address of "46600 SE North Bend Way, North Bend, WA 98045," a truck stop called TA Truck Service just off Interstate 90 in North Bend, Washington.  Based on the previous communication between LOPEZ and PUENTES, agents believed this would be their likely meeting location.  Immediately after intercepting this text message, agents began conducting physical surveillance in the area of TA Truck Service in anticipation of a meeting between PUENTES and LOPEZ.

514.   At 8:29 p.m., agents intercepted an outgoing call (Session 1811 over TT51) from LOPEZ (TT51) to PUENTES (TT64).  During this call, agents believe LOPEZ told PUENTES he would be there (i.e., at TA Truck Service) in five minutes.  PUENTES then told LOPEZ to meet him "where the trucks are at," further indicating to agents

1   PUENTES would be likely driving a tractor-trailer.  Based on my training, experience,

2   and previously intercepted communications between LOPEZ and PUENTES, I believe

3   when PUENTES asked, "Are you bringing it inside a box or something?" he wanted to be

4   sure LOPEZ was going to conceal the suspected drug proceeds in order to reduce

5   unnecessary attention from passers-by or detection from law enforcement.  I further

6   believe this type of behavior is consistent with that of a drug trafficker taking precaution

7   in order to avoid detection.

8        515.   At 8:34 p.m., agents intercepted an outgoing call (Session 1813 over TT51)

9   to PUENTES (TT64) from LOPEZ (TT51).  During this call, LOPEZ relayed to

10  PUENTES that he had arrived "where the restaurant is at."  Agents then traveled to the

11  neighboring restaurant, Country Pride, in order to locate LOPEZ.  At 8:35 p.m., agents

12  found LOPEZ (in **TV4**) parked at the Country Pride restaurant, next door to TA Truck

13  Services.  A couple minutes later, agents then observed a Hispanic male—positively

14  identified as PUENTES based on past surveillance photographs—walk from TA Truck

15  Services over to **TV4** and get inside.  Agents watched LOPEZ and PUENTES meet in

16  **TV4** for a couple of minutes.  At 8:39 p.m., **TV4**—occupied by LOPEZ and

17  PUENTES—drove over to an area where TA Truck Services allotted space for tractor-

18  trailer parking.

19       516.   Subsequently, agents conducting surveillance lost sight of **TV4**; however,

20  agents did locate a **2010 red tractor-trailer truck bearing California license XP09765**.

21  PUENTES was driving this same **2010 red tractor-trailer truck bearing California**

22  **license XP09765** when he met with LOPEZ on October 5, 2018, for a suspected bulk

23  drug delivery.  At 8:40 p.m., agents saw PUENTES in the **2010 red tractor-trailer truck**

24  **bearing California license XP09765** digging around in the cab as if he was trying to

25  hide something (i.e., what I believe to have been the bulk cash he recently obtained from

26  LOPEZ).  At 8:48 p.m., agents saw LOPEZ (**TV4**) leave the area and discontinued

27  surveillance.  This is just one instance where agents have observed PUENTES utilizing

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  the **2010 red tractor-trailer truck bearing California license XP09765** during physical

2  surveillance of the CASTRO DTO.

3      517.    Agents will only seek to execute the search warrant on the **2010 red**

4  **tractor-trailer truck bearing California license XP09765** if it is located in this District.

5          dd.     **A blue 2004 Volvo S80 bearing Washington license plate**
                    **BHK8013, registered to Jerry RODRIGUEZ Jaime at 859 116th**
6                   **Street S, Tacoma, Washington.**

7
8       518.    This vehicle is referenced in bold as a **blue 2004 Volvo S80 bearing**

9  **Washington license plate BHK8013** in Section VII (cc) of this Affidavit.

10  RODRIGUEZ has used this **blue 2004 Volvo S80 bearing Washington license plate**

11  **BHK8013** during the instant investigation.

12          ee.     **A silver 2006 BMW bearing Washington license AYY7257 and/or**
                    **VIN WBAVB13536PT26465, registered to Brian LIVELY at 8123**
13                  **71st Pl. SE, Snohomish, Washington.**

14
15      519.    This vehicle is referenced in bold as **a silver 2006 BMW bearing**

    **Washington license AYY7257**, in Section VII (z) of this Affidavit.  LIVELY has used
16
    this **silver 2006 BMW bearing Washington license AYY7257** during the instant
17
    investigation.
18
            ff.     **A black Chevrolet Silverado bearing Washington license C21970N**
19                  **and/or VIN 3GCUKREC8JG497850, registered to Brian LIVELY**
                    **at 8123 71st Pl. SE, Snohomish, Washington.**
20
21      520.    This vehicle is referenced in bold as **a black Chevy Silverado with no**

22  **rear license plate**, in Section VII (z) of this Affidavit.  This black Chevrolet Silverado

23  bearing Washington license C21970N has been in the driveway of LIVELY's **8123 71st**

24  **Pl. SE, Snohomish, Washington** residence several times during the instant investigation.

25

26

27

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

gg.     **A blue Ford focus bearing Washington License BER8834 and/or VIN 1FAFP34P32W344894, registered to Nicole Duke at 75 NE Brookdale Ln, Apartment E102, Bremerton, Washington.**

521.    This vehicle is referenced in bold as **a blue Ford focus bearing Washington License BER8834**, in Section VII (nn) of this Affidavit. Larry SWEITZER has used this **blue Ford focus bearing Washington License BER8834** during the instant investigation.

hh.     **A 1996 white Nissan Maxima bearing Washington license BGR7720, registered to Joshua MENDIOLA at 10502 141st St. Court E, Puyallup, Washington.**

522.    This vehicle is referenced in bold as **a 1996 white Nissan Maxima bearing Washington license BGR7720**, in Section VII (ee) of this Affidavit. Joshua MENDIOLA has used this **1996 white Nissan Maxima bearing Washington license BGR7720** during the instant investigation.

ii.     **A grey 2016 Honda Accord bearing Arizona license CJN8101 and Oregon license CA99207 and/or VIN 1HGCR2F72GA220572, registered to Paola Edith Morales Ortiz at 5727 East Seneca Street, Tucson, Arizona.**

523.    On November 15 and 16, 2018, agents conducted physical and electronic surveillance of Carlos LOPEZ. On both of those days, agents saw LOPEZ meet with Oscar CARRILLO for two separate money drops that occurred at the Southcenter Mall. Agents were still intercepting communications over CARRILLO's phone (TT62) during that time.

524.    Agents intercepted a number of communications between LOPEZ and CARRILLO on November 15, 2018. Based on physical and electronic surveillance during that day, agents knew CARRILLO was with Gregory WERBER, in Western Washington, and the two were there to rent an apartment for CARRILLO in Tukwila, Washington. LOPEZ and CARRILLO agreed to meet at the Southcenter Mall for LOPEZ to deliver drug proceeds to CARRILLO. Prior to this money drop, agents had

1    watched LOPEZ meet with other members of the DTO, including SCOTT, URIAS,

2    VALENZUELA, and a newly identified member of the DTO, known only at this time by

3    his nickname, "WILSON."

4        525.    Once LOPEZ had finished his suspected money pickups from other

5    members of the DTO, he contacted CARRILLO and the two agreed to meet at the

6    Southcenter Mall in Tukwila, Washington.  Agents were physically watching LOPEZ and

7    CARRILLO at that time.  As it got closer to their agreed-upon meeting time, CARRILLO

8    left the hotel he was staying in and drove a **grey 2016 Honda Accord bearing Arizona**

9    **license CJN8101 and Oregon license CA99207** to the Southcenter Mall.  At that time,

10   agents noticed the vehicle had an Oregon license plate displayed on the front of the

11   vehicle and an Arizona license plate displayed on the rear of the vehicle.  Agents checked

12   Arizona and Oregon vehicle licensing records and found the VINs associated with the

13   two different license plates was the same.

14       526.    LOPEZ and CARRILLO met in the mall on November 15, 2018, and

15   LOPEZ handed a shopping bag to CARRILLO.  They then walked out of the mall

16   together and went over to LOPEZ's vehicle (**TV4**) in the parking lot.  LOPEZ retrieved a

17   small black bag from **TV4's** back seat.  LOPEZ gave that bag to CARRILLO and

18   CARRILLO placed it inside the shopping bag LOPEZ had given him earlier.

19   CARRILLO took that bag over to his **grey 2016 Honda Accord bearing Arizona**

20   **license CJN8101 and Oregon license CA99207**, left the mall, and returned to the hotel

21   where WERBER was located.  Based on intercepted communications over TT70

22   (LOPEZ), agents believe LOPEZ delivered $59,000 of drug proceeds to CARRILLO

23   during their meeting.  Based on agents' observations, they know CARRILLO used the

24   **grey 2016 Honda Accord bearing Arizona license CJN8101 and Oregon license**

25   **CA99207** to transport these proceeds.  They believe he may have given these proceeds

26   directly to WERBER once the two of them met back up at the hotel in Tukwila.

27   CARRILLO drove WERBER back to the airport (in the **grey 2016 Honda Accord**

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  **bearing Arizona license CJN8101 and Oregon license CA99207**) immediately after

2  CARRILLO got back from this meeting with LOPEZ.

3  527.   On November 16, 2018, LOPEZ met with CARRILLO again and the two

4  conducted a very similar set of activities at the Southcenter Mall.  Agents watched

5  CARRILLO accept another bag from LOPEZ (a bag which LOPEZ pulled from **TV4**);

6  and then CARRILLO transported that bag in the **grey 2016 Honda Accord bearing**

7  **Arizona license CJN8101 and Oregon license CA99207** back to the **Airmark**

8  **Apartments, 229 Andover Park E, Apartment 409, Tukwila, Washington**.  Agents

9  believe CARRILLO has used and is using the **grey 2016 Honda Accord bearing**

10 **Arizona license CJN8101 and Oregon license CA99207** to transport drug proceeds and

11 facilitate the money laundering activities of the CASTRO DTO.  I believe evidence of

12 these crimes may be located with the vehicle.

13 ## IX.   TACTICS USED BY DRUG TRAFFICKERS

14 528.   Based upon my training, experience, and participation in this and other

15 investigations involving narcotics trafficking, my conversations with other experienced

16 investigators and law enforcement investigators with whom I work, and interviews of

17 individuals who have been involved in the trafficking of methamphetamine, cocaine,

18 oxycodone, fentanyl and other drugs, I have learned and know the following:

19 529.   Drug trafficking organizations often use "stash houses" to conceal their

20 illegal activities and contraband.  Such stash houses allow drug traffickers to keep their

21 contraband at a hidden location, where they may not live, thereby making it more

22 difficult for law enforcement and/or competitors to identify these locations where drugs

23 and drug proceeds may be hidden.

24 530.   It is common for drug dealers to hide proceeds of illegal narcotics sales and

25 records of illegal narcotics transactions in secure locations within their residences, stash

26 houses, storage units, garages, outbuildings and/or vehicles on the property for their

27 ready access and to conceal them from law enforcement authorities.

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

531.   It is common to find papers, letters, billings, documents, and other writings, which show ownership, dominion, and control of businesses, residences, and/or vehicles in the residences, stash houses, storage units, garages, outbuildings and/or vehicles of drug traffickers.  Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises also include canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, keys, financial papers, rental receipts and property ownership papers, personal and business telephone and address books and telephone toll records, and other personal papers or identification cards in the names of subjects involved in the criminal activity being investigated.

532.   Drug traffickers frequently amass large proceeds from the illegal sale of controlled substances that they attempt to legitimize.  To accomplish this goal, drug traffickers use financial institutions and their attendant services, securities, cashier's checks, safe deposit boxes, money drafts, real estate, shell operations, and business fronts.  Persons involved in drug trafficking and/or money laundering keep papers relating to these activities for future reference, including federal and state tax records, loan records, mortgages, deeds, titles, certificates of ownership, records regarding investments and securities, safe deposit box rental records and keys, and photographs.  I know from my training and experience that often items of value are concealed by persons involved in large-scale drug trafficking inside of safes, lock boxes, and other secure locations within their residences, outbuildings, and vehicles.

533.   Drug traffickers very often place assets in names other than their own to avoid detection of these assets by government agencies, and even though these assets are in other individual or business names, the drug dealers actually own and continue to use these assets and exercise dominion and control over them.

534.   Drug traffickers often document aspects of their criminal conduct through photographs or videos of themselves, their associates, their property, and their product.  Drug traffickers usually maintain these photographs or videos in their possession.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

535.    Drug traffickers often maintain large amounts of US currency in order to maintain and finance their ongoing illegal drug trafficking business.  Drug traffickers from other countries operating in the United States frequently use wire remitters and bulk cash transfers to transfer currency to co-conspirators living in other countries.

536.    Drug traffickers commonly have in their possession, on their person, and at their residences and/or in their storage units, firearms and other weapons that are used to protect and secure a drug trafficker's property.

537.    Drug traffickers use mobile electronic devices including cellular telephones and other wireless communication devices to conduct their illegal trafficking business.  As described below, such equipment often contains evidence of these illegal activities.

538.    Traffickers of controlled substances commonly maintain addresses, vehicles, or telephone numbers that reflect names, addresses, vehicles, and/or telephone numbers of their suppliers, customers, and associates in the trafficking organization, and it is common to find drug traffickers keeping records of said associates in cellular telephones and other electronic devices.  Traffickers often maintain cellular telephones for ready access to their clientele and to maintain their ongoing narcotics business.  Traffickers frequently change their cellular telephone numbers to avoid detection by law enforcement, and it is common for traffickers to use more than one cellular telephone at any one time.

539.    Drug traffickers use cellular telephones as a tool or instrumentality in committing their criminal activity.  They use them to maintain contact with their suppliers, distributors, and customers.  They prefer cellular telephones because, first, they can be purchased without the location and personal information that landlines require.  Second, they can be easily carried to permit the user maximum flexibility in meeting associates, avoiding police surveillance, and traveling to obtain or distribute drugs.  Third, they can be passed between members of a drug conspiracy to allow substitution when one member leaves the area temporarily.  Since cellular phone use became widespread, every drug dealer I have interacted with has used one or more cellular

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   telephones for his or her drug business.  I also know that it is common for drug traffickers

2   to retain in their possession phones that they previously used, but have discontinued

3   actively using, for their drug trafficking business.  Based on my training and experience,

4   the data maintained in a cellular telephone used by a drug dealer is evidence of a crime or

5   crimes.  This includes the following:

6        a.     The assigned number to the cellular telephone (known as the mobile

7        directory number or MDN), and/or the identifying telephone serial number

8        (Electronic Serial Number (ESN), Mobile Identification Number (MIN),

9        International Mobile Subscriber Identity (IMSI) number, or International Mobile

10        Equipment Identity (IMEI) number) are important evidence because they reveal

11        the service provider, allow agents to obtain subscriber information, and uniquely

12        identify the telephone.  This information can be used to obtain toll records, to

13        identify contacts by this telephone with other cellular telephones used by co-

14        conspirators, to identify other telephones used by the same subscriber or purchased

15        as part of a package, and to confirm if the telephone was contacted by a

16        cooperating source.

17        b.     The stored list of recent received calls and sent calls is important evidence.

18        It identifies telephones recently in contact with the telephone user.  This is

19        valuable information in a drug investigation because it will identify telephones

20        used by other members of the organization, such as suppliers, distributors and

21        customers, and it confirms the date and time of contacts.  If the user is under

22        surveillance, it identifies what number he called during or around the time of a

23        surveilled drug transaction or meeting.  Even if a contact involves a telephone user

24        not part of the conspiracy, the information is helpful (and thus is evidence)

25        because it leads to friends and associates of the user who can identify the user,

26        help locate the user, and provide information about the user.  Identifying a

27        defendant's law-abiding friends is often just as useful as identifying his drug-

28        trafficking associates.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1      c.     Stored text messages are important evidence, similar to stored numbers.

2      Agents can identify both drug associates, and friends of the user who likely have

3      helpful information about the user, his location, and his activities.

4      d.     Photographs on a cellular telephone are evidence because they help identify

5      the user, either through his or her own picture, or through pictures of friends,

6      family, and associates that can identify the user.  Pictures also identify associates

7      likely to be members of the drug trafficking organization.  Some drug traffickers

8      photograph groups of associates, sometimes posing with weapons and showing

9      identifiable gang signs.  Also, digital photos often have embedded "geocode"

10     information within them.  Geocode information is typically the longitude and

11     latitude where the photo was taken.  Showing where the photo was taken can have

12     evidentiary value.  This location information is helpful because, for example, it

13     can show where coconspirators meet, where they travel, and where assets might be

14     located

15     e.     Stored address records are important evidence because they show the user's

16     close associates and family members, and they contain names and nicknames

17     connected to phone numbers that can be used to identify suspects.

18     540.   It is common for drug dealers to possess narcotics, drug paraphernalia, and

19 other items that are associated with the sale and use of controlled substances such as

20 scales, containers, cutting agents/substances, and packaging materials in their residences,

21 stash houses, storage units, garages, outbuildings and/or vehicles on their property.

22     541.   Drug traffickers commonly have in their possession, that is, on their person,

23 at their residences, stash houses, storage units, garages, outbuildings and/or vehicles,

24 firearms, and other weapons, which are used to protect and secure their property.

25     542.   Drug distributors frequently try to conceal their identities by using

26 fraudulent names and identification cards.  Once identities have been created or stolen

27 from other individuals, drug traffickers use those identifications to falsify records such as

28 DOL records and phone records to evade detection by law enforcement.

1       543.   It is a common practice for drug traffickers to maintain records relating to

2   their drug trafficking activities in their residences, stash houses, storage units, garages,

3   outbuildings and/or vehicles.  Because drug traffickers in many instances will "front"

4   (i.e., sell on consignment) controlled substances to their clients, or alternatively, will be

5   "fronted" these items from their suppliers, such record keeping is necessary to keep track

6   of amounts paid and owed, and such records will also be maintained close at hand so as

7   to readily ascertain current balances.  These records include "pay and owe" records to

8   show balances due for drugs sold in the past (pay) and for payments expected (owe) as to

9   the trafficker's suppliers and distributors, telephone and address listings of clients and

10   suppliers, and records of drug proceeds.  These records are commonly kept for an

11   extended period.

12       544.   Drug traffickers maintain books, records, receipts, notes, ledgers, airline

13   tickets, money orders, and other papers relating to the transportation and distribution of

14   controlled substances.  These documents, whether in physical or electronic form, are

15   maintained where the traffickers have ready access to them.  These documents include

16   travel records, receipts, airline tickets, auto rental agreements, invoices, and other

17   memorandum disclosing acquisition of assets and personal or business expenses.  I also

18   know that such records are frequently maintained in narcotics traffickers' residences,

19   stash houses, storage units, garages, outbuildings and/or vehicles.

20       **X.    REQUEST FOR EARLY EXECUTION OF WARRANTS**

21       545.   Based upon physical and electronic surveillance observed by agents during

22   the course of this investigation, several members of the CASTRO DTO appear to have

23   employment that requires them to leave before or around 6 a.m. from their residences.  I

24   am therefore requesting authorization to serve the requested search warrants at 5 a.m. to

25   ensure the apprehension of the CASTRO DTO members believed to be in residence at the

26   locations mentioned throughout this Affidavit.  Additionally, it is safer for both agents

27   and suspects when agents execute such warrants in a preplanned tactical entry while the

28   suspects are asleep in bed, away from weapons.

# XI.   CONCLUSION

546.   On November 29, 2018, a grand jury sitting in the Western District of Washington returned a sealed Indictment against 31 members of the CASTRO DTO, *United States v. Carlos Eduardo Lopez Hernandez, et al.*, CR18-5579RBL, including many of the individuals whose residences and/or vehicles I am seeking authorization to search.

547.   This Affidavit is submitted in support of an application to search 48 specific locations and 35 particular vehicles (in addition to other vehicles found within the curtilage of the 48 specified locations), more fully described in Attachments A, and A1-A84.  Again, I am requesting permission to execute these search warrants prior to 6:00 a.m., in order to preserve evidence and ensure the subjects of this investigation do not have the opportunity to flee from prosecution.  Based on intercepted phone calls and controlled purchases, such as those described in this Affidavit, as well as continued physical and electronic surveillance, I believe the locations and vehicles described in this Affidavit have been and continue to be used by members of the CASTRO DTO to further their drug trafficking and money laundering crimes in violation of Title 21, United States

//
//
//
//
//
//
//
//
//

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections

2  924(c), 1956, and 1957, and that evidence of such, as described more particularly in

3  Attachment B, will be found at these locations and in these vehicles.

4

5

6  _____

7  JEREMY TAN

   Special Agent

8  Drug Enforcement Administration

9  SUBSCRIBED and SWORN TO before me this 3rd day of December, 2018.

10

11

12  _____

13  THERESA L. FRICKE

   UNITED STATES MAGISTRATE

14  JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AFFIDAVIT OF JEREMY TAN - 211

## ATTACHMENT A

### Locations and vehicles to be searched

This warrant authorizes the government to search the following locations and vehicles for evidence and/or fruits of the commission of the following crimes, as further described in Attachment B hereto:  distribution and possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), and conspiracy to commit these offenses in violation of Title 21, United States Code, Section 846; use of a communications facility in furtherance of a felony drug offense in violation of Title 21, United States Code, Section 843(b); importation of controlled substances, in violation of Title 21, United States Code, Section 952; possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c), and laundering of monetary instruments in violation of Title 18, United States Code, Sections 1956 and 1957.

With respect to the locations to be searched, where that location is an apartment or multi-family residence, the search is to include all rooms within the residence, any assigned garages or storage rooms, attached or detached, and any vehicles found within such an assigned garage or in any assigned parking space, whether or not particularly named among the vehicles for which specific search authorization is sought.

With respect to the locations to be searched, where that location is a single-family residence, the search is to include all rooms within the residence, any garages or storage rooms, attached or detached, and any vehicles found within the curtilage of the residence, whether or not particularly named among the vehicles for which specific search authorization is sought.

Where the location to be searched is a business, the search is to include all rooms within the business, and any garages or storage units, attached or detached, within the curtilage of the business.

**ATTACHMENT A1**

Suspected drug and money stash location and prior residence of Carlos Eduardo LOPEZ Hernandez: **22025 100th Ave. SE, Kent, Washington**.

**Physical Description:** White "Dutchmen Classic" trailer with green stripes located in the center of the fenced property addressed "22025." There is a rolling gate with the numbers "22025" painted on a piece of diamond plate metal affixed to the gate. The residence is visible as soon as the gate is opened and the property is accessed. There is also a red work shed and blue residence located on the property.





## ATTACHMENT A2

Residence of Carlos Eduardo LOPEZ Hernandez: **Pasa Fino II Apartments, 12212 SE 310th St., Apt AA303, Auburn, Washington.**

**Physical Description:**   Apartment AA303 of the multi-dwelling apartment complex named "Pasa Fino II Apartments," tan with brown trim.   The apartment is the only apartment on the third floor of the AA building. The apartment is at the top right of the AA building stairwell of the when facing the stairwell.   The stairwell has "AA, 303, 203, 103" written vertically on a red placard affixed to a pillar on the right side of the stairwell.



**ATTACHMENT A3**

Business location for Cindy SOLTERO Jimenez: **Soltero's Market Mexican Store, 24202 104th Ave. SE Unit 104, Kent, Washington.**

**Physical Description**: A place of business with tan exterior, dual glass front door with black metal security bars, a sign above the doors in red and green lettering on a white background that reads "SOLTERO'S MARKET MEXICAN GROCERY," and the numbers "24202" affixed horizontally above the sign,



**ATTACHMENT A4**

Residence of Cindy SOLTERO Jimenez: **31600 126th Ave. SE, Space 106, Auburn, Washington**.

**Physical Description**: Single level single family mobile home located in the "College Place Mobile Home Park," greenish brown with white trim, white door, dark shingle roof, the numbers "106" affixed diagonally to the right of the front door when facing the dwelling.





## ATTACHMENT A5

Residence of Jesus Rene SARMIENTO Valenzuela: **10545 SE 238th St., Unit 8, Kent, Washington**.

**Physical Description**: Unit 8 of the multi-dwelling apartment complex named "Twin Crest Apts," brown with tan trim.  The numbers "10545" affixed horizontally above the name of the apartment complex, Unit 8 located at the top left of a stairwell when facing the stairwell with the number "8" affixed to the center of the door.





# ATTACHMENT A6

Residence of Jaime HEREDIA Castro: **350 S. Burlington Blvd., Burlington, Washington**.

**Physical Description**: Two level residential dwelling, gray in color with blue trim, white front door, with the numbers "350" affixed horizontally to the right of the front door when facing the residence. There is a large deck on the front of the residence with as exterior stairway leading to the deck from the ground level.





### ATTACHMENT A7

Residence of Juan AVILES Berrelleza: **La Mirage Apartments, 11247 SE 258th Pl., Apartment D306, Kent, Washington.**

**Physical Description**: Apartment 306 of the "D" building of the multi-dwelling apartment complex named "La Mirage Apartments," the address "11247 SE 258th Pl" and letter "D" affixed to a tan, gray, brown, and blue interior access only building. Apartment 306 is located mid-hallway on the 3rd level of the building, the numbers "306" affixed to the door of the apartment.





# ATTACHMENT A8

Residence of Hector Manuel URIAS Moreno: **428 105th St. SW, Everett, Washington**.

**Physical Description**: Two story single family dwelling, tan in color with white trim, with black shingle roof, with numbers "428" affixed vertically to the right porch post when facing the residence, with an addition currently under construction.





## ATTACHMENT A9

Suspected Stash Location for Hector Manuel URIAS Moreno: **8503 8th Ave. W, Everett, Washington**.

**Physical Description**: Single story, single family dwelling, brown and tan with white window frames and a dark shingle roof, tan door with the numbers "8503" affixed horizontally to the right side of the front door when facing the residence.





## ATTACHMENT A10

Residence of Jorge VALENZUELA Armenta: **4416 S 137th St., Tukwila, Washington**.

**Physical Description**: Brown single level single family dwelling with white trim, white front door, black shingle roof, the numbers "4416" affixed vertically to the left front porch post when facing the residence.





## ATTACHMENT A11

Residence of Michael John and Esther La Rena SCOTT: **8024 150th St. SE, Snohomish, Washington**.

**Physical Description:** Two story single family dwelling, brown and tan with white trim and stone fascia, brown front door, the numbers "8024" affixed vertically on the right side of the garage when facing the residence, multiple surveillance cameras attached to the residence.





**ATTACHMENT A12**

Business of Michael John and Esther La Rena SCOTT:  **Wired in Networks 18421 Highway 99, Suite B, Lynnwood, Washington**.

**Physical Description**: Business located in a small business strip mall, glass front, tinted glass door, with "B" and "WIRED IN NETWORKS" printed horizontally on the glass door, a large sign on the roof of the business that reads "WIRED IN NETWORKS".



## ATTACHMENT A13

Residence of Gerald Keith RIGGINS: **5824 152nd St E, Puyallup, Washington**.

**Physical Description:** One level single-family residence, yellow with white trim, white front door, and black shingle roof at the end of a long gravel driveway, the numbers "5824" affixed to the mailbox at the beginning of the driveway.





## ATTACHMENT A14

Residence of Julian Gauge ORDONEZ: **34402 28th Pl. SW Federal Way, Washington**.

**Physical Description:** Two story single family dwelling, tan with white trim, white front door, dark shingle roof, the numbers "34402" affixed vertically to the right of the front door when facing the residence, shed under construction in the back yard.



**ATTACHMENT A15**

Residence of Julian Gauge ORDONEZ: **34235 18th Pl. S, Federal Way, Washington**.

**Physical Description:** Single story, beige-colored residence with grey-colored roofing.  The numbers "34235" appear horizontally on the left side of the residence, when facing it.





## ATTACHMENT A16

Residence of Monique GREEN: **1020 SW 305th St., Federal Way, Washington**.

**Physical Description:** Yellow single-family dwelling with white trim and a dark colored shingle roof, the numbers "1020" affixed horizontally to the left side of the front door when facing the residence.





## ATTACHMENT A17

Residence of Rolando ESPINDOLA and Jessica JOHNSON: **314 N 133rd St., Seattle, Washington**.

**Physical Description:** Yellow single story single family dwelling with white and brown trim, brick fascia, brown shingle roof, and brown front door, the numbers "314" affixed horizontally to a black mailbox in front of the residence.





## ATTACHMENT A18

Stash location for Carlos Alejandro CASTRO Perez and Nicolas CISNEROS: **952 SW Campus Dr., Apt 26E-1, Federal Way, Washington**.

**Physical Description**: Building 26, unit E-1 of the multi-dwelling apartment complex "GLEN PARK," beige building with tan trim, lower left side door when facing the building; "26" affixed to the right side of the stairwell, "E-1, E-2, E-3, F-1, F-2, and F-3" affixed to right side of the building.





**ATTACHMENT A19**

Residence of Carlos Alejandro CASTRO Perez: **Fox Run Apartments, 34726 2nd Lane S, Unit C40, Federal Way, Washington**.

**Physical Description:** Apartment 40 of the "C" building of the "Fox Run Apartments" multi -family residential building.  The building is yellow in color with white trim.  A placard that reads "Fox Run Apartments C 31-48 34726 2nd Lane So." is attached to the building where Apartment 40 is located.  Apartment 40 is located on the bottom level, right side when facing the building, with the numbers "40" affixed horizontally to the white door.





## ATTACHMENT A20

Residence of Emmanuel REYES Perez: **2136 S 260th St., Apartment CC-201, Des Moines, Washington**.

**Physical Description:** Apartment 201 of the "CC" building of the "Saddlebrook Apartments" multi-family residential building. The building is white in color with dark green trim. A placard that reads "CC 2136" Is attached to the building where apartment #201 is located. Apartment 201 is located on the second level, left side when facing the building, with the numbers "201" affixed horizontally to the white door.





### ATTACHMENT A21

Residence of Karen SURYAN: **210 NW 107th St., Seattle, Washington.**

**Physical Description:** Blue two level single family dwelling with white trim and shingle roof, white front door, the numbers "210" affixed horizontally to the right side of the front door when facing the residence.





## ATTACHMENT A22

Residence of Michael SURYAN: **16809 8th Ave. SW, Normandy Park, Washington**.

**Physical Description:** Two level single family tan colored single family dwelling with brown trim, red front door, white garage door, black shingle roof, the numbers"16809" affixed horizontally above the garage door.





## ATTACHMENT A23

Residence of Orlando BARAJAS: **310 N Anacortes St., Burlington, Washington**.

**Physical Description**: Two story single family dwelling, tan in color with white trim, with black shingle roof, with numbers "310" affixed horizontally above the front door, surrounded by a chain link fence.





**ATTACHMENT A24**

Business location for Orlando BARAJAS: **Taco El Antojito, 628 E Fairhaven Ave., Burlington, Washington.**

**Physical Description**: White storefront with "Tacos El Antojito" in red lettering on yellow background above the front window, red, white, and green lighted sign that reads "TACOS" and "OPEN" in the front window, numbers "628" affixed horizontally on right side of the door when facing the building.





**ATTACHMENT A25**

Residence of Jose VELASCO: **506 Tiger Lane, Burlington, Washington.**

**Physical Description**: Single level, single family blue residential dwelling with blue trim and a white garage door, the numbers "506" affixed horizontally to the left of the garage door when facing the residence.



## ATTACHMENT A26

Residence of Brian LIVELY: **8123 71st Pl. SE, Snohomish, Washington**.

**Physical Description**: Two level, single family red residential dwelling with white trim, a white garage door, a brown front door, and a black shingle roof, the numbers "8123" affixed horizontally above the garage door and vertically to the right of the front door when facing the residence.





## ATTACHMENT A27

Residence of Uriel ZELAYA: **28527 37th Pl. S, Auburn, Washington**.

**Physical Description**: Two story, single family dwelling, tan with white trim, white front door, white garage door, and dark shingle roof, the numbers "28527" affixed horizontally to right side of the front door when facing the residence.





**ATTACHMENT A28**

Residence of Omar VALTIERRA: **16508 SE 147th St., Renton, Washington**.

**Physical Description**: Blue, two level, single family dwelling with black trim, white window frames, dual white front doors, brown shingle roof, and white garage door.





## ATTACHMENT A29

Residence of Jerry Austin RODRIGUEZ Jaime: **859 116th St, Tacoma, Washington**.

**Physical Description**: Two level, single family home residential dwelling. Upper level is light blue/green-colored with a tan-colored lower level, which has an attached garage (white door). The numbers "859" are affixed vertically to the right of the garage door when facing the residence.





## ATTACHMENT A30

Residence of Jake WILSON: **7111 193rd St. E, Spanaway, Washington**.

**Physical Description**: Single level, single family off-white colored residential dwelling with blue trim, white garage door, white front door with white security door, a black shingle roof, and the numbers "7111" affixed horizontally to the right of the garage door when facing the residence.



**ATTACHMENT A31**

Residence of Joshua MENDIOLA: a **5th wheel trailer parked at 21515 111th Ave. Court E, Graham, Washington**.

**Physical Description**: a white-colored 5th wheel trailer parked next to a light-colored, single story dwelling with dark-colored roofing.



## ATTACHMENT A32

Residence of Allex and David HUBLY: **713 S Yakima Ave., Apartment 9, Tacoma, Washington**.

**Physical Description**: Gray four level multi family dwelling with white trim, Apartment "9" is located on alley (east) side of the building (not Yakima Ave. side), bottom left door when facing the building, the number "9" affixed to the door.





## ATTACHMENT A33

Residence of Charles JOSLYN:  **8422 214th Ave. E, Bonney Lake, Washington**.

**Physical Description**: Tan-colored single story residence with dark brown trim and an attached garage.





**ATTACHMENT A34**

Residence of Tim CRAWFORD: **3435 Auburn Way S, Apartment 38, Auburn, Washington.**

**Physical Description**: Apartment #38 in a yellow and tan multi-dwelling apartment complex, unit is located in the corner of the complex and has white storm and exterior doors, the numbers "38" affixed horizontally on the right side of the front door.





## ATTACHMENT A35

Residence of Kurtis and Lindsay NEMEYER: **9119 114th St. E, Puyallup, Washington**.

**Physical Description**: Light brown two level single family dwelling with a dark brown garage door and dual teal blue front doors, the numbers "9119 affixed horizontally above the front doors.





**ATTACHMENT A36**

Residence of Natasha DJORDJEVIC: **1001 E 63rd St., Tacoma, Washington**.

**Physical Description**: Green single level single family dwelling with brown trim, tan front door, black shingle roof, the numbers "1001" affixed horizontally to the right side of the garage door when facing the residence.





## ATTACHMENT A37

Residence of Corey RILEY: **9121 Washington Hwy 162, Puyallup, Washington**.

**Physical Description**: Light green single level single family mobile home with brown trim, white window frames, and a dark shingle, located behind a gate for "STORAGE INSIDE & OUTSIDE."





**ATTACHMENT A38**

Residence of Julia CAMMEL: **7002 224th St. E, Graham, Washington.**

**Physical Description**: Single level single family dwelling, two-tone brown with white trim, tan front door, dark shingle roof, metal access gate, surrounded by a cedar fence, the numbers "7002" marked in black lettering on the mailbox in front of the residence.





## ATTACHMENT A39

Residence of Blake HYNEK: **1908 92nd Ave. E, Edgewood, Washington**.

**Physical Description**: Multi-level single family light-colored residential dwelling with a brown front door and a brown shingle roof.  This residence is gated.





**ATTACHMENT A40**

Residence of Larry SWEITZER: **75 Brookdale Lane, Apartment E102, Bremerton, Washington**.

**Physical Description**: Apartment E102 of the multi-dwelling apartment complex named "Park Place Apartments," a grey building with white trim. The apartment is on the ground floor of the "75" building of the complex. The entryway to the apartment is a south facing door and is on the left side of the building as you view the building from NE Brookdale Lane.



**ATTACHMENT A41**

Storage Unit of Gregory WERBER: **Unit 248B at 1st Avenue Self Storage, 2400 1st Ave. South, Seattle, Washington.**

**Physical Description:** Storage unit with a blue-colored door, which is approximately four feet tall and three feet wide.  Master key to the unit is held by 1st Avenue Self-Storage management.





## ATTACHMENT A42

Residence of Frances and Agustin JUAREZ Castillo: **20707 106th Pl. SE, Kent, Washington.**

**Physical Description**: Single level single family brown residential dwelling with brown and white trim, a brown front door, a white garage door, a brown shingle roof, and the numbers "20707" affixed vertically to the right of the front door when facing the residence.





## ATTACHMENT A43

Residence of Carlos HERNANDEZ: **521 S Henderson St., Seattle, Washington.**

**Physical Description**: 1600 square foot light brown/tan two level single family dwelling with dark brown trim, 4 bedrooms and 1.5 bathrooms and a dark-colored front door.  This residence has a surrounding fence.





## ATTACHMENT A44

Residence for Edgar CABRERA: **900 NE 65th St., Apartment 609, Seattle, Washington.**

**Physical Description**: Newer studio apartment complex with secure access.



## ATTACHMENT A45

Residence for Constantino MARES Garcia: **1312 80th Ave. SE, Lake Stevens, Washington**.

**Physical Description**: Two level brown-colored single family home with white trim and an attached garage. The numbers "1312" are affixed horizontally above the garage door. This residence is located near a dead end street.



### ATTACHMENT A46

Residence of Oscar Humberto CARRILLO Salcedo:  **Airmark Apartments, 229 Andover Park East, Apartment 409, Tukwila, Washington.**

**Physical Description**: Apartment complex with long hallways.  The number "409" is marked horizontally on a placard to the left of the door.





## ATTACHMENT A47

Residence of Martin Dean GREGORY:  **204 18th St. SE, Puyallup, Washington**.

**Physical Description**: Blue-colored single family dwelling with a gate blocking the entrance to the driveway.  To the right of the gate, the number "204" is placed vertically on a post.





## ATTACHMENT A48

Residence of Jose RANGEL Ortega: **11007 Paine Field Way Everett, Washington.**

**Physical Description**: Two level single family gray single family dwelling with green and white trim, a white garage door, a white front door, and a black shingle roof, the numbers "11007" affixed vertically to the right of the garage door when facing the residence.





**ATTACHMENT A50**

A red 2006 Ford Ranger bearing Washington license C04697M and/or Vehicle Identification Number (VIN) 1FTYR44E66PA14670, registered to Gerardo Arias at 1020 SW 126th St., Apartment 214, Burien, Washington, used by Carlos Eduardo LOPEZ Hernandez.

## ATTACHMENT A51

A white 2008 Honda Accord bearing Washington license BJN4395 and /or VIN 1HGCP26808A009967, registered to Shawn Shaputis at 8188 Graystone Way NW, Silverdale, Washington, but used by Jesus Rene SARMIENTO Valenzuela.

**ATTACHMENT A52**

A red 2002 Honda Civic bearing Washington license BKS2788 and/or VIN 1HGEM22912L053228, registered to Jaime HEREDIA Castro at 10115 Holly Drive, Apt B106, Everett, Washington.

**ATTACHMENT A53**

A beige 2001 Jeep Grand Cherokee bearing Washington license BKG1931 and/or VIN 1J4GW58N01C666831, registered to Juan Carlos AVILES at 11239 SE 260th St., Apt D-306, Kent, Washington.

**ATTACHMENT A54**

A 2016 Nissan Frontier bearing Washington license C30123H and/or VIN 1N6AD0EV0GN768584, registered to Cindy SOLTERO at 31600 126th Ave SE, Space 106, Auburn, Washington.

**ATTACHMENT A55**

A black 2007 Kia Rondo, bearing Washington license BLE9305 and/or VIN KNAFG525477034596, registered to Hector URIAS Moreno at 428 105th St. SW, Everett, Washington.

**ATTACHMENT A56**

A green 2005 BMW X5 bearing Washington license BJM0956 and/or VIN 5UXFA13595LY22689, registered to Alma Yesenia Moran Reyes at 125 SW Campus Dr., Apartment 4-205, Federal Way, Washington, but believed be used by Carlos Alejandro CASTRO Perez.

**ATTACHMENT A57**

A 2008 black Honda Civic bearing Washington License BFZ2558 and/or VIN 2HGFG21538H701703, registered to Adonia Melendez at 8024 150th St. SE, Snohomish, Washington, but believed be used by Michael John SCOTT.

**ATTACHMENT A58**

A 2000 tan Chevy Silverado bearing Washington license C67402H and/or VIN 1GCEK19T7YE110772, registered to Jason Reed at 1228 Crowe St. SE, Lacey, Washington, but used by Julian Gauge ORDONEZ.

**ATTACHMENT A59**

A silver 2013 Toyota Highlander bearing Washington license AQB8456 and/or VIN 5TDBK3EH8DS272785, registered to Michael and Esther SCOTT at 8024 150th St. SE, Snohomish, Washington.

**ATTACHMENT A60**

A grey Toyota Camry bearing Washington license BKD8497 and/or VIN 4T1BE46K49U323365, registered to Aureliano De Jesus-Bazante at 2010 Front St., Trailer 7, Lynden, Washington, but used by Edgar CABRERA.

**ATTACHMENT A61**

A red 1995 Mitsubishi Eclipse bearing Washington license AEV9270 and/or VIN 4A3AK44YXSE181939, registered to Jessica JOHNSON at 314 N 133rd St., Seattle Washington.

**ATTACHMENT A62**

A 2010 Harley Davidson motorcycle bearing Washington License 3E8988 and/or VIN 1HD1FR419AB631070, registered to Gerald RIGGINS at 5824 152nd St. E, Puyallup, Washington.

**ATTACHMENT A63**

A silver 2000 Toyota Camry bearing Washington license BKU5269 and/or VIN 4T1BG22K8YU641962, registered to Michael SURYAN at 2131 Freestad Rd., Arlington, Washington.

**ATTACHMENT A64**

A grey 2007 Toyota Scion, bearing Washington license BGH6676 and/or VIN JTKDE177170159625, registered as sold to Josafat RANGEL at 11007 Paine Field Way, Everett, Washington, used by Jose RANGEL Ortega.

**ATTACHMENT A65**

A white 1998 Honda bearing Washington license BKC6466 and/or VIN
1HGCG2258WA023530, registered to Constantino MARES Garcia at 16717
Alderwood Mall Pkwy, Apt K304, Lynnwood, Washington.

**ATTACHMENT A66**

A blue 2016 Toyota Tacoma bearing Washington license C08613M and/or VIN 3TMCZ5AN2GM006576, registered to Constantino MARES Garcia at 2510 164th St. SW, Apartment B105, Lynnwood, Washington.

**ATTACHMENT A67**

A red 2018 Chevrolet Silverado, bearing Washington license C66267L and/or VIN 3GCUKSEC7JG172100, registered to Wenceslao BARAJAS-Barajas at 628 East Fairhaven Ave., Burlington, Washington, but used by Orlando BARAJAS.

**ATTACHMENT A68**

A spray-painted red 2001 Lexus IS bearing Washington license 419ZVA and/or VIN JTHBD182410010023, registered as sold to Martin Dean GREGORY at 1006 W Main, Puyallup, Washington.

**ATTACHMENT A69**

A white 2012 Dodge Ram 1500 truck bearing Washington license C50312M and/or VIN 1C6RD7KP8CS278496, registered to Omar VALTIERRA at 16508 SE 147th St., Renton, Washington.

## ATTACHMENT A70

A 2013 black Chrysler 300 sedan bearing Washington license AKG4277 and/or VIN 2C3CCAAG4DH533206, registered to Omar VALTIERRA at 16508 SE 147th St., Renton, Washington.

**ATTACHMENT A71**

A 2005 grey Volkswagen Jetta bearing Oregon license 902KTS and/or VIN 3VWPG71K75M643370, registered to Jorge VALENZUELA Armenta at 515 SW 13th Place, Apartment H3, Hermiston, Oregon.

**ATTACHMENT A72**

A 2001 white Nissan Altima bearing Washington license AVW7517 and/or VIN 1N4DL01D41C121162, registered to Cleotilde Velasco at 1400 North 30th St. 167, Mount Vernon, Washington, but used by Jose VELASCO.

**ATTACHMENT A73**

A 2000 black Mercedes 5004D bearing Washington license BLY6302 and/or VIN WDBNG75J9YA056681, registered to Brenden K Freitas at 3201 228th St. SW, Brier, Washington, but used by Andrew KRISTOVICH.

**ATTACHMENT A74**

A 2002 silver Mercedes 3204D bearing Washington license AYT2335 and/or VIN WDBRF64J92F203530, registered to Gabor Kallai at 3055 Burris Road Lot 148, Davie, Florida, but used by Brittany and Andrew KRISTOVICH.

**ATTACHMENT A75**

A 2012 white Hyundai Accent bearing California license 7CQD771 and/or VIN KMHCT4AE9CU170677, registered to Victoria Mendez at 2629 Lincoln Way D14, Lynnwood City, Washington, but used by Carlos Alejandro CASTRO Perez.

**ATTACHMENT A76**

A grey 2004 Hummer H2 bearing Washington license ADH9133 and/or VIN 5GRGN23U94H115275, registered to Salvador HERNANDEZ at 2014 S 26th Ave., Yakima, Washington, but used by Carlos HERNANDEZ.

**ATTACHMENT A77**

A black 1999 Toyota Corolla bearing Washington license AXZ8671 and/or VIN 1NXBR12E6XZ168642, registered to Juan Cervantes Falfan at 11315 26th Ave. S, Apartment 5-208, Burien, Washington, but used by Uriel ZELAYA.

**ATTACHMENT A78**

A 2010 red tractor trailer truck bearing California license XP09765 and/or VIN 1XKAD49X8AJ271744, registered to Southwester Carriers Corporation at 8684 Avenida De La Fuente, San Diego, California, but used by Ramon PUENTES.

**ATTACHMENT A79**

A blue 2004 Volvo S80 bearing Washington license plate BHK8013 and/or VIN YV1TS92DX41346028, registered to Jerry RODRIGUEZ Jaime at 859 116th Street S, Tacoma, Washington.

**ATTACHMENT A80**

A silver 2006 BMW bearing Washington license AYY7257 and/or VIN WBAVB13536PT26465, registered to Brian LIVELY at 8123 71st Pl. SE, Snohomish, Washington.

**ATTACHMENT A81**

A black Chevrolet Silverado bearing Washington license C21970N and/or VIN 3GCUKREC8JG497850, registered to Brian LIVELY at 8123 71st Pl. SE, Snohomish, Washington.

**ATTACHMENT A82**

A blue Ford focus bearing Washington License BER8834 and/or VIN 1FAFP34P32W344894, registered to Nicole Duke at 75 NE Brookdale Ln, Apartment E102, Bremerton, Washington, but used by Larry SWEITZER.

**ATTACHMENT 83**

A 1996 white Nissan Maxima bearing Washington license BGR7720 and/or VIN JN1CA21D2TT735849, registered to Joshua MENDIOLA at 10502 141st St. Court E, Puyallup, Washington.

**ATTACHMENT A84**

A 2016 Honda Accord bearing Arizona license CJN8101 and/or VIN 1HGCR2F72GA220572, registered to Paola Edith Morales Ortiz at 5727 East Seneca Street, Tucson, Arizona, but used by Oscar Humberto CARRILLO Salcedo.

## ATTACHMENT B
### Items to be seized

From the locations and vehicles listed in Attachment A, and A1 through A84 of this warrant, the government is authorized to search for and seize the following items, which are evidence and/or fruits of the commission of the following crimes:  distribution and possession with intent to distribute controlled substances in violation of Title 21, United States Code, Section 841(a)(1), and conspiracy to commit these offenses in violation of Title 21, United States Code, Section 846; use of a communications facility in furtherance of a felony drug offense in violation of Title 21, United States Code, Section 843(b); importation of controlled substances, in violation of Title 21, United States Code, Section 952; possession of firearms in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c); and laundering of monetary instruments in violation of Title 18, United States Code, Sections 1956 and 1957, including the following:

1)      Any suspected controlled substances, for example, methamphetamine, fentanyl, and heroin;

2)      Firearms and firearms-related items, including magazines, ammunition, holsters, and body armor, or other dangerous weapons;

3)      Cellular telephones and other communications devices including iPhones, smartphones, flip phones, and similar devices, which may be searched only for the following items:

- Assigned telephone number and identifying serial number (e.g., ESN, MIN, IMSI, IMEI);
- Stored list of recent received, sent, or missed calls;
- Stored contact information;
- Stored photographs of narcotics, currency, guns or other weapons, suspected criminal activity, and/or the user of the phone or co-conspirators; and

- Stored text messages that relate to the above-enumerated federal crimes;

4)    Financial profits, proceeds and instrumentalities of trafficking in narcotics and money laundering, including US currency and other items of value;

5)    Paraphernalia for packaging, smuggling, processing, diluting, manufacturing, weighing, and distributing controlled substances, for example: hidden compartments, scales, blenders, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and diluting agents such as inositol, vitamin B12, etc.;

6)    Books, records, receipts, notes, ledgers, and other documents relating to the distribution of controlled substances, money laundering, communications between members of the conspiracy, and evidence of the use of apparently legitimate businesses to disguise profits;

7)    Photographs, video tapes, digital cameras, and similar items depicting friends and relatives of the property occupants, or suspected buyers or sellers of controlled substances, controlled substances, and assets derived from the distribution of controlled substances;

8)    Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, and money laundering;

9)    Financial records relating to controlled substances income and expenditures of money and wealth, to wit:  money orders, wire transfer records, cashier's checks and receipts, bank account records, passbooks, tax records, safe deposit box keys and records, checkbooks, and check registers, as well as precious metals and gems such as gold, silver, diamonds, etc.;

10)    Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises and/or vehicle, including canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

11)     Identification documents, including passports, visas, alien registration cards, any travel documents, immigration documents, driver's licenses, identification cards, and social security cards;

12)     Documents indicating travel in interstate and foreign commerce, to include airline tickets, notes and travel itineraries; airline schedules; gas receipts, bills; charge card receipts; hotel, motel, and car rental statements; correspondence with travel agencies and other travel related businesses; airline, rental car, and hotel frequent flier or user cards and statements; passports and visas; telephone bills; photographs of foreign locations; and papers relating to domestic and international travel;

13)     Stored footage from surveillance systems at the locations to be searched which identifies the person(s) in residence, occupancy, control, or ownership of the premises; suspected buyers or sellers of controlled substances; persons in possession of firearms in furtherance of drug trafficking; and persons suspected of engaging in money laundering activities; and

14)     Latent prints and identifying material from items at the residences and vehicles.